## OFFICE OF THRIFT SUPERVISION

## <u>Receivership Of A Federal Savings Bank</u>

| | |
|---|---|
| **Date:** | January 21, 2011 |
| **Order No.:** | 2011-05 |
| **OTS No.:** | 06679 |

The Acting Director of the Office of Thrift Supervision (OTS), or his designee, in cooperation with the Federal Deposit Insurance Corporation (FDIC), has determined to appoint the FDIC as receiver of United Western Bank, Denver, Colorado (Savings Bank).

## GROUNDS FOR APPOINTMENT OF FDIC AS RECEIVER
## FOR THE SAVINGS BANK

The Acting Director, or his designee, based upon the administrative record finds and determines:

(i)     the Savings Bank is in an unsafe and unsound condition to transact business;

(ii)    the Savings Bank is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business; and

(iii)   the Savings Bank is undercapitalized as defined in 12 U.S.C. § 1831o(b), and failed to submit a capital restoration plan acceptable to OTS within the time prescribed under 12 U.S.C. § 1831o(e)(2)(D).

The Savings Bank is a federally chartered savings bank, the accounts of which are insured by the Deposit Insurance Fund. The Savings Bank's home office is in Denver, Colorado, and the Savings Bank has seven branch offices, all in Colorado. As of September 30, 2010, the Savings Bank reported total assets of approximately $2.05 billion.

The Savings Bank has a high ratio of classified assets to capital and reserves: as of September 30, 2010, the Savings Bank had classified assets of approximately $348.2 million, which equaled approximately 17 percent of total assets and 207 percent of core capital plus the allowance for loan and lease losses. Large loan loss provisions[1] and the

---

[1]     The Savings Bank recorded provisions for loan losses of approximately $19.3 million for the nine months ended September 31, 2010; and approximately $38.1 million for the year ended December 31, 2009.

recognition of other-than-temporary impairment (OTTI) on some non-agency MBS[2] resulted in significant operating losses: the Savings Bank reported net losses of approximately $68.8 million for the nine months ended September 30, 2010, and approximately $69.4 million the year ended December 31, 2009.

OTS's September 2010 comprehensive examination included a review of the Savings Bank's process for modeling OTTI. On October 25, 2010, OTS presented the Savings Bank's management with an Exception Sheet indicating that the Savings Bank's OTTI modeling process was inadequate and stating that the Savings Bank needed to record an additional $15.1 million in OTTI as of June 30, 2010. OTS subsequently advised the Savings Bank's management that further OTS review had identified another $1.2 million in OTTI charges as of September 30, 2010, resulting in a total OTTI charge of $16.3 million.

The Savings Bank's management responded to the Exception Sheet on October 26, 2010. The response disagreed with OTS's findings and asserted that the Savings Bank's OTTI methodology was consistent with Generally Accepted Accounting Principles and with industry practice. After reviewing the Savings Bank's responses, OTS determined that the Savings Bank's methodology did not conform to regulatory reporting requirements and that the Savings Bank was required to record an OTTI charge of $16.3 million. On December 3, 2010, OTS issued a directive letter requiring the Savings Bank to restate its September 30, 2010, Thrift Financial Report (TFR) by December 6, 2010, to reflect the $16.3 million OTTI charge.

The Savings Bank subsequently filed an amended TFR on December 8, 2010, indicating that the Savings Bank's total risk-based capital ratio had fallen to 7.8 percent from the 8.1 percent reported on the September 30, 2010 TFR. As a result, the Savings Bank became "undercapitalized" within the meaning of the prompt corrective action (PCA) provisions of 12 U.S.C. § 1831o(b) and 12 C.F.R. § 565.4(b).

On October 28, 2010, the Holding Company entered into an Investment Agreement with certain investors (Anchor Investors), pursuant to which the Anchor Investors would place approximately $100 million of capital into the Holding Company. The Investment Agreement requires the Holding Company, before closing the contemplated funding transaction, to obtain binding commitments from additional investors (Additional Investors) to place an additional $100 million into UWBK. Together with the investment by the Anchor Investors, the gross proceeds from the capital raise would be approximately $200 million (Investment), of which approximately $102.5 million would be contributed as capital to the Savings Bank.

The Investment Agreement contains numerous conditions that must be satisfied on or prior to closing of the investment transaction, including, among others: (i) OTS

---

[2]    The Savings Bank recognized OTTI of approximately $27.8 million for the nine months ended September 20, 2010, and $21 million for the year ended December 31, 2009.

approval of the Savings Bank's application to acquire Legent Clearing, LLC (Legent Clearing) as an operating subsidiary; (ii) OTS approval of the Savings Bank's business plan; and (iii) OTS's termination of the growth restrictions applicable to the Savings Bank.[3]

None of these three conditions precedent to consummation of the transaction contemplated by the Investment Agreement will be met:

  o On January 18, 2011, OTS denied the Savings Bank's application to acquire Legent Clearing as an operating subsidiary.[4]

  o On January 18, 2011, the OTS rejected the Savings Bank's business plan.[5]

  o Due to the Savings Bank's significant problems, OTS will not remove the Savings Bank's growth restrictions.

On December 13, 2010, OTS confirmed to the Savings Bank that it was undercapitalized and required the Savings Bank to file a capital restoration plan (CRP) no later than December 20, 2010.[6]  OTS required the CRP to demonstrate compliance with adequately capitalized standards and ongoing compliance with such capital standards for four consecutive quarters.  On December 20, 2010, the Savings Bank submitted a CRP, which incorporated the Investment Agreement and projected an infusion of approximately $102.5 million in new capital into the Savings Bank following the consummation of the Investment Agreement.

On January 18, 2011, OTS denied the CRP.  The CRP included several deficiencies, including the CRP's reliance on consummation of the transaction contemplated by the Investment Agreement, which is subject to the conditions precedent mentioned above, which will not be satisfied.[7]

Other than the Investment Agreement, the Savings Bank has not entered into or provided any binding letters of intent or other investment agreements with potential investors.  Therefore, the Savings Bank will not be able to raise sufficient additional capital in the near term to become adequately capitalized for PCA purposes.

The decline in the Savings Bank's capital position has led to a liquidity crisis at the Savings Bank.  Approximately 68 percent of the Savings Bank's deposits are

---

[3]      In a later communication, the Savings Bank reiterated that these conditions were required in order for consummation of the transaction to occur.
[4]      See, OTS Order No. 2011-02 (January 18, 2011) (Operating Subsidiary Order).  The Operating Subsidiary Order sets forth the reasons for the denial.
[5]      The letter that OTS sent to the Savings Bank in connection with the rejection sets forth the reasons for the rejection.
[6]      OTS shortened the Savings Bank's time to file a CRP due to the Savings Bank's unsafe and unsound condition.  12 C.F.R. § 565.7(c).
[7]      OTS's letter to the Savings Bank denying the CRP sets forth each reason for denial of the CRP.

institutional deposits placed by one of four institutional depositors.  One of these institutional depositors is already required to remove its deposits because of the Savings Bank's PCA undercapitalized status.[8]  This depositor has already withdrawn most of its deposits, and is expected to withdraw its remaining deposits in the near future.  Two of the remaining institutional depositors, including one that holds approximately 44 percent of the Savings Bank's total deposits, generally have the right to withdraw their deposits in the event the Savings Bank is undercapitalized, but have entered into agreements not to withdraw their deposits before certain dates in the near future, in contemplation of the completion of the transaction contemplated by the Investment Agreement.  Accordingly, these two institutional depositors will have the right under applicable agreements to withdraw their deposits, with minimal notice, in the near future.  Moreover, each of these two institutional depositors has indicated that its willingness to retain its deposits at the Savings Bank is based upon the Savings Bank obtaining additional capital in the near future.  In light of the fact that the conditions precedent to the proposed capital raise will not be satisfied, there is an unacceptable risk that these two institutional depositors will withdraw their deposits, totaling approximately 53 percent of the Savings Bank's deposits,  in the near future.

Notwithstanding requests from OTS to do so, the Savings Bank has failed to identify viable funding alternatives to the deposits placed by its institutional depositors.  Moreover, the Savings Bank has insufficient liquidity resources to fund the potential withdrawals after expiration of the applicable standstill agreements or notice periods and also fund ongoing operations, loan commitments, and withdrawals by retail depositors.  Combining on- and off-balance-sheet amounts, the Savings Bank reported approximately $416 million in liquidity as of January 13, 2011.  Including an additional $137 million in available liquidity from another source identified by the Savings Bank, the Savings Bank has $553 million in available liquidity.  Because of the anticipated outflows of deposits from institutional depositors of $848 million, available liquidity will be insufficient to allow the Savings Bank to meet its operating liquidity needs.

## DISCUSSION OF GROUNDS FOR APPOINTMENT
## OF A RECEIVER FOR THE SAVINGS BANK

Section 5(d)(2)(A) of the Home Owners' Loan Act (HOLA), 12 U.S.C. § 1464(d)(2)(A), provides that the Acting Director may appoint a receiver for any insured savings association if the Acting Director determines that one or more grounds specified in section 11(c)(5) of the Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1821(c)(5), exist.

---

[8]      A depository institution that is undercapitalized for PCA purposes is unable to accept employee benefit plan deposits.  *See* 12 U.S.C. § 1821(a)(1)(D)(ii).  The term "employee benefit plan" is defined in 12 U.S.C. § 1821(a)(1)(D)(iii)(II).

**Unsafe or Unsound Condition to Transact Business**

Under section 11(c)(5)(C) of the FDIA, the Acting Director may appoint a receiver if a savings association is in an unsafe or unsound condition to transact business. An unsafe or unsound condition has been identified as one where an institution is operated in a manner that causes an unacceptable risk to its depositors' funds. See Franklin Savings Association v. Director, OTS, 934 F.2d 1127, 1145 (10th Cir. 1991), cert. denied, 503 U.S. 937 (1992).

The Savings Bank has an unsafe and unsound concentration in institutional deposits.[9]  The Savings Bank's reliance on a small number of institutional depositors, along with its weak capital position and significant asset problems, has rendered it vulnerable to a significant outflow of deposits with minimal notice and without adequate funds to meet the demand.  By relying on only four large depositors to fund most of its operations, the viability of the Savings Bank rests on the decisions of the institutional depositors, and the Savings Bank is therefore in an unsafe and unsound condition to transact business.

Also, the Savings Bank has engaged in unsafe and unsound practices by operating without adequate liquidity, without an adequate liquidity plan, and without proper regard for funds management, and is therefore in an unsafe and unsound condition to transact business.

Furthermore, the Savings Bank is in an unsafe and unsound condition as a result of the combination of potential severe liquidity strain, an excessive amount of classified assets, continuing significant operating losses, insufficient capital, and no realistic prospects for raising capital in the short term.

Based on the foregoing, the Acting Director, or his designee, concludes that the Savings Bank is in an unsafe and unsound condition to transact business.

**Likely to be Unable to Pay its Obligations or Meet its Depositors' Demands in the Normal Course of Business**

Under section 11(c)(5)(F) of the FDIA, the Acting Director may appoint a receiver if a savings association is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business.  For the reasons discussed above,

---

[9]     The Savings Bank's deposits have been concentrated in a small number of institutional depositors for several years.  In certain previous examinations, OTS did not object to the concentration.  However, as a result of the recent financial crisis, the Savings Bank's asset quality problems and attendant losses, and the risk that most of these institutional depositors may withdraw their deposits on relatively short notice, OTS has concluded that the Savings Bank's concentration of deposits presents unacceptable risks and is unsafe and unsound.

there is an unacceptable risk that institutional depositors may withdraw their deposits in the near term. The amount of deposits that is likely to be withdrawn is also likely to exceed the Savings Bank's liquidity resources.

Therefore, the Acting Director, or his designee, concludes that the Savings Bank is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business, because the Savings Bank does not have sufficient liquid assets to pay those obligations and fund the expected withdrawals.

**Undercapitalized and Has Failed to Submit a Capital Restoration Plan Acceptable to OTS Within the Time Prescribed by OTS Under 12 C.F.R. § 1831o(e)(2)(D)**

Under section 11(c)(5)(K)(iii) of the FDIA, the Acting Director may appoint a receiver if a savings association is undercapitalized as defined in 12 U.S.C. § 1831o(b) and fails to submit a capital restoration plan that is acceptable to OTS within the time prescribed under 12 U.S.C. § 1831o(e)(2)(D). Section 1831o(e)(2)(D) provides for OTS to promulgate regulations generally requiring an institution to submit such a plan not later than 45 days after the savings association becomes undercapitalized. OTS promulgated such a regulation. As permitted under 12 C.F.R. § 565.5(a)(1), OTS prescribed a shorter timeframe, based on the condition of the Savings Bank. Section 1831o(e)(2)(C)(i)(II) provides that OTS shall not accept a capital restoration plan unless OTS concludes that the plan is based on realistic assumptions and is likely to succeed in restoring the institution's capital.

The Savings Bank is undercapitalized. OTS required the Savings Bank to submit its CRP by December 20, 2010, and the Savings Bank submitted its CRP on that date. On January 18, 2011, OTS denied the CRP for the reasons described above, and for other reasons set forth in OTS's letter to the Savings Bank.

Therefore, the Acting Director, or his designee, concludes that the Savings Bank is undercapitalized and that the Savings Bank has failed to submit a capital restoration plan acceptable to OTS within the prescribed timeframe.

The Acting Director, or his designee, therefore, has determined that grounds for the appointment for a receiver for the Savings Bank exist under section 5(d)(2) of the HOLA, and sections 11(c)(5)(C), (F), and (K)(iii) of the FDIA, 12 U.S.C. §§ 1821(c)(5)(C), (F), and (K)(iii).

## ACTIONS ORDERED OR APPROVED

**Appointment of a Receiver**

The Acting Director, or his designee, hereby appoints the FDIC as receiver for the Savings Bank, for the purpose of liquidation, pursuant to section 5(d)(2) of the HOLA, and section 11(c)(6)(B) of the FDIA, 12 U.S.C. § 1821(c)(6)(B).

Order No.: 2011-05
Page:  7

**Delegation of Authority to Act for OTS**

  The Acting Director, or his designee, hereby authorizes the OTS Western
Regional Director, or his designee, and the Deputy Chief Counsel for Business
Transactions of the Chief Counsel's Office, or his designee, to: (i) certify orders; (ii) sign,
execute, attest, or certify other documents of OTS issued or authorized by this Order;
(iii) designate the persons or entity that will give notice of the appointment of a receiver
for the Savings Bank and serve the Savings Bank with a copy of this Order pursuant to
12 C.F.R. § 558.2; and (iv) perform such other functions of OTS necessary or appropriate
for implementation of this Order.  All documents to be issued under the authority of this
Order must be first approved, in form and content, by the Chief Counsel's Office.  In
addition, the Acting Director, or his designee, hereby authorizes the Deputy Chief
Counsel for Business Transactions, or his designee, to make any subsequent technical
corrections, that might be necessary, to this Order, or any documents issued under the
authority of this Order.

  By Order of the Acting Director of OTS, or his designee, effective: (a) as to the
above matters regarding the delegation of authority, immediately upon signature; and
(b) as to the above matters regarding the appointment of the FDIC as receiver,
immediately upon service of this Order on the Savings Bank.

  Executed this 21st day of January, 2011

                     John E. Bowman
                     Acting Director