# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                )
UNITED WESTERN BANK,                            )
                                                )
      Plaintiff,                             )
                                                )   1:11-cv-00408
      v.                                     )   The Honorable Amy Berman Jackson
                                                )
OFFICE OF THE COMPTROLLER                       )
OF THE CURRENCY, *et al.*,                       )
                                                )
      Defendants.                            )
_____)

## UNITED WESTERN BANK'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiff United Western Bank ("the Bank") respectfully moves this court for summary judgment on its claim against Defendants Thomas J. Curry, Comptroller of the Currency, and the Office of the Comptroller of the Currency. As explained in the accompanying memorandum, the decision of the Acting Director of the Office of Thrift Supervision to seize the Bank was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. Consequently, the Court should set the decision aside, order Defendants to remove the Federal Deposit Insurance Corporation from its position as receiver of the Bank, and return the Bank to its rightful owner.

Respectfully Submitted,

s/ Andrew L. Sandler
Andrew L. Sandler (DC Bar No. 387825)
Samuel J. Buffone (DC Bar No. 161828)
Liana R. Prieto (DC Bar No. 987287)
Michael R. Williams (DC Bar No. 994953)
BUCKLEYSANDLER LLP
1250 24th Street NW, Suite 700
Washington, DC 20037
(202) 349-8001 (Telephone)
(202) 349-8080 (Facsimile)

s/ Kirby D. Behre
Kirby D. Behre (DC Bar No. 398461)
Lawrence D. Kaplan (DC Bar No. 415186)
PAUL HASTINGS LLP
875 15th Street NW
Washington, DC 20005
(202) 551-1719 (Telephone)
(202) 551-0119 (Facsimile)

s/ Theodore J. Abariotes
Theodore J. Abariotes
Deputy General Counsel
UNITED WESTERN BANCORP, INC.
700 17th Street, Suite 2100
Denver, Colorado 80202
(720) 932-4216 (Telephone)
(720) 946-1218 (Facsimile)

*Attorneys for Plaintiff United Western Bank*

Dated:  April 20, 2012

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of April, 2012, a true copy of the foregoing motion and accompanying memorandum was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.  Parties may also access this filing through the Court's electronic filing system.

*s/* Liana R. Prieto
Liana R. Prieto

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————
|   |   |
|---|---|
| UNITED WESTERN BANK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 1:11-cv-00408 |
| v. | ) The Honorable Amy Berman Jackson |
| | ) |
| OFFICE OF THE COMPTROLLER | ) |
| OF THE CURRENCY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

—————————————————————

## MEMORANDUM IN SUPPORT OF
## UNITED WESTERN BANK'S MOTION FOR SUMMARY JUDGMENT

Andrew L. Sandler (DC Bar No. 387825)
Samuel J. Buffone (DC Bar No. 161828)
Liana R. Prieto (DC Bar No. 987287)
Michael R. Williams (DC Bar No. 994953)
BUCKLEYSANDLER LLP
1250 24th Street NW, Suite 700
Washington, DC 20037
(202) 349-8001 (Telephone)
(202) 349-8080 (Facsimile)

Theodore J. Abariotes
Deputy General Counsel
UNITED WESTERN BANCORP, INC.
700 17th Street, Suite 2100
Denver, Colorado 80202
(720) 932-4216 (Telephone)
(720) 946-1218 (Facsimile)

Kirby D. Behre (DC Bar No. 398461)
Lawrence D. Kaplan (DC Bar No. 415186)
PAUL HASTINGS LLP
875 15th Street NW
Washington, DC 20005
(202) 551-1719 (Telephone)
(202) 551-0119 (Facsimile)

*Attorneys for Plaintiff United Western Bank*

April 20, 2012

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ....................................................................................2

    A.    The Bank Builds a Stable, Successful Business .......................................2

        1.    The Bank's "Long-Standing" Institutional Depositor Relationships ..................................................................................3

        2.    The Bank's Community Lending: "Exceed[ing] Expectations" ................6

    B.    The OTS Abruptly Changes Its Mind on the Bank's Business Model ...................6

    C.    The OTS Secretly Decides to Seize the Bank ........................................12

    D.    The Bank Attempts to Address the OTS's Concerns ...............................13

        1.    Legent Purchase ...............................................................................13

        2.    $200 Million Recapitalization Transaction ..................................14

    E.    The OTS Reveals Its Intent to Seize the Bank .......................................16

        1.    Ultimatums and Demands ................................................................16

        2.    The January 18 Rejections ...............................................................19

    F.    The Bank *Again* Addresses the OTS's Concerns .................................20

    G.    The OTS Seizes the Bank ......................................................................22

STANDARD OF REVIEW ...................................................................................24

ARGUMENT .........................................................................................................26

I.    The OTS Arbitrarily and Capriciously Denied the Bank's Capital Restoration Plan ........26

    A.    The OTS Unjustifiably Demanded a Plan Within Just Seven Short Days ............26

    B.    The OTS Arbitrarily Rejected the Bank's Plan to Recapitalize with $200 Million in Outside Investment .......................................................29

II.    The OTS Imagined a Liquidity Crisis at the Bank .........................................34

    A.    The OTS Reversed its Prior Policy Concerning the Institutional Depositors for No Discernible Reason ..................................................35

## TABLE OF CONTENTS (continued)

Page

B.      There was No Likelihood Whatsoever That the Institutional Depositors
        Would Withdraw.................................................................................37

III.   The OTS Arbitrarily and Capriciously Decided that the Viable, Stable Bank Was
       Operating in an Unsafe or Unsound Condition.................................................39

       A.      The OTS Applied the Wrong Standard....................................................39

       B.      The Bank was Operating in a Safe and Sound Condition.....................................41

CONCLUSION...............................................................................................43

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Action Alliance of Senior Citizens of Greater Philadelphia v. Sullivan,*
    930 F.2d 77 (D.C. Cir. 1991) .................................................................... 33-34

*Allegheny Gen. Hosp. v. NLRB,*
    608 F.2d 965 (3d Cir. 1979) ........................................................................... 40

*Am. Bioscience, Inc. v. Thompson,*
    269 F.3d 1077 (D.C. Cir. 2001) ...................................................................... 25

*Armenian Assembly of Am., Inc. v. Cafesjian,*
    772 F. Supp. 2d 20 (D.D.C. 2011) ................................................................. 27

*Boston Duck Tours, LP v. Super Duck Tours, LLC,*
    531 F.3d 1 (1st Cir. 2008) ............................................................................... 38

*Catholic Health Initiatives—Iowa, Corp. v. Sebelius,*
    No. 10-cv-411 (RCL), 2012 WL 255275 (D.D.C. Jan. 30, 2012) ................. 25

*Chevron U.S.A. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ........................................................................................ 27

*Citizens to Preserve Overton Park v. Volpe,*
    401 U.S. 402 (1971) ........................................................................................ 34

*Cnty. of Los Angeles v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999) ...................................................................... 29

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.,*
    45 F.3d 481 (D.C. Cir. 1995) .......................................................................... 39

*E. Carolinas Broad. v. FCC,*
    762 F.2d 95 (D.C Cir. 1985) ........................................................................... 37

*Evans v. Fenty,*
    701 F. Supp. 2d 126 (D.D.C. 2010) ......................................................... 27, 44

*Fahey v. Mallonee,*
    332 U.S. 245, 253-54 (1947) ............................................................................ 1

*FCC v. Fox Television Stations, Inc.,*
    129 S. Ct. 1800 (2009) .................................................................................... 37

*First Fed. Sav. Bank & Trust v. Ryan,*
    927 F.2d 1345 (6th Cir. 1991) ........................................................................... 1

*First Nat'l Bank of Eden v. OCC,*
    568 F.2d 610 (8th Cir. 1978) ........................................................................... 40

*Franklin Sav. Ass'n v. OTS,*
    934 F.2d 1127 (10th Cir. 1991) ................................................................. 23, 40

*Gibraltar Sav. v. Ryan*,
    772 F. Supp. 1290 (D.D.C. 1991) ........................................................................................ 24

*Green Cnty. Mobilephone, Inc. v. FCC*,
    765 F.2d 235 (D.C. Cir. 1985) ............................................................................................. 29

*Greene Cnty. Bank v. FDIC*,
    92 F.3d 633 (8th Cir. 1996) ................................................................................................ 41

*Greyhound Corp. v. ICC*,
    668 F.2d 1354 (D.C. Cir. 1981) ........................................................................................... 44

*Gulf Fed. Sav. and Loan Ass'n v. Fed. Home Loan Bank Bd.*,
    651 F.2d 259 (5th Cir. 1981) ................................................................................... 40, 41, 42

*Henderson v. Kennedy*,
    253 F.3d 12 (D.C. Cir. 2001) .............................................................................................. 42

*Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n*,
    628 F.3d 568 (D.C. Cir. 2010) ........................................................................................... 36

*Hyatt v. Heckler*,
    807 F.2d 376 (4th Cir. 1986) .............................................................................................. 40

*In re B. & R. Glove Corp.*,
    249 F. 372 (2d Cir. 1922) ................................................................................................... 27

*In re Bourguignon*,
    416 B.R. 745 (Bankr. D. Idaho 2009) ................................................................................. 28

*In re Keating*,
    No. AP 93-85, 1993 WL 724714 (OTS Jan. 29, 1991) ........................................................ 41

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    626 F.3d 84 (D.C. Cir. 2010) .............................................................................................. 36

*Inv. Co. Inst. v. FDIC*,
    728 F.2d 518 (D.C. Cir. 1984) ........................................................................................... 42

*Ithaca Coll. v. NLRB*,
    623 F.2d 224 (2d Cir. 1980) ......................................................................................... 40, 41

*James Madison Ltd. by Hecht v. Ludwig*,
    82 F.3d 1085 (D.C. Cir. 1996) ........................................................................................... 24

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
    613 F.3d 1112 (D.C. Cir. 2010) .................................................................................... 35, 36

*Johnson v. OTS*,
    81 F.3d 195 (D.C. Cir. 1996) ............................................................................................. 41

*Johnson v. U.S. R.R. Retirement Bd.*,
    969 F.2d 1082 (D.C. Cir. 1992) ......................................................................................... 40

*Landry v. FDIC*,
    204 F.3d 1125 (D.C. Cir. 2000) ......................................................................................... 40

*Local 144, Hotel, Hosp., Nursing Home & Allied Servs. Union v. NLRB*,
   9 F.3d 218 (2d Cir. 1993) ................................................................................................ 40

*Mudd v. Caldera*,
   26 F. Supp. 2d 113 (D.D.C. 1998) .................................................................................. 31

*Nat'l Fed'n of Fed. Emp., Local 1309 v. Dep't of Interior*,
   526 U.S. 86 (1999) ......................................................................................................... 40

*NSK Corp. v. United States*,
   712 F. Supp. 2d 1356 (Ct. Int'l Trade 2010) .................................................................. 38

*Olympic Fed. Sav. & Loan Ass'n v. OTS*,
   732 F. Supp. 1183 (D.D.C. 1990) ................................................................................... 26

*Penobscot Indian Nation v. U.S. Dep't of Hous. & Urban Dev.*,
   539 F. Supp. 2d 40 (D.D.C. 2008) ............................................................................ 25, 27

*Phillips Petroleum Co. v. FERC*,
   792 F.2d 1165 (D.C.Cir.1986) ........................................................................................ 41

*Platte River Ins. Co. v. Baptist Health*,
   No. 4:07cv0036 SWW, 2009 WL 2015102 (E.D. Ark. Apr. 17, 2009) ........................... 38

*Proffitt v. FDIC*,
   200 F.3d 855 (D.C. Cir. 2000) ........................................................................................ 27

*Radio Condenser Co. v. Coe*,
   75 F.2d 523 (D.C. Cir. 1934) .......................................................................................... 27

*Reed Research, Inc. v. Schumer Co.*,
   243 F.2d  602 (D.C. Cir. 1957) ....................................................................................... 27

*Republic Airline Inc. v. U.S. Dep't of Transp.*,
   669 F.3d 296 (D.C. Cir. 2012) ........................................................................................ 36

*Scharff v. Wyeth*,
   No. 2:10–CV–220–WKW [WO], 2011 WL 4361634 (M.D. Ala. Sept. 19, 2011) ................. 38

*Sea–Land Serv., Inc. v. Dep't of Transp.*,
   137 F.3d 640 (D.C.Cir.1998) .......................................................................................... 41

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ......................................................................................................... 41

*Sierra Club v. Costle*,
   657 F.2d 298 (D.C. Cir. 1981) ........................................................................................ 35

*St. Margaret Mem'l Hosp. v. NLRB*,
   991 F.2d 1146 (3d Cir. 1993) .......................................................................................... 40

*U.S. Dep't of Energy v. Fed. Labor Relations Auth.*,
   106 F.3d 1158 (4th Cir. 1997) ........................................................................................ 40

*United States v. Nelson*,
   921 F. Supp. 2d 105 (E.D.N.Y. 1996) ............................................................................ 38

*United States v. Philip Morris USA Inc.*,
    No. Civ. A 99-2496(GK), 2004 WL 5355971 (D.D.C. Aug. 2, 2004) .................................... 39

*United States v. Phillips*,
    No. H-04-512, 2010 WL 1544297 (S.D. Tex. Apr. 19, 2010).......................................... 38

*United States v. Powell*,
    761 F.2d 1227 (8th Cir. 1985) .............................................................................. 38

*United Techs. Corp. v. U.S. Dep't of Def.*,
    601 F.3d 557 (D.C. Cir. 2010) .............................................................................. 25

*United Western Bank v. OTS*,
    No. 11-0408 (ABJ), 2012 WL 601030 (D.D.C. Feb. 24, 2012) ............................. 24

*Vensure Fed. Credit Union v. Nat'l Credit Union Admin.*,
    798 F. Supp. 2d 1 (D.D.C. 2011) ......................................................................... 24

*Wachtel v. OTS*,
    982 F.2d 581 (D.C. Cir. 1993) ............................................................................. 27

*Whidden Mem'l Hosp. v. Sebelius*,
    No. 09-2231 (JEB), 2011 WL 6189474, (D.D.C. Dec. 14, 2011) .......................... 25

*Wieland-Werke AG v. United States*,
    525 F. Supp. 2d 1353 (Ct. Int'l Trade 2007) ...................................................... 38

*Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*,
    No. 3:11–cv–00622–RCJ–VPC, 2011 WL 4377932 (D. Nev. Sept. 16, 2011) ...................... 38

## S<small>TATUTES</small>, R<small>EGULATIONS</small>, & A<small>DMINISTRATIVE</small> M<small>ATERIALS</small>

5 U.S.C. § 706 ...................................................................................................... 25, 27

12 C.F.R. § 337.6 ................................................................................................. 10, 13

12 C.F.R. § 516.220 ............................................................................................. 32

12 C.F.R. § 516.270 ............................................................................................. 14

12 C.F.R. § 565.4 ................................................................................................. 9

12 C.F.R. § 565.5 ................................................................................................. 28, 33, 34

12 C.F.R. § 574.74 ............................................................................................... 13

12 U.S.C. § 1464 ................................................................................................. 1, 24, 26, 40

12 U.S.C. § 1818 ................................................................................................. 40

12 U.S.C. § 1821 ................................................................................................. 1, 37, 44

12 U.S.C. § 1831*o* ............................................................................................. *passim*

12 U.S.C. § 5413 ................................................................................................. 4

44 U.S.C. § 3512 ................................................................................................. 33

Prompt Corrective Action; Rules of Practice for Hearings,
    57 Fed. Reg. 44866 (Sept. 29, 1992) ...................................................................... 28

**OTHER AUTHORITIES**

*Accounting for Certain Investments in Debt and Equity Securities,*
    Statement of Fin. Accounting Standards No. 115 (Fin. Accounting Standards Bd. 1993) ........ 9

*Black's Law Dictionary* (9th ed. 2004).................................................................... 27

*Black's Law Dictionary* (7th ed. 2000).................................................................... 38

Brady Dennis,
    *Born in a Previous Crisis, OTS Faces Extinction*, Wash. Post., June 18, 2009 ........................ 8

Brief for the FDIC in Opposition,
    *Greene Cnty. Bank v. FDIC*, 117 S. Ct. 944 (1997) (No. 96-708), 1997 WL 33562074 ........ 41

*FASB ASC 320 Investments – Debt and Equity Securities, 10 Overall, 35 Subsequent*
    *Measurement* (FASB ASC 320-10-35)....................................................................... 9

Heather Draper,
    *First Citizens Banks on Failures: North Carolina Bank Has Been Buying*
    *Up Assets of Failed Banks in Colorado*, Denver Bus. J. (July 15, 2011) ................................ 24

Helen A. Garten,
    *Whatever Happened to Market Discipline of Banks?*,
    1991 Ann. Surv. Am. L. 749 (1991) ....................................................................... 31

Julie Williams,
    *Savings Institutions: Mergers, Acquisitions, and Conversions* (2012)....................................... 3

Michelle D. Monse,
    *Ethical Issues in Representing Thrifts*, 40 Buff. L. Rev. 1 (1992) .......................................... 10

Office of the Comptroller of the Currency,
    *An Examiner's Guide to Problem Banks: Identification, Rehabilitation,*
    *and Resolution* (2001)........................................................................................ 33

OTS CEO Letter # 320,
    Accounting Considerations Related to Other-Than-Temporary
    Impairment of Securities (Sept. 3, 2009) ................................................................... 9

OTS Examination Handbook (July 2010)......................................................................... 8

OTS Op. Chief Counsel (Oct 17, 1994)......................................................................... 13

OTS Order No. 2010-41, 2010 WL 2811658 (July 16, 2010)..................................................... 40

OTS Order No. 2010-43, 2010 WL 2811661 (July 16, 2010)..................................................... 40

OTS Order No. 2010-48, 2010 WL 3313201 (August 20, 2010).................................................. 40

OTS Order No. 2011-29, 2011 WL 1468376 (Apr. 15, 2011) .................................................... 40

Press Release, Federal Deposit Insurance Corporation, First-Citizens Bank &
    Trust Company, Raleigh, North Carolina, Assumes All of the Deposits of United

Western Bank, Denver, Colorado (Jan. 21, 2011) ..................................................................... 24

Press Release,
   First Citizens Reports Earnings for First Quarter 2011
   (Apr. 25, 2011), *available at* https://www.firstcitizens.com/meet-first-citizens/news-
   awards/news/20110425-earnings-first-quarter-2011/ ............................................................ 24

Steve Y. Koh,
   *Nonacquiescence in Immigration Decisions of the U.S. Courts of Appeals*,
   9 Yale L. & Pol'y Rev. 430 (1991)........................................................................................... 40

Thomas L. Holzman,
   *Unsafe or Unsound Practices: Is the Current Judicial Interpretation of the Term
   Unsafe or Unsound?*, 19 Ann. Rev. Banking. L. 425 (2000) .................................................... 41

U.S. Government Accountability Office,
   *Federal Deposit Insurance Corporations Funds' 2011 and 2010
   Financial Statements* (2012) ...................................................................................................... 24

V. Gerard Comizio, et al.,
   *When Banking Agencies Unleash Their Regulatory Weapons*,
   125 Banking L.J. 795, 805 (2008) ............................................................................................... 1

## **R**ULES

Federal Rule of Civil Procedure 56 ............................................................................................ 24

## PRELIMINARY STATEMENT

In the Financial Institutions Reform, Recovery and Enforcement Act of 1989

("FIRREA"), Congress empowered the Director of the Office of Thrift Supervision ("OTS") to

appoint receivers for federal savings associations.  Recognizing that the power to seize a bank is

"a heavy responsibility to be exercised with disinterestedness and restraint,"[1] Congress coupled

that power with certain obligations.  In particular, Congress insisted that at least one of certain

statutorily enumerated circumstances[2] exist before the OTS may employ this "draconian

measure."[3]  The relevant circumstances are exceptional; they generally involve significant threats

to a bank's financial position, violations of the law, or "critical management failures."[4]  If none

of these conditions existed, then the OTS was required to stand aside.

In the case of United Western Bank ("United Western" or "the Bank"), the OTS ignored

these statutory requirements.  Rather than acting with restraint, the agency seized a viable

institution that held significant capital and faced no risk of failing.  It did so based on three

unsupported grounds.  *First*, that the Bank had not submitted an adequate capital restoration

plan—despite the fact that the Bank had submitted a $200 million recapitalization plan within the

unreasonably short time that agency afforded it to do so.[5]  *Second*, that certain of the Bank's

depositors might withdraw their money—even though these long-standing depositors had

provided written assurances that they would not withdraw and even though the OTS had

recognized for years before that the depositors were safe.  And *third*, that the Bank was operating

in an unsafe and unsound condition—in spite of the fact that the Bank was in a perfectly safe

---

[1]    *Fahey v. Mallonee*, 332 U.S. 245, 253-54 (1947).

[2]    12 U.S.C. §§ 1464(d)(2)(A), 1821(c)(5).

[3]    *First Fed. Sav. Bank & Trust v. Ryan*, 927 F.2d 1345, 1358 (6th Cir. 1991).

[4]    V. Gerard Comizio, et al., *When Banking Agencies Unleash Their Regulatory Weapons*, 125 Banking L.J. 795, 805 (2008).

[5]    12 U.S.C. § 1831*o*(e)(2)(D)(i).

condition, even under the agency's incorrect interpretation of what constitutes an "unsafe or unsound" practice or condition.

As demonstrated below, the OTS arbitrarily and capriciously wielded its power of seizure to enforce a new and unsubstantiated notion of what constitutes an acceptable model for community banking. The Acting Director's unsupported and specious decision to seize the Bank should be reversed; it was arbitrary, capricious, an abuse of discretion, and not in accordance with FIRREA's requirements. The Bank accordingly asks the Court to order the Office of the Comptroller of the Currency ("OCC"), the successor-agency to the OTS, to remove the Federal Deposit Insurance Corporation ("FDIC") as receiver and return the Bank to its rightful owner.

## STATEMENT OF FACTS

For many years leading up to its seizure by the OTS, United Western operated a successful business model focusing on both processing services and community lending. That model generated "an unbroken 16 years of profitability" from 1993 into 2009, well into the current financial crisis. AR 1474.[6] That model was so strong that the Bank survived the worst of the financial crisis and was positioned to re-emerge as a stronger institution, all while hundreds of other banks failed. Then, astonishingly, this relatively well-capitalized bank was seized, in one of the last acts of a discredited bank regulator soon to have its own doors shut.[7] The record reveals that this seizure was based on nothing more than that regulator's sudden decision that it no longer liked the Bank's established, and previously approved, business model.

### A.   The Bank Builds a Stable, Successful Business

United Western, until the very day it was seized, was a community bank with a

---

[6]   The Administrative Record is cited herein as "AR." Internal citations and marks are also omitted throughout this memorandum.

straightforward and successful business model.  It attracted a substantial number of its deposits

from *outside* the community while it lent money *inside* the community.  This asset-liability mix

reflected the two strengths of the Bank.  First, the Bank had special expertise in performing

settlement and processing services for certain types of trust, settlement, clearing, and investment

companies ("the Institutional Depositors").  And second, the Bank was a community lender that

understood and served its local market.

### 1.    "Long-Standing" Institutional Depositor Relationships

For more than a decade, the Bank enjoyed close relationships with multiple Institutional

Depositors.  United Western's Institutional Depositors held various types of customer funds that

were "in transit," awaiting their ultimate disbursement to customers or outside investments.  AR

1756.  Some depositors, for instance, provided clearing services to financial firms.  AR 1760.

Others were trust companies acting on behalf of individual customers.  AR 1761.  Still others

handled escrow transactions for various clients.  AR 1761.  But regardless of their business, the

Institutional Depositors shared one key characteristic: they needed a bank that could settle and

process a high volume of transactions and maintain their customers' funds until disbursement.

AR 1756.  United Western filled that role.

The Bank began working with these depositors in 1993, when a company controlled by

Guy A. Gibson purchased United Western.  AR 387.  Gibson had formed a company called

Matrix Financial Services Corporation ("Matrix Financial"), which purchased residential

mortgage-servicing rights.  AR 387.  In servicing these mortgages, Matrix Financial would

receive monthly mortgage payments and escrow deposits from borrowers and deposit this money

into the Bank.  AR 387-88.  Soon, the Bank started performing similar deposit services for other

---

[7]    The Dodd-Frank Act "abolished the OTS, which many in Congress viewed as an ineffective regulator."  Julie
Williams, *Savings Institutions: Mergers, Acquisitions, and Conversions* § 2.01[6] (2012); *see also* 12 U.S.C.

companies.

In 1997, the Bank's holding company—United Western Bancorp, Inc. ("UW Bancorp" or "the Holding Company")—purchased Sterling Trust Company (renamed "UW Trust Company"), a company that provided certain custodial and administrative services for self-directed individual retirement accounts.  AR 388.  UW Trust deposited customers' cash awaiting investment into an omnibus account at United Western.  AR 388-89.  UW Trust in turn formed Matrix Advisory Services, Inc. to provide financial custodial services for financial firms and others.  AR 389.  That company created a new way to process mutual fund transactions and formed a joint venture to carry out the idea.  AR 390.  The joint venture, Matrix Settlement and Clearing Services, LLC ("MSCS"), then began processing billions of dollars in mutual fund transactions.  AR 390.  As part of the transaction process, MSCS would be left with a portion of funds at the end of each trading day.  AR 390.  MSCS placed these customer funds into an omnibus account at United Western.  AR 390.

Gibson also helped the Bank form an important relationship with Legent Clearing, LLC ("Legent").  Like the other Institutional Depositors, Legent provided a service—clearing securities transactions—that generated large idle cash balances.  AR 391.  In mid-2002, Gibson stepped down from active management of UW Bancorp and bought Legent.  AR 391.  Legent then started depositing a portion of its customers' cash balances into the Bank.  AR 392.  In 2005, after Gibson sold Legent and returned to the Bank, the deposit relationship between United Western and Legent only continued to grow.  AR 392.

Soon, other large depositors recognized the Bank's unique expertise in providing settlement and processing services and began depositing their customers' funds with the Bank.

§ 5413, *et seq.* (abolishing the OTS and transferring its duties to the OCC).

Equity Trust Company ("Equity Trust"), a retirement trust company, began placing its customers' idle funds in the Bank in 2000.  AR 390.  The company eventually developed such a close relationship with the Bank that it purchased UW Trust's custodial retirement accounts in 2009.  AR 391.  Two more trust companies, Lincoln Trust Company ("Lincoln Trust"), AR 541, and Trust Management, Inc. ("Trust Management"), followed later, depositing a portion of their customers' funds at the Bank.

Put simply, the Institutional Depositors supplied the Bank with stable, low cost sources of deposit funds.  *See, e.g.*, AR 406, 415, 423, 547.  And as reflected above, those depositors had relationships with United Western for years, some of them for more than a decade.  Still, the Bank did not rely merely on close relationships and good-faith understandings to protect its flow of deposits; it also entered into written agreements with its largest depositors.  Among other things, these agreements required the Institutional Depositors to maintain minimum deposit levels and barred them from making particular types of immediate withdrawals—at least without notice.  *See, e.g.*, AR 1914-21; AR 1949-57; AR 1970-79; AR 1989-2004; AR 2028-31.

Furthermore, the Bank had a justifiable basis to believe that its relationships with the Institutional Depositors enjoyed regulatory acceptance and approval.  This deposit strategy was regularly reviewed and approved by the OTS in periodic examinations of the Bank.  *See, e.g.*, AR 55.  For example, in a 2007 examination, more than 14 years after the Bank began taking deposits from Institutional Depositors, the OTS identified institutional deposits as one of the two "primary sources of funding" for the Bank.  AR 55, 81.  The OTS noted, without criticism, its expectation that these deposits would "remain the dominant part of the liability base for a long period."  AR 57.  Not only did this concentration not prompt any adverse action,[8] it spurred

---

[8]    For instance, the October 2007 Report of Examination did not recommend any corrective action related to the Institutional Depositors.  *See generally* AR 51-101.

positive comment.  In one report dismissing any concern over the Institutional Depositors, for instance, the OTS emphasized that "[m]any of the institutional deposit relationships [were] long-standing."  AR 99.  The OTS also found it significant that the Bank "had contracts and other arrangements with its institutional deposits requiring advance notice of the withdrawal of deposits in excess of an established threshold."  AR 99.  In short, at no time before 2009 did the OTS indicate any concern with the Bank's reliance on the Institutional Depositors as a primary source of deposits.

### 2.     Community Lending Program: "Exceed[ing] Expectations"

While the Institutional Depositors supported the liability side of the Bank's balance sheet, community lending (along with direct and indirect investments in home mortgages) became the foundation for the Bank's asset side beginning in late 2005.  In mid-2005, after selling Legent to an independent third party, Gibson approached the OTS with a proposal to recapitalize the Bank and refocus it on community lending.  AR 392.  The OTS endorsed this plan without comment as to the Institutional Depositors.  AR 392.  So, in December 2005, the Bank embarked on its new community lending strategy with new leadership, new capital, and regulatory support.  AR 392.

Over the course of the next few years, the Bank developed a network of eight branches within the Colorado "Front Range" and grew its community lending business.  AR 57, 392-93.  It further shifted away from certain lines of business that did not fit within its new strategy, focusing instead on "community bank loans."  AR 393.  And because of the new branches, the Bank was able to increase so-called "community bank deposits" by $389 million over just a few years.  AR 393.  Importantly, however, the Bank was able to grow this "service-focused" business in the midst of a competitive marketplace for deposits precisely because of the Institutional Depositors' funding.  AR 301.

Here again, the OTS was well aware of the Bank's choice to pursue a community banking strategy.  In 2007, for example, the agency observed that the Bank was "changing the composition of its asset base as it follows the community banking strategy adopted in late 2005 and early 2006."  AR 55.  The OTS approved of this shift.  In the October 2007 Report of Examination the agency noted that the new strategy had "enhanced the reliability of earnings" and caused the Bank's mortgage securities portfolio to shrink.  AR 57.  The same report indicated that the community banking strategy had resulted "in a significant increase in core income and a more stable net income stream."  AR 76.  The 2007 Report of Examination for UW Bancorp was more direct, praising the community bank restructuring efforts as having "exceeded expectations."  AR 109.

**B.      The OTS Abruptly Changes Its Mind on the Bank's Business Model**

Like every other depository institution, United Western's business faced significant challenges as a result of the current financial crisis.  As the OTS put it, the Bank faced "unprecedented declines in real estate markets, a changing economic environment, and dislocation in capital markets."  AR 135.  And the Bank, like other lenders, felt the sting of the financial crisis by (i) suffering losses on mortgage-backed securities and (ii) being forced to take reserves on other assets.  AR 23.  Unsurprisingly, these events negatively affected the Bank's revenues, earnings, and assets.

Still, until late 2009, there was no indication that the OTS had a problem with the Bank's basic business model.  Prior OTS examinations certainly did not conclude that the Institutional Depositor relationships posed any threat to the Bank.  Nor did those reports fault the community banking strategy.  However, as the OTS became subject to increased criticism of its own for its

failure to effectively regulate subprime lenders,[9] the OTS's position would suddenly change.[10]

In September 2009, the Bank received the OTS's March 30, 2009 Report of Examination, which unexpectedly sounded a different note than prior positive reports of examination.  AR 130-31.  In an abrupt and unexplained change of position for the OTS, the report rebuked the Bank for what the OTS termed "less than satisfactory" capital, AR 135, even though the Bank was considered "well capitalized,"[11] *see, e.g.*, AR 141.  The OTS report further declared that the Bank had wrongfully focused on higher-risk assets—including the very same community-based lending previously encouraged by the OTS.[12]  AR 135, 143.  The report also suggested—for the first time—that the OTS took issue with the Bank's reliance upon the Institutional Depositors.  AR 136.  While acknowledging that the Bank had "adequately manage[d] its day-to-day liquidity needs and ke[pt] sufficient liquid funds for that purpose," the report inexplicably concluded that liquidity was an issue for the Bank.  AR 136.

A short while after releasing this report, in December 2009, the OTS compelled the Bank and UW Bancorp to sign memoranda of understanding.  AR 220-49.  These memoranda further hinted at the OTS's newly aggressive approach to the Bank.  Among other things, the

---

[9]   *See, e.g.*, Brady Dennis, *Born in a Previous Crisis, OTS Faces Extinction*, Wash. Post., June 18, 2009, at A15 ("We are going to abolish, I hope, the Office of Thrift Supervision[.] … AIG and some others that were theoretically regulated by the OTS, that was like being regulated by the meter maid." (quoting Congressman Barney Frank)); *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/06/17/AR2009061703548.html.

[10]   No one can be certain as to why this change occurred, as the agency never explained it and the record does not provide any insight.  Still, historical events provide some context.  The OTS—and specifically the same regional office responsible for the supervision of the Bank—had just played a role in two of the largest bank failures in history: Washington Mutual Bank and IndyMac Bank.  As many of the key OTS supervisors involved in those failures were also involved in the supervision of United Western, the OTS's sudden shift might be seen as an overreaction to criticism following those two failures.

[11]   The Federal Deposit Insurance Corporation Improvement Act of 1991 requires regulated banks to meet certain minimum capital requirements.  The Act provides five categories of capital-ratio categories: well capitalized, adequately capitalized, undercapitalized, significantly undercapitalized, and critically undercapitalized.  *See* 12 U.S.C. § 1831*o*(b).

[12]   The examiner was concerned with the Bank's number of "classified assets."  The term refers to assets classified as "adverse" under the OTS's asset classification system.  *See* OTS Examination Handbook 260.3 (July 2010), *available at* http://files.ots.treas.gov/422089.pdf.

memoranda called for the Bank to meet and maintain a risk-based capital level of more than

twelve percent (and core capital level of eight percent) by June 30, 2010. AR 220-49. This

unexplained requirement imposed a substantially higher capital requirement than that normally

required of well-capitalized banks (*i.e.*, total risk-based capital of at least ten percent and "core"

capital of at least six percent).[13]

Days after entering into the memoranda of understanding, the OTS announced that it

planned to conduct a "field visit" of United Western in January 2010. AR 251. Only a few days

after the field visit finished in late February, the OTS declared that the Bank was "in troubled

condition." AR 275-79. According to the OTS, the asset quality issues first raised in the March

30, 2009 Report of Examination—combined with new concerns over earnings—required

immediate action. AR 275-79.

A flood of new directives and limitations accompanied the troubled condition

designation—restrictions on growth at the Bank, limitations on compensation, dividends and

severance agreements, and imposition of a variety of other conditions. AR 276-77, 284-286. In

another letter, sent a day later, the OTS directed the Bank to "refine its securities review

process." AR 289-90. That letter also invoked an accounting concept known as an "other-than-

temporary impairment" ("OTTI") expense. AR 289-90. Such an expense occurs if it is

"probable that the investor," here the Bank, "will be unable to collect all amounts due according

to the contractual terms of a debt security not impaired at acquisition."[14] Faulting the Bank's

---

[13]   *See* 12 C.F.R. § 565.4(b)(1).

[14]   *Accounting for Certain Investments in Debt and Equity Securities*, Statement of Fin. Accounting Standards No.
115, § 16 (Fin. Accounting Standards Bd. 1993), *available at* http://www.fasb.org/pdf/fas115.pdf   *See also
FASB ASC 320 Investments – Debt and Equity Securities, 10 Overall, 35 Subsequent Measurement* (FASB ASC
320-10-35); OCC-UWB 00010-00026; OTS CEO Letter # 320, Accounting Considerations Related to Other-
Than-Temporary Impairment of Securities (Sept. 3, 2009) ("[A]ssessing OTTI is complex and involves
significant judgment.")  While the appropriate accounting standard requires a finding that it is *probable* that an
investor will default, the Bank's modeling involved analysis of mortgage securities with 30 to 40-year
durations, some of which suggested that some of the securities were subject to defaults towards the end of their

accounting approach for certain private label mortgage-backed securities ("MBS") owned by the Bank, the agency instructed United Western to refile the Bank's Thrift Financial Report for the quarter ending December 31, 2009 to reflect additional OTTI expense.  And, on April 1, 2010, the OTS ordered the Bank to produce a revised liquidity plan because of the agency's new concerns related to the Bank's long-standing, stable relationships with the Institutional Depositors.  AR 356.

The OTS further directed the Bank not to rollover or renew any existing brokered deposits (or accept any new ones) because the agency was "concerned" about them.  AR 281.  A brokered deposit is "any deposit that is obtained, directly or indirectly, from or through the mediation or assistance of a deposit broker."[15]  Such deposits are deemed less stable because, "[u]nlike individual deposit accounts, brokered deposits could be—and were—moved daily in search of better returns."[16]  The OTS's directive, however, implicitly equated *the Institutional Depositors*, which were historically stable, with this type of "hot money."[17]  In conflating these two deposit types, the OTS effectively handicapped the Bank's central base of deposits in a single, cursory act.

Late-April 2010 brought more bad news—this time in the form of a letter from the OTS informing the Bank of the earlier field visit's results.  AR 267-69.  The letter stated that the Institutional Depositors had now become such a concern (because of the suddenly perceived risk of their withdrawal) that the OTS encouraged the Bank to consider the extreme options of "sale, merger, or self-liquidation."  AR 267.  This dire warning was issued even though the

---

stated-durations, decades in the future.  As was repeatedly discussed with the OTS, to no avail, *possible* defaults decades in the future are very different from *probable* defaults, which require an OTTI charge.  AR 1337-1343.

[15]   12 C.F.R. § 337.6(a)(2).

[16]   Michelle D. Monse, *Ethical Issues in Representing Thrifts*, 40 Buff. L. Rev. 1, 11 n.32 (1992).

corresponding Report of Examination[18] found that "management ha[d] elected to maintain

excess liquidity … during the … distressed economic environment[.]"  AR 263.  Indeed, the

Report of Examination concluded that the Bank's "large liquidity position" effectively

"lessened" the "likelihood of an immediate liquidity crisis" stemming from the so-called

"brokered deposit exposure."  AR 264.  The agency also labeled the Bank's capital level

"inadequate"—despite the fact that the Bank was well-capitalized as of the date of the

examination—because the OTS had "implicitly stated" that capital levels were "deficient" in the

earlier memoranda of understanding.  AR 267-68.

　　　　After the field visit, the OTS continued to act hastily and arbitrarily.  In a letter dated

May 24, the FDIC preliminarily[19] concluded that some of the Institutional Depositors were

"deposit brokers."  AR 369-80.[20]  The OTS responded by speedily downgrading United

Western's liquidity rating based on this preliminary finding.  AR 549.  The agency contended

that it was "uncertain" that the Bank could "reach agreement with the FDIC on a plan for the

orderly reduction of the institutional deposits," AR 549, even though the FDIC had indicated, in

writing, that it anticipated a "gradual[]" elimination of those deposits.  AR 369.  And although

the Bank had requested a waiver of the FDIC's determination (at the OTS's insistence), OCC-

---

[17]　The OTS did so though the Bank had produced legal opinion letters from two law firms concluding that the Institutional Depositors were not deposit brokers within the meaning of the applicable regulation.  AR 506-11, 532-37, 540-45.

[18]　The OTS Supervisory Memo ("S-Memo") in support of the seizure states that the January 2010 Report of Examination was mailed to the Bank on April 28, 2010.  AR 23.  However, after the Bank questioned this assertion and stated that it had not been provided with the report, the OTS admitted that its files contain no indication that it had been provided to the Bank.  08/11/2011 Tr. at 57.  The Bank promptly acted to comply with the recommendations in the letter, only to later learn that the OTS expected the Bank to comply with the differing recommendations set forth in the report that it had never received.

[19]　Though not initially couched as such, the FDIC shortly thereafter characterized this decision as a "preliminary determination."  AR 661.

[20]　While United Western was directed to treat deposits by Institutional Depositors as brokered deposits, the Bank became aware that other depository institutions receiving deposits from the same depositors were directed not to treat those deposits as brokered.  AR 1756.  The practical effect of this directive was that dollar $x$ placed by an

UWB 00729, AR 360-67, the OTS nevertheless believed that the waiver would not reduce the Bank's liquidity risk because "the duration of such waiver" was "also uncertain." AR 549. The agency imposed the lowest possible liquidity rating on the Bank based on this pure speculation. AR 549.

### C.   The OTS Secretly Decides to Seize the Bank

Though the Bank did not know it at the time, the OTS had already determined as of June 2010 to seize the Bank. Documents initially withheld by Defendants but later obtained in court-ordered discovery revealed the true picture: by June, the OTS had begun writing the memorandum to justify the seizure and was already in discussions with the FDIC over how to handle an "orderly resolution." OCC-UWB 00734. Of course, none of the grounds that the OTS would later use to justify the seizure existed at that time. And none of these facts were revealed during a June 30 meeting between the FDIC, the OTS, and the Bank concerning the open regulatory issues. AR 661-64. Instead, the OTS chose to slowly reveal its intent to seize the Bank by issuing a series of directives, orders, and decisions over the next several months.

It began with cease-and-desist orders. On June 25, 2010, the OTS issued two such orders against United Western and UW Bancorp ("the Cease and Desist Orders"), AR 553-594, which required the Bank and its holding company to take a variety of actions. Among other things, the Bank's Cease and Desist Order commanded it to submit a variety of plans and imposed various other limits on the Bank's activities.[21] But perhaps most importantly, the Bank's Cease and Desist Order required it to meet and maintain an unusually high level of capital—eight percent core capital and twelve percent risk-based capital—within *five days* of the Order. AR 554.

Recognizing the five-day capital deadline was impossible to meet, the Bank made several

---

Institutional Depositor at United Western was brokered, while dollar *y* placed by the same Institutional Depositor at another bank was not brokered.

requests for an extension of time to meet the capital requirement.  *See, e.g.*, OCC-UWB 00740.

All of these requests were summarily rejected.  AR 671.

Meanwhile, the OTS continued to create complications for the Bank because of its new

dislike of the Bank's relationships with the Institutional Depositors.  Beginning in mid-July, for

instance, the OTS imposed an impromptu reporting requirement on the Bank.  In particular, the

agency ordered the Bank to report to the OTS any time an Institutional Depositor intended to

terminate its deposit relationship, revise its deposit agreement, or otherwise withdraw five

percent or more of the Institutional Depositor's funds at the Bank.  AR 666.

### D.      The Bank Attempts to Address the OTS's Concerns

In an attempt to address the OTS's concerns, the Bank undertook several efforts in mid to

late 2010.  Two of those efforts are especially relevant here.

### 1.      Legent Purchase

First, the Bank determined to purchase Legent, rendering it an operating subsidiary of the

Bank, AR 663, and obviating any concerns regarding the stability or status of Legent's

deposits.[22]  The Bank formally notified the OTS of its intent to acquire Legent on July 27.  AR

1112, 2551.[23]  As the formal notice indicated, the Legent purchase was expected to do several

positive things for the Bank, including:

---

[21]   The Bank made many of these submissions on July 2, 2010.  AR 600-659.

[22]   Operating subsidiaries of federal savings associations have traditionally been viewed as departments or
divisions of their parent savings associations.  *See* OTS Op. Chief Counsel (Oct 17, 1994) (citing to a former
OTS regulation authorizing the establishment of operating subsidiaries, 12 C.F.R. § 574.74(c).  Accordingly, an
operating subsidiary and its parent federal savings association are generally consolidated and treated as a single
unit for statutory and regulatory purposes.  12 C.F.R. § 559.3(h)(1).  *See* OTS Op. Chief Counsel P-2006-6, 3-4
(July 20, 2006).  Deposits gathered by Legent as an operating subsidiary, therefore, could not be deemed to be
brokered as FDIC regulations explicitly exclude from the term deposit broker, among other things, "[a]n insured
depository institution, with respect to funds placed with that depository institution," subject to the Bank not
paying rates which are significantly higher than the prevailing rates of interest on deposits offered by other
insured depository institutions in such depository institution's normal market area.  *See* 12 C.F.R. §
337.6(a)(ii)(A), (iii);  AR 674-687.

[23]   The Bank had provided informal notice of its intent to acquire Legent on June 15, 2010.  AR 2789.

- Reducing the Bank's reliance on third-party institutional deposits while increasing overall deposits;

- Giving the Bank a new product line, thus diversifying the Bank's portfolio;

- Providing the Bank with more access to additional stable deposits; and

- Creating fee revenues and other new opportunities for earnings growth at the Bank.

AR 2552-53.

Rather than supporting the Bank's efforts to address the regulator's concerns, the OTS immediately began creating impediments to the Legent transaction. First, the agency decided that the proposed acquisition presented "supervisory concerns" that required the OTS to treat the "notice" as an "application" for approval. AR 2848. The agency next announced that it would not approve the Legent application until after the FDIC made a final determination on the brokered deposits issue, even though the Legent purchase was not conditioned on the ultimate outcome of the FDIC's brokered deposit decision. AR 2855. Then, over the course of several months, the OTS sent a number of requests for additional information, insisting that all of them were required to approve the application. *See* AR 2855-58; AR 3002-06; AR 4038-41; AR 2533. The Bank produced several thousand pages of responsive documents. More than three months after the first notice was submitted, the OTS's Regional Office suddenly determined the application raised "significant issues of policy" and moved the application to the OTS's Washington office, further delaying approval.[24] AR 3008. It would be more than six months later, and only days before the seizure, before the Bank would receive any answer to its request.

## 2. $200 Million Recapitalization Transaction

While the Bank pursued the Legent acquisition, the Holding Company also developed a

---

[24] If an application deemed to raise "significant issues of law or policy," regulatory time frames mandating agency action do not apply. 12 C.F.R. § 516.270.

multi-million dollar investment deal ("the Recapitalization Transaction") to recapitalize United Western.  *See generally* AR 972-1091.  The Recapitalization Transaction was intended to provide UW Bancorp with at least $200 million in outside investment to support the Bank, starting with a $103 million investment from three primary investors ("the Anchor Investors") and continuing with a further $97 to $102 million from other private investors.  AR 980.  The Holding Company signed a formal agreement with the Anchor Investors ("the Investment Agreement") on October 28, 2010.  AR 972-1091.[25]

The transaction would have provided two important benefits to the Bank.  First, the Recapitalization Transaction would have given the Bank enough capital—approximately $150 million, AR 1811—to return to well-capitalized status, AR 1111.  Once the Recapitalization Transaction was complete, projections estimated that the Bank would hold, and maintain for several years, a "core capital" ratio of at least nine percent and a total risk-based capital ratio of at least eighteen percent.  AR 1111, 1811.  These capital levels far exceeded the regulatory requirements for well-capitalized institutions and even satisfied the heightened "meet and maintain" provision of the Bank's Cease and Desist Order.

The Recapitalization Transaction would also have removed certain MBS off of the Bank's balance sheet.  AR 1111.  Specifically, the Investment Agreement anticipated that these securities, which had been responsible for a substantial portion of the Bank's losses, would be sold to UW Bancorp for their book value.  AR 1811.  This sale would have allowed the Bank to avoid any future accounting losses (*i.e.*, the OTTI charges) associated with the securities while allowing UW Bancorp to hold them without any impact on the Bank until the MBS market stabilized.  AR 1111.

---

[25] The transaction was eventually delayed, partly because the OTS did not timely process two required regulatory filings by the Anchor Investors.  *See, e.g.*, AR 1474.

Like virtually all investment transactions, the Investment Agreement included a number of "closing conditions," or conditions that needed to be met before the transaction could close. AR 981-985. Many of these conditions concerned standard corporate issues, such as board composition and the like. Some conditions, however, directly implicated the Cease and Desist Orders that the OTS had issued against the Bank and the Holding Company. AR 1812. The Bank hoped that the OTS would eliminate some of the requirements of the Cease and Desist Orders at closing, when the Bank returned to well-capitalized status. AR 1812.

### E.      The OTS Reveals Its Intent to Seize the Bank

The Bank's efforts to allay the OTS's concerns were for naught. Based on information provided only after the Court ordered additional discovery, the Bank learned that the Acting Director and other members of the FDIC board of directors met on November 9, 2010.[26] OCC-UWB 01014. By the end of that meeting, the Board had voted to adopt a resolution accepting an appointment of the FDIC as receiver over the Bank. OCC-UWB 00992-01011. The Bank's course was set, even as the Bank was in the midst of complying with the OTS's commands.

### 1.      Ultimatums and Demands

The process of closing the Bank continued on November 17, when OTS senior staff, FDIC senior staff, and United Western's senior management met in Washington.[27] OCC-UWB 00787. The OTS Deputy Director, the number two official at the agency, ominously repeated the OTS's new position that it was "not comfortable with business models that rely on large blocks of 'institutional' or otherwise wholesale deposits," regardless of whether those deposits were deemed "brokered" or something else. OCC-UWB 00787. And he indicated that, even if the

---

[26]   A memorandum to the FDIC board supporting the actions to be taken at the November 9, 2010 meeting was circulated on October 25, 2010, before any of the grounds for receivership even existed. OCC-UWB 00972-1011.

[27]   This session followed several (failed) requests by the Bank for such a meeting.

Bank was recapitalized, "[t]he simple infusion of capital into the institution would not immediately solve the problems there."  OCC-UWB 00787.  In short, the OTS had announced its intention to undermine even a well-capitalized United Western.

Despite the OTS's truculence, the Bank attempted to outline certain closing conditions at the meeting that the parties had all agreed could be removed from the Investment Agreement.  AR 1154-75, 1181-90.  As of November 17, the removal of the "meet-and-maintain" requirement from the Bank's Cease and Desist Order remained in the Investment Agreement as a necessary condition, AR 1182, but the Bank was prepared to seek further concessions from the Anchor Investors—and it appeared the Anchor Investors were willing to make such concessions.  AR 4190.

Unmoved, and evidently intent on blocking the Recapitalization Transaction, the OTS continued on the path toward receivership.  On December 2, the FDIC scheduled the Bank's receivership for January 7, 2011, and commenced marketing the Bank's assets and liabilities.  OCC-UWB 00788.[28]  On December 3, the OTS sent a letter stating (without explanation) that it would not remove the meet-and-maintain requirement.  AR 1193.  The very same day that it underscored the meet-and-maintain requirement, the OTS issued another directive: the Bank was to take an additional $16.3 million OTTI charge on the Bank's Thrift Financial Report for the quarter ending September 30, reflecting the OTS' calculation of estimated OTTI on certain mortgage-backed securities.  AR 2092-93.  The Bank objected but ultimately complied, amending its financial report on December 8.  AR 1441.  This OTS-driven OTTI charge dropped the Bank's total risk-based capital ratio to 7.8 percent, just 0.2 percent below the threshold for an

---

[28]   Notably, Defendants produced no communications, either internal or with the FDIC, regarding the initial scheduling of the seizure or the subsequent delay.

adequately capitalized bank.  AR 1441.[29]

Once the OTS forced the Bank's capital ratios to dip below the eight percent total risk-based capital level, the agency sprang into action.  It began by issuing new directives, some of which were facially conflicting.  In one directive, for instance, the OTS directed the Bank to stop accepting deposits from any person depositing employee plan benefits; the OTS suggested that "certain of [the Bank's] institutional depositors" might be affected by this prohibition.  AR 1457.  Yet the OTS *also* directed that the Bank was not to allow any Institutional Depositor to maintain deposits of "less than the minimum dollar amount … that is currently required to be maintained with the [Bank] pursuant to the terms of the applicable Depositor Agreement."  AR 1462.  In other words, one directive ordered the Bank to reduce institutional deposits while the other prohibited that reduction.

In another letter sent late on the afternoon of December 13, *see* AR 1468, the OTS instructed the Bank (among many other things) to submit a capital restoration plan ("CRP"), AR 1441.  The Bank was to submit the plan just seven days later "in light of the Association's unsafe and unsound condition," AR 1441, though the applicable statute requires a bank be given a reasonable time to submit a CRP.[30]  The letter did not identify any particular basis for the unsafe or unsound condition.  The agency further dispensed with its ordinary "timeframes" and required the Bank to restore its capital position "no later than December 31, 2010."  AR 1142.  Thus, the Bank was granted only a few days to develop a plan to secure several million dollars in additional capital in a little more than two weeks.  Of course, the OTS was well aware that the Recapitalization Transaction—a transaction months in the making—was scheduled to close by January 31, 2011.  AR 4247.

---

[29]   Of course, any concerns over OTTI would have been resolved by the Recapitalization Transaction, had the OTS allowed it to proceed.  AR 1111, 1811.

Despite these overwhelming constraints, the Bank successfully filed its CRP on December 20. AR 1473-79. The CRP discussed the anticipated Recapitalization Transaction and its favorable effect on the Bank's capital. AR 1476-78. It noted that the Recapitalization Transaction would limit any future losses on mortgage-backed securities by moving them off the Bank's balance sheet. AR 1477. And it reiterated the Bank's intent to focus in the future on government-guaranteed loans and prudently underwritten community bank loans. AR 1477-78.

The day after the Bank submitted its CRP, the OTS directed it to submit a revised liquidity contingency plan in light of unspecified "[s]ubsequent developments." AR 1534. The Bank submitted that plan on December 28. AR 1553-1725. In outlining the Bank's liquidity position, United Western informed the OTS that *all* of the remaining Institutional Depositors would maintain deposits with the Bank. 1553-54. Equity Trust, Lincoln Trust, Legent, Trust Management, and UW Trust had each indicated in communications with the Bank that they did not anticipate making any "material withdrawals." AR 1555-57.[31]

## 2.    The January 18 Rejections

The OTS's December directive suggested that the Bank's condition required action in a matter of days. So it was odd when the agency took roughly a month to take any other formal action with regard to the Bank. Finally, on January 18, 2011, the OTS took two simultaneous actions. These acts would prove to be fatal to the Bank.

First, the OTS rejected the Bank's application to purchase Legent. AR 4119-21. As the

---

[30]   12 U.S.C. § 1831*o*(e)(2)( D)(i).

[31]   Despite the Bank's submissions and efforts, the relentless stream of demands and directives from the OTS continued. The Boards of the Bank and the Holding Company learned via a December 29 letter that OTS had reduced the institution's composite "CAMELS" rating from four to five, the worst possible rating. AR 1727. The OTS indicated the same day that the revised liquidity contingency plan had only raised *additional* issues requiring "immediate clarification." AR 1742. The Bank responded in 24 hours. AR 2245-53. Then, on January 5, 2011, the OTS issued an "exception sheet" requiring the Bank to take more corrective actions. AR 1776. The Bank quickly responded to that exception sheet, as well. AR 4246-49.

OTS had itself recognized, the recapitalization efforts "hinge[d] on the Legent application."

OCC-UWB 00782.  Nevertheless, the OTS would not allow the transaction to go forward.  AR

4120.

Second, the OTS rejected the Bank's CRP.  AR 4123-27.  The OTS presented seven

ostensible grounds:

- The CRP "unreasonably assume[d]" that the Bank would be able to secure the additional investment of $100 million anticipated by the Investment Agreement with the Anchor Investors;

- The CRP unreasonably assumed that the OTS would approve further asset growth at the Bank;

- The CRP inappropriately anticipated further growth in institutional deposits;

- The Recapitalization Transaction incorrectly anticipated that the OTS would approve the Bank's business plan.  The business plan could not be approved because of "excessive concentration in institutional deposits" and an "excessive level of asset growth";

- The Recapitalization Transaction incorrectly anticipated that the OTS would approve the Bank's proposed purchase of Legent;

- The CRP assumed that the Anchor Investors would amend or waive certain conditions precedent in their investment agreement; and

- The Bank had submitted a guarantee different from the OTS's standard-form guarantee.

AR 4124-25.  The rejection letter did not provide the Bank with any opportunity to submit an

amended CRP.

### F.    The Bank *Again* Addresses the OTS's Concerns

Even after the CRP rejection, the Bank continued to try to appease the OTS.  It started by

pressing on with its capital formation and liquidity efforts, which were detailed in regular

updates to the OTS in late December and early January.  AR 1747, 1800.  On January 11, for

example, UW Bancorp confirmed that it had secured an additional investment, bringing the

confirmed capital raise to $136.6 million.  AR 2468-69.  In addition, the Bank had a variety of

investors involved in the investment process, including investors in the document review stage

willing to invest up to $58 million in December and $71.5 million in January.  AR 1748.  At the

same time, the three largest Institutional Depositors—Equity Trust, Lincoln Trust, and Legent—

all had signed written agreements to extend their deposit relationships with the Bank.  AR 1944-

45, 1947, 1985-87, 4192.

Likewise, United Western kept trying to make the OTS understand the clear benefits of

working with the Bank towards a private sector recapitalization that avoided failure and the

attendant losses to the FDIC Deposit Insurance Fund.  After numerous requests for an in-person

meeting, *see e.g.* AR 4190, the OTS agreed to a late afternoon conference call on January 20.

AR 4192.  During this call, the Bank explained that capitalization efforts had been successful:

the Anchor Investors were willing to increase their investments, other investors were in various

stages of signing commitments, and the Bank was on track to fulfill the conditions of the

Recapitalization Transaction.  AR 4192.  And the Bank's liquidity position was improving, with

the Bank having excess liquidity in the amount of $426 million on January 20, 2011.  OCC-

UWB 00793, 798.  In response, the agency posed no questions, AR 4192-93, and refused to offer

any comments, AR 4228.

After the call, the Bank supplied the OTS with more evidence of the continuing viability

of the Recapitalization Transaction.  Olympus Partners committed to invest approximately $50

million.  AR 4192.  On January 21, the Bank transmitted a series of new investment

commitments, including a $10 million commitment from Kemnay Fund Investors, a $17.5

million commitment from Auda Alternative Investments, and agreements by the Anchor

Investments to increase their initial investments.  AR 4195-4225.

Nevertheless, the OTS was determined to stay its course; OTS staff internally opined that

"nothing in the [January 20] call [or subsequent communications] should change the OTS's approach with respect to the Bank."  AR 4229.  The OTS did not believe, despite all the indications to the contrary, that the recent efforts demonstrated a realistic prospect of recapitalization.  AR 4229.  And although the OTS never told the Bank what requirements it would need to meet to stave off receivership, internal documents revealed during discovery suggest they were onerous: immediate, additional written changes to all of the major Institutional Depositor agreements, amendment of all the contingencies in the original Investment Agreement, and receipt of binding commitments from all outside investors.  AR 4229.  Even these changes, however, likely would not have been enough by January 20, as the "winning bidder" for the Bank had already been selected several days before.  OCC-UWB 00694.

### G.      The OTS Seizes the Bank

The Acting Director signed an order seizing the Bank and appointing the FDIC receiver on January 21, 2011 ("the Seizure Order").  AR 2-8.  Though the Seizure Order engaged in a meandering discussion of the recent history of the Bank, it ultimately relied upon only three bases for appointing a receiver.

*First*, the OTS believed that the Bank had failed to submit an "acceptable" CRP.  AR 7. The agency placed special emphasis on the fact that the Investment Agreement contained "conditions precedent" that would not—in the agency's view—be satisfied.  AR 4.  It did not consider the Bank's position that these conditions would be changed upon agreement from the relevant investors.  The Seizure Order also mused that, because the Bank had not yet signed any other investment agreements, there was no apparent possibility that it would do so "in the near term."  AR 4.

*Second*, the agency felt that there was "an unacceptable risk that institutional depositors

*may* withdraw their deposits in the near term." AR 7 (emphasis added).  The Seizure Order specifically alluded to MSCS's withdrawal of funds, which only resulted from an OTS directive requiring the withdrawal.[32]  AR 5.  The Seizure Order also noted that two of the "remaining depositors" would have the *right* to withdraw their funds in future.  AR 5.  The Seizure Order did not assert that the depositors would invoke that right; indeed, it conceded that these depositors "ha[d] indicated its willingness to retain its deposits at the [Bank]."[33]  AR 5.[34]  Finally, the OTS believed that two of the Institutional Depositors were likely to withdraw because the Bank's recent recapitalization efforts had been unsuccessful in the view of the OTS.  AR 5.

*Third,* the OTS declared that the Bank was operating in an "unsafe and unsound condition," as defined by a twenty-year old case from the Tenth Circuit.  AR 6 (citing *Franklin Sav. Ass'n v. OTS*, 934 F.2d 1127, 1145 (10th Cir. 1991)).  This finding rested principally on the Bank's relationships with the Institutional Depositors.  AR 6.  While (again) not actually suggesting that the depositors would present an immediate liquidity risk, the Seizure Order worried that "viability of [the Bank] rest[ed] on the decisions of the institutional depositors."  AR 6.  The Seizure Order also listed, without discussion, a variety of other purportedly unsafe and unsound practices and conditions; these practices and conditions largely restated the OTS's concerns over the Bank's capital and liquidity.  AR 6.

On a Friday night, the Seizure Order appointed the FDIC as receiver.  AR 7.  The FDIC

---

[32]   MSCS was required by the OTS to withdraw funds because of new restrictions on the Bank's ability to accept employee plan benefits.  AR 2242-43.  This withdrawal would not have occurred had the OTS not issued the directive forcing the Bank's total risk-weighted capital to drop to 7.8%.

[33]   The Order remarked that this "willingness" was "based on the Savings Bank obtaining additional capital in the near term."  AR 5.  The OTS apparently was referring here to certain boilerplate language in two letters submitted by the depositors to the Bank.

[34]   In direct contradiction of this statement, the S-Memo states that "recent communications from several of these depositors suggest that, in the immediate future, the [Bank] is likely to experience substantial deposit withdrawals."  AR 24.  Nothing in the record or Defendants' responses to the Court-approved discovery evidences any such communications with the Institutional Depositors.

promptly entered into a purchase and assumption agreement transferring the Bank's assets and

deposit accounts (including all of the Institutional Depositor accounts) to First-Citizens Bank &

Trust Company ("First Citizens").[35]   First Citizens would control the Bank's operations by

Monday morning.   It would go on to close four of United Western's former branches[36] while

enjoying a $65.5 million acquisition gain from the Bank's seizure.[37]   Meanwhile, the FDIC

estimated that it would suffer a $312.8 million loss to the Deposit Insurance Fund.[38]

## STANDARD OF REVIEW

United Western brought this action under FIRREA's judicial review provision, which

directs that "the court shall upon the merits dismiss such action or direct the Director to remove

[a] … receiver."[39]   "[T]he weight of the authority indicates that this review should ordinarily be

confined to the administrative record as in an ordinary [Administrative Procedure Act ("APA")]

case."[40]   Likewise, the APA standard of review would apply.[41]   Thus, the Bank's motion for

summary judgment should be treated like one brought in an "ordinary APA case."[42]

In the typical APA case, "the district judge sits as an appellate tribunal."[43]   Therefore,

Federal Rule of Civil Procedure 56 "doesn't apply due to the limited role of a court in reviewing

---

[35]   *See* Press Release, Federal Deposit Insurance Corporation, First-Citizens Bank & Trust Company, Raleigh, North Carolina, Assumes All of the Deposits of United Western Bank, Denver, Colorado (Jan. 21, 2011), *available at* http://www.fdic.gov/news/news/press/2011/pr11013.html.

[36]   Heather Draper, *First Citizens Banks on Failures: North Carolina Bank Has Been Buying Up Assets of Failed Banks in Colorado*, Denver Bus. J. (July 15, 2011), *available at* 2011 WLNR 14104005.

[37]   *See* Press Release, First Citizens Reports Earnings for First Quarter 2011 (Apr. 25, 2011), *available at* https://www.firstcitizens.com/meet-first-citizens/news-awards/news/20110425-earnings-first-quarter-2011/.

[38]   The estimate may be incorrect.   *See generally* U.S. Government Accountability Office, *Federal Deposit Insurance Corporations Funds' 2011 and 2010 Financial Statements* (2012), *available at* http://www.gao.gov/products/GAO-12-416.http://www.gao.gov/products/GAO-12-416.

[39]   *See* 12 U.S.C. § 1464(d)(2)(B).

[40]   *United Western Bank v. OTS*, No. 11-0408 (ABJ), 2012 WL 601030, at *3 (D.D.C. Feb. 24, 2012).

[41]   *Gibraltar Sav. v. Ryan*, 772 F. Supp. 1290, 1292 (D.D.C. 1991); *see also James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1094-95 (D.C. Cir. 1996) (applying APA standard of review to case challenging appointment of FDIC receiver); *Vensure Fed. Credit Union v. Nat'l Credit Union Admin.*, 798 F. Supp. 2d 1, 4 (D.D.C. 2011) (reviewing appointment of NCUA conservatorship under arbitrary and capricious standard).

[42]   *United Western*, 2012 WL 601030, at *3.

24

the administrative record."[44]  Summary judgment becomes merely a "mechanism for deciding, as

a matter of law, whether the agency action is supported by the administrative record and

otherwise consistent with the APA standard of review."[45]

The APA standard of review is a familiar one: the OTS's decision must be set aside if it

was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[46]

Although this standard does not empower the Court "to substitute its judgment for that of the

agency," the Court still must conduct "a thorough, probing, in-depth review" of the OTS

decision.[47]  In particular, the Court must consider whether the OTS acted within the scope of its

legal authority, whether it adequately explained its decision, whether the facts the OTS

supposedly relied upon have some basis in the record,[48] and whether the OTS considered all

relevant factors.[49]

Under APA review, the Court should not defer to the OTS's "conclusory or unsupported

suppositions."[50]  And in this context—the seizure of private property as one of the last acts of a

federal agency soon to be dissolved for its failure to be an effective regulator—searching judicial

review is especially appropriate.  Indeed, in passing FIRREA and granting the OTS the

receivership power, Congress expressly provided for *meaningful* judicial review.  Meaningful

review is all the more important where, as here, a government agency is permitted to strip private

---

[43]   *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

[44]   *Catholic Health Initiatives—Iowa, Corp. v. Sebelius*, No. 10-cv-411 (RCL), 2012 WL 255275, at *5 (D.D.C. Jan. 30, 2012).

[45]   *Whidden Mem'l Hosp. v. Sebelius*, No. 09-2231 (JEB), 2011 WL 6189474, at *6 (D.D.C. Dec. 14, 2011).

[46]   5 U.S.C. § 706(2)(A).

[47]   *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971).

[48]   "If the agency's holding is based on factual analysis, the court will set it aside only if the holding is unsupported by 'substantial evidence.' The substantial-evidence test requires enough evidence that a reasonable mind might accept as adequate to support the conclusion of the agency."  *Beverly Enters., Inc. v. Herman*, 130 F. Supp. 2d 1, 12-13 (D.D.C. 2000).

[49]   *Penobscot Indian Nation v. U.S. Dep't of Hous. & Urban Dev.*, 539 F. Supp. 2d 40, 47 (D.D.C. 2008).

[50]   *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010).

citizens' of their property *ex parte* and auction it off to whomever wants it.[51]

## ARGUMENT

The issue in this case is not whether the Acting Director of the OTS could, as a general matter, seize a savings and loan association.  Obviously, he could.  Rather, the question here is whether the Acting Director must have provided genuine, supportable, statute-based reasons for doing so.  He must.  Congress' command to the OTS was plain: before seizing a bank, the agency must determine that at least one statutory ground exists.[52]  The Seizure Order sets forth three unsupported and conclusory grounds for the seizure; none is defensible.  Accordingly, the decision must be reversed.

## I.   The OTS Arbitrarily and Capriciously Denied the Bank's Capital Restoration Plan.

The Seizure Order asserts that the Bank failed to submit a CRP "acceptable to the OTS within the prescribed timeframe."  AR 7.  But the OTS's "prescribed timeframe" was fundamentally unreasonable.  What is more, the Bank *met* this unreasonable deadline and submitted an acceptable $200 million CRP.  The OTS nevertheless rejected this reasonable plan without making any effort to work with the Bank to address any legitimate regulatory concerns.  Such acts hardly reflect reasoned decisionmaking.

### A.   The OTS Unreasonably Demanded a Plan Within Just Seven Short Days.

The OTS did not provide the Bank with "reasonable time" to submit its CRP.  The Bank was entitled to such time by law.  The Court can overturn an agency's decision "taken 'without observance of procedure required by law.'"[53]  It should do so here.

When a financial institution is deemed "undercapitalized," it must submit "an acceptable

---

[51]   *Cf. Olympic Fed. Sav. & Loan Ass'n v. OTS*, 732 F. Supp. 1183, 1191 (D.D.C. 1990) (finding judicial review of OTS Director's appointment authority was especially appropriate in light of "awesome" appointment power and obvious "irreparable injury").

[52]   12 U.S.C. § 1464(d)(2)(A).

capital restoration plan" to its regulator.[54]  Among other things, this plan must outline (i) the

steps the institution is taking to raise its capital back to "adequate" levels, (ii) the levels of capital

the institution plans to reach each year during the plan, (iii) how the institution will comply with

other restrictions and requirements imposed on undercapitalized institutions, and (iv) the kinds of

activities the institution plans to engage in.[55]  The plan also must be built on "realistic

assumptions" and cannot "appreciably increase" the risk to the institution.[56]

Because it is a significant task to draft a CRP incorporating all of these elements,

Congress instructed that an institution must be given "reasonable time" to do it.[57]  What

constitutes a reasonable time is a question of law for this Court[58] and an issue for which the

agency receives no deference.[59]  As a general matter, though, a "reasonable" time would be

enough time that is "fair, proper, and moderate under the circumstances."[60]  It was Congress'

---

[53]  *Penobscot Indian Nation*, 539 F. Supp. 2d at 47 (quoting 5 U.S.C. § 706(2)(D)).

[54]  12 U.S.C. § 1831*o*(e)(2)(A).

[55]  *Id.* § 1831*o*(e)(2)(B).

[56]  *Id.* § 1831*o*(e)(2)(C).

[57]  *Id.* § 1831*o*(e)(2)(D)(i).

[58]  *Cf. Reed Research, Inc. v. Schumer Co.*, 243 F.2d  602, 604 (D.C. Cir. 1957) ("[W]hat is a reasonable time, is a question of law for the court."); *Radio Condenser Co. v. Coe*,  75 F.2d 523, 524 (D.C. Cir. 1934) ("[T]he question whether the application was made within a reasonable time is, in most, if not in all, such cases, a question of law for the court."); *accord In re B. & R. Glove Corp.*, 249 F. 372, 379-80 (2d Cir. 1922) (listing cases establishing that "[t]he question of what is a reasonable time within which an act can be done is generally a question of law for the court").

[59]  *See Beverly Enters.*, 130 F. Supp. 2d at 13 ("If the agency's finding concerns a purely legal question, … the court reviews the finding *de novo* to ensure the agency does not exceed its authority.").  Moreover, because the "reasonable time" requirement falls within the Federal Deposit Insurance Act ("FDI Act"), the OTS is not entitled to deference under *Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  "When a statute is administered by more than one agency, a particular agency's interpretation is not entitled to *Chevron* deference."  *Proffitt v. FDIC*, 200 F.3d 855, 860 (D.C. Cir. 2000) (explaining that the FDIC's interpretation of the FDI Act was not entitled to deference); *Wachtel v. OTS*, 982 F.2d 581, 585 (D.C. Cir. 1993) (holding OTS interpretation of FDI Act was not entitled to deference).

[60]  *Black's Law Dictionary* 1293 (9th ed. 2004) (defining "reasonable"); *cf. Armenian Assembly of Am., Inc. v. Cafesjian*, 772 F. Supp. 2d 20, 124 (D.D.C. 2011) ("What constitutes a reasonable time for performance [of a contract] depends on the circumstances of each case."); *Evans v. Fenty*, 701 F. Supp. 2d 126, 157 (D.D.C. 2010) ("What constitutes 'reasonable time' for a filing under Rule 60(b)) depends on the facts of each case.").

evident expectation that this reasonable time would "generally" be 45 days.[61]  OTS regulations

also provide that an undercapitalized bank ordinarily has 45 days to submit a CRP.[62]

The OTS did not grant United Western the usual 45-day period to complete a CRP.

Instead, on December 13, the agency ordered the Bank to file a CRP by December 20.  AR 1441.

*Id.*  The OTS remarked that it had unilaterally "shorten[ed] the time to file" the plan because of

an unspecified "unsafe and unsound condition." [63]  AR 1441.  Giving the Bank only seven[64] short

days to act—more than a month shorter than the presumptive time—did not give the Bank

"reasonable time" to file its CRP.  The OTS's decision was hardly fair, proper, or moderate on its

face, given the task faced by the Bank in preparing the CRP.  In just one week's time, the Bank

was required to undertake significant financial analyses and make financial projections that

would shape the Bank's business for years to come.  It was further required to lay out a plan for

compliance with a variety of agency directive and requirements.  And in doing all this, it was

forced to balance the (sometimes competing) interests of customers, shareholders, and regulators

to develop a plan acceptable to all.  It was no "reasonable" undertaking to do all this in half a

fortnight.  It is all the worse that the agency dispensed with the congressionally presumed

reasonable time without any reasoned explanation for doing so.  Of course, "[w]here the agency

has failed to provide a reasoned explanation" for its action, the court "must undo its action."[65]

---

[61]   12 U.S.C. § 1831*o*(e)(2)(D)(i) (explaining CRP should generally be submitted "not later than 45 days after the institution becomes undercapitalized"); *cf. In re Bourguignon*, 416 B.R. 745, 753 (Bankr. D. Idaho 2009) ("If 'not later than' is followed by a number of days 'after' an event, then the requirement must occur within that time frame, and the term 'not later than' establishes the last day for an action to occur.").

[62]   12 C.F.R. § 565.5(a)(1); *see also* Prompt Corrective Action; Rules of Practice for Hearings, 57 Fed. Reg. 44866, 44868 (Sept. 29, 1992) (indicating that regulations were intended to require submission of a CRP "generally within 45 days").

[63]   While a CRP addresses a bank's capital, ostensibly the OTS was concerned about the Bank's liquidity position, which would not be addressed by increased capital.  A concern about the Bank's liquidity position does not support materially truncating the statutory time period for submission of a plan to augment bank capital.

[64]   The CRP was also due just twelve days from the filing of the report indicating the Bank's undercapitalized status.  AR 1441.

[65]   *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999).

And were that not enough, the agency's choice to dispense with the statutory deadline was

inconsistent with its treatment of other undercapitalized institutions that received the ordinary 45

days.[66]  This *ad hoc* rule change cannot stand.

> **B.      The OTS Arbitrarily Rejected the Bank's Plan to Recapitalize With $200 Million in Outside Investment.**

Even assuming that the OTS provided the Bank with sufficient time to submit its CRP,

the agency's decision to reject it was arbitrary and capricious.  A close reading of the OTS's

"grounds" for rejection reveals that none of them passes muster.[67]  The Bank's plan, based on the

pending $200 million Recapitalization Transaction, should have been accepted.

*Institutional Depositor Issues.*  The OTS argued that the CRP increased the risk to the

Bank because it anticipated an increase in the number of institutional deposits.  AR 4124.  This

increase, the OTS said, increased "concentration risk."  AR 4124.  As explained below, the

Institutional Depositors did not pose a threat to the Bank.  The Bank was entirely justified in

relying on such deposits, as the OTS had allowed it to do for many years before.  But regardless,

the agency misinterpreted the CRP: it did not anticipate a relevant rise in the level of institutional

deposits.  Although the CRP projected an increase in the *absolute dollar amount* of these

deposits, it projected that the *percent* of institutional deposits (of the Bank's total deposits)

would drop from approximately 74.6% in September 2010 to 69.4% in December 2013.  AR

1491.  As reflected by the agency's repeated reliance on percent figures in its own assessments

of the Institutional Depositors, these percent figures best capture the purported liquidity risk.

*Investment Agreement.*  The OTS also criticized the Bank for "unreasonably assum[ing]"

---

[66]   "A sometime[s]-yes, sometimes-no, sometimes maybe policy of deadlines cannot be squared with [the court's] obligation to preclude arbitrary and capricious management of an agency's mandate." *Green Cnty. Mobilephone, Inc. v. FCC*, 765 F.2d 235, 237 (D.C. Cir. 1985).

[67]   These grounds are found in the agency's letter to the Bank on January 18, 2011.  AR 4123-27.  The letter was incorporated by reference into the Seizure Order.  AR 4 n.7.

that it would be able to secure the roughly $100 million in additional funding anticipated by the

Investment Agreement.  AR 4124.  But as the OTS admitted, the Bank had "identified … several

potential Additional Investors."  AR 4124.  These investors were serious and substantial.  Three

investors willing to invest up to $71.5 million had started document review by January 10, 2011.

AR 1801.  Three other investors had offered serious expressions of interest; these investors

represented an additional $52 million in investment.  AR 1801.  Three more investors had also

commenced due diligence, adding an additional $15 million to the investment pool.  AR 1801.

Before January 21, many of these investors did in fact sign commitments totaling $77.5 million.

AR 4192-4225.  And on the morning of January 21, the Bank informed the OTS that UW

Bancorp had secured at least the $200 million in commitments necessary to complete the

Recapitalization Transaction.  AR 4203.

The OTS nevertheless dismissed the committed investors as inconsequential merely

because they had not signed agreements sufficient to appease the agency.  That was asking too

much: neither the statute nor the OTS's regulations demand that level of proof.[68]  And, of course,

the CRP was merely a snapshot in time (as of December 20), which did not reflect the high level

of subsequent commitments to the Recapitalization Transaction.

In a related ground, the OTS refused to believe that the Anchor Investors would waive

certain closing conditions included in the Investment Agreement, including OTS approval of the

Bank's Revised Business Plan.  AR 4125.  Here again, the agency was speculating about

business relationships that it did not understand.  Unlike the OTS, the Bank had spoken with the

Anchor Investors.  It understood their position and their commitment to the transaction.  The

Bank had already informed the OTS, for instance, that the Anchor Investors had agreed to waive

---

[68]   *See* 12 U.S.C. § 1831*o*(e)(2) (requiring only that a CRP "specify" certain information and that it be built on
"realistic assumptions," and that it not "appreciably increase" a bank's risk).

various closing conditions and were prepared to amend the Investment Agreement accordingly.[69]

AR 1185-90.  The Bank also had provided a list of each closing condition to the OTS and, in a

line-by-line analysis, explained which conditions would need to stay or go.  But in an act of

purposeful obtuseness, the agency nevertheless claimed the Bank asserted that conditions could

be waived "without support or explanation."  AR 4125.  The agency indicated that the Bank's

submission had only "suggested" that some conditions could be waived.  AR 4125 n.2.  A simple

review of the Bank's submission to the OTS shows that is not so, AR 1185-90, and the agency

should have addressed the Bank's representations that the Anchor Investors would waive the

conditions.  Instead, the OTS ignored them.[70]  The agency also complicated the process of

obtaining waivers of additional closing conditions through its own actions.  Though the Bank

stressed that it could only obtain such concessions from the Anchor Investors if the OTS

explained what conditions needed to be waived, the OTS refused to provide further guidance.

AR 4190, 4192.

 *Increased Assets.*  In another ground, the OTS expressed concern over the Bank's

anticipated growth in total assets.[71]  AR 4124-25.  The CRP rejection letter noted the Bank's

condition and seemed to assume that asset growth is *per se* destructive, AR 4124, but it did not

explain the basis for that assumption.  The assumption is unfounded.[72]  To be sure, a bank that

---

[69] In fact, the Anchor Investors had indicated that the Revised Business Plan's approval would be removed as a closing condition.

[70] *See Mudd v. Caldera*, 26 F. Supp. 2d 113, 120-23 (D.D.C. 1998) (explaining that an agency must address non-frivolous grounds).  The OTS also noted that the Bank had not filed a formal Form 8-K indicating that an amendment had occurred.  Once more, the OTS demanded a form of proof that is not required by the statute or the relevant regulation.

[71] These two concerns formed the basis for the OTS's refusal to remove the "meet and maintain" requirement in the Bank's Cease and Desist Order (*i.e.*, the second ground for rejection of the CRP) and the OTS's rejection of the Bank's revised business plan (*i.e.*, the fourth ground for rejection of the CRP).  *See* AR 4124-25, 4158.

[72] *See, e.g.*, Helen A. Garten, *Whatever Happened to Market Discipline of Banks?*, 1991 Ann. Surv. Am. L. 749, 780-81 (1991) ("A study of 531 undercapitalized banks in the late 1980s found that only 16 percent had rates of asset growth in excess of 10 percent.  The survival rate for undercapitalized banks that tried to grow out of their problems was roughly equal to that of undercapitalized banks that pursued more conservative policies.").

simply attempts to add additional assets into a failing institution might end up exacerbating the problem.  But the OTS did not suggest that United Western was engaged in this kind of reckless growth.  Common sense dictates that a bigger bank is not in all cases a weaker bank, and the OTS effectively admitted as much in approving $193 million in asset growth at the Bank during the last quarter of 2010.  AR 1738.  Nevertheless, the OTS failed to provide any explanation for why the Bank's proposed growth was inevitably harmful.  This absence of reasoning is particularly inexplicable given that the asset growth would have only occurred *after* the Bank was returned to well-capitalized status via the Recapitalization Transaction.

*The Legent Purchase*.  The OTS further attacked the Bank's CRP for assuming "unreasonably" that the OTS would accept the Bank's application to acquire Legent as an operating subsidiary.  AR 4125.  The Bank was forced to speculate about the prospects for the Legent application's success because of the regulators' months-long delay in deciding it.  As of the submission of the CRP, the application remained pending, as the agencies had refused to move forward with any expeditious review.  *See, e.g.*, AR 1114 (November 5 letter imploring the agencies to move forward on the Legent application).  In the meantime, the OTS sent a series of repetitive information requests to the Bank that delayed finalization of the Bank's application. At least one of these requests was, under the agency's own regulations, untimely.[73]  *See* AR 2855-58; AR 3002-06; AR 4038-41; AR 2533.  This delay was especially consequential in this case, as the Legent application and the CRP were denied on the same day.  Had the OTS issued its decision regarding Legent even one day before the CRP denial, then the Bank could have

---

[73]   When an institution provides supplemental information upon the OTS's request, the OTS must respond within 15 days if it wants more.  *See* 12 C.F.R. § 559.11 (explaining "standard treatment" procedures apply to operating subsidiary applications raising "supervisory concerns, or raises significant issues of law or policy"); 12 C.F.R. § 516.220(a)(1)(ii) (instructing that the OTS will notify an institution within 15 days that it wants additional information).  Here, however, the OTS requested additional information on December 6, 2010, a full 19 days after the Bank's submissions.

revised its CRP to reflect new assumptions following the rejection.  Instead, the agency kept the

Bank in the dark and punished it for guessing wrong.  Then, the OTS did not even bother to give

United Western a chance to submit a revised CRP after the denial, a right contemplated by the

agency's own regulations.[74]

*Holding Company Guarantee.*  Finally, in a last effort to justify the CRP denial, the OTS

contended that the Holding Company did not submit an "acceptable guarantee."  AR 4125.

When an institution becomes undercapitalized, the institution's holding company must guarantee

that "the institution will comply with the plan until the institution has been adequately capitalized

on average during each of 4 consecutive calendar quarters."[75]  The Holding Company submitted

a lawful guarantee, AR 1528-29, but the OTS was disappointed because it "expect[ed]" the

Holding Company to execute what it claims is a standard form guarantee drafted by the agency,

AR 4125.  This expectation, however, is nowhere to be found in the relevant statute or the OTS's

regulations.  Indeed, this rigid "expectation" is contrary to (i) the agreement of all the regulators

that the terms of a CRP guarantee should not be a set standard applicable to every case;[76] and (ii)

the actual practice of regulators of using different types of guarantees.[77]  Moreover, the OTS did

not submit its "standard form" guarantee to the Office of Management and Budget for approval,

so the Paperwork Reduction Act instructs that the Bank cannot be punished for failing to use it.[78]

---

[74]   *See* 12 C.F.R. § 565.5(d) ("If a capital restoration plan is not approved by the OTS, the savings association shall submit a revised capital restoration plan, when directed to do so, within the time specified by the OTS.").

[75]   12 U.S.C. § 1831o(e)(2)(C)(ii).

[76]   *See* Prompt Corrective Action; Rules of Practice for Hearings, 57 Fed. Reg. 44866, 44879 (Sept. 29, 1992)  ("At this time, the agencies agree with the commenters that the adequacy of a capital guarantee and of the assurances of performance should be determined on a case-by-case basis in connection with an agency's review of capital restoration plans, and not by regulation.").

[77]   *See, e.g.,* Office of the Comptroller of the Currency, *An Examiner's Guide to Problem Banks: Identification, Rehabilitation, and Resolution* 115-18 (2001) (providing sample OCC guarantee), *available at* http://www.occ.treas.gov/publications/publications-by-type/other-publications-reports/prbbnkgd.pdf.

[78]   44 U.S.C. § 3512(a) ("[N]o person shall be subject to any penalty for failing to comply with a collection of information that is subject to this subchapter if … the collection of information does not display a valid control number assigned by the Director in accordance with this subchapter."). *See also Action Alliance of Senior*

In short, the form of guarantee is not an appropriate basis for rejecting a CRP.

In any event, the guarantee submitted by the Bank complied with the statutory requirements.  Though the OTS took issue with the guarantee's definition of "available assets," holding companies are not required (under the statute or the regulations) to provide particular types of assets in support of a guarantee.  Instead, the statute speaks only to the amount of assets that back a guarantee.[79]  The OTS also criticized the two provisions in the termination clause of the guarantee.  One of those provisions—termination if the Holding Company gave up control of the Bank—is supported by the relevant statute itself, which bars any liability on a guarantee for any company not actually controlling the bank.[80]  The other provision—termination of the guarantee upon termination of the CRP—captures a simple idea: the Holding Company cannot "guarantee" compliance with a CRP that is not in force.  Likewise, the Holding Company's willingness to guarantee only those matters within its control was perfectly understandable; a party's guarantee of a matter beyond his control is nothing more than a reckless wager.

Quite simply, there was no basis for the OTS to reject the Bank's CRP.  It was timely submitted and satisfied all statutory standards.  It should have been accepted.

## II.    The OTS Imagined a Liquidity Crisis at the Bank.

The Seizure Order wrongfully concluded that the Bank faced a liquidity crisis because of its relationships with the Institutional Depositors.  First, that conclusion was an unexplained and

---

*Citizens of Greater Philadelphia v. Sullivan*, 930 F.2d 77, 79-80 (D.C. Cir. 1991) (explaining the reach of the Paperwork Reduction Act).

[79]    The statute only says that the liability of the holding company should be limited to the lesser of 5% of an *undercapitalized bank's* assets—not the holding company's—or the amount that would be needed to adequately capitalize the bank.  *See* 12 U.S.C. § 1831*o*(e)(2)(E)(i).  If the OTS had accepted the guarantee and later found the Holding Company's assets wanting, it could have subjected the Bank to the same disciplinary action available when the agency rejected the Bank's plan at the outset.  *See* 12 C.F.R. § 565.5 (describing the consequences of a holding company's failure to honor a guarantee).

[80]    *See* 12 U.S.C. § 1831*o*(e)(2)(E)(ii)(I) ("This paragraph [governing guarantees] may not be construed as … requiring any company not having control of an undercapitalized insured depository institution to guarantee, or otherwise be liable on, a capital restoration plan.").

unsubstantiated reversal of the OTS's policy for more than a decade.  Second, the record lacks

any indication that these long-standing depositors posed any new, immediate threat to the Bank.

> **A.    The OTS Reversed Its Prior Policy Concerning the Institutional Depositors for No Discernible Reason.**

As the OTS put it: "The Institution's deposits [had] been concentrated in a small number

of institutional depositors for several years.  In several previous examinations, OTS did not

object to the concentration."  AR 12.  The OTS engaged in more than silent acceptance.  As a

federal banking regulator, it was intimately involved in the Bank's affairs.  It undertook frequent

examinations of the Bank's business, AR 55, and did not hesitate to raise matters of concern.

The agency recognized that the Institutional Depositors were a significant part of the Bank's

business and accounted for that in its examinations.  AR 55.  Nevertheless, the agency never

once suggested that the Bank take a different course.  It was only shortly preceding the seizure

that the OTS suddenly came to believe that "there [was] an unacceptable risk that institutional

depositors may withdraw their deposits in the near term."  AR 7.

The Seizure Order does not explain why the agency switched its position and determined

that the Institutional Depositors presented a sudden liquidity danger.  That failure alone should

doom the Acting Director's decision.  "When there is a contemporaneous explanation of the

agency decision, the validity of that action must stand or fall on the propriety of that finding."[81]

Thus, the Court should look only to the Seizure Order to supply relevant reasoning.  The Seizure

Order did not address the switch.  It reflects no awareness on the part of the Acting Director that

he was reversing the agency's position.  Such an unexplained change is "not acceptable"[82] and is

---

[81]    *Sierra Club v. Costle*, 657 F.2d 298, 392 (D.C. Cir. 1981).

[82]    *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010).

the very essence of an arbitrary and capricious act.[83]

Even were the Court inclined to give the agency the benefit of the doubt by looking beyond the Seizure Order, there would still be no reasoned explanation to be found.  The closest thing to an explanation comes in the so-called "L-Memorandum," which remarks:

> [T]he recent financial crisis, the Institution's asset quality problems and attendant losses, and the risk that most of these institutional depositors may withdraw their deposits on relatively short notice, has led OTS staff to conclude that the Institution's concentration of deposits presents unacceptable risks.

AR 12.  "Conclusory explanations," like these, "do not suffice to meet the deferential standards of [the Court's] review," especially where such explanations go directly to "matters involving a central factual dispute."[84]  A cursory review of the OTS's "reasons" reveals they are inadequate. For instance, the vague allusion to the "recent financial crisis" does not explain how United Western's particular circumstances had changed.  Nor is it clear how losses the Bank suffered on MBS, which would be removed from the Bank upon the closing of the Recapitalization Transaction, would drive long-standing depositors away who had always had the right to withdraw their funds under certain controlled conditions.[85]  Moreover, the explanation in the L-Memo directly contradicts the agency's conclusion, less than two weeks prior, that "the institutional depositors were unlikely to immediately withdraw significant amounts of funds." OCC-UWB 00793.

---

[83]   *See, e.g.*, *Republic Airline Inc. v. U.S. Dep't of Transp.*, 669 F.3d 296, 299 (D.C. Cir. 2012) ("One of the core tenets of reasoned decision-making is that an agency when changing its course is obligated to supply a reasoned analysis for the change."); *Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n*, 628 F.3d 568, 579 (D.C. Cir. 2010) ("As a general matter, … an agency is free to alter its past rulings and practices even in an adjudicatory setting. ... However, it is equally settled that an agency must provide a reasoned explanation for any failure to adhere to its own precedents."); *Jicarilla Apache Nation*, 613 F.3d at 1119 ("[R]easoned decision making ... necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously.").

[84]   *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010).).

[85]   To the extent that the agency contended that circumstances had changed because of the Bank's undercapitalized status, that contention is belied by the record evidence showing no intention by the Institutional Depositors to leave for that reason.

Lastly, the agency did not consider—at all—the Bank's "serious reliance interests" in the OTS's previous acceptance of the Institutional Depositor relationships.[86]   The Bank built its business model around the Institutional Depositors.  With the full endorsement of the OTS, it had developed a special expertise that enabled it to compete for business in a way unique to other depository institutions.  If the OTS truly had good reasons to reverse its earlier policy, it was required to provide notice to the Bank and should have worked with the Bank to reduce those deposits in a restrained, orderly, and non-detrimental fashion.  Instead, it insisted on a rash, immediate, and unachievable reversal in the Bank's fundamental business model.[87]

### B. There Was No Likelihood Whatsoever That the Institutional Depositors Would Withdraw.

In addition to ignoring its own prior position, the OTS also arbitrarily and capriciously ignored the evidence.  In concluding that the Institutional Depositors were likely to withdraw, the OTS imagined a risk that was not there.  The Institutional Depositors—excepting the one required by an OTS directive to leave—were staying.  AR 4192.

The OTS could justify seizing the Bank on this ground if the risk of Institutional Depositor withdrawal rendered the Bank "likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business."[88]  Thus, the OTS would need to establish two elements: (i) that the Institutional Depositors were in fact likely to withdraw; and (ii) that their withdrawal would result in the Bank likely being unable to pay out on deposits or other

---

[86]   *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009) (explaining that an agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "its prior policy has engendered serious reliance interests that must be taken into account").

[87]   *See E. Carolinas Broad. v. FCC*, 762 F.2d 95, 101 (D.C Cir. 1985) ("[T]he lack of administrative exercise imposes on the agency some obligation to protect the parties before it, where possible, from the consequences of their reliance upon its earlier practice.  Specifically, abrupt changes in discretionary agency practice or interpretation require some degree of notice, if possible, when the change threatens to penalize parties for reasonable reliance on the prior practice.").

[88]   12 U.S.C. § 1821(c)(5)(F).

obligations.  At a minimum, something is generally "likely" when it is more probable than not.[89]
It is more than a mere possibility.[90]

The OTS's analysis stumbles at the first step: the record does not indicate any "likely"
withdrawal by any of the Institutional Depositors,[91] let alone a "likely" simultaneous withdrawal
of the two largest ones.  Even treating the agency's decision with deference, there was nothing
more than the slim chance of withdrawal.  The Seizure Order admits as much by anticipating
only a "*potential* severe liquidity strain."  AR 6 (emphasis added).  Potential means only
"[c]apable of coming into being; possible,"[92] not likely.

The facts show the same.  The Institutional Depositors of course had a *right* to remove
their deposits (subject to the terms of their respective agreements with the Bank), much like any
other depositor at every other bank.  Still, all the relevant circumstances suggested that they were
not going to invoke that right.  The substantial history between these depositors and the Bank,
AR 387-92, is one reason to doubt any argument that they were ready to run.  Most of the
Institutional Depositors had been customers of the Bank for many years and through significant

---

[89]   *See, e.g.*, *United States v. Powell*, 761 F.2d 1227, 1239 n.2 (8th Cir. 1985) ("Both the common understanding of
the term and its use in a legal context compel the conclusion that "likely" means "probable"—both terms
referring to a greater than 50% chance that something will occur."); *Scharff v. Wyeth*, No. 2:10–CV–220–WKW
[WO], 2011 WL 4361634, at *18 n.28 (M.D. Ala. Sept. 19, 2011); *Winnemucca Indian Colony v. United States
ex rel. Dep't of the Interior*, No. 3:11–cv–00622–RCJ–VPC, 2011 WL 4377932, at *4 (D. Nev. Sept. 16, 2011);
*United States v. Phillips*, No. H-04-512, 2010 WL 1544297, at *1 (S.D. Tex. Apr. 19, 2010) (defining "likely"
as "more probable than not"); *Wieland-Werke AG v. United States*, 525 F. Supp. 2d 1353, 1361 (Ct. Int'l Trade
2007) ("Although the word 'likely' is not defined in either [of two statutes], its meaning is not ambiguous.");
*United States v. Nelson*, 921 F. Supp. 2d 105, 121 & n.7 (E.D.N.Y. 1996) (defining "likely" as a probability
greater than fifty percent).

[90]   *See, e.g.*, *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008) ("We have
interpreted likely confusion to mean more than the theoretical possibility of confusion."); *NSK Corp. v. United
States*, 712 F. Supp. 2d 1356, 1361 n.3 (Ct. Int'l Trade 2010) ("The term 'likely' means 'probable' or 'more
likely than not,' and requires more than mere possibility."); *Platte River Ins. Co. v. Baptist Health*, No.
4:07cv0036 SWW, 2009 WL 2015102, at *12 n.19 (E.D. Ark. Apr. 17, 2009) ("[S]tating that something 'may'
happen is 'used to express possibility,' which common sense dictates is less certain or forceful than something
that is 'likely' to happen, 'likely' being defined as 'probably or apparently destined' or 'seeming like truth, fact,
or certainty.'").

[91]   This excludes, of course, the withdrawal by MSCS, which was mandated by law.

[92]   *Black's Law Dictionary* 952 (7th ed. 2000).

market disruptions.[93]  They valued the Bank for its expertise—an expertise that they believed would be difficult to find elsewhere. The history did not stand alone, as many of the Institutional Depositors had signed written agreements reflecting their commitment to United Western.  *See, e.g.*, AR 1914-21.  Even as the OTS condemned their presence, they stayed with the Bank and reiterated their intention to keep their deposits intact.  AR 4192.

Still, the OTS barely addressed any of these facts; the historical context was entirely ignored, while the written agreements were mentioned and dismissed without analysis in the Seizure Order.  Instead, the OTS chose to rely on its own version of "anticipated events" and certain unidentified, unsupported "recent communications" from the Institutional Depositors. *See, e.g.*, AR 24.  Such unsupported conjecture is not enough for an agency to reject the conclusion dictated by the evidence.[94]

## III.    The OTS Arbitrarily and Capriciously Decided that the Viable, Stable Bank was Operating in an Unsafe or Unsound Condition.

In a final ground, the OTS simply lumped together many of the preceding grounds, added a few additional bits of information, and characterized the jumble as an "unsafe or unsound condition to transact business."  AR 6.  Most fundamentally, the agency erred in applying the wrong standard for an "unsafe or unsound practice."  But even if the agency had applied the correct standard, the agency's position would still be refuted by the facts before it.

### A.    The OTS Applied the Wrong Standard.

The Seizure Order incorrectly defines an "unsafe or unsound" condition.  To be sure, the relevant statutes do not define the term "unsafe or unsound."  The courts of this circuit, however,

---

[93]    "Judicial notice may be taken of historical, political, or statistical facts."  *United States v. Philip Morris USA Inc.*, No. Civ. A 99-2496(GK), 2004 WL 5355971, at *1 (D.D.C. Aug. 2, 2004).

[94]    *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 45 F.3d 481, 485-86 (D.C. Cir. 1995)) (admonishing an agency for failing to reject an explanation supported by the record based on the agency's speculation).

have.  In particular, the U.S. Court of Appeals for the D.C. Circuit has defined the term to mean a condition or practice that presents a reasonably foreseeable[95] undue risk to the institution.[96]

Rather than applying that definition, the Seizure Order attempted to define the term by relying upon a decision of the U.S. Court of Appeals for the Tenth Circuit.[97]  AR 6.  That court concluded that an unsafe or unsound practice is any practice that causes "unacceptable levels of risk to [the bank's] depositors' funds."[98]  The Tenth Circuit's decision falls in line with certain cases that broadly interpret unsafe or unsound conditions and practices to embrace *any* risk to an institution or shareholder, even if the risk does not pose a direct threat to the institution's financial viability.[99]

---

[95]   *Kaplan v. OTS*, 104 F.3d 417, 421 (D.C. Cir. 1997) (interpreting "unsafe or unsound" in the context of 12 U.S.C. § 1818(i)); *see also Landry v. FDIC*, 204 F.3d 1125, 1138 (D.C. Cir. 2000); *accord Gulf Fed. Sav. and Loan Ass'n v. Fed. Home Loan Bank Bd.*, 651 F.2d 259, 267 (5th Cir. 1981).

[96]   *Kaplan*, 104 F.3d at 421.

[97]   An agency must of course follow the law of the circuit having jurisdiction over the action.  *Johnson v. U.S. R.R. Retirement Bd.*, 969 F.2d 1082, 1090-91 (D.C. Cir. 1992); *accord Local 144, Hotel, Hosp., Nursing Home & Allied Servs. Union v. NLRB*, 9 F.3d 218, 221 (2d Cir. 1993); *Hyatt v. Heckler*, 807 F.2d 376, 379 (4th Cir. 1986) ("The separation of powers doctrine requires administrative agencies to follow the law of the circuit whose courts have jurisdiction over the cause of action.").  In this case, two courts of appeals could have exercised jurisdiction: the Tenth Circuit and the D.C. Circuit.  *See* 12 U.S.C. § 1464(d)(2)(B).  But this venue choice does not permit the agency to simply pick its preferred law.  Indeed, the National Labor Relations Board, an agency facing a similar provision splitting venue between this circuit and another "local" circuit, has garnered sharp criticism from the courts for doing just that.  *See, e.g.*, *Ithaca Coll. v. NLRB*, 623 F.2d 224, 228 (2d Cir. 1980); *Allegheny Gen. Hosp. v. NLRB*, 608 F.2d 965, 970 (3d Cir. 1979), *overruled on other grounds by St. Margaret Mem'l Hosp. v. NLRB*, 991 F.2d 1146, 1155 (3d Cir. 1993).  As the Fourth Circuit has put it, venue uncertainty might put the agency in a "difficult position," but it is no excuse to "flout" the law of the circuit.  *U.S. Dep't of Energy v. Fed. Labor Relations Auth.*, 106 F.3d 1158, 1162 n.8 (4th Cir. 1997), *abrogated on other grounds by Nat'l Fed'n of Fed. Emp., Local 1309 v. Dep't of Interior*, 526 U.S. 86 (1999); *see also* Steve Y. Koh, *Nonacquiescence in Immigration Decisions of the U.S. Courts of Appeals*, 9 Yale L. & Pol'y Rev. 430, 444 (1991) ("[Agency] decisions permitting intercircuit nonacquiescence may become intracircuit in nature as a result of a venue choice provision.").  The agency also did not invoke venue uncertainty in explaining its decision to use the Tenth Circuit standard, so it should not be permitted to argue that now.  *Johnson*, 969 F.2d at 1091-92.  And in any event, any attempt by the agency to argue that it chose the Tenth Circuit standard because United Western was a Colorado bank would be disingenuous; the agency routinely uses the Tenth Circuit standard, even in cases with no Tenth Circuit nexus.  *See, e.g.*, OTS Order No. 2011-29, 2011 WL 1468376, at *1 (Apr. 15, 2011) (applying Tenth Circuit standard to Alabama bank); OTS Order No. 2010-48, 2010 WL 3313201, at *1 (Aug. 20, 2010) (applying Tenth Circuit standard to California bank); OTS Order No. 2010-41, 2010 WL 2811658, at *1 (July 16, 2010) (applying Tenth Circuit standard to South Carolina bank); OTS Order No. 2010-43, 2010 WL 2811661, at *1 (July 16, 2010) (applying Tenth Circuit standard to Florida bank).

[98]   *Franklin Sav. Ass'n*, 934 F.2d at 1145.

[99]   *See, e.g.*, *First Nat'l Bank of Eden v. OCC*, 568 F.2d 610, 611 n.2 (8th Cir. 1978).

As the OTS and the FDIC have recognized in the past,[100] the D.C. Circuit's definition creates a higher threshold for an "unsafe or unsound" finding than the Tenth Circuit's.  The law of this circuit requires that the practice or condition in question have a direct—as opposed to distant—effect on the institution's financial stability.[101]  In other words, as one FDIC attorney has explained, "[a] significant distinction exists between a practice, that, if continued, could possibly threaten 'abnormal risk or loss or damage' and a practice that immediately threatens the financial integrity or soundness of the institution."[102]

In choosing the line of cases that offered a broader definition of "unsafe and unsound," the OTS contravened the applicable law in this case.[103]  "[A]n order may not stand if the agency has misconceived the law."[104]  Because the OTS failed to apply the correct standard, and never determined that the Bank's challenged activities posed a direct and reasonably foreseeable threat to the financial integrity of the Bank, the decision must be reversed.

## B.   The Bank was Operating in a Safe and Sound Condition.

Even if the OTS had applied the correct standard, its decision would still be an

---

[100]   Brief for the FDIC in Opposition, *Greene Cnty. Bank v. FDIC*, 117 S. Ct. 944 (1997) (No. 96-708), 1997 WL 33562074, at *9 ("Petitioner correctly observes … that other courts of appeals have adopted a higher threshold for a finding of unsafe or unsound banking practices than that applied by the FDIC and the Eighth Circuit in this case." (citing, *inter alia*, *Johnson v. OTS*, 81 F.3d 195 (D.C. Cir. 1996); *In re Keating*, No. AP 93-85, 1993 WL 724714, at *13 n.37 (OTS Jan. 29, 1991) ("The ALJ erroneously used the standard for 'unsafe and unsound' conduct set forth in [*Gulf Fed.*, 651 F.2d at 264], that additionally requires a reasonably direct effect on the institution's financial soundness.  The OTS has previously determined that the standard set forth in the *Saratoga* and *Eden* cases is the appropriate standard to apply."); *see also Greene Cnty. Bank v. FDIC*, 92 F.3d 633, 636 (8th Cir. 1996) (noting split amongst circuits over definition of unsafe and unsound)

[101]   *See Johnson v. OTS*, 81 F.3d 195, 204 (D.C. Cir. 1996) ("[T]he 'unsafe or unsound practice' provision … refers only to practices that threaten the financial integrity of the association." (citing *Gulf Fed.*, 651 F.2d at 267)).

[102]   Thomas L. Holzman, *Unsafe or Unsound Practices: Is the Current Judicial Interpretation of the Term Unsafe or Unsound?*, 19 Ann. Rev. Banking. L. 425, 438 (2000).

[103]   "The position of any administrative tribunal whose hearings, findings, conclusions and orders are subject to direct judicial review is much akin to that of a United States District Court, and as must a district court, an agency is bound to follow the law of the Circuit." *Ithaca Coll.*, 623 F.2d at 228.

[104]   *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *accord Sea–Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C.Cir.1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained where it is based not on the agency's own judgment but on an erroneous view of the law."); *Phillips Petroleum*

unjustifiable amalgamation of various contentions that do *not* support a bank's seizure.  Maybe

the agency believed that the whole would be greater than the sum of its parts.  "But in law as in

mathematics zero plus zero equals zero."[105]  And as explained above, not every unfavorable

aspect of a bank's operations will constitute an unsafe or unsound practice.  Unsafe or unsound

conditions must involve genuine, not speculative, threats to a financial institution.[106]  That was

not the case here.

    *First*, the "unsafe or unsound" determination in the Seizure Order evidentially relied on

the Institutional Depositor relationships five times over, alleging that the Bank: (i) had an

"unsafe and unsound concentration in institutional deposits"; (ii) operated "without adequate

liquidity"; (iii) operated "without an adequate liquidity plan," (iv) operated "without proper

regard for funds management," and (v) faced a "potential severe liquidity strain."  AR 6.

Because all these contentions depended on the same faulty premise that the Institutional

Depositors posed a liquidity risk to the Bank, they require no further discussion.  It suffices to

say here that the OTS had no basis for drawing conclusions that stemmed from incorrect and

uninformed assumptions about the Institutional Depositors' intent to withdraw deposits.

    *Second*, the Seizure Order continued by observing that Bank had "insufficient capital"

and "no realistic prospects for raising capital in the short term."  AR 6.  These factors seem to be

a crude attempt to justify the receivership with the Bank's undercapitalized status.  Yet the

agency again lost sight of the relevant standard.  Congress instructed that an undercapitalized

institution could be seized if there was "no reasonable prospect of [the institution] becoming

---

Co. v. FERC, 792 F.2d 1165, 1169 (D.C.Cir.1986) ("When ... the agency's decision is based on an erroneous view of the law, its decision cannot stand.").

[105] *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001).

[106] *Gulf Fed.*, 651 F.2d at 264 ("We fail to see how the Board can safeguard Gulf Federal's finances by making definite and immediate an injury which is, at worst, contingent and remote."); *cf. Inv. Co. Inst. v. FDIC*, 728

adequately capitalized."[107]  Congress did *not* demand immediate recapitalization.  Quite the opposite, the relevant statutes anticipate a longer time—otherwise, statutorily-mandated steps like the CRP would be largely meaningless.  A longer time horizon is especially appropriate where, as here, the Bank is far from hitting critically low levels of capitalization (and is short of the required capital level by a miniscule amount, like 0.2%).  Yet the Seizure Order did not contemplate longer timeframes; it seemed to believe that the Bank's recapitalization efforts would necessarily rise and fall with the Recapitalization Transaction.  Of course, that is an unduly narrow view of the Bank's capital prospects.  But regardless, the agency was incorrect in believing there were no short-term prospects, given the significant progress that was made by the Bank in consummating the Recapitalization Transaction.  AR 4190, 4192.

At bottom, this case simply does not involve the ordinary scenario of an "unsafe" or "unsound" institution that is teetering on the brink.  The Bank was not engaged in unlawful activities.  It was not taking highly speculative risks.  And it was not a "zombie bank" stumbling about with no capital to sustain it.  United Western was a bank that had confronted challenges from the financial crisis, but had taken sober steps—with the firm support of the Institutional Depositors and the Anchor Investors—to address them.  Such circumstances hardly bespeak a bank in "unsafe or unsound" condition.

## CONCLUSION

Ultimately, Congress saw fit to address some of the problems at the OTS by ending the agency's existence.  But this case might be seen as one lingering symptom of a troubled agency.  Though it would only be a fool's errand to try to determine what *exactly* motivated the OTS to act rashly in seizing United Western, the record demonstrates that it was not "restrained"

---

F.2d 518, 525 (D.C. Cir. 1984) (requiring FDIC to show, in cease and desist context, "a reasonable, not merely a theoretical, possibility of insolvency or other serious financial weakening of a bank").

decisionmaking that carried the day.  Instead, the agency evidently made an impulsive decision to close the Bank—to invoke a remedy at the outset that the law traditionally considers a "last resort"[108]—and then took steps intended to support the agency's predetermined result.  In doing so, the OTS reversed some of its own well-established policies, applied the wrong law in some instances, and overlooked critical facts at almost every stage.

The OTS was never empowered to simply seize a bank because it would prefer it to run differently than a bank's owner.  Rather, the OTS was a *regulator* that was called to step in when matters of pressing need and national interest required the government's involvement.  No interest is served, nor any need fulfilled, when an agency acts hastily and haphazardly to seize private property in the manner seen here.  "When an agency … is vested with discretion to impose restrictions on an entity's freedom to conduct its business, the agency must exercise that discretion in a well-reasoned, consistent, and evenhanded manner."[109]  That did not happen.  The Court should therefore reverse the Seizure Order and instruct Defendants to remove the FDIC from its position as receiver.  The rightful owner of United Western should be allowed to run its business once more.

---

[107]   12 U.S.C. § 1821(c)(5)(K).

[108]   *Evans v. Fenty*, 480 F. Supp. 2d 280, 326 (D.D.C. 2007).

[109]   *Greyhound Corp. v. ICC*, 668 F.2d 1354, 1359 (D.C. Cir. 1981).

Respectfully submitted,

_s/_ Andrew L. Sandler
Andrew L. Sandler (DC Bar No. 387825)
Samuel J. Buffone (DC Bar No. 161828)
Liana R. Prieto (DC Bar No. 987287)
Michael R. Williams (DC Bar No. 994953)
BUCKLEYSANDLER LLP
1250 24th Street NW, Suite 700
Washington, DC 20037
(202) 349-8001 (Telephone)
(202) 349-8080 (Facsimile)

_s/_ Kirby D. Behre
Kirby D. Behre (DC Bar No. 398461)
Lawrence D. Kaplan (DC Bar No. 415186)
PAUL HASTINGS LLP
875 15th Street NW
Washington, DC 20005
(202) 551-1719 (Telephone)
(202) 551-0119 (Facsimile)

_s/_ Theodore J. Abariotes
Theodore J. Abariotes
Deputy General Counsel
UNITED WESTERN BANCORP, INC.
700 17th Street, Suite 2100
Denver, Colorado 80202
(720) 932-4216 (Telephone)
(720) 946-1218 (Facsimile)

*Attorneys for Plaintiff United Western Bank*

Dated:  April 20, 2012