-4-

approximately 68 percent of the Institution's total deposits. As discussed in more detail below, the S-Memorandum concludes that there is an unacceptable risk that two of the Major Institutional Depositors will remove their deposits from the Institution in the near future. Another Major Institutional Depositor, Matrix Settlement and Clearance Services (MSCS), recently withdrew nearly all of its deposits from the Institution, which represented approximately 10 percent of the Institution's total deposits as of mid-December 2010. The S-Memorandum demonstrates that the Institution has insufficient liquidity to handle the withdrawal of three of the Major Institutional Depositors' deposits.

The largest of the Major Institutional Depositors, Equity Trust Company (ETC), currently holds $697 million in deposits at the Institution, representing 44 percent of total deposits. ETC generally may terminate its Depositor Agreement in the event the Institution files a TFR indicating that the Institution is less than PCA "adequately capitalized." In a letter to the Institution dated October 26, 2010, ETC stated that it would not exercise this right to terminate its Depositor Agreement until: (a) the Institution files a TFR indicating it is "significantly undercapitalized" or "critically undercapitalized"; (b) the Investment Agreement is terminated or consummated; or (c) December 31, 2010. A subsequent letter from ETC to the Institution dated December 29, 2010, incorporated the terms of the October letter, but modified the final date for termination of the ETC Depositor Agreement to February 15, 2011. ETC's December 29 letter expressly stated that ETC's action was based upon ETC's understanding that "the Bank is cooperating with its regulators and is very close to securing capital to remedy this situation... ."

Another Major Institutional Depositor, Lincoln Trust Company (LTC), currently places approximately $136 million in deposits with the Institution, or 9 percent of total deposits. LTC informs its customers that their deposits will be placed only with "well-capitalized" depository institutions. LTC's Depositor Agreement provides that LTC may terminate the Depositor Agreement "upon 30 days' written notice . . . in the event that Bank no longer meets the definition of 'well-capitalized' pursuant to 12 CFR § 565.4(b)(1)(ii)." On December 22, 2010, LTC issued a letter to the Institution stating that LTC currently has the right to terminate its Depositor Agreement pursuant to this provision. However, LTC's letter stated that LTC was refraining from terminating its Depositor Agreement, expressly relying upon the Institution's representation that it "is cooperating with its regulators and is very close to securing capital to remedy this situation...." LTC's letter requested that the Institution "keep LTC apprised of all material developments with regard to its capital situation," and specifically reserved the right to terminate its Depositor Agreement "in the event the Bank's capital situation worsens" or if the Institution failed to become PCA "well-capitalized" by January 31, 2011.

Until mid-December 2010, another Major Institutional Depositor, MSCS, placed approximately $152 million with the Institution, or approximately 10 percent of all deposits placed with the Institution at that time. On December 21, 2010, the Institution notified OTS that MSCS was removing all of its deposits from the Institution. The Institution indicated that MSCS was required to remove all of its deposits because the Institution's PCA "undercapitalized" status prohibits it from accepting employee benefit plan deposits.[2] MSCS's Depositor Agreement

---

[2]     A depository institution that is undercapitalized for PCA purposes is unable to accept employee benefit

Appendix

-5-

states that the funds placed by MSCS with the Institution "are generally qualified employee benefit plan participant funds held in a fiduciary capacity by a custodian or other third parties." To date, MSCS has removed all but $13.9 million in deposits from the Institution; these remaining deposits will be removed in the near future.

Based on the relevant agreements and the actions of the Major Institutional Depositors, and the fact (as discussed below) that several conditions precedent to the Holding Company's proposed capital raise will not be satisfied, the S-Memorandum concludes that there is an unacceptable risk that ETC will withdraw approximately $697 million from the Institution in the near future and that LTC will withdraw approximately $136 million from the Institution in the near future.

As described in more detail in the S-Memorandum, the Institution has failed to identify viable alternatives to the deposits placed by the Major Institutional Depositors. The S-Memorandum states that as a result of the Institution's increasing problems with asset quality and deteriorating capital levels, these institutional deposits are not appropriate as a continuing funding source for the Institution, and that the Institution's reliance on these deposits as a funding source is unsafe and unsound.

The S-Memorandum discusses the Institution's funding sources in detail, and concludes that the Institution does not have sufficient liquidity to fund the potential withdrawal of approximately $848 million of institutional deposits.

Furthermore, the S-Memorandum concludes that the Institution has engaged in unsafe or unsound practices by operating without adequate liquidity or proper regard for funds management in light of the Institution's asset and liability mix. The Institution's reliance on four Major Institutional Depositors has rendered it vulnerable to a significant outflow of deposits without adequate funds to meet the demand. By relying on only four large depositors to fund its operations, the viability of the Institution as a going concern rests on the decisions of these Institutional Depositors. Significantly, the removal of a large number of deposits or withdrawal of funds by one or two of the Major Institutional Depositors will likely cause the Institution to experience a liquidity event.

## C.   Capital Raising Efforts

On October 28, 2010, the Holding Company entered into an Investment Agreement with three potential investors (Anchor Investors) to sell approximately $100 million of the Holding Company's common stock to the Anchor Investors. The Investment Agreement requires that, prior to consummation of the transaction, additional investors (Additional Investors) must acquire an additional $100 million of the Holding Company's common stock. Together with the investment by the Anchor Investors, the gross proceeds from the capital raise would be

plan deposits. *See* 12 U.S.C. § 1821(a)(1)(D)(ii).  The term "employee benefit plan" is defined in 12 U.S.C. § 1821(a)(1)(D)(iii)(II).

14

Appendix

-6-

approximately $205 million.  Approximately $102.5 million of the proceeds of the transaction would be infused into the Institution.

The Investment Agreement contains numerous conditions that must be satisfied on or prior to closing of the investment transaction, including, among others[3]:

- OTS's approval of the Institution's application to acquire Legent Clearing, LLC (Legent Clearing) as an operating subsidiary;

- OTS's approval of the Institution's modified Business Plan; and

- OTS's termination of the growth restrictions in the current Institution and Holding Company orders. [4]

None of these three conditions precedent to consummation of the transaction contemplated by the Investment Agreement will be met:

- On January 18, 2011, the OTS denied the Institution's application to acquire Legent Clearing as an operating subsidiary of the Institution (Legent Clearing Application).[5]  OTS denied the Legent Clearing Application due to multiple supervisory concerns regarding the economic merits of the transaction, Legent Clearing's profitability, Legent Clearing's recent history of enforcement actions, Legent Clearing's recent loss of its largest customer, and the effect of the proposed acquisition on the Institution's existing concentration of institutional deposits.[6]

- On January 18, 2011, OTS denied the proposed Revised Business Plan submitted by the Institution as part of its Capital Restoration Plan (CRP).  The proposed

---

[3]     Other conditions include: (i) OTS's approval of five proposed employment contracts for officers of the Holding Company and the Institution; (ii) OTS's non-objection to two proposed directors on each of the Holding Company's and Institution's boards representing the Anchor Investors; (iii) OTS's notification to the Institution that it would be deemed "well-capitalized" as defined at 12 C.F.R. § 565.4(b)(1) on a *pro forma* basis after completing the investments; (iv) JPMorgan Chase Bank, N.A.'s execution of an agreement with the Holding Company to accept a discounted payoff amount equal to $10,562,500 plus interest on outstanding debt owed by the Holding Company; (v) the Institution's having at least $1.5 billion in deposits on the closing date; and (vi) the aggregate market value of the Institution's investment securities portfolio exceeding a given target amount as calculated by a specified consulting firm.

[4]     On November 29, 2010, the Institution submitted a letter (November 29 Letter) to OTS and the FDIC indicating that some, but not all, of the closing conditions in the Investment Agreement were negotiable, and outlined specific proposed changes to the Investment Agreement.  The November 29 Letter suggested that seven items were "must haves" including, *inter alia,* the approval of the business plan (effectively releasing the Institution from growth restrictions); approval of the operating subsidiary application; and deletion of the "meet and maintain" language from the Institution Order.  The November 29 Letter did not indicate whether any of the Anchor Investors had agreed to any of the proposed changes.

[5]     See, OTS Order No. 2011-02 (Jan. 18, 2011).

[6]     The bases for denial of the operating subsidiary application are set forth fully in the denial order.

Appendix

Revised Business Plan did not address the Institution's concentration in
institutional deposits, did not provide for adequate liquidity or proper regard for
funds management, and called for an excessive level of asset growth in light of
the Institution's troubled condition, high level of existing problem assets, and
history of poor earnings.

o   Due to the Institution's significant problems, OTS is not willing to remove the
Institution's growth restrictions.

On December 13, 2010, OTS issued a PCA notice to the Institution that required
submission of a CRP, including a business plan, by December 20, 2010.[7] The Institution
submitted its CRP to OTS on December 20, 2010. On January 18, 2011, OTS denied the CRP,
because it contained multiple unsupported and unrealistic assumptions. Among these
assumptions were that, prior to or contemporaneous with the closing of the transaction:  (1) the
Institution would be able to secure $100 million in funding from Additional Investors; (2) OTS
would agree to remove the growth restriction in Paragraph 26 of the Institution Order; (3) OTS
would approve the Institution's business plan; and (4) OTS would approve the Institution's
operating subsidiary application.[8]

Other than the Investment Agreement, the Institution has not entered into or provided any
letters of intent or other investment agreements with potential investors. Therefore, the
Institution will not be able to raise sufficient additional capital in the near term to become PCA
"adequately capitalized" or to otherwise address the issues discussed in this memorandum.

**D.   Summary**

As a result of increases in the level of the Institution's problem assets, the Institution has
experienced significant losses and is now undercapitalized. As a result of the Institution
becoming undercapitalized, OTS required the Institution to file a CRP. The Institution's CRP
was based on the capital raise contemplated under the Investment Agreement, described above,
and the capital raise is subject to numerous contingencies, including at least three significant

---

[7]   OTS shortened the Institution's time to file a CRP due to the Savings Bank's unsafe and unsound
condition. 12 C.F.R. § 565.7(c).

[8]   The OTS found numerous other deficiencies in the CRP submitted by the Institution, as detailed in the
Denial of Capital Restoration Plan letter OTS issued to the Institution on January 18, 2011. Among other
deficiencies, the Holding Company failed to submit an acceptable performance guarantee, preventing the OTS from
accepting the Institution's CRP. 12 U.S.C. § 1831o(e)(2)(C)(ii). The Holding Company submitted an executed
guarantee document (CRP Guarantee). However, the CRP Guarantee did not conform to the PCA Standard Form of
Guarantees and Assurances that the OTS expects holding companies to execute (OTS Standard Guarantee), a copy
of which was included as "Attachment C" in the December 13 Notice. The Holding Company made significant
unacceptable modifications to the OTS Standard Guarantee. In addition, the CRP appreciably increased the
concentration risk by increasing exposure to institutional depositors (12 U.S.C. § 1831o(e)(2)(C)(i)(III)). The
proposed Revised Business Plan did not address the Institution's concentration in institutional deposits, did not
provide for adequate liquidity or proper regard for funds management, and called for an excessive level of asset
growth in light of the Institution's troubled condition, high level of existing problem assets, and history of poor
earnings.

-8-

contingencies that will not be satisfied: (i) OTS approval of the Institution's operating subsidiary application; (ii) OTS's approval of the Institution's business plan; and (iii) OTS's removal of growth restrictions on the Institution that are included in the C&D Order. In this regard, on January 18, 2011, for reasons described above, in the S-Memorandum and in the operative documents, OTS denied the operating subsidiary application and rejected the Institution's Business Plan. The Regional Office is not willing to remove the growth restriction. Accordingly, OTS has denied the Institution's CRP.

The fact that several of the conditions precedent to the capital raise will not be met creates an unacceptable risk that two of the Major Institutional Depositors, with approximately 55 percent of the Institution's deposits, will withdraw their deposits in the near future. The Institution does not have the liquidity to fund such withdrawals.

## III.   DISCUSSION OF LEGAL ISSUES FOR APPOINTMENT OF A RECEIVER FOR THE INSTITUTION

Section 5(d)(2)(A) of the Home Owners' Loan Act (HOLA)[9] provides that the Acting Director may appoint a receiver for any insured savings association if the Acting Director determines that one or more of the grounds specified in section 11(c)(5) of the FDIA, 12 U.S.C. § 1821(c)(5), exist.

### A.   Unsafe or Unsound Condition to Transact Business

Under section 11(c)(5)(C) of the FDIA, the Acting Director may appoint a receiver if a savings association is in an unsafe or unsound condition to transact business. An unsafe or unsound condition has been identified as one where an institution is operated in a manner that causes an unacceptable risk to its depositors' funds. See Franklin Savings Association v. Director, OTS, 934 F.2d 1127, 1145 (10th Cir. 1991), cert. denied, 503 U.S. 937 (1992).

There is an adequate legal basis to conclude that the Institution has an unsafe and unsound concentration in institutional deposits. The Institution's reliance on a small number of institutional depositors, along with its weak capital position and significant asset problems, has rendered it vulnerable to a significant outflow of deposits with minimal notice and without adequate funds to meet the demand. By relying on only four large depositors to fund most of its operations, the viability of the Institution rests on the decisions of the institutional depositors, and the Institution is therefore in an unsafe and unsound condition to transact business.

Also, the Institution has engaged in unsafe and unsound practices by operating without adequate liquidity, without an adequate liquidity plan, and without proper regard for funds management, and is therefore in an unsafe and unsound condition to transact business.

Furthermore, the Institution is in an unsafe and unsound condition as a result of the combination of potential severe liquidity strain, an excessive amount of classified assets,

---

[9]      12 U.S.C. § 1464(d)(2)(A).

Appendix

-9-

continuing significant operating losses, insufficient capital, and no realistic prospects for raising capital in the short term.

In our opinion, the facts presented by the Regional Office are sufficient for the Acting Director, or his designee, to conclude that the Institution is in an unsafe and unsound condition to transact business. Therefore, there is an adequate legal basis for the Acting Director, or his designee, to appoint a receiver for the Institution under this standard.

### B.    Inability to Pay Obligations or Meet Depositors' Demands

Under section 11(c)(5)(F) of the FDIA, the Acting Director may appoint a receiver if a savings association is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business.

As discussed in above, the Institution's declining capital position (including its inability to raise additional capital pursuant to the Investment Agreement or otherwise) has now created an unacceptable risk that all but one of the Major Institutional Depositors will remove its deposits from the Institution. These Major Institutional Depositors have the contractual right to withdraw deposits representing approximately 56 percent of the Institution's deposits. The Institution does not have the liquidity to fund the withdrawals.

Based on the foregoing, in our opinion, there is an adequate legal basis to conclude that it is likely that the Institution will be unable to pay its obligations or meet its depositors' demands in the normal course of business.

### C.    Failure of an Undercapitalized Institution to Submit an Acceptable Capital Restoration Plan within the Time Prescribed

Under section 11(c)(5)(K)(iii) of the FDIA, the Acting Director may appoint a receiver for an undercapitalized savings association if that institution fails to submit a capital restoration plan that is acceptable to OTS within the time prescribed under 12 U.S.C. § 1831o(e)(2)(D). Section 1831o(e)(2)(D) provides for OTS to promulgate regulations generally requiring an institution to submit such a plan not later than 45 days after the savings association becomes undercapitalized. OTS promulgated such a regulation. See 12 C.F.R. § 565.5(a)(1). As permitted under 12 C.F.R. § 565.5(a)(1), OTS prescribed a shorter timeframe, based on the condition of the Savings Bank. Section 1831o(e)(2)(C)(i)(II) provides that OTS shall not accept a capital restoration plan unless OTS concludes that the plan is based on realistic assumptions and is likely to succeed in restoring the institution's capital.

On December 13, 2010, the Institution was notified that it had become undercapitalized. OTS required the Institution to submit a capital restoration plan by December 20, 2010, and the Institution submitted its CRP on that date. OTS denied the CRP on January 18, 2011, for the reasons set forth in the denial letter and summarized in the S-Memorandum and above. In our

Appendix

-10-

opinion, the facts described above present a sufficient legal basis for the Acting Director, or his designee, to conclude that this ground has been satisfied.

Therefore, there is an adequate legal basis for the Director to appoint a receiver for the Institution under the standards described above.

**BUSINESS TRANSACTIONS DIVISION CONTACT**: Gary Jeffers
**PHONE**: 906-6457

19

Appendix



**Office of Thrift Supervision**
Department of the Treasury                                    *Regional Director, Western Region*

225 East John Carpenter Freeway, Suite 500, Irving, TX 75062-2326 • Telephone: (972) 277-9500
P.O. Box 619027, Dallas/Fort Worth, TX 75261-9027 • Fax: (972) 277-9501

### *PRIVILEGED AND CONFIDENTIAL*

**MEMORANDUM FOR:**   Thomas A. Barnes, Deputy Director
                                     Examinations, Supervision and Consumer Protection

**FROM:**                      Philip A. Gerbick, Regional Director
                                     Western Region

**DATE:**                      January 19, 2011

**SUBJECT:**                Recommendation for Appointment of the Federal Deposit
                                     Insurance Corporation (FDIC) as Receiver for
                                     United Western Bank, Denver, Colorado (OTS No. 06679)

## I.   RECOMMENDATION AND SUMMARY

The Western Region Office recommends that the Acting Director of the Office of Thrift Supervision (OTS) appoint the Federal Deposit Insurance Corporation (FDIC) as receiver for United Western Bank, Denver, Colorado (OTS No. 06679) (the Institution, UWB, or Association).  We believe that grounds exist for the appointment pursuant to Section 5(d)(2) of the Home Owners' Loan Act (HOLA), 12 U.S.C. § 1464(d)(2), and Section 11(c)(5) of the Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1821(c)(5).  Grounds supporting the receivership include the following:

1.  The Institution is in an unsafe and unsound condition to transact business (12 U.S.C. § 1821(c)(5)(C));

2.  The Institution is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business (12 U.S.C. § 1821(c)(5)(F)); and

3.  The Institution is undercapitalized (as defined in 12 U.S.C. § 1831o(b)), and has failed to submit a capital restoration plan acceptable to the OTS within the time prescribed by the OTS under 12 U.S.C. § 1831o(e)(2)(D) (12 U.S.C. § 1821(c)(5)(K)(iii)).

Appendix

Western Region Receivership Recommendation
United Western Bank, Denver, CO (OTS No. 06679)
January 19, 2011
Page 2

## II.   KEY FINANCIAL AND SUPERVISORY INFORMATION

| Selected PCA Capital Ratios - Source: 09/30/10 UTPR and Amended 09/30/10 TFR. See Exhibits 28 and 30 | | | |
|---|---|---|---|
| PCA Capital Category: | Undercapitalized  (December 8, 2010) | | |
| Tier 1 (Core) Capital/Adjusted Total Assets | (FDICIA Cap. Adequacy) | 6.20 | % |
| Total Risk-based Capital/Risk-Weighted Assets | (FDICIA Cap. Adequacy) | 7.80 | % |
| Tier 1 (Core) Capital/Risk-Weighted Assets | (FDICIA Cap. Adequacy) | 6.53 | % |
| Tangible Equity/Total Assets | (FDICIA Cap. Adequacy) | 6.20 | % |

| Source: 9/30/10 5-Quarter UTPR and 9/30/10 3-Year UTPR (See Exhibits 28 and 29):  ($000s) | | | | |
|---|---|---|---|---|
| Total Assets: | $ | 2,050,651 | Net Income (9-Mo ended 09/30/10) | $ | -68,819 |
| Total Liabilities: | $ | 1,929,691 | Net Income (4 qtrs. ended 12/31/09) | $ | -69,359 |
| Total Equity Capital | $ | 120,960 | | |

| Selected Supervisory Information | | | | | | | |
|---|---|---|---|---|---|---|---|
| Most Recent Limited Examination Mail Date: | | | | December 29, 2010 | | | |
| CAMELS Ratings: [1]- Ratings Date:  December 29, 2010 Letter | | | | | | | |
| Composite | C | A | M | E | L | S | |
| 5 | 5 | 4 | 4 | 5 | 5 | 3 | |
| | | | Y/N | Comments (if applicable) | | | |
| Consent Agreement? (Y/N) | | | N | | | | |
| Open Issues or Applications? (Y/N) | | | Y | Appeal to FDIC regarding brokered deposit determination letter dated November 5, 2010; Rebuttal of Control filings; Application to approve Golden Parachute payments for D. Santistevan and 16 others | | | |
| Denied Capital Plan (Y/N): | | | Y | Notice of Denial issued January 18, 2011 (*See* Exhibit 96) | | | |
| Capital Disputes? (Y/N): | | | Y | Dispute re: OTTI (see below) | | | |
| Enforcement Actions? (Y/N): | | | Y | Cease and Desist Order Effective June 25, 2010 (*See* Exhibit 18) | | | |
| PCA Directive? (Y/N): | | | N | | | | |
| TARP Recipient? (Y/N): | | | N | | | | |
| FDIC Marketing Resolution (Y/N): | | | Y | December 20, 2010 | | | |

## III.   OVERVIEW AND KEY FINANCIAL INFORMATION

### A.   Corporate Structure and General Background

The Institution is a federally chartered stock institution headquartered in Denver, Colorado with eight branches. *See* **Exhibits 3 and 79**. The Institution is wholly owned by United Western Bancorp, Inc. (UWBK or Holding Company). The Holding Company's stock is publicly traded. The Institution

---

[1] CAMELS = Capital, Asset Quality, Management, Earnings, Liquidity, and Sensitivity to Market Risk.

Appendix

Western Region Receivership Recommendation
United Western Bank, Denver, CO (OTS No. 06679)
January 19, 2011
Page 3

has historically provided a significant portion of the revenue for the Holding Company, and
comprises nearly all of the assets of the Holding Company on a consolidated basis. *See* **Exhibit 65**.

The Institution adopted a community banking strategy in early 2006. Under that strategy, the
Institution primarily originated construction, land, commercial real estate, and non-mortgage
commercial loans, mostly within Colorado. The community banking strategy also included a large
amount of Small Business Administration (SBA) credits. *See* **Exhibit 3**. While embarking on the
community banking strategy, the Institution retained a large portfolio of non-agency mortgage-
backed securities (MBS). *Id*.

A large percentage of the Institution's deposits come from a small number of institutional depositors.
As part of its community banking strategy, the Institution sought to diversify its funding base and
added eight retail branches. *See* **Exhibit 3**. Despite the new branches, the Institution remained
highly reliant on institutional deposits and on Federal Home Loan Bank (FHLB) advances. *Id*.

**B.     Significant Supervisory History**

The financial and economic crisis that began in 2007 had a significant impact on the Institution.
Beginning in the last quarter of 2008, the rating agencies downgraded the non-agency MBS that the
Institution held. *See* **Exhibit 3**. The poor economy also contributed to deterioration in the asset
quality of the community bank loan portfolio. This combination resulted in a high ratio of classified
assets to capital and reserves. *See* **Exhibits 28-29**. Large loan loss provisions and the recognition of
other-than-temporary impairment (OTTI) on some non-agency MBS resulted in significant operating
losses. *Id*.

The OTS informed the Institution that it was in troubled condition in a letter dated March 4, 2010.
*See* **Exhibit 10**. The Institution's composite rating has significantly deteriorated since 2009. The
Institution received a "4" composite rating in the January 11, 2010 limited report of examination
mailed on April 28, 2010 (2010 Limited ROE). *See* **Exhibit 8**. On December 29, 2010, the OTS
downgraded the Institution to a "5" composite rating due to continued erosion in capital and asset
quality. *See* **Exhibit 55**. Asset quality and earnings at the Institution remain deficient. *Id*.

The Institution is operating under an Order to Cease and Desist issued on June 25, 2010 (Institution
Order). *See* **Exhibit 18**. The Institution Order replaced a Memorandum of Understanding dated
December 10, 2009. *See* **Exhibit 5**. Since June 30, 2010, the Institution has been in violation of the
requirements contained in the Institution Order to meet and maintain a Tier 1 (Core) capital ratio of 8
percent and a total risk-based capital ratio of 12 percent. *See* **Exhibits 18 and 28**.

UWBK is not able to provide financial support to the Institution. Like the Institution, UWBK has
been designated as in "troubled condition" and is also operating under an Order to Cease and Desist
issued on June 25, 2010 (Holding Company Order) that replaced a previous MOU. *See* **Exhibits 6,
12, and 19**. Additionally, UWBK faces significant cash flow pressures on the parent level. UWBK
has suspended payments on $30.4 million in trust preferred securities and is currently in default on its

Appendix