Western Region Receivership Recommendation
United Western Bank, Denver, CO (OTS No. 06679)
January 19, 2011
Page 13

Pursuant to its Depositor Agreement, ETC may remove at least $150 million in deposits from the Institution at any time. *See* **Exhibit 72**. In addition, although the Depositor Agreement currently requires ETC to place a minimum of $550 million in deposits with the Institution, ETC may withdraw all of its deposits by providing a 30 day notice to the Institution and terminating its Depositor Agreement.[14] *See* **Exhibits 53, 54, and 72**.

ETC may terminate its Depositor Agreement in the event the Institution files a Thrift Financial Report (TFR) indicating that the Institution is less than PCA "adequately capitalized." *See* **Exhibit 72**. In a letter to the Institution dated October 26, 2010, ETC stated that it would not exercise this right to terminate its Depositor Agreement until: (a) UWB files a TFR indicating it is "significantly undercapitalized" or "critically undercapitalized"; (b) the Investment Agreement is terminated or consummated; or (c) December 31, 2010. *Id.* A subsequent letter to the Institution dated December 29, 2010, incorporated the terms of the October letter, but modified the final date for termination of the ETC Depositor Agreement to February 15, 2011. *Id.* ETC's December 29 letter expressly stated that this modification was based upon ETC's understanding that "the Bank is cooperating with its regulators and is very close to securing capital to remedy this situation…." *Id.*

For the reasons set forth above, it is highly unlikely that the Institution will become "adequately capitalized" by February 15, 2011. Furthermore, because the Investment is unlikely to be consummated, the Investment Agreement will likely be terminated in the near future. Based upon

---

[14] In its December 21, 2010 liquidity contingency plan Directive (LCP Directive), the OTS asked the Institution to notify the OTS if the statements in Attachment A to the LCP Directive were incorrect. *See* **Exhibit 52**. Among those statements was: "Each of the Association's Depositor Agreements contains termination provisions that allow the applicable Institutional Depositor to terminate the contract upon the occurrence of various events or contingencies. Should an Institutional Depositor terminate its Depositor Agreement with the Association, that Institutional Depositor has the contractual right to remove all deposits placed with the Association following the expiration of the applicable contractual notice period."

In its response dated December 28, 2010, the Institution did not notify the OTS that this description was incorrect. *See* **Exhibit 54**. However, in a telephone call with OTS staff on December 29, 2010, the Institution stated that, upon an early termination of the ETC Depositor Agreement, ETC would be contractually prohibited from withdrawing in any one calendar month more than 1/6 of the total deposits placed by ETC at the Institution. In a letter dated December 29, 2010, the OTS asked the Institution to provide support for this assumption; the Institution responded on December 30, 2010 (December 30 Letter). *See* **Exhibits 58 and 84**.

Following review, the Institution has not sufficiently supported this assumption. Section 9 of ETC's Depositor Agreement establishes the term of the contract, and provides for automatic renewal upon the expiration of the term unless notice to the contrary is provided by either party. *See* **Exhibit 72**. However, Section 9 does not address early termination for cause, which is addressed by Section 11 of the Depositor Agreement. Section 9 of the ETC Depositor Agreement contains a provision requiring staged withdrawal of deposits, but by its terms applies only to terminations "pursuant to this Section 9." *Id.* Section 11 of the ETC Depositor Agreement, on the other hand, the relevant provision for the purposes of early termination, contains no such requirement. Moreover, that section specifically states that its provisions apply "[n]otwithstanding Sections 9 or 10…." *Id.* The December 30 Letter also states that the last sentence of Section 9 of the ETC Depositor Agreement, which provides that "all rights, obligations, terms and conditions of this Agreement shall remain in effect with respect to any cash balances in the Bank Accounts until such balances have been fully withdrawn or distributed," would require a staged withdrawal of deposits following a termination made pursuant to Section 11. *See* **Exhibit 84**. This interpretation of the ETC Depositor Agreement is not self-evident and the December 30 Letter does not support such a reading. *Id.*

The Institution has not provided the OTS with any communications from ETC supporting its assumptions. Neither the Institution's LCP nor the December 30 Letter provides sufficient information to permit the OTS to determine that ETC will in fact withdraw only 1/6 of its deposits per month following termination. *See* **Exhibits 54 and 84**.

33

Appendix

Western Region Receivership Recommendation
United Western Bank, Denver, CO (OTS No. 06679)
January 19, 2011
Page 14

ETC's communications with the Institution, there is an unacceptable risk that ETC will terminate its Depositor Agreement and withdraw approximately $697 million in deposits from the Institution once it becomes clear that the Institution's present attempts to raise capital will be unsuccessful.

In addition, ETC placed employee benefit plan deposits with the Institution until ETC became legally prohibited from doing so because of the Institution's PCA "undercapitalized" status.[15] *See* **Exhibits 50 and 54**. This legal restriction now prevents ETC from placing such deposits with the Institution, and increases the risk that ETC will be required to remove additional deposits.[16] These restrictions imposed upon the Institution because of its PCA "undercapitalized" status increase the risk that ETC will seek to remove deposits from the Institution.

The Institution's reliance on a single Major Institutional Depositor for the placement of 44 percent of its total deposits, coupled with the Institution's weak capital position and significant asset problems, has rendered the Institution highly vulnerable to a liquidity event. Accordingly, there is an unacceptable risk that ETC will withdraw approximately $697 million in deposits from the Institution in the near future.

*ii.   LTC*

LTC currently places approximately $136 million in deposits with the Institution, or 9 percent of total deposits. *See* **Exhibit 71**. LTC's contract requires LTC to place a minimum of $110 million with the Institution. *See* **Exhibit 73**. LTC serves as custodian of employee benefit plans and self-directed IRAs. LTC's Depositor Agreement states that "LTC, as custodian or directed trustee, provides custodial and related services to employee benefit plan, individual retirement plans and other qualified plan accounts" and also "acts as custodian for self-directed IRA accounts and other retirement accounts...." *Id*.

LTC informs its customers that their deposits will be placed only with "well-capitalized" depository institutions. *See* **Exhibit 53**. LTC's Depositor Agreement provides that LTC may terminate the Depositor Agreement "upon 30 days' written notice ... in the event that Bank no longer meets the definition of 'well-capitalized' pursuant to 12 CFR § 565.4(b)(1)(ii)." *See* **Exhibit 73**. On December 22, 2010, LTC issued a letter to the Institution stating that LTC currently has the right to terminate its Depositor Agreement pursuant to this provision. *Id*. However, LTC's letter stated that LTC was refraining from terminating its Depositor Agreement, expressly relying upon the

---

[15] By statute, a PCA "undercapitalized" institution is unable to accept employee benefit plan deposits. *See* 12 U.S.C. § 1821(a)(1)(D)(ii). The term "employee benefit plan" is defined in 12 U.S.C. § 1821(a)(1)(D)(iii)(II).

[16] To date, the ultimate effect of the statutory employee benefit plan deposit restriction on ETC is unclear. The Institution has asserted that ETC is currently replacing approximately $2.756 million of employee benefit plan deposits placed with the Institution. *See* **Exhibits 54**. However, these assertions contradict multiple earlier statements by the Institution that ETC is not a "deposit broker" because ETC is "[a] person acting as a plan administrator or an investment adviser in connection with a pension plan or other employee benefit plan...performing managerial functions with respect to the plan." *See* 12 U.S.C. § 1831f(g)(2)(E); 12 C.F.R. § 337.6(a)(5)(ii)(E). *See* **Exhibits 16, 25, 47, and 72**. The Institution's assertions also contradict language in the ETC Depositor Agreement, which states that ETC places employee benefit plan deposits at the Institution and states that all of the "Custodial Accounts" subject to that contract are "qualified plan accounts." *See* **Exhibit 72**. To date, the Institution has failed to present satisfactory evidence that it is currently complying with this law. *See* **Exhibit 47, 50**.

Western Region Receivership Recommendation
United Western Bank, Denver, CO (OTS No. 06679)
January 19, 2011
Page 15

Institution's representation that it "is cooperating with its regulators and is very close to securing capital to remedy this situation...." *Id.* LTC's letter requested that the Institution "keep LTC apprised of all material developments with regard to its capital situation," and specifically reserved the right to terminate its Depositor Agreement "in the event the Bank's capital situation worsens" or if the Institution failed to become PCA "well-capitalized" by January 31, 2011. *Id.*

For the reasons set forth above, it is highly unlikely that the Institution will become "well capitalized" by January 31, 2011. Based on the facts set forth regarding LTC, there is an unacceptable risk that LTC will terminate its Depositor Agreement and withdraw approximately $136 million in deposits from the Institution.[17]

*iii.  MSCS*

Until mid-December 2010, MSCS placed approximately $152 million with the Institution, or approximately 10 percent of all deposits placed with the Institution at that time. *See* **Exhibit 53**. On December 22, 2010, the UWB notified the OTS that MSCS was removing all of its deposits from the Institution. *See* **Exhibit 83**. The Institution indicated that MSCS was required to remove all of its deposits because the Institution's PCA "undercapitalized" status prohibits it from accepting employee benefit plan deposits. *Id.* MSCS's Depositor Agreement states that the funds placed by MSCS with the Institution "are generally qualified employee benefit plan participant funds held in a fiduciary capacity by a custodian or other third parties." *See* **Exhibit 74**. As of January 13, 2011, MSCS had removed all but $14.4 million in deposits from the Institution; these remaining deposits will be removed in the near future. *See* **Exhibits 54 and 71**.

*iv.  Legent Clearing*

Legent Clearing, an SEC registered broker-dealer, sweeps deposits into MMDA and NOW accounts maintained at the Institution and other insured depository institutions through an FDIC Insured Sweep Program maintained by Deutsche Bank Trust Company of America (DBTCA). *See* **Exhibits 25 and 75**. Legent Clearing is also the subject of the Institution's application to acquire it as an operating subsidiary that OTS denied on January 18, 2011. *See* **Exhibits 93 and 94**. Legent Clearing has not indicated that it is likely to remove its deposits from the Institution in the near future.[18]

**b.      OTS Actions to Address the Institution's Inadequate Liquidity Management**

The Institution's declining capital position, declining asset quality, and poor earnings, and the fact that critical conditions precedent to consummation of the capital infusion contemplated by the Investment Agreement will not be satisfied results in an unacceptable risk that the Major Institutional Depositors (other than Legent) will remove their deposits from the Institution. The removal of

---

[17] The risk of withdrawal by LTC is increased by the statutory restrictions on accepting employee benefit plan deposits.
[18] However, the Institution's declining capital position may require Legent to cease accepting deposits from the Institution. Legent may be required to cease sweeping deposits into the Institution if the FDIC does not grant the Institution's appeal of the FDIC's November 5, 2010 determination that Legent is a "deposit broker." *See* **Exhibits 15 and 23**.

Western Region Receivership Recommendation
United Western Bank, Denver, CO (OTS No. 06679)
January 19, 2011
Page 16

deposits by these three of the Institution's four Major Institutional Depositors would result in the loss of approximately $848 million, or 53 percent of the Institution's total deposits.

The Institution has engaged in unsafe or unsound practices by operating without adequate liquidity or proper regard for funds management.[19] The Institution's reliance on four Major Institutional Depositors has rendered it vulnerable to a significant outflow of deposits with minimal notice and without adequate funds to meet the demand. By relying on only four large depositors to fund its operations, the viability of the Institution rests on the decisions of these Major Institutional Depositors.

On December 13, 2010, in anticipation of liquidity problems at the Institution, the OTS directed the Institution not to permit any Institutional Depositor to withdraw more deposits than permitted by existing contract. *See* **Exhibit 48**. On December 21, 2010, the OTS issued a directive letter (LCP Directive) indicating that the Institution's Liquidity Contingency Plan (LCP) was inadequate to address the acute liquidity risks, resulting in an unsafe and unsound practice.[20] *See* **Exhibit 53**. The LCP Directive required the Institution to submit a Revised LCP by December 28, 2010, that conformed to the requirements of the Institution Order[21] and applicable regulatory guidance. *Id*. The LCP Directive required the new plan to address the multiple risks to the Institution's liquidity position, including the risk that certain specific provisions in the Institution's Depositor Agreements would permit the rapid withdrawal of deposits in excess of the Institution's liquidity capacity. *Id*.

On December 28, 2010, the Institution submitted its revised LCP. *See* **Exhibit 54**. The LCP stated that it was an interim plan covering the period between December 28, 2010, and the consummation of the Recapitalization Transaction. *Id*. The LCP stated the withdrawal of deposits by institutional depositors was "highly unlikely" in light of the pending Investment, and stated that the Institution could withstand any such withdrawals by accessing funds from the Federal Home Loan Bank of Topeka (FHLB-Topeka), accessing deposits from QwickRate, and receiving additional deposits from Legent Clearing. *Id*.

OTS determined that the LCP contained numerous unreasonable assumptions. Contrary to the instructions in the LCP Directive, the LCP failed to contain specific strategies for addressing liquidity in the event the Investment was not completed or the Investment Agreement was terminated. *See* **Exhibits 53 and 54**. The LCP also contained unsupported assumptions regarding the availability of

---

[19] *See* 12 C.F.R. § 563.161(a)(2) - The OTS determines on a case-by-case basis whether a savings association is maintaining sufficient liquidity to ensure its safe and sound operation. *See* 66 Fed. Reg. 15015, 15015 (March 15, 2001); 62 Fed. Reg. 62509, 62510 (Nov. 24, 1997); 2009 OTS Regulatory Bulletin 37-51 (Jan. 15, 2010).
[20] *See* OTS CEO Memorandum No. 342 (March 17, 2010) (Interagency Policy Statement on Funding and Liquidity Risk Management).
[21] Among other things, Paragraph 22 of the Institution Order required the LCP to include (i) "a cash flow analysis of liquidity that includes reasonable assumptions, identifies anticipated funding needs and the sources of liquidity to meet those needs, and addresses potential contingent liabilities;" (ii) "identification of alternative funding sources to meet extraordinary demands, including, at a minimum, the selling of assets, obtaining lines of credit from correspondent institutions, recovering charged-off assets, and injecting additional equity capital;" and (iii) "the assumptions used in the formulation of the [LCP], including, but not limited to, assumptions regarding the source of the Association's deposits, the quality of the Association's unpledged assets, the collateral requirements for [FHLB] advances, and borrowing capability from Federal Reserve Banks." *See* **Exhibit 18**.

Western Region Receivership Recommendation
United Western Bank, Denver, CO (OTS No. 06679)
January 19, 2011
Page 17

additional deposits from FHLB-Topeka, QwickRate, and Legent Clearing. *Id.* In addition, the LCP did not respond to certain specific questions included in Attachment C to the LCP Directive regarding provisions of the Depositor Agreements, and otherwise failed to adequately address the current liquidity risk at the Institution. *Id.*

On December 29, 2010, the OTS issued a letter to the Institution requiring immediate clarification regarding a number of issues raised by the LCP, including the availability of funds from QwickRate and Legent Clearing and an unclear provision in the ETC Depositor Agreement. *See* **Exhibit 58**. The Institution responded on December 30, 2010. *See* **Exhibit 84**. The Institution also submitted new amendments to the ETC and Legent Clearing Depositor Agreements. *See* **Exhibits 72 and 75**. The Institution's December 30 response also did not adequately address the liquidity concerns discussed herein. The response failed to provide sufficient support for the LCP's assumptions regarding available sources of liquidity, and did not sufficiently clarify the provisions of the Depositor Agreements cited in the LCP Directive. *See* **Exhibits 53 and 54**.

The Institution's LCP and its December 30, 2010 letter failed to identify viable alternatives to the deposits placed by Institutional Depositors. *See* **Exhibits 54 and 84**. As a result of the Institution's increasing problems with asset quality and deteriorating capital levels, these institutional deposits are not appropriate as a continuing funding source for the Institution. The Institution did not develop an adequate retail deposit funding source through its eight branches. The Institution's overreliance on institutional deposits is unsafe and unsound.

c.     **Brokered Deposits Risks**

The FDIC has issued two written determinations to the Institution indicating that each of the Major Institutional Depositors is a "deposit broker" as defined in 12 C.F.R. § 337.6, and that all of the deposits placed at the Institution by the Major Institutional Depositors are "brokered deposits." *See* **Exhibits 34 and 85**. Because the Institution is not PCA "well capitalized," 12 U.S.C. § 1831f and 12 C.F.R. § 337.6 would prohibit the Institution from accepting, renewing, or rolling over these deposits, which would require the Institution immediately to cease taking deposits from Institutional Depositors, which are often received on a daily basis.[22] During the past year, the Institution has engaged in extended discussions with FDIC to resolve these brokered deposit questions and with the OTS to address the resulting unsafe and unsound condition and possible precipitous liquidity failure of the Institution. *See* **Exhibits 8, 22, 25, and 35**. Moreover, by letter dated January 4, 2010, the Institution appealed the FDIC's determination. *See* **Exhibit 60**.

The Institution also has entered into letter agreements with its institutional depositors (except MSCS) in an attempt to restructure the Depositor Agreements to conform to the terms of the FDIC Advisory Opinion No. 05-02 (February 3, 2005).[23] *See* **Exhibits 54 and 86**. To date, the FDIC has not provided any indication to the OTS or the Institution that the Institution's appeal will be successful, or that these recent amendments to the agreements with the Major Institutional Depositors cause the deposits to be other than brokered deposits. *See* **Exhibit 54**.

---

[22] The Institution has stated that freezing dollar amounts for individual processing and trust customers of the Institutional Depositors would force the Institution to breach its Depositor Agreements. *See* **Exhibit 54**.
[23] *See* 12 U.S.C. § 1831f and 12 C.F.R. § 337.6.

Western Region Receivership Recommendation
United Western Bank, Denver, CO (OTS No. 06679)
January 19, 2011
Page 18

As a result of the Institution's decline to PCA "undercapitalized" status as of December 8, 2010, the Institution is no longer eligible for an FDIC waiver from the legal prohibition on accepting brokered deposits. *See* 12 C.F.R. § 337.6. The Institution has warned the OTS and the FDIC about the danger to the Institution and the Deposit Insurance Fund that has resulted from the brokered deposit restrictions and the decline in the Institution's capital.[24] The FDIC brokered deposits determinations have materially increased the risk of withdrawals of deposits by Major Institutional Depositors, when taken into consideration with the Institution's declining financial condition.

d.  **Funding Sources are Inadequate to Meet Expected Liquidity Needs**

The Institution has insufficient liquidity resources to fund the potential withdrawals of institutional deposits after the expiration of standstill letters or requisite notice periods and also fund ongoing operations, loan commitments, and withdrawals by retail depositors. As of January 13, 2011, the Institution reported $398.5 million in liquid assets. *See* **Exhibit 71**. In its LCP, the Institution estimates that about $50 million in cash is necessary for daily operations. *See* **Exhibit 54**. Thus, available liquid assets are approximately $349 million as of January 13, 2011.

In on-balance-sheet liquidity, the Institution estimated that it had $386 million in cash and interest bearing deposits. *Id.* In December 2010, the Institution closed its $19 million secure line of credit at the Federal Reserve discount window and transferred the collateral to the FHLB-Topeka to add to its borrowing capacity there. *See* **Exhibit 54**. On December 29, 2010, anticipating liquidity problems at the Institution, the OTS suggested the Institution draw down its remaining unused borrowing capacity at FHLB-Topeka; the Institution subsequently drew down on its line of credit.[25] *See* **Exhibits 57 and 71**. The Institution has also accessed the QwickRate system to solicit Internet certificates of deposits. *See* **Exhibit 54**. As of January 13, 2011, the Institution had received approximately $268 million in such deposits. *See* **Exhibit 71**.

---

[24] In its Form 10-K filed on March 15, 2010, UWBK stated: "If the OTS or FDIC were to impose further limitations on brokered deposits or classify other deposits as brokered, this could materially impact our liquidity." *See* **Exhibit 87**. In a letter to the FDIC dated June 10, 2010, the Institution requested a brokered deposit waiver, stating: "[t]he inability to accept, renew, or rollover the [institutional deposits discussed above] would have an unsafe and unsound effect" on the Institution and would "impair the [Institution's] ability to have sufficient liquid assets to address possible deposit withdrawals in the ordinary course by customers in compliance with Section 29 of the FDIA." *See* **Exhibit 16**. In a letter dated November 5, 2010, counsel for UWB stated that OTS approvals in connection with the Investment were required to "avoid severe...consequences to the Bank, the public, and the Deposit Insurance Fund." *See* **Exhibit 35**. The Holding Company has provided the OTS with a letter from NASDAQ to the Holding Company dated December 2, 2010 (December 2 Letter) that contains similar representations. *See* **Exhibit 88**. In the December 2 Letter, NASDAQ stated that UWBK "expects that at the end of the current year, the Bank will fall below the level required to be adequately capitalized, absent the Proposed Transaction [*i.e.*, the Investment]. As a result, the Bank would be unable to hold certain deposits...and *would face a liquidity crisis that it believes would lead to the regulator recommending the seizure of the Bank*, resulting in the liquidation of [UWBK]. [UWBK] believes that *the Proposed Transaction is the only viable option available to it*." *Id.* (emphasis added).

[25] As of January 13, 2011, the Institution reported that $17.8 million in unused borrowing capacity was available from FHLB-Topeka. *See* **Exhibit 71**.

Western Region Receivership Recommendation
United Western Bank, Denver, CO (OTS No. 06679)
January 19, 2011
Page 19

The Institution's LCP also estimated that $400 million in additional deposits could be received from Legent Clearing if necessary. *See* **Exhibit 54**. In a letter dated December 30, 2010, the Institution revised this amount to $350 million. *See* **Exhibit 84**. On December 30, 2010, Legent Clearing amended its Depositor Agreement to allow the Institution to request Legent Clearing to place up to an additional $325 million in deposits, and required Legent Clearing to "use its commercially reasonable efforts to comply with such" deposit request to the extent that Legent Clearing has such deposits available, up to a maximum of 10 percent of the "total client account assets held in client accounts" at Legent Clearing.[26] *See* **Exhibit 75**. However, there are significant indications that diminish confidence in the Institution's estimate that these additional deposits are immediately available from Legent Clearing. Among other things: (a) the contractual 10 percent restriction limits Legent Clearing's total deposits at the Institution to approximately $363 million, and therefore the amount of additional funds available from Legent Clearing is currently $137 million;[27] (b) Legent Clearing's ability to place deposits depends upon the cooperation of Deutsche Bank Trust Company of America (DBTCA) in a liquidity crisis, which is not a reliable assumption;[28] (c) Legent Clearing does not have a clear legal obligation to provide additional funds in a liquidity crisis;[29] and (d) neither the LCP nor Legent Clearing's letter amendment estimates the length of time necessary for Legent Clearing to provide additional funds to the Institution. *See* **Exhibits 53, 54, and 75**.

The Institution reported $416 million in total liquidity as of January 13, 2011. Including an additional $137 million in available liquidity from Legent Clearing, the Institution has $553 million in available liquidity.[30] Because of the anticipated outflows of deposits from its Major Institutional

---

[26] The December 30, 2010 amendment incorporates by reference the 10 percent restriction contained in the December 3, 2010 First Amendment to the Legent Clearing Depositor Agreement. *See* **Exhibit 75**.

[27] According to the terms of the Legent Depositor Agreement, Legent Clearing may place with the Institution up to a maximum of 10 percent of the "total client account assets held in client accounts" at Legent. *See* **Exhibit 75**. As of November 30, 2010, total reported client account assets held in client accounts at Legent are approximately $3.63 billion. *See* **Exhibit 89**. Therefore, total Legent Clearing's deposits at the Institution are limited to approximately $363 million, and the amount of additional funds available is only $137 million.

[28] Legent Clearing places all of its deposits with the Institution through a money market deposits account (MMDA) placement program operated by DBTCA. *See* **Exhibits 53, 75, and 78**. DBTCA's contract is with Legent, not the Institution. *Id*. Pursuant to that contract, the Institution's decline in capital status may cause DBTCA to refuse to place deposits with the Institution. *Id*. Furthermore, Legent Clearing's Depositor Agreement does not contemplate placement of deposits outside of DBTCA's MMDA Program. *Id*. The Institution has not provided the OTS with a contingency plan with Legent Clearing to place deposits in the event DBTCA refuses to do so. *Id*. The Institution's LCP states that the Institution is "not aware of any indication from Legent Clearing that Deutsche Bank will limit its deposits at the Bank," but does not support this assertion or dispute the facts identified in the LCP Directive. *See* **Exhibit 54**. The Institution has not provided sufficient information to enable the OTS to determine whether DBTCA, and thus Legent Clearing, will be a reliable source of funds in the event of significant deposit withdrawals by Major Institutional Depositors.

[29] Neither the Deposit Agreement nor the LCP defines the "commercially reasonable efforts" that Legent Clearing is required to use to ensure that it provides the amount of deposits that the Institution might request. *See* **Exhibits 53, 54, and 75**. It is not self-evident that such efforts would include an infusion of funds during a liquidity crisis, especially in light of Legent's duties to its retail and business clients.

[30] Even if this estimate of available funds were to include the full $350 million amount available from Legent Clearing as estimated by the Institution, resulting in a total of $766 million in liquidity as of January 13, 2011, the Institution's liquidity would be insufficient to address the likely withdrawal of institutional deposits.

Western Region Receivership Recommendation
United Western Bank, Denver, CO (OTS No. 06679)
January 19, 2011
Page 20

Depositors if the proposed recapitalization does not occur, it is likely this amount will be insufficient to allow the Institution to meet its operating liquidity needs.[31]

Core earnings are insufficient to supplement the Institution's cash base. As of September 30, 2010, the Institution reported continued deterioration of the Institution's profitability levels. Core income before provisions declined to -.08 percent of average assets for the first nine months of 2010. *See* **Exhibit 29**. Given loan delinquency trends, the likely need for higher loan loss provisioning, and possible future OTTI chargeoffs, operating losses are likely to continue during the near term.

Based on information provided by the Institution, the Institution is not likely be able to timely sell assets to provide a sufficient amount of additional liquidity to meet immediate withdrawals by the Major Institutional Depositors. *See* **Exhibit 54**. The Institution considered possible asset sales to be only a secondary source of liquidity that could take as long as "90+ days" to implement. The Institution's LCP identifies only the sale of SBA purchased loans and pooled securities of $95 million, single tenant portfolio of $28 million, residential loans of $50 million, GNMA buyouts of $30 million, and BOLI of $21 million. *Id.*[32] Such projected sale of assets is in an insufficient amount and would take place over a time frame too long to fund the anticipated outflow of institutional deposits.

The Institution is incapable of quickly converting a sufficient amount of its assets into cash to pay deposit obligations resulting from volatility in its deposit structure. Given the Institution's available cash resources and other liquid assets, and the contractual rights of the Major Institutional Depositors to withdraw significant deposits, it is unlikely that the Institution will be able to meet its operating liquidity needs. Therefore, the Institution is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business.

### IV. DESCRIPTION OF MAJOR PROBLEMS/GROUNDS FOR TRANSFER

The Acting Director is authorized to appoint the FDIC as receiver for any savings association if the Director determines that grounds exist under 12 U.S.C. § 1821(c)(5). *See* 12 U.S.C. § 1464(d)(2)(A). The specific grounds applicable include:

1. **The Institution is in an unsafe or unsound condition to transact business (12 U.S.C. § 1821(c)(5)(C)).**

Pursuant to 12 U.S.C. § 1821(c)(5)(C), the Acting Director may appoint a receiver for a savings association if the savings association is in an unsafe or unsound condition to transact business. An unsafe and unsound condition has been identified as one where an institution is operated in a manner that causes an unacceptable risk to its depositors' funds.[33]

---

[31] As of January 13, 2011, including deposits placed by ETC (approximately $697 million), LTC (approximately $137 million), and remaining deposits placed by MSCS (approximately $14 million), total anticipated withdrawals by these three Major Institutional Depositors are approximately $848 million.
[32] The Institution notes that a potential sale of $900 million of community bank loans or loan participations would require a longer sale cycle and would have a "bigger negative impact to core capital." *See* **Exhibit 54**.
[33] *See Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1145, *cert. denied*, 503 U.S. 937 (1992).