## Asset Quality (continued)

additional steps management intends to initiate to enhance its origination and monitoring of these loans. Management's responses addressed our concerns.

### APPRAISAL PRACTICES

Our review of the bank's appraisal practices disclosed the following weaknesses with respect to this function: (1) three single-family loans that were closed prior to reviewing the appraisal for appropriateness; and (2) weaknesses with appraisals supporting construction or land projects. In our Findings Memo dated May 19, 2009, addressing these appraisal weaknesses, we also provided management with suggestions for enhancing the bank's Appraisal Policy and Environmental Risk Policy. The bank's written response dated June 2, 2009, satisfactorily addressed our concerns.

### CLASSIFIED ASSETS

As the following table depicts, the level of classified assets at UWB materially increased during the review period.

Table 2: Classified Asset Trends

| AQ Measures | 03/31/2009 | | | 06/30/2007 | | |
|---|---|---|---|---|---|---|
| | Mil | % of TA | Peer (%) | Mil | % of TA | Peer (%) |
| Classified Assets | $70.3 | 3.11 | 2.58 | $25.2 | 1.24 | 0.77 |
| Special Mention | $11.7 | 0.52 | 1.24 | $ 4.5 | 0.22 | 0.27 |
| Total Criticized Assets | $82.0 | 3.63 | 3.82 | $29.7 | 1.46 | 1.04 |
| | | | | | | |
| NPA (Gross) | $49.2 | 3.23 | 2.08 | $24.0 | 1.18 | 0.47 |
| NPA (Net of Guarantee by US Gov't Agency) | $34.2 | 2.01 | 1.83 | $13.6 | 0.67 | NA |

TA = Total Assets
*Source: Five Quarter UTPR dated March 31, 2009, with peer group data for the 82 institutions nationwide between $1 billion and $5 billion*

The level of classified assets at March 31, 2009, totaling $82.0 million or 34.7 percent of core capital plus ALLL, is considered less than satisfactory. The level of classified assets increased significantly during the review period primarily due to an increase in problem construction, land, and commercial real estate loans.

On June 11, 2009, the OTS issued revised guidance regarding the classification of investments (Regulatory Bulletin 37-39). Management should review the revised guidance and classify its investments in accordance with the revised guidance.

16

Appendix

## *Liquidity*

*Liquidity is evaluated in relation to the trend and stability of deposits; the degree of reliance on short-term, volatile sources of funds, including any undue reliance on borrowings or brokered deposits, to fund longer term assets; availability of assets readily convertible to cash without undue loss; ability to securitize and sell certain pools of assets; access to money markets and other sources of funding; the adequacy of liquidity sources and ability to meet liquidity needs; the effectiveness of liquidity policies and practices, funds management strategies, management information systems, and contingency funding plans; capability of management to properly identify, measure, monitor, and control liquidity; and the level of diversification of funding sources, both on- and off-balance sheet.*

**Component Rating:      3**

## Conclusion

- UWB adequately manages its day-to-day liquidity needs and keeps sufficient liquid funds for that purpose.  However, given the concentration of the majority of its deposits in a small number of institutional deposit accounts, the Bank may have inadequate access to funds on reasonable terms to meet unexpected liquidity needs.
- The liquidity contingency plan is inadequate because it does not contemplate specific adverse liquidity events that may require the Bank to gain access to extraordinary levels of liquidity.
- The liquidity policy needs revision because it neither establishes formal limits on funding concentrations (e.g., institutional deposits) nor addresses minimum acceptable levels of borrowing capacity and minimum levels of unpledged assets that must be available for liquidity purposes.  Additionally, the policy does not specify the reports to be generated by management, the content of those reports, and the distribution and frequency of such reports.

## Comments and Supporting Analysis

### LIQUIDITY MANAGEMENT/FUNDS MANAGEMENT

Liquidity and cash flow management are satisfactory for the bank's day-to-day operations. Management currently uses two measures to monitor the bank's liquidity position: a daily on-balance sheet minimum of 1.0 percent and a 15.0 percent on- and off-balance sheet minimum of total liquidity available to the Bank (including borrowing capacity with the FHLB). These ratios were modified since the prior examination from a daily minimum of 1.5 percent and a total liquidity ratio of 10.0 percent.  The approach currently utilized by management is adequate for the daily management of liquidity under a normal business environment, but insufficient to plan for potentially adverse liquidity events. Management produces daily liquidity reports showing the bank's liquidity position and other short-term liquidity projections that provide the necessary information to identify, monitor, and control cash needs and overall liquidity.

26

Appendix

| Office of Thrift Supervision | Examination Date: | 03/30/2009 |
|---|---|---|
| Report of Examination | Docket Number: | 06679 |

### Liquidity (continued)

## SOURCES OF FUNDS/LIQUIDITY

UWB's primary sources of funds continue to be institutional deposits and borrowings from the FHLB of Topeka. To a lesser extent, the Bank uses repurchase agreements, brokered deposits, and retail deposits as additional funding sources. The following table shows the bank's deposit composition for the quarter-end March 31, 2009, and year-end 2007:

| Deposits | 03/31/09 ($Millions) | % Total Deposits | 12/31/07 ($Millions) | % Total Deposits | Change as % of TD |
|---|---|---|---|---|---|
| Equity Trust Company | $501.3 | 28.1% | $455.9 | 32.0% | -3.9% |
| Sterling Trust Company | 327.7 | 18.4% | 404.6 | 28.4% | -10.0% |
| Matrix Fin. Solution | 231.0 | 12.9% | 236.4 | 16.6% | -3.7% |
| Legent Clearing[a] | 115.9 | 6.5% | 163.5 | 11.5% | -5.0% |
| Matrix Fin. Services | 18.8 | 1.1% | 18.3 | 1.2% | -0.1% |
| Other Inst. Deposits | 316.5 | 17.7% | 44.5 | 3.1% | 14.6% |
| Brokered Deposits | 39.5 | 2.2% | 13.0 | 0.9% | 1.3% |
| **Total Inst. Deposits** | **$1,550.7** | **86.9%** | **$1,336.2** | **93.7%** | **-6.8%** |
| Retail Deposits | 234.1 | 13.1% | 89.3 | 6.3% | 6.8% |
| **Total Deposits[b]** | **$1,784.8** | **100.0%** | **$1,425.5** | **100%** | **25.2%** |

Institutional deposits constitute the majority of the bank's deposits as of March 31, 2009, albeit at a percentage below the level observed at year-end 2007. Total institutional deposits represent 86.9 percent of the bank's total deposits with the largest six depositors accounting for 77.5 percent of total deposits. The largest depositor is Equity Trust Company (ETC) and this depositor alone represents 28.1 percent of total deposits. In late June 2009, ETC acquired Sterling Trust Company, a wholly-owned subsidiary of UWBI. This acquisition has resulted in an increased concentration of deposits in one single depositor to approximately 46 percent of the bank's total deposits.

Management views institutional deposits as a reasonably priced and stable source of funds, since the Bank has had most of these relationships for several years. Additionally, the term-agreements in place with some of these institutional depositors provide some stability to the deposit base. Management also indicated that there are several other institutional depositors that are willing to start deposit relationships with the Bank and that these new relationships would serve to replace funds withdrawn by existing institutional depositors, should they decide to do so. Moreover, the Chairman of the Board of UWBI has a minority interest in one of the larger depositors (Legent Clearing) and management believes that the minority ownership interest mitigates the concentration risk with this particular institutional depositor. The following table shows existing agreements with institutional depositors as of March 31, 2009, and their respective maturity dates.

---

[a] The Chairman of the Board of Directors of UWB's parent has a minority ownership interest in this company.

[b] Source: Thrift Financial Report Lines SC 710 and 712 -- Includes $189.0 million in escrow accounts.

27

Appendix

## Liquidity (continued)

| Depositor | Balance ($Millions) | Maturity |
|---|---|---|
| Equity Trust Company[c] | $501.3 | April 2010[d] |
| Matrix Fin. Solution | $231.0 | July 2010 |
| Legent Clearing | $115.9 | November 2010 |
| The Reserve | $100.0 | No term/6-month notice |
| Promontory (IND)/CDARS | $61.5 | September 2010 |
| TMI | $10.6 | Monthly |
| Others without Agreements | $530.4 | NA |

We reviewed individual contracts between the Bank and the six institutional depositors shown in the above table.  The terms of the contracts vary from one month to two years and have maturities between June 2009 and November 2010.  Most of the contracts automatically renew for successive one-year terms unless terminated by one or both parties.  Termination clauses include breach of the overall terms of the agreements and, in some instances, the agreements require the Bank to maintain a well capitalized status (e.g., Legent Clearing), a certain ranking as determined by the IDC Financial Publishing Inc. (ETC), and others require UWB to be able to accept brokered deposits (e.g., IND, Legent/Deutsche Bank).  Based on our initial discussions, management did not seem to have a clear command of all contractual terms with these institutional depositors.  At March 31, 2009, the Bank also had $530.4 million in institutional deposit relationships not governed by term agreements (includes deposits from Sterling Trust Company) that can be terminated at any time.

The termination of one or more of the larger institutional deposit relationships could place UWB in a precarious liquidity position, as it may not be able to find replacement funding on reasonable terms.  This is primarily because of the bank's relatively low borrowing capacity and the possibility that it may not be able to access wholesale deposit sources (e.g., brokered deposits).  Another factor compounding the liquidity risk is that of the Bank not having sufficient collateral to pledge because of the downgrade of a significant number of securities in the investment portfolio[e] and the negative trend in the bank's overall asset quality.  As of March 31, 2009, UWB has a significant volume of mortgage loans on its balance sheet ($548 million) that are ineligible to be pledged as collateral and the remaining loan types such as construction and commercial real estate are subjected to deep "haircuts" ranging from 45 percent to 60 percent.

---

[c] As part of the pending sale of Sterling Trust to ETC, a new term agreement is in process that will have a 5-year maturity.
[d] ETC is allowed per term agreement to withdraw most of the deposits after September 30, 2009.
[e] Refer to the Miscellaneous section of this report for a discussion of the bank's mortgage-backed securities portfolio.

28

Appendix

## Rating Definitions

## CAMELS Rating Definitions

### Composite 1
Financial institutions in this group are sound in every respect and generally have components rated 1 or 2.  Any weaknesses are minor and can be handled in a routine manner by the board of directors and management.  These financial institutions are the most capable of withstanding the vagaries of business conditions and are resistant to outside influences such as economic instability in their trade area.  These financial institutions are in substantial compliance with laws and regulations.  As a result, these financial institutions exhibit the strongest performance and risk management practices relative to the institution's size, complexity, and risk profile, and give no cause for supervisory concern.

### Composite 2
Financial institutions in this group are fundamentally sound.  For a financial institution to receive this rating, generally no component rating should be more severe than 3.  Only moderate weaknesses are present and are well within the board of directors' and management's capabilities and willingness to correct.  These financial institutions are stable and are capable of withstanding business fluctuations.  These financial institutions are in substantial compliance with laws and regulations.  Overall risk management practices are satisfactory relative to the institution's size, complexity, and risk profile.  There are no material supervisory concerns and, as a result, the supervisory response is informal and limited.

### Composite 3
Financial institutions in this group exhibit some degree of supervisory concern in one or more of the component areas.  These financial institutions exhibit a combination of weaknesses that may range from moderate to severe; however, the magnitude of the deficiencies generally will not cause a component to be rated more severely than 4.  Management may lack the ability or willingness to effectively address weaknesses within appropriate time frames.  Financial institutions in this group generally are less capable of withstanding business fluctuations and are more vulnerable to outside influences than those institutions rated a composite 1 or 2.  Additionally, these financial institutions may be in significant noncompliance with laws and regulations.  Risk management practices may be less than satisfactory relative to the institution's size, complexity, and risk profile.  These financial institutions require more than normal supervision, which may include formal or informal enforcement actions.  Failure appears unlikely, however, given the overall strength and financial capacity of these institutions.

### Composite 4
Financial institutions in this group generally exhibit unsafe and unsound practices or conditions.  There are serious financial or managerial deficiencies that result in unsatisfactory performance.  The problems range from severe to critically deficient.  The weaknesses and problems are not being satisfactorily addressed or resolved by the board of directors and management.  Financial institutions in this group generally are not capable of withstanding business fluctuations.  There may be significant noncompliance with laws and regulations.  Risk management practices are generally unacceptable relative to the institution's size, complexity, and risk profile.  Close supervisory attention is required, which means, in most cases, formal enforcement action is necessary to address the problems.  Institutions in this group pose a risk to the deposit insurance fund.  Failure is a distinct possibility if the problems and weaknesses are not satisfactorily addressed and resolved.

### Composite 5
Financial institutions in this group exhibit extremely unsafe and unsound practices or conditions; exhibit a critically deficient performance; often contain inadequate risk management practices relative to the institution's size, complexity, and risk profile; and are of the greatest supervisory concern.  The volume and severity of problems are beyond management's ability or willingness to control or correct.  Immediate outside financial or other assistance is needed in order for the financial institution to be viable.  Ongoing supervisory attention is necessary.  Institutions in this group pose a significant risk to the deposit insurance fund and failure is highly probable.

58

Appendix



# HOLDING COMPANY
# REPORT OF EXAMINATION

**March 30, 2009**

**United Western Bancorp, Inc.**
700 17th Street, Suite 2100
Denver, CO
**Structure Number: S1601**
**Docket Number: H2192**

| | |
|---|---|
| **OTS Supervisory Office:** | Western |
| **Type of Examination:** | Holding Company Regular |
| **Examination Start Date:** | 3/30/2009 |
| **Examination Completion Date:** | 8/04/2009 |

## *Prohibition of Disclosure or Release*

This document is the property of the Office of Thrift Supervision. OTS furnishes this document to the holding company for its confidential use. Except as provided in 12 C.F.R. Section 510.5, the holding company, its directors, officers, or employees may not disclose the report, or any portion of it, to unauthorized persons or organizations. Unauthorized persons or organizations include anyone not officially connected with the holding company as an officer, director, employee, attorney, auditor, independent auditor, subsidiary institution, or affiliated holding company.

If the holding company receives a subpoena or other legal process calling for production of this document, notify the appropriate Supervisory Office immediately. Advise the attorney and, if necessary, the court of the above prohibition and refer them to 12 C.F.R. Section 510.5.

Appendix

## Examiner Findings (continued)

The need to support UWB's capital position in the fourth quarter of 2008 resulted in a $12.0 million cash injection, significantly reducing UWBI's liquidity and creating the need to substantially draw down the credit line with JP Morgan Chase. Overall, cash declined from $14.0 million at June 30, 2007, to $7.1 million at December 31, 2008. Subsequent to the review period, an additional $9.0 million capital injection caused UWBI to draw down its remaining availability on the LOC in order to provide the needed capital support. As of March 31, 2009, the cash balance was below $1.0 million.

A detailed three-year cash flow worksheet is maintained for liquidity management. The May 2009 worksheet, containing actual monthly source and use figures for 2008 and estimates through 2010, projects $4.4 million and $3.4 million in non-thrift and UWB dividends in 2009, respectively, along with $11.5 million in tax payments (the UWB dividend did not assume the sale of STC assets). Without additional borrowings, the worksheet indicates that UWBI's cash position would become negative in the third quarter of 2009, although approximately $400,000 of other sources exist in cash balances maintained at various subsidiaries (Matrix Bancorp Trading, UW Asset Corp., and Equi-Mor Holdings, Inc.) Consummation of the STC asset sale was expected to provide substantial liquidity to UWBI, absent the need to continue to support UWB's capital with additional cash infusions.

The $30.0 million revolving credit line had only $2.0 million undrawn as of December, 31, 2008. Subsequent to the examination, the remaining unused portion was utilized to partially fund the first quarter 2009 UWB capital infusion. In connection with the credit line's renewal in June 2009, management has considered increasing the available balance to improve contingency funding plans.

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding (Memorandum or MOU) is made and effective this

__10th__ day of __December__, 2009 (Effective Date), by and between United Western Bank,

Denver, Colorado, OTS Docket No. 06679 (Association) and the Office of Thrift Supervision

(OTS), acting by and through its Regional Director for the Western Region (Regional Director).

Association, acting through its Board of Directors (Board), agrees to take the following corrective

actions to address the unsafe and unsound practices and the supervisory concerns and deficiencies

set forth in the full-scope examination of the Association as of March 30, 2009.

### CORRECTIVE ACTION PROVISIONS

**Capital Plan.**

1.      Within thirty (30) days from the Effective Date, the Board shall adopt and submit a written

Capital Plan for the Regional Director's review and comment. The Capital Plan shall address the

steps the Association will take to meet and maintain by June 30, 2010, a Tier 1 (core) capital ratio

of eight percent (8%) and a total risk-based capital ratio of twelve percent (12%). The Capital

Plan shall: (a) set forth all assumptions underlying the Capital Plan; (b) provide documentation

for all relevant assumptions; and (c) set forth pro forma projections through 2012.

2.      The Capital Plan shall be delivered to the Regional Director for review and non-objection

no later than five (5) days after approval by the Board. The Board shall make changes to the

Capital Plan required by the Regional Director, if any, within fifteen (15) days after receipt.

Thereafter, the Board shall adopt the Capital Plan and shall cause the Association to adhere to it.

Any request to modify the Capital Plan shall be submitted to the Regional Director for review and

written non-objection at least thirty (30) days prior to the proposed date to implement any such

modification.

United Western Bank
OTS Docket No. 06679
Memorandum of Understanding

3.      Effective immediately, the Board shall continue to:  (a) review the Association's capital

levels at each regular monthly Board meeting; and (b) ensure that the Association continually

assesses the sufficiency of the Association's capital levels relative to its risk profile, included, but

not limited to, such risks as classified asset levels, concentrations of loan types, holdings of non-

agency mortgage backed securities, and core earnings.  The Board's review of these and other

risks and of capital adequacy shall be fully detailed in the Board meeting minutes.

**Classified Asset Reduction Plan.**

4.      Within thirty (30) days from the Effective Date, the Board shall review and approve a

written comprehensive Classified Asset Reduction Plan.  The Classified Asset Reduction Plan

shall contain specific Board strategies for reducing the Association's ratio of classified assets to

Tier One (Core) Capital plus ALLL to twenty-five percent (25%) by December 31, 2010.  The

Classified Asset Reduction Plan shall specify the manner and methods for reducing the

Association's level of classified assets to the target set therein and provide a contingent plan to

further strengthen its capital base in the event this target is not met.  Further, the Classified Asset

Reduction Plan shall require provision of monthly asset quality reports to the Board (with a copy

to the Regional Director) in order for the Board to assess the Association's progress in achieving

the targeted classified assets ratio.  The Board shall document its review of the periodic asset

quality reports in the Board meeting minutes.

5.      The Classified Asset Reduction Plan shall be delivered to the Regional Director for review

and non-objection no later than five (5) days after approval by the Board.  The Board shall make

any changes to the Classified Asset Reduction Plan required by the Regional Director, if any,

within fifteen (15) days after receipt.  Thereafter, the Board shall adopt the Classified Asset

Reduction Plan and shall ensure that the Association adheres to it.  Any request to modify the

Appendix

Classified Asset Reduction Plan shall be submitted to the Regional Director for review and written non-objection at least thirty (30) days prior to the proposed date to implement any such modification.

**Concentration Reduction Plan.**

6.     Within thirty (30) days from the Effective Date, the Board shall review and approve a written Concentration Reduction Plan for submission to the Regional Director for review and comment. The Concentration Reduction Plan shall detail how the Association will reduce its existing concentration of construction loans, non-residential mortgage loans and non-agency MBS, as a percentage of Tier 1 Capital plus ALLL to a level acceptable to the Regional Director within a timeframe satisfactory to the Regional Director. At a minimum, the Concentration Reduction Plan shall include:

(a)     targets for reduction of the concentrations in each category as a percentage of Tier 1 Capital plus ALLL and time frames for each such target;

(b)     a description of the manner and methods for reducing the Association's concentrations in each category to the targets set therein; and

(c)     all relevant assumptions and projections and documentation supporting such assumptions and projections.

7.     The Concentration Reduction Plan shall be delivered to the Regional Director for review and non-objection no later than five (5) days after approval by the Board. The Board shall make any changes to the Concentration Reduction Plan required by the Regional Director, if any, within fifteen (15) days after receipt. Thereafter, the Board shall adopt the Classified Asset Reduction Plan and shall ensure that the Association adheres to it. Any request to modify the Classified

United Western Bank
OTS Docket No. 06679
Memorandum of Understanding

3

Appendix