We determined that UWB does not have an accurate, robust and well-documented credit risk management framework for internal monitoring of the bank's MBS portfolio for OTTI. Consequently, during our visit we required the Bank to enhance its modeling for OTTI. These re-calculations resulted in $18 million of additional OTTI recorded at year-end 2009. This reduced core capital below eight percent and risk-based capital (RBC) to a level slightly above 10 percent. The process and internal model must be revised and appropriately vetted prior to completion of the March 31, 2010, MBS portfolio analyses.

As a result of our field visit findings and ongoing supervision of the Bank, in a letter dated March 4, 2010, the OTS: (1) downgraded the bank's composite CAMELS rating from a "3" to a "4;" and (2) notified UWB that it was "in troubled condition" (as the term is defined at 12 C.F.R. 563.555) and subject to various operating restrictions.

Our review also recommends downgrades in individual component ratings for Capital, Asset Quality, Management, Earnings and Liquidity to a "4," and Sensitivity to a "3."

**FINDINGS**

**CAPITAL:   4**

During the field visit, we reviewed capital trends since the prior examination date. In addition, we re-evaluated the accuracy of the bank's methodology for calculating risk-based capital for non-agency MBS to ensure compliance with CEO memo 307. As of December 31, 2009, the FDICIA core capital and RBC ratios were reported at 8.4 percent and 10.8 percent, respectively, compared to March 31, 2009, totals of 8.1 percent and 10.4 percent.

Our review determined that internal processes for monitoring the bank's MBS portfolio for impairment were inadequate. Revised OTTI calculations performed by the Bank during the field visit and approved by OTS and the FDIC resulted in the Bank recording $18.1 million in additional OTTI for year-end 2009 (See Asset Quality). Given the additional OTTI write-down, a revised TFR was submitted for year-end 2009 that showed core capital and RBC decreasing to 7.68 percent and 10.07 percent, respectively. Although these ratios exceed well capitalized FDICIA standards, OTS has implicitly stated in the MOU between UWB and OTS (effective December 10, 2009), that both core capital and RBC are deficient. The MOU requires that UWB meet and maintain core capital and RBC levels at 8 percent and 12 percent, respectively by June 30, 2010.

We determined that the bank's methodology for calculating risk-based capital for non-agency MBS complies with CEO memo 307. Exceptions noted were minor and responsible bank personnel indicated that corrective action will be taken.

2

Appendix

We determined that capital is deficient given the bank's high risk profile, deteriorating asset quality trends, the potential impact of future OTTI (see Asset Quality), and the recent large operating losses (see Earnings). Consequently, we recommend that the Capital component rating be downgraded from a "3" to a "4."

## ASSET QUALITY:   4

Our review focused on internal monitoring processes for reviewing and classifying the bank's non-agency MBS portfolio. We also reviewed: (1) asset classification procedures; (2) the internal asset review function; and (3) the adequacy of allowances for loan and lease losses (ALLL).

### Non-agency MBS

The Bank's portfolio of MBS declined from $490 million as of March 31, 2009, to $346 million as of December 31, 2009. This portfolio remains comprised mostly of non-agency securities. Additionally, as of December 31, 2009, 44 securities (totaling $211.2 million) of the 61 non-agency MBS (totaling $311.6 million) were rated below investment grade.

We determined that UWB does not have an accurate, robust, and well-documented credit risk management framework. For monitoring purposes, management still needs to rank order the entire portfolio and modify the criteria for obtaining credit valuations to broaden the universe of bonds tested to ensure that all bonds with potential credit impairment are analyzed. Additionally, management needs to adopt clear, coherent, and consistent written procedures that outline these practices. For modeling and credit impairment analysis, the Bank must refine the model used to more accurately reflect current market and specific bond conditions. Going forward, any factors deemed unrealistic by management must be addressed in the underlying assumption inputs into the model used rather than subsequently disregarding selective portions of the model output.

### OTTI Calculation

Prior to our field visit, the Bank was using the Forge "loan level" methodology and applying a five-year time cut off to the limited credit value reports received from Forge. We determined that the "loan level" methodology was not adequate in reflecting the credit risk in the securities, as the methodology ignored the growing delinquencies and the resulting lag between delinquency and default -- especially given the current market conditions in which disposition times have dramatically increased due to various modification and other intervention programs. During our visit, the bank's staff conducted an additional analysis of UWB's MBS portfolio for OTTI. This additional review included certain additional assumptions that more accurately reflect current market conditions and potential further deterioration in the bank's portfolio. We requested that UWB obtain the credit valuation reports for a much larger sample of the portfolio and re-evaluate the credit impairment based on this larger sample.

3

Appendix

Our self-calculated credit impairment estimates for December 31, 2009, totaled approximately $21.7 million for UWB, or an additional $18.9 million to the $2.8 million charge the Bank had previously reported. This credit impairment estimate was derived by utilizing the credit value reports from Forge under the "collateral" method without a time truncation to the cash flows, but with a 10 percent materiality test included, and also taking into consideration all securities with a Bloomberg coverage ratio less than 1x. We believed that given the imprecision of the various methods under the Forge model and the limited time frame in which to ascertain impairment for year-end 2009, this approach provided a reasonable stopgap until the Bank could employ a better model with appropriate and supportable assumptions for future quarters.

Management indicated that they preferred to adopt an interim approach that was divergent from other Forge models. In particular, management used the "Security Credit Value" approach provided by Forge in the Credit Valuation Report with a time cut-off of three years and a materiality test of 10 percent. Management indicated that this approach was consistent with the approach used by their direct competitors and was also an approach that was plausible with their external auditors. We did not review this particular approach, nor have we concluded that we would be willing or able to accept this particular methodology, going forward, and we did not agree that the time frame cut-off was appropriate under any circumstance. However, the resulting OTTI from this approach was a total bank level credit impairment of $21.0 million or an incremental increase of $18.2 million, which approximates to the $21.7 million total bank and $18.9 million incremental levels we observed using the narrowing of the "collateral" approach mentioned above. Therefore, we accepted this valuation method as a stopgap for the December 2009 quarter only. We determined that the process and model must be revised and vetted for first quarter 2010 and the Bank would not be able to use either of the above mentioned methodologies going forward.

Based on the above modeling issues, we continue to believe that management should classify all below investment grade securities as "Substandard."

Classified Assets

As the following table depicts, the level of classified assets at UWB materially increased since the previous examination:

| AQ Measures | 12/31/2009 | | | 03/31/2009 | | |
|---|---|---|---|---|---|---|
| | Mil | % of TA | Peer (%) | Mil | % of TA | Peer (%) |
| Classified Assets | $368.9* | 14.58 | 4.15 | $70.3 | 3.11 | 2.67 |
| Special Mention | $43.5 | 1.72 | 1.47 | $11.7 | 0.52 | 1.18 |
| Total Criticized Assets | $412.4 | 6.93 | | $82.0 | 3.63 | |
| | | | | | | |
| NPA (Gross) | $81.6 | 3.23 | 2.06 | $49.2 | 2.17 | 1.41 |
| NPA (Net of Guarantee) | $71.2 | 2.81 | | $34.2 | 1.51 | |

TA = Total Assets   * Includes $210.2 million of noninvestment grade securities.
Source: Five Quarter UTPR dated December 31, 2009, with peer group data for the 72 institutions nationwide between $1 billion and $5 billion

4

Appendix

Classified assets (CA) have increased to 148.7 percent of core capital plus ALLL. However, CA totals include $210.2 million in noninvestment grade securities OTS has required the Bank to classify "Substandard" due to weaknesses in internal OTTI modeling and calculation practices discussed previously. Minus these securities, CA totals would still be noteworthy at $158.7 million, or 64 percent of core capital plus ALLL and 6.3 percent of total assets. The increase in mortgage loan classified assets since the previous examination is primarily due to increases in nonperforming construction and land loans.

Internal Asset Review

Since the previous examination, the board of directors approved revisions to the Loan Review & Asset Classification Policy at their August 27, 2009 and December 29, 2009 meetings. These policy revisions incorporated internal actions in response to our findings noted in the previous examination report and recommendations from an evaluation of policy and procedures performed by an independent third party consultant. Also, the Policy incorporates recent accounting recodification and regulatory guidance (CEO Letter #325).

Management of this function was bolstered by recent hirings, as discussed in the Management section. We reviewed a sample of internally criticized loans with Chief Credit Officer Gary Petak, James Peoples (recently hired SVP/Senior Credit Officer), and Anthony Codori, head of the Workout Group. We determined that overall internal monitoring practices are satisfactory. However, we noted that an impairment analysis should have been performed on the One Carefree Place, LLC loan. During the field visit, an impairment analysis was performed that indicated the need for $1.8 million in specific reserves against this loan rather than $1.3 million in general valuation allowances that had been established. Mr. Petak agreed to establish this reserve and to implement corrective action to improve the impairment analysis process.

ALLL

The Bank's methodology for calculating ALLL was revised in response to the previous OTS examination findings and from the review of an independent third party consultant firm who assessed UWB's process for determining adequacy of allowances. As of December 31, 2009, the level of ALLL at UWB totaled $35.4 million, or 1.4 percent of total assets and 2.4 percent of total loans. Since March 31, 2009, the bank's ALLL has increased by $17.8 million as a result of $36.6 million in loss provisions less chargeoffs. Recoveries totaled $253 thousand during this time period. We noted that the Bank incorrectly included in reported loan loss provisions $4.7 million in OTTI charges incurred since the previous examination. Accounting was advised of this reporting error and the responsible individual indicated that corrective action will be taken.

5

Appendix

Due to continuing deterioration in asset quality noted since the previous exam date (and the need for increasing loan loss provisioning that is having a large negative impact on earnings and capital formation) and risk posed by the bank's non-agency MBS portfolio, we recommend a downgrade in the Asset Quality rating from a "3" to a "4."

**MANAGEMENT:   4**

Management's review of the bank's MBS portfolio for impairment has been deficient, as discussed in the above Asset Quality section. In addition, the Bank is experiencing negative asset quality trends due to increasing delinquencies in its community bank real estate loans portfolio. Further, earnings performance for the most recent three-quarter period ended December 31, 2009, has been poor. While the current management team should be held accountable for many aspects of the bank's current condition, it should also be recognized that the securities portfolio and the savings deposit structure (See Liquidity) were mostly inherited. In addition, we noted that management has been proactive in attempts to diversify the bank's savings deposit structure and is actively monitoring problem loans and developing workout strategies when needed. Also, management was actively involved in the successful capital raise completed during the third quarter of 2009.

Since the prior examination, UWB has employed a Chief Investment Officer, a new CFO/EVP, an EVP/Senior Credit Officer, and a SVP/Director of Loan Review. All new hires are experienced in the banking field. However, these hires are relatively new and we are not able to properly assess the quality of their performance at this time. Additionally, pending receipt of a non-objection from OTS to a Compensation Arrangement for Scot Wetzel (request presented in correspondence to OTS dated March 18, 2010), CEO Wetzel has agreed to resign his positions as CEO and Director of UWB. He will remain with the Bank in the role of Corporate Development Officer (not as a senior officer) reporting to Guy Gibson (Chairman of the Board of Directors of United Western Bancorp, Inc) to provide continuity to the Bank. On March 29, 2010, UWB submitted a no-objection request to OTS for appointment of James R. Peoples as interim Chairman of the Board, President, and CEO of the Bank. Mr. James R. Peoples was recently hired at the Bank and is currently functioning as EVP/Senior Credit Officer.

Due to the deterioration in the financial condition of UWB since the previous examination and other concerns noted discussed throughout this report, we recommend that the Management component rating be downgraded from a "2" to a "4." There is also uncertainty regarding the impact that the recent changes in senior management, and those that are in process, will have on the Bank.

**EARNINGS:   4**

Our review found that the bank's earnings are deficient and insufficient to support operations and maintain appropriate capital and loan loss allowance levels.

Level and Trend

UWB's key profitability measures had historically exceeded peer medians.  However, as noted in the table below, subsequent to March 31, 2009, the bank's profitability measures have experienced a significant downturn.

| % of Avg. Assets | 12/31/2009 | 09/30/2009 | 06/30/2009 | 03/31/2009 |
|---|---|---|---|---|
| ROAA | -1.63 | -1.03 | -5.00 | 0.42 |
| ROAE | -19.97 | -12.94 | -69.74 | 5.93 |
| IEA Yield | 3.93 | 4.19 | 4.73 | 4.90 |
| Cost of Funds | 1.25 | 1.31 | 1.30 | 1.32 |
| Spread | 2.68 | 2.88 | 3.43 | 3.58 |
| NIM | 2.43 | 2.78 | 3.26 | 3.46 |
| G&A Expenses | 2.48 | 2.79 | 2.61 | 2.35 |
| Core Inc before Prov | 0.03 | 0.07 | 0.73 | 1.18 |
| Net Income | $-11,057 | $-6,434 | $-29,319 | $2,350 |

Source: 5Q UTPR as of December 2009

UWB reported operating losses for the most recent three quarters ended December 31, 2009, as a result of a compressing net interest margin (NIM), losses from the sale of non-agency MBS, OTTI writedowns on certain Held-to-Maturity MBS, and increasing loan loss provisions due to deterioration in the bank's mortgage loan portfolio.

As of June 30, 2009, the Bank reported losses of $29.3 million for the quarter, as a result of the following: a $47.0 million loss on the sale of five non-agency MBS secured by option ARM loans; a $6.7 million loss provision posted to support impairments and deterioration in the mortgage loan portfolio.

For the quarter ended September 30, 2009, UWB reported $6.4 million in net losses.  These losses resulted from a declining NIM position (decreased 48 basis points from the prior quarter) primarily due to management's decision to maintain a high liquidity position at the Bank, and $12.1 million in recorded loan loss provisions that included a $1.9 million OTTI write-off incurred on one non-agency MBS.  The bank's core income before provisions as of September 30, 2009, decreased to 0.07 percent, from 0.73 percent the prior quarter.

Fourth quarter 2009 results show continued deterioration of the bank's profitability ratios, as the NIM contracted further by approximately 35 bp from the prior quarter, primarily as a result of decreasing asset yields due to the bank's continuing high liquidity position.  Also, $17.7 million in additional loss provisions, including a $2.8 million OTTI chargeoff on a non-agency security, contributed further to losses for the quarter.  Core income before provisions decreased to 0.03 percent.

7

Appendix

In an attempt to boost earnings, management advised that they were in the process of negotiating a participation of approximately $300 million in deposits at UWB provided by Equity Trust Corporation (ETC), the largest institutional depositor at the Bank. Management's internal assessment noted that the participation of these deposits would result in approximately $8.0 million net reduction in interest expense (due to a reduction in subaccounting fees). However, the expectation of additional OTTI write downs and uncertain levels of loan reserve provisions, poses a significant threat to any projected increase in earnings generated by reducing subaccounting fees. Operating losses are likely to continue during near term 2010.

Core Income

As shown in the table below, core income declined consistently during our review period to only 0.03 percent as of December 31, 2009. This large decline in core income is due to management electing to maintain a higher liquidity position at the Bank (leading to lower yielding assets and a negative impact on NIM) coupled with higher subaccounting fees (noninterest expense) from the UWB/ETC deposit relationship. Given these results, core earnings before loan loss provisions are not sufficient to augment capital.

| (Millions) | 12/31/09 | 09/30/09 | 06/30/09 | 03/31/09 |
|---|---|---|---|---|
| Interest Income | $23,525 | $24,516 | $25,851 | $26,067 |
| Interest Expense | 7,028 | 7,242 | 6,769 | 6,605 |
| Net Interest Income | $16,497 | $17,274 | $19,082 | $19,462 |
| Fee Income | 631 | 658 | 610 | 496 |
| Less: G&A and Intangible Expense | 16,785 | 17,349 | 15,302 | 13,214 |
| CORE Income Before Loss Provisns. | $   237 | $   433 | $  4,306 | $  6,660 |

Source 5-Quarter UTPR as of December 2009

Results Compared to Business Plan

UWB's 2009-2012 Business Plan projected consolidated net income before tax for 2009 of approximately $21.0 million. However, actual consolidated income before tax at the end of 2009 was reported at negative $74.0 million, or a significant negative variance of approximately $95.0 million for the year. This variance was primarily due to: (1) the $47.0 million loss on the sale of MBS; (2) $5.0 million in unanticipated OTTI charges for the year; (3) larger than projected loan loss provisions ($27.0 million over budget) for the year; and (4) net interest income that was unfavorable to plan by $14.4 million (a result of maintaining higher levels of lower yielding liquid assets). Net income was projected at $14.1 million for 2009 but actual results totaled ($44.2) million, or ($58.4) million below budget. The plan also projected a return on average assets (ROAA) for the year at 0.62 percent. However, actual ROAA was recorded at (1.94) percent for 2009.

8

Appendix

The Plan's 2010 projections expect net income of $7.5 million. Given loan delinquency trends and the likely need for higher loan loss provisioning, as well as possible future OTTI chargeoffs, it is questionable that income projections for 2010 will be met. Management needs to update the business plan to reflect changes in business strategies planned for 2010 and the impact of regulatory restrictions that have been imposed on the Bank.

Due to the above findings, we recommend a downgrade in the Earnings component from a "2" to a "4."

**LIQUIDITY:   4**

The previous examination report expressed concern with the bank's large concentration in institutional deposits. Also, the bank's liquidity contingency plan was inadequate because it did not contemplate specific adverse liquidity events that might require the Bank to gain rapid access to significant levels of liquidity. During our visit, we reviewed the contracts with institutional depositors to better understand their provisions. We also assessed the latest available liquidity contingency plan provided by management in response to the MRBA presented in the previous report of examination.

In recent years, management has implemented a retail deposit strategy to reduce dependence on institutional deposits and, as a result, UWB has increased its network of full service retail branches. Since the examination date, the Bank has increased its funding sources. Deposit growth has come from an increase in community bank deposits, institutional deposits, and to a much lesser extent, brokered deposits (mainly through certificates of deposits as part the Certificate of Deposit Account Registry Service -"CDARS"). However, the Bank is still reliant on institutional deposits and FHLB borrowings to fund operations. In recent months management has elected to maintain excess liquidity (fueled by deposit growth and proceeds from capital raising efforts) during the current distressed economic environment even though it is negatively impacting the bank's net interest margin and ultimately earnings.

A review of UWB's Liquidity Contingency Plan noted various deficiencies and the need for enhancements. During the field visit we provided management with our recommendations for improving the Plan.

Funding Structure

The Bank has an unusual funding structure, with 80 percent of fundings concentrated in institutional deposits. The institutional depositors are from non-depository trust companies and clearings firms. Within the institutional deposits, 46 percent is concentrated in one depositor, Equity Trust Company (ETC). The following table summarizes the bank's deposit structure and borrowing position as of year end 2009:

9

Appendix

| Deposit Source | Deposits as of 12/31/09 (000s) | % of Total Deposits |
|---|---|---|
| Equity Trust Company (ETC) | 933,852 | 45.84 |
| Matrix Financial Solutions (MSCS) | 135,006 | 6.63 |
| Promontory (IND) | 114,558 | 5.62 |
| Remaining Institutional Deposits | 341,953 | 15.47 |
| CDARS and Other Brokered Deposits | 104,588 | 5.13 |
| **Total Institutional Deposits** | **1,602,957** | **78.69** |
| Core Deposits | 464,868 | 22.82 |
| Intercompany Eliminations | (30,795) | (1.51) |
| **Total Deposits** | **2,037,030** | **100.00** |
| Borrowings | 255,607 | 12.55 |

Institutional Deposits/Brokered Deposits Issues

The FDIC is reviewing whether the institutional deposits should be deemed brokered under applicable FDIC regulations. Under these regulations, the Bank would no longer be able to accept or renew brokered deposits without a waiver from the FDIC once it becomes "Adequately Capitalized." If this determination is made, the FDIC must also determine what constitutes a renewal of these institutional deposits. The contracts are of varying maturities (e.g., ETC has remaining maturity of over four years). The mechanics of the inflows and outflows of the omnibus arrangements between the Bank and the depositing institutions result in daily inflows and outflows of funds. Under a strict interpretation of what constitutes a renewal or rollover, the Bank could face a dramatic shrinkage of funds in a relatively short period of time. UWB has recently provided legal opinions on some of the relationship contracts that argue that these deposits should not be deemed brokered. These opinions have been provided to the FDIC and to OTS Legal and are under review.

We are monitoring events closely, but the likelihood of an immediate liquidity crisis is lessened because management has recently taken action to reduce its brokered deposit exposure through use of its large liquidity position it has maintained at UWB since the previous examination. In particular, UWB terminated its relationships with several institutional depositors (IND, TBS, Reserve) deemed as brokered by the FDIC during our field visit, and all deposits from these entities have subsequently left the Bank as of March 31, 2009. Sufficient liquidity also appears to be available to handle the reduction in CDARS deposits and other brokered deposits that are expected to leave the Bank at maturity. In addition, UWB has recently provided its consent (a requirement of the relationship contract) to ETC to move $300 million of deposits to another bank, thereby reducing its concentration at UWB. Currently, UWB is focused on maintaining only its core processing and trust deposits and community bank deposits. The core processing and trust deposits are from ETC, MSCS, Legent and Lincoln Trust.

10

Appendix