3. Applications and Notices. The Holding Company will not qualify for expedited treatment for applications and notices filed with OTS. See 12 C.F.R. § 516.5.

In addition, the OTS imposes the following restrictions or requirements upon the Holding Company:

1. Capital Distribution. The Holding Company may not declare or pay dividends or make any other capital distribution or redeem any capital stock without prior written notice of non-objection of the Regional Director. Holding Company's written request for non-objection shall be submitted to the Regional Director at least thirty (30) days prior to the anticipated date of the proposed dividend payment or distribution of capital.

2. Restrictions on Debt. The Holding Company shall not, directly or indirectly, incur, issue, renew, repurchase, make payments on or rollover, or increase any debt or commit to do so without the prior written notice of non-objection of the Regional Director. All requests of the Holding Company for the Regional Director's non-objection to engage in such debt transactions, at a minimum, shall: (a) describe the purpose of the proposed debt; (b) set forth and analyze the terms of the proposed debt and covenants; (c) analyze the Holding Company's current cash flow resources available to satisfy such debt repayment; and (d) set forth the anticipated source(s) of repayment of the proposed debt.

3. Restrictions on Compensation or Benefits. The Holding Company shall not enter into, renew, extend or revise any contractual arrangement related to compensation or benefits with any director or officer of the Holding Company or increase the compensation of a director or an officer, unless it first: (a) provides a minimum of thirty (30) days advance notice of a proposed transaction; and (b) receives a written notice of non-objection from the Regional Director. In addition, the Holding Company shall not make any bonus payments to, or otherwise increase the compensation of, any of its directors or officers unless it first: (a) provides a thirty-(30) day advance written notice of such proposed bonus or increase, including all documentation required to evaluate the proposal; and (b) receives a written notice of non-objection to the proposal from the OTS.

The restrictions and requirements set forth above are effective immediately upon receipt of this directive and shall remain in effect until terminated, modified, or suspended by the Regional Director. The OTS reserves all of its rights. Nothing in this directive shall be construed as: (1) restricting the OTS in any way from taking such actions (enforcement or otherwise) as it determines are appropriate and authorized; or (2) allowing the Holding Company to violate any law, rule, regulation, or policy statement to which it is subject. The OTS will take formal enforcement action to address our regulatory concerns regarding the Holding Company.

If you have questions, please contact Assistant Director Nicholas J. Dyer at (650) 746-7025 or Field Manager Kevin Swanson at (650) 746-7066.

Sincerely,

Edwin C. [illegible] for

C.K. Lee
Regional Director

cc: Mr. Thomas J. Dujenski, Regional Director, FDIC-Dallas



**Office of Thrift Supervision**
Department of the Treasury *Western Region*

Pacific Plaza, 2001 Junipero Serra Boulevard, Suite 650, Daly City, CA 94014-1976
P.O. Box 7165, San Francisco, CA 94120-7165 • Telephone: (650) 746-7000 • Fax: (650) 746-7001

March 5, 2010

Board of Directors
Attn: Mr. Scot D. Wetzel, Chairman
United Western Bank
700 17th Street, Suite 100
Denver, CO 80202

RE: Refiling the December 31, 2009 Thrift Financial Report

Dear Members of the Board:

On February 25, 2010, our examiners concluded the on-site portion of the field visit that began on January 11, 2010. The field visit included a review of United Western Bank's process for reviewing mortgage-backed securities for other-than-temporary impairment. During the visit, the Bank's staff conducted an additional analysis of the Bank's mortgage-backed securities portfolio for other-than-temporary impairment. This additional analysis included certain additional assumptions that more accurately reflect current market conditions and potential further deterioration in the Bank's portfolio.

Toward the end of the field visit, we reviewed the results of this additional analysis and discussed the results with Vice-Chairman William Snyder and CFO Chuck Caswell. The results indicate that a significant additional amount of other-than-temporary impairment must be recognized in the Bank's December 31, 2009 financial statements and reflected in a revised Thrift Financial Report. Management and the examiners are in agreement about the amount of additional other-than-temporary impairment that must be recognized as a result of this process, but we understand that the total additional expense recognized for the period may also be affected by an additional valuation allowance associated with the deferred tax asset. This additional valuation allowance may be required because of the additional other-than-temporary impairment expense recognized. Based on our discussions with Mr. Snyder and Mr. Caswell, it is our understanding that the December 31, 2009 financial statements will be completed and issued no later than March 16, 2010. It is also our understanding that these financial statements will reflect the additional other-than-temporary impairment recognized as well as any additional expense associated with the deferred tax asset. We expect that a revised December 31, 2009 Thrift Financial Report will also be filed by this date.

Going forward, we expect the Bank to continue to refine its securities review process to ensure that the process fully reflects changing market conditions as well as any further deterioration in the Bank's mortgage-backed securities portfolio.

Should you have any questions about this matter, please contact me at (650) 746-7025, or Field Manager Kevin Swanson at (650) 746-7066.

Sincerely,

Nicholas J. Dyer

Nicholas J. Dyer
Assistant Director

Table of Contents

United Western Bancorp, Inc. and Subsidiaries
Notes to Unaudited Consolidated Financial Statements
March 31, 2010

**1. Basis of Presentation and Significant Accounting Policies**

United Western Bancorp, Inc. (the "Company") is a unitary thrift holding company and, through its subsidiaries, a diversified financial services company headquartered in Denver, Colorado. The Company's operations are conducted primarily through United Western Bank® (the "Bank"). UW Trust Company ("UW Trust") (formerly known as Sterling Trust Company), see Note 18 Discontinued Operations — Sale of UW Trust Assets for further discussion, Matrix Financial Services Corporation ("Matrix Financial"), and UW Investment Services, Inc. ("UW Investment"), all of which are wholly owned subsidiaries of the Company.

We have completed the fourth year of our community bank business strategy. This strategy has included the development of a branch network within the Colorado Front Range and selected mountain community markets and building a balance sheet that includes community bank loan and deposit products. We are developing a service-focused business that serves the community in which our management team and employees work and live. As we view the landscape of today's deposit marketplace we believe the competition for community banking deposits, both retail and business, will be substantial and will continue to increase as the dominant national banks increase their branch presence further, and as retail and business customers migrate away from bank branches to other platforms. In this regard, we have continued to capitalize on our longstanding core deposit base through the development of processing and trust deposit relationships (which includes securities clearing and settlement, custodial, trust and escrow) that provide a stable, long-lived and inexpensive alternative to the traditional branch banking concept. We anticipate that our management will evaluate various additional sources to this deposit gathering strategy, and in the future, we may consider acquiring deposits from processing businesses that have significant deposit generating capacity that is incidental to their primary purpose. See Note 11 "Regulatory Matters" for the impact on operations as a result of the Company and Bank entering into separate informal Memorandums of Understanding ("Informal Agreements") with the Office of Thrift Supervision (the "OTS").

We originate Small Business Administration ("SBA") loans on a national basis. In addition to the community-based banking operations of the Bank, we also offer cost effective deposits and deposit services on a national basis to a variety of customers, including those involved in the processing services industries (*e.g.*, securities settlement, mortgage banking, custodial), as well as escrow paying agent and trust account management services through UW Trust.

The consolidated financial statements of the Company and its subsidiaries in this Quarterly Report on Form 10-Q have not been audited by an independent registered public accounting firm, but in the opinion of management reflect all adjustments necessary for a fair presentation of the Company's financial position and results of operations. All such adjustments were of a normal and recurring nature. The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial information and with the instructions to Form 10-Q adopted by the Securities and Exchange Commission ("SEC"). Accordingly, these financial statements do not include all of the information and footnotes required by GAAP for complete financial statements and should be read in conjunction with the Company's consolidated financial statements, and notes thereto, for the year ended December 31, 2009 included in the Company's Annual Report on Form 10-K filed with the SEC on March 15, 2010. Operating results for the interim periods disclosed herein are not necessarily indicative of results that may be expected for the full year or any future period.

**Significant Accounting Estimates**

The Company has established various accounting estimates that govern the application of GAAP in the preparation and presentation of the Company's consolidated financial statements. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities, and the reported amounts of income and expenses during the reporting period which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, knowledge of the accounts and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of assets and liabilities and the results of operations of the Company.


**Office of Thrift Supervision**
Department of the Treasury *Western Region*
Pacific Plaza, 2001 Junipero Serra Boulevard, Suite 650, Daly City, CA 94014-3897 Daly City Area Office
P.O. Box 7165, San Francisco, CA 94120-7165 • Telephone: (650) 746-7000 • Fax: (650) 746-7001

April 1, 2010

OTS No. 06679

Board of Directors
United Western Bank
700 17th Street, Suite 100
Denver, CO 80202-3501

*VIA FED-EX*

Dear Members of the Board:

The Memorandum of Understanding (MOU) effective December 10, 2009 between the Office of Thrift Supervision (OTS) and United Western Bank (UWB or Association) included a requirement that the Board should review and approve a Liquidity Contingency Plan and thereafter provide a copy to the Regional Director for review and approval (Paragraphs 11 &12 of the MOU). The Association provided the OTS with a Board approved Liquidity Policy, dated January 8, 2010, that included a Contingency Funding Plan (CFP). The OTS reviewed the Liquidity Policy and included CFP in connection with the Field Visit conducted as of January 10, 2010. Based upon this review, OTS has determined that the Association needs to enhance its liquidity policy.

Of primary importance, the policy must be expanded to include potential contingencies that will become applicable to the Association should it become less than well-capitalized pursuant to Prompt Corrective Action (PCA) provisions under the Federal Deposit Insurance Corporation (FDIC) Improvement Act. The contingencies may include restrictions on rates paid for deposits, the need to seek approval from the FDIC to accept brokered deposits, and the inability to accept brokered deposits. UWB should prepare for such contingencies, including the possibility that some or all of the institutional deposits held by the Association are considered brokered deposits. Such contingency planning should take into account the potential impact of the application of such restrictions at both the omnibus and sub-account levels.

To assist Association management in enhancing its contingency planning, we are enclosing a copy of CEO Letter 342 dated March 17, 2010, which transmitted the Interagency Policy Statement on Funding and Liquidity Risk Management. The policy statement describes the process that institutions should follow to identify, measure, monitor, and control funding and liquidity risk and sets forth supervisory expectations in this key area of safe and sound operations. The section dealing with Contingency Funding Planning should be of particular assistance in this effort.



James R. Peoples
Chairman, President &
Chief Executive Officer
720.956.6576
jpeoples@uwbank.com

***CONFIDENTIAL TREATMENT REQUESTED*** [1]

June 10, 2010

Kristie K. Elmquist
Acting Regional Director
Federal Deposit Insurance Corporation
1601 Bryan Street
Dallas, Texas 75201

***SENT VIA OVERNIGHT MAIL DELIVERY SERVICE***

**RE: Brokered Deposit Waiver Request Pursuant to 12 U.S. C. § 1831(c) and 12 C.F.R. § 337.6(c) by United Western Bank, Denver, Colorado**

Dear Director Elmquist:

This letter is an application to the Federal Deposit Insurance Corporation (the "FDIC") pursuant to Section 29(c) of the Federal Deposit Insurance Act (the "FDIA") and Section 337.6(c) of the rules and regulations of the FDIC, seeking permission for United Western Bank, a federal savings bank headquartered in Denver, Colorado (the "Bank") to continue to accept, renew and rollover certain brokered deposits described in the May 24, 2010 FDIC letter addressed to the Bank (the "FDIC Letter"), as discussed below.[2] The Bank currently is deemed to be "adequately capitalized" as such term is defined at Section 565.4(b)(2) of the rules and regulations of the Office of Thrift Supervision (the "OTS"). As a result, under Section 29(a) of the FDIA, absent a waiver, the Bank may not accept, renew or roll over for deposit funds obtained directly or indirectly by or through any deposit broker. *See* 12 U.S.C. § 1831f(a).

As you are aware, in the FDIC Letter, which was dated May 24, 2010, but delivered to the Bank on June 2, 2010,[3] the FDIC determined that a significant portion of the Bank's institutional

[1] This letter and the enclosed documents contain confidential business information not in the public domain. This letter is being provided to the federal bank regulators of United Western Bank in their supervisory capacity over the Bank and therefore should be granted confidential treatment pursuant to the bank examination and supervision exemption to the Freedom of Information Act. Accordingly, we request, pursuant to 5 U.S.C. § 552(b)(8), confidential treatment of such materials and enclosures. Please notify us if anyone submits a Freedom of Information Act request for a copy of this letter or the enclosures.

[2] A copy of the FDIC Letter is provided at Exhibit A hereto. In the FDIC Letter, the FDIC deemed the following seven institutional deposit relationships with the Bank to be brokered deposits: Equity Trust Company, MSCS, Lincoln Trust Company, Legent Clearing, LLC, Constellation Trust Company, TMI and UW Trust Company. The Bank seeks a waiver from the FDIC from accepting, renewing or rollover of such deposit relationships.

[3] Although the FDIC Letter is dated Monday, May 24, 2010, it was not delivered to the Bank until Wednesday, June 2, 2010. In fact, the FDIC Letter was not even delivered to United Parcel Service until Friday, May 28, 2010. Accordingly, the Bank was

deposits should be deemed to be brokered deposits (the "Newly-Deemed Brokered Deposits"). While the Bank strongly disagrees with the conclusions set forth in the FDIC Letter and reserves all rights with respect to seeking a review of the determination in the FDIC Letter, pending such review, the Bank is taking appropriate steps to satisfy all required regulatory directives.

Specifically, via a letter dated June 2, 2010, the Bank's primary federal regulator, the OTS, directed the Bank to file a brokered deposit waiver request with the FDIC. On a case-by-case basis and upon application by an insured depository institution that is adequately capitalized, the FDIC is authorized to waive the applicability of such prohibition upon a finding that acceptance of such deposits do not constitute an unsafe or unsound practice with respect to such institution. *See* 12 U.S.C. § 1831f(c).

A waiver would be consistent with the FDIC Letter, which explicitly states that the FDIC "stands ready to consider the Bank's strategies to ***gradually eliminate*** these brokered deposits until such time as the Bank becomes well capitalized and is not subject to any Federally issued written agreement containing a 'meet and maintain' capital provision" (emphasis added). The Bank has tentatively scheduled a meeting for the week of June 21st with representatives of the FDIC in Washington, D.C. to discuss appropriate strategies and implement a plan to ensure compliance with all applicable laws as recently interpreted by the FDIC.

A key initial component to such strategies is for the Bank to meet and maintain enhanced capital requirements. United Western Bancorp, Inc. (the "Company"), the Bank's holding company, expects to consummate a capital raising transaction in the near future[4] at the completion of which the Company will contribute additional capital to the Bank with a view to bringing the Bank into compliance with OTS mandated enhanced core and total risk based capital ratio requirements. Upon exceeding these enhanced capital standards, the Bank expects to petition the agency to modify these requirements. On a longer-term basis, in the event that OTS does not modify its "meet and maintain" directive, as described below, the Bank will cease renewing any brokered deposits as they come to term. For example, from March 4, 2010 to May 31, 2010, the Bank shed over $271 million in deposits (see Exhibit B). Similarly, unless the FDIC permits the renewal of specific institutional deposit relationships, the Bank shall take appropriate steps consistent with those relationships to terminate those relationships.

Finally, we note that the Bank received the FDIC Letter on Wednesday June 2, 2010, which requires fundamental restructuring of the Bank's current operations. On the same date, the Bank was directed by the OTS to file this waiver request. Accordingly, the Bank expects to undertake a more comprehensive review of certain methods to reduce its exposure to brokered deposits, after meeting with FDIC officials in Washington, D.C., tentatively scheduled for the week of June 21st, as well as taking into account the Bank's capital status upon consummation of the capital raise transaction, which should occur during the next ninety (90) days. As discussed

---

not on notice of the determinations set forth in the FDIC Letter until Wednesday, June 2, 2010, after the Memorial Day holiday.

4 The Company retained Goldman Sachs & Company in March 2010 to represent it in capital raising transaction. The Company, assisted by Goldman Sachs, is currently in discussions with over 10 firms, either private equity groups or bank holding companies, any one of whom may provide the required level of financing for the Company to allow the Bank to meet or exceed its enhanced capital ratio targets.

below, as the initial waiver would be for a minimum of ninety (90) days, additional strategies will be formulated and submitted to the FDIC to the extent waivers are required in the future.

Until such immediate strategies can be implemented, given the conclusions set forth in the FDIC Letter, we believe that a waiver of the prohibition against the Bank from accepting, renewing or rolling over deposits deemed by the FDIC Letter as brokered is appropriate for the Bank, consistent with Section 29(c) of the FDIA, as discussed below, since the continued acceptance of the deposits addressed in the FDIC Letter, does not constitute an unsafe or unsound practice with respect to the Bank.

**Background**

The Bank has taken all appropriate steps to eliminate the acceptance of any and all deposits that are brokered under FDIC regulations (*e.g.*, CDARS® deposits, traditional brokered deposits and certain brokered institutional deposit relationships). Further, the Bank is not renewing any such deposits as they come to term. Attached as Exhibit B is a chart representing the reduction in the amount of brokered deposits from March 4, 2010 to May 31, 2010, that the Bank previously determined to be brokered deposits.

The facts surrounding the Bank's use of well recognized brokered deposits such as CDARS® are markedly different from those in the Bank's current situation arising out of the recent FDIC Letter in which deposit relationships of long tenure have recently been deemed to be "brokered deposits" under applicable FDIC regulation. As previously described to the FDIC (see attached Exhibit C, which is a copy of a White Paper entitled, *United Western Bank Core Deposit Strategic Planning and Regulatory Positions*, dated March 8, 2010 on the brokered deposit issue, prepared by the Bank and previously submitted to the FDIC ), the Bank has long term contractual relationships pertaining to these accounts. These institutional relationships have extended over a decade in many instances. As a consequence, the Bank finds itself in a unique situation that requires a waiver under Section 29(c) of the FDIA in order to preclude a completely preventable liquidity crisis.

As the FDIC is aware, the Bank has entered into a number of agreements with institutions that have custody of customer funds, pursuant to which these institutions, as agent for their customers, maintain deposit funds in money market and/or demand deposit accounts at the Bank. These are ordinary course deposit relationships between the institutions and their clients which are provided to their retail customers as an incident of the institutions' primary businesses; in no instance is it the primary business of any of these institutions to place deposits with the Bank or any other bank or FDIC insured depository institution. The FDIC is well versed in the history of these relationships, some of which have persisted for over thirteen years and all of which show consistent growth and stability over the time period the funds have been on deposit with the Bank (see Exhibit D).

As of May 31, 2010, the Bank had approximately $1.2 billion in deposits (67% of the aggregate) of the Newly-Deemed Brokered Deposits under the FDIC Letter, out of a total deposit base of approximately $1.8 billion. The inability to accept, renew or rollover the Newly-Deemed Brokered Deposits would have an unsafe and unsound effect on the Bank as such newly-imposed regulatory impediment would unnecessarily impair the Bank's ability to have sufficient liquid

assets to address possible deposit withdrawals in the ordinary course by customers in compliance with Section 29 of the FDIA.

We note that the Newly-Deemed Brokered Deposits are not inappropriate "hot money" that has been gathered by a deposit broker who shops for financial institutions paying the highest rates, as has previously been explained to the FDIC (see attached White Paper in Exhibit C). Rates paid on the deposits held by the Bank under its contractual relationships range from 0 basis points to 1.10%.[5] Moreover, these funds are stable deposits, unlikely to move out of the Bank, absent an adverse, inappropriate regulatory determination. As set forth on Exhibit D, the balances in the various contractual relationships have increased over time. This historical data conclusively demonstrates that the Newly-Deemed Brokered Deposits are in reality stable and not rate-sensitive and, therefore, do not possess the characteristics of deposits that the FDIC typically attributes to "hot money."

**Required Information for a Waiver Pursuant to Section 303.243(c)**

In accordance with Section 303.243(c) of the rules and regulations of the FDIC, applications to the FDIC for a waiver must set forth: the time frame for the waiver, a statement of the bank's policy governing the use of brokered deposits in the bank's overall funding and liquidity management program, current and anticipated volumes, rates and maturities, internal limits, explanation of how brokered deposits are priced and other funding alternatives; as well as a detailed discussion of the Bank's asset growth plans, procedures and practices to solicit brokered deposits, management systems to oversee the solicitation, acceptance and use of such deposits, and an explanation as to why the acceptance, renewal or rollover poses no undue risk to the Bank. 12 C.F.R. §303.243(c). The required information is set forth below and in the enclosures herewith.

**Time Frame for Waiver**

The Bank seeks a waiver from the limitation in Section 29(a) of the FDIA and Section 337.6(b) of the FDIC rules for a minimum period of ninety (90) days, subject to renewal. The Bank's current adequately capitalized status is based upon the fact that its total risk based capital ratio fell below 10% at March 31, 2010. At such date, the Bank's core capital ratio was 6.6%. It should also be noted that the Bank's core capital ratio is projected to exceed 7% as of June 30, 2010. The Bank further notes that the OTS may seek to require that the Bank enter into a formal enforcement agreement that reiterates specific "meet and maintain" capital ratios. However, as noted above, as a result of the Company's ongoing capital raising transaction, the Bank expects to meet and exceed both the traditional prompt corrective action "well capitalized" level ratios as well as enhanced capital ratios in the near term. Accordingly, the Bank will seek approval of the OTS to terminate any such OTS mandated "meet and maintain" provisions as promptly as possible after exceeding the regulatory capital requirements in any OTS' directive.

[5] Note that the rates paid on the subject deposits do not include subaccounting and administrative fees paid to the institutional depositors pursuant to the contractual agreements.