### Bank's Policy Governing the Use of Brokered Deposits in the Bank's Overall Funding and Liquidity Management Program

Bank policy eschews the use of interest rate sensitive brokered deposits as a primary or secondary source of liquidity. The Bank has and will continue to seek long-term stable sources of deposit funding. Despite the FDIC's conclusions in the FDIC Letter, the Bank still believes that the deposits subject to the FDIC Letter were such types of deposits.[6] The Bank's belief is based upon the stable, long tenured history of such deposits as evidenced by the chart on Exhibit D and as discussed in detail in the White Paper. Generally, retail deposits will first be sought, and then the availability of FHLB advances versus projected liquidity needs will be evaluated to determine the secondary source of funding. The deposits subject to the FDIC Letter are stable, generally low rate deposits, consistent with deposits that are long-term in nature and that are not interest rate sensitive.

In addition, the Bank will shortly enter into a binding agreement, subject to OTS and FDIC approval as well as other regulatory approvals, to acquire a 100% interest in Legent Clearing LLC ("Legent Clearing"), a FINRA member firm engaged in securities clearing and processing services. Legent Clearing will become an operating subsidiary of the Bank. As the FDIC is well aware, an operating subsidiary of a federally or nationally chartered bank is treated as a division of the Bank itself. *See e.g., Waters v. Wachovia, N.A.,* 550 U.S. 1, 35-36 (2007) Legent Clearing clients currently have approximately $700 million of cash balances that will be available to the Bank as additional liquidity and such deposits should not be classified as "brokered deposits."

### Current and Anticipated Volumes, Rates and Maturities

Exhibit D sets forth a listing of the Newly-Deemed Brokered Deposits under the FDIC Letter. These deposits represent approximately 75% of the Bank's deposit base, net of deposits truly deemed to be brokered, and are critical to the Bank's current operations. In sum, these deposits have no attributes of brokered deposits that have been criticized for years by federal regulatory agencies. Specifically, these are low-rate and stable deposits. These deposits are not being raised to fund unsustainable rapid growth, support risk and speculative asset investment by a weak or insolvent institution. Requiring the Bank to divest of this long-lived, stable source of liquidity while the Bank is temporarily adequately capitalized is imprudent, unsafe and unsound. Elimination of these deposits does not address the concerns repeatedly expressed about the transient nature of brokered deposits by FDIC Chairman Sheila Bair.

Further, these deposits are controlled by agreements which provide that the customer deposits will be maintained at the Bank for a specific term. The Bank submits that the FDIC can and should find that the tenor of the deposit relationships are controlled by these agreements, not the terms of the underlying account paperwork as the superior agreements bind the institutions to maintain the omnibus deposit accounts as agent for the underlying retail customers.

---

[6] Further, notwithstanding the FDIC Letter, the Bank is of the opinion, based on the advice of competent counsel, that the subject deposits are not "brokered deposits" for purposes of Section 29 of the Federal Deposit Insurance Act and under applicable regulations and the Bank will consider all options available to it to reconcile its position vis a vis the FDIC Letter.

Ms. Kristie K. Elmquist
June 10, 2010
Page 6 of 8

For example, the Bank's deposit relationship with MSCS is governed by an Amended and Restated Services Agreement dated July 5, 2007 (the "Services Agreement").[7] Pursuant to the terms of such agreement, the Services Agreement automatically renews on July 5, 2010. The Bank therefore seeks explicit FDIC waiver of the newly imposed brokered deposit restrictions with respect to this deposit relationship pursuant to this letter.

**Internal Limits**

Until the time that the Bank and the FDIC formally resolve the definition of "brokered deposits," the Bank will treat the relationships noted in the FDIC Letter, with the exception of all deposits associated with UW Trust Company, a wholly owned subsidiary of the Company and an affiliate of the Bank, as "brokered deposits." The Bank and the Company believe that it is inappropriate to deem the UW Trust Company deposits as brokered since UW Trust Company is a part of the affiliated group controlled by the Company. In addition, the UW Trust Company deposits represent escrow deposits maintained on behalf of life settlement investors and as such these deposits are clearly not brokered deposits.

The Bank also will limit growth of the Newly-Deemed Brokered Deposits to no more than 25% in the aggregate from the amounts held by the Bank as of the date of this letter. This limit is to account for transitory amounts that may be deposited with the Bank due to underlying customer demands (e.g., monthly or quarterly deposits received in light of 401k plan contributions via employee withholding) that are in transit to mutual fund or other investments. In no case will the Bank employ these amounts to increase any asset position other than government guaranteed investments (e.g., GNMA certificates) or deposits within the Federal Reserve system. This self-imposed limit should adequately provide comfort to the FDIC that the Bank is not using "hot money" to balloon its balance sheet in risky investments.

**Explanation of how Brokered Deposits are Priced**

The Newly-Deemed Brokered Deposits are priced in accordance with long-term contractual relationships and are not priced as traditional "hot money" designed to fund rapid growth. Exhibit D sets forth the pricing of the deposits for each relationship addressed in the FDIC Letter.

As of June 1, 2010, the weekly national average interest rate for money market accounts was 0.30% with a rate cap of 1.05%. As set forth on Exhibit D, the Bank's deposits do not otherwise materially exceed these amounts. To the extent interest rates exceed the national average, the Bank is notifying the counterparties that the rates are being adjusted accordingly, as of the date the Bank was notified of the FDIC's determination on June 2, 2010.

---

[7] The Bank's relationship with MSCS has been on-going since 1998 and the Services Agreement has been renewed throughout that period.

Appendix

Ms. Kristie K. Elmquist
June 10, 2010
Page 7 of 8

**Funding Alternatives**

The Bank utilizes FHLB advances in addition to deposits to meet its funding needs. Currently, the Bank has $268.5 million available through FHLB advances to meet funding needs, in addition to currently outstanding FHLB advances in the amount of $180.5 million. As described above, the acquisition of Legent Clearing, which can be accomplished within 10 business days following approval of the acquisition by the OTS and the FDIC, FINRA and the SEC, will add approximately $700 million of liquidity to the Bank which it will employ to supplant the deposits questioned by the FDIC in the FDIC Letter.

**Asset Growth Plans**

At this time, the Bank has no short term plans to increase its asset base. In fact, from February 28, 2010 to May 31, 2010, the Bank's total assets declined approximately $731 million. The Bank will limit its growth in accordance with the terms of the current or any future directive from the OTS.

**Procedures and Practices to Solicit Brokered Deposits**

The Bank currently does not solicit traditional, interest rate sensitive "hot money" brokered deposits. The Bank, however, will not seek new deposit relationships with the retail clients of institutional processing companies of the type giving rise to the FDIC Letter until such time as the definition of brokered deposits is resolved with the FDIC or until the time that the Bank returns to well capitalized status.

**Management Systems to Oversee the Solicitation, Acceptance and Use of Brokered Deposits**

The Bank has procedures in place to direct brokered deposit inquiries to a centralized area within deposit operations. The Bank's deposit operation's staff will not open any additional accounts without the written approval of either the Bank's COO or CFO. As a final precaution, an enhanced due diligence (EDD) questionnaire is completed on every new account prior to opening the account. The compliance department of the Bank reviews the questionnaires and would determine if the deposit originated from a deposit broker. Finally, all branch personnel are trained to identify all potential deposit brokers.

**Why the Acceptance, Renewal or Rollover Poses No Undue Risk to the Bank.**

The Bank's continued acceptance, renewal and rollover of the Newly-Deemed Brokered Deposits poses no undue risk to the Bank because:

1. these deposits are controlled by written agreements with the customers' agents which provide for a set term of the relationship and the Bank is not under threat of these contracts being terminated or abrogated unless the FDIC were to cause such action due to its recent determination as to the brokered status of these deposits;

2. the Bank is not expanding its balance sheet and is not endangering its liquidity by accreting additional, illiquid assets to its balance sheet;

Ms. Kristie K. Elmquist
June 10, 2010
Page 8 of 8

3. with time and the approval of the Legent Clearing LLC acquisition as an operating subsidiary of the Bank, the Bank will be in position to effectively release non-controlled deposits, regardless of their status as Brokered Deposits or not, to reduce the concentrations at Equity Trust Company client and other client deposits; and

4. there is not now, nor does the Bank expect that, any depositor concern will cause a sudden diminishment in the balance of deposits directed to the Bank by the clients of the processing companies questioned in the FDIC Letter as "deposit brokers."

In fact, the Newly-Deemed Brokered Deposits enhance the safe and sound operations of the Bank because they enhance the Bank's liquidity status. As the FDIC is aware, a significant portion of the Bank's operations center around the deposits recently deemed by the FDIC as brokered. Elimination of these relationships will cause significant harm to the Bank, while retention of the deposits, or a slow, gradual elimination, as provided for in the FDIC Letter, mitigates the harm caused by recent regulatory determinations and reactions resulting in a precipitous withdrawal of these deposits.

* * * *

For the foregoing reasons, we respectfully request that the FDIC permit the Bank to continue to accept, renew and roll over the Newly-Deemed Brokered Deposits in accordance with the terms of this request for a minimum of ninety (90) days. We note that time is of the essence with respect to this request for a waiver. If you have any questions regarding the foregoing, please do not hesitate to contact me at (720) 956-6576 or Thomas Kientz at (720) 956-6548.

Sincerely,

James R. Peoples
Chairman, President and CEO


cc: Joseph A. Meade, Assistant Regional Director, FDIC
    Thomas L. Trujillo, Case Manager, FDIC
    Lori A. Quigley, Acting Regional Director, OTS
    Edwin Chow, Regional Deputy Director, OTS
    Nicholas Dyer, Regional Assistant Director, OTS
    Lawrence D. Kaplan, Esq. / Paul Hastings Janofsky & Walker, LLP

    Enclosures

Appendix

EXHIBIT A

FDIC
**Federal Deposit Insurance Corporation**
**Dallas Regional Office**
1601 Bryan Street, Dallas, Texas 75201
(800) 568-9161 FAX (972) 761-2082

**Division of Supervision and Consumer Protection**
**Memphis Area Office**
5100 Poplar Avenue, Suite 1900, Memphis, Tennessee 38137
(901) 685-1603 FAX (901) 821-5308

May 24, 2010

Mr. James R. Peoples
Chairman of the Board
CEO and President
United Western Bank
700 17th Street, Suite 100
Denver, CO 80202

Re: Deposit Agreements

Dear Mr. Peoples:

This letter is to notify the Bank that the FDIC has determined that the Bank's deposits from seven institutional relationships described below are brokered deposits. The seven institutional depositors facilitate the placement of deposits of their respective customers by opening omnibus accounts at the Bank. These accounts, which consist of MMDA's, non-interest bearing accounts and NOW accounts, are typically opened in the name of the institutional depositor for the benefit of their customers. In turn, the institutional depositors maintain detailed records at the account level of each of their customers' ownership interest in each omnibus account. The FDIC realizes the impact that this determination has on the Bank, particularly in light of the bank's current "Adequately Capitalized" position under the Prompt Corrective Action provisions of Section 38 of the Federal Deposit Insurance Act, 12 U.S.C. § 1831o. The current "Adequately Capitalized" position triggers the requirement that adequately capitalized insured depository institutions may not accept, renew or roll over any brokered deposit unless it has applied for and been granted a waiver by the FDIC. Accordingly, the FDIC stands ready to consider the Bank's strategies to gradually eliminate these brokered deposits, until such time as the Bank becomes well capitalized and not subject to any Federally issued written agreement containing a "meet and maintain" capital provision. Please note that since it is the individual customers who own the deposits in the omnibus accounts, the maturity date of the deposits is not the contractual maturity date of the contracts between the institutional depositors and the Bank, but the maturity date of the deposit instruments comprising the omnibus accounts.

In connection with FDIC's brokered deposits determination, the FDIC's Division of Supervision and Consumer Protection and the Legal Division reviewed numerous agreements, legal opinions and other documents, including the following:

1. Amended and Restated Subaccounting Agreement between Bank, Equity Trust Company ("ETC"), Equity Administrative Services, Inc. ("EAS") and Sterling Administrative

Services, LLC ("SAS"), with an effective date of June 27, but with no year provided,[1] as revised by the First Amendment to Amended and Restated Subaccounting Agreement dated February 24, 2010 ("ETC Agreement");

2. Third Amended and Restated Administrative Services Agreement between Bank, Matrix Settlement and Clearance Services, L.L.C. ("MSCS") and MG Colorado Holdings, Inc., dated July 5, 2007, as revised by Amendment to The Third Addendum, dated February 11, 2010 ("MSCS Agreement");

3. Subaccounting Agreement between Lincoln Trust Company ("Lincoln") and Bank, with an effective date of February 1, 2010 ("Lincoln Agreement");

4. Program Bank Fee Agreement between Bank and Legent Clearing LLC ("Legent"), dated November 24, 2008, as amended by Amendment Number One To Program Bank Fee Agreement, dated January 25, 2010 ("Legent Agreement"). We were also provided with three other agreements pertaining to Legent: Legent Insured Deposits Bank and Broker-Dearler Agreement between Bank and Legent, dated May 11, 2006; Broker-Dealer Money Market Deposit Account Agreement dated November 18, 2008, between Deutsche Bank Trust Company Americas ("DBTCA") and Legent; and Program Bank Money Market Deposit Account Agreement, dated June 2006, between DBTCA and Bank;

5. Subaccounting Agreement between Matrix Capital Bank, Constellation Trust Company and Gemini Fund Services, LLC ("GFS"), dated May 11, 2005 ("Constellation Trust Agreement");

6. Subaccounting Services Agreement between Matrix Capital Bank and Trust Management, Inc. ("TMI"), dated May 10, 1999 ("TMI Agreement"); and

7. Amended and Restated Omnibus Subaccounting Agreement between Bank and UW Trust Company ("UWTC"), dated June 26, 2009 ("UWTC Agreement").

8. Four Bank counsel legal opinions from Luse Gorman Pomerenk & Schick ("Luse Gorman"), dated February 23, 2010;

9. Two Luse Gorman legal opinions dated March 8, 2010;

10. Bank counsel legal opinion from Buckley Sandler LLP, dated March 10, 2010;

11. United Western Bank Core Deposit Management Strategic Planning and Regulatory Positions, dated March 8, 2010 ("White Paper");

12. "Legent and the Clearing Industry" Memorandum from Guy A. Gibson, Michael J. McCloskey and Michael A. Stallings, to the Board of Directors of United Western Bancorp, Inc. and United Western Bank, dated January 7, 2010 ("Legent Memorandum");

13. The Equity Trust Company Application For Traditional, Roth, and SEP Accounts;

14. "Legent FDIC Insured Deposits," from www.legentclearing.com/ps_cms.php;

15. Sterling Trust Company Self-Directed IRA Application Kit; and

16. Equity Trust Company Traditional and Roth, IRA Custodial Account Agreements and Disclosure Statements.

A summary of our assessment of each of the seven deposit agreements reviewed is set forth below.

---

[1] This agreement cites other agreements executed in 2009.

Equity Trust Company Agreement

According to the White Paper, ETC "is a self directed IRA custodian that offers custodial and managerial business services to individual participants' accounts in employee benefit plans, individual retirement plans and other qualified plan accounts thereby providing its clients with the ability to invest in real estate, private placements, tax liens and other non-traditional assets within a self-directed IRA or 401(k) plan" and has been a Bank client since 2000. Each individual retirement account, the White Paper indicates, maintains certain liquidity that is typically less than 10% of the total assets in such account. This liquidity is deposited in multiple omnibus accounts at the Bank. Under the ETC Agreement, ETC has agreed to place deposits with the Bank in order to obtain the benefits of pass through deposit insurance coverage under 12 C.F.R. § 330.5 for the benefit of its customers. ETC represents in the agreement that as custodian it "provides custodial and business services to individual participants' accounts in employee benefit plans, individual retirement plans and other qualified accounts." The other two parties to the agreement, EAS and SAS, which are affiliates of ETC, agree to also open accounts at the Bank in order to secure pass through deposit insurance coverage for the benefit of ETC's custodial account holders. EAS, SAS and the Bank further agree under the contract that EAS and SAS, as agents for the Bank, will provide the Bank with account holder and record-keeping services for the custodial account holders. The agreement is for a term consisting of the later of five years, or the date all amounts owing under the "Seller Financing," as defined in the Purchase Agreement of April 7, 2009, pursuant to which ETC and SAS agreed to acquire from SAS its individual retirement and qualified plan business. Following this initial term, the agreement automatically renews on a yearly basis, unless a party provides a 60-day notice of termination before the next renewal date.

Based on the foregoing, ETC, EAS and SAS meet the definition of a deposit broker since they have facilitated the placement of deposits of third parties with insured depository institutions. The next step in the analysis is to determine whether these entities meet any of the exceptions from the deposit broker definition as set forth in 12 C.F.R. § 337.6(a)(5)(ii). In the Luse Gorman legal opinion of February 23, 2010, on this contract, the Bank contends that ETC, "as a custodian, provides custodial and business services to individual participants' accounts in employee benefit plans, individual retirement accounts, and other qualified plan accounts." Bank counsel further indicates that although ETC "does not exercise any investment discretion over the accounts of its customers, it performs managerial and administrative functions for its customers by, for example, collecting rents, paying taxes, collecting reports and annual evaluations of the assets maintained in the customers accounts and the like." Bank counsel concludes that ETC should not be deemed a deposit broker because ETC "is acting as a plan administrator for its customers and performs a managerial function for its customers." Luse Gorman makes a similar conclusion in its March 8, 2010, opinion on this contract, and the Buckley Sandler LLP legal opinion of March 10, 2010, on this contract also reaches a similar conclusion.

The FDIC interprets the plan administrator exception to require that the entity be the plan administrator for a pension plan or other employee benefit plan and that such entity perform managerial functions with respect to the plan. Accordingly, the Bank has not proven that ETC

meets the "plan administrator" exception since the Bank has not proven that ETC is the plan administrator of a pension plan or other employee benefit plan.

In the legal opinion, Bank counsel also contends that since ETC's customers have investment discretion over their accounts "the primary purpose of the deposit accounts is to facilitate the customers' exercise of that investment discretion."[2] Although not specifically contended in the legal opinion, this statement from Bank counsel appears to be an attempt to bring ETC under the primary purpose exception of 12 C.F.R. § 337.6(a)(5).

FDIC Advisory Opinion No. 05-02 explains the "primary purpose exception" by referencing previous FDIC opinions where the phrase "primary purpose" is deemed synonymous with "primary intent."[3] The FDIC Advisory Opinions clarify that the "primary purpose exception" applies to an agent who places funds into a depository institution when the agent's primary intention is something other than obtaining deposit insurance coverage for a customer or to provide the customer with a deposit placement service. For example, in Advisory Opinion No. 94-13,[4] a credit card bank assisted would-be cardholders in placing security deposits at another bank. The FDIC staff determined that the "primary purpose exception" was applicable because the "primary purpose" of the credit card bank was "to obtain a perfected security interest in collateral, not to provide a deposit-placing service to its customers." In Advisory Opinion No. 94-39,[5] a registered broker-dealer placed client funds into an account at a bank in order to satisfy a reserve requirement enforced by the SEC. In that case, the "primary purpose exception" was applicable because the broker-dealer's "primary purpose" was to satisfy the SEC rule, not to provide a deposit-placement service.

In FDIC Advisory Opinion 05-02,[6] the FDIC applied the primary purpose exception to a sweep program into money market and transaction accounts at two affiliated banks provided by Company on behalf of its customers for whom Company provided securities' services. The FDIC determined that such a program would qualify for the primary purpose exception if the following criteria were met:

1. The swept funds should not exceed 10% of the total assets being handled for the customers ("permissible ratio');
2. The 10% limit should be applied on a monthly basis (the "monthly ratio");
3. The permissible ratio is not exceeded on consecutive months, or the permissible ratio is not exceeded for three months during any 12-month period; and
4. The fees paid by the depository institution to Company were for recordkeeping and not payment for the placement of deposits.

The fact that ETC's customers possess investment discretion does not mean that ETC can not be a "deposit broker." In fact, investment discretion is possessed by many, if not most depositors

---

[2] Luse Gorman legal opinion of February 23, 2010.
[3] See, e.g., Advisory Opinion No. 90-21 (May 29, 1990); Advisory Opinion No. 94-13 (March 11, 1994); and Advisory Opinion No. 94-39 (August 17, 1994).
[4] http://www.fdic.gov/regulations/laws/rules/4000-8850.html.
[5] http://www.fdic.gov/regulations/laws/rules /4000-9110.html.
[6] http:///www.fdic.gov/regulations/laws/rules/4000-10350.html.

Appendix

who use the services of deposit brokers. Moreover, when a customer exercises discretion to place funds into deposit accounts, no distinction exists between "facilitating the customer's exercise of investment discretion" and "facilitating the customer's placement of deposits." In both cases, the facilitator is a "deposit broker" who does not qualify for the "primary purpose exception." In addition, even assuming that "facilitating the exercise of investment discretion" might be the type of purpose covered by the "primary purpose exception," we do not believe that this exception is applicable in this case.

Despite Bank counsel's contention, there is substantial evidence in the agreement that contravenes the contention that the primary purpose of the deposit accounts is to facilitate the customers' exercise of that investment discretion. First, under numbered paragraph 1 of the agreement, ETC, EAS and SAS may withdraw from and move these deposits to another financial institution up to $100 million should they desire to do so in the event certain individuals were to acquire control of this other financial institution.[7] These individuals own a controlling interest in ETC. Accordingly, this provision in the agreement tends to show that the selection of the Bank was not to facilitate an investment discretion, but to benefit the controlling shareholders of ETC by allowing them the option to transfer $100 million to an institution these shareholders might control.

Second, the fees paid by the Bank to at least EAS and SAS for certain administrative services might not be directly related to the administrative services provided. Under the ETC Agreement, the parties agree to pay EAS and SAS ("Companies") a fee "based upon the number of Custodial Accounts at Bank and the aggregate monthly balance of such Custodial Accounts in light of the amount of recordkeeping services and other associated services to be provided by the Companies with respect to the Custodial Accounts." Specifically, under numbered paragraph 6 of the agreement, the Bank pays EAS and SAS a monthly fee of $40 times the number of active deposit accounts placed by ETC and the Companies with the Bank. Furthermore, this sum is subject to a maximum cap, which is tied to the interest yield paid by the Bank on these deposit accounts. By tying the maximum compensation that EAS and SAS may receive for their recordkeeping and other services to the balance on the deposit accounts, the Bank appears to be compensating EAS and SAS for placing these deposits in the Bank.

In FDIC Advisory Opinion 04-04 (July 28, 2004), the FDIC discussed how fees charged by a listing service might result in the listing service being deemed a deposit broker:

""although the staff did not articulate the rationale for this distinction, the rationale is inferable: compensation based on the amount of deposits placed through a 'listing service' may create a motivation on the part of the service to become involved in the placement of deposits. Indeed, such compensation strongly suggests that the service is involved in some manner in placing deposits. Therefore, the existence of such compensation will result in the classification of the 'listing service' as a 'deposit broker.'"

Similarly, in this agreement, the compensation the Bank paid the Companies was tied to the number of deposit accounts and the balance in these accounts placed by these entities with the

---

[7] The three individuals identified in the ETC Agreement are Jeffrey A. Desich, Richard Desich and Richard A. Desich.

Appendix