Bank. There is present therefore a motivation on the part of EAS, ETC and SAS to place more customer deposits and to create more customer deposit accounts with the Bank.

Thirdly, under the 2010 revision to the ETC Agreement, the Bank, ETC and the Companies may agree to participate out deposits in the bank accounts with a third party bank. If such third party bank pays interest, subaccounting or other administrative fees to ETC and the Companies that exceed the Contract Variable Rate the Bank pays under the ETC Agreement, the parties agree to split on a 50-50 basis the surplus fee. Additionally, if the Contract Variable Rate exceeds the Third Party Rate, the Bank agrees to make ETC and the Companies whole. Clearly, this provision evidences that the primary purpose of this agreement is for the placement of funds with depository institutions.[8]

Fourthly, ETC and the Companies, under the 2010 revision to the contract, may terminate the agreement if the Bank files a financial report reflecting that the Bank is neither "well capitalized" nor "adequately capitalized." Having this provision in the agreement is an indicia that the deposits in question are brokered deposits because a bank that is undercapitalized can not accept, renew, or roll over any brokered deposit. 12 C.F.R. § 337.6(b)(ii)(B)(3)(ii).

Finally, under the 2010 revision to the ETC Agreement, the parties acknowledge that despite the fact Custodial Account Holders have the right to direct Companies and ETC to deposit their funds at another institution, the Companies and ETC agree "to use commercially reasonable efforts to have cash balances relating to Custodial Accounts retained at the Bank." This provision of the agreement shows that the placement of the deposits in the Bank by the Companies and ETC was not to facilitate the customers' exercise of their investment discretion since the Companies and ETC agreed to used their best efforts to keep their customers' funds in the Bank, presumably even if the Customers wanted to move the funds to another depository institution.

Based on the foregoing analysis, the FDIC determined that the deposits from the ETC Agreement are brokered deposits.

<u>MSCS Agreement</u>

In this agreement MSCS facilitates the clearing of purchase and redemption trades of various mutual fund shares for its customers by placing these funds on deposit with the Bank. According to the agreement, the funds "are generally qualified employee benefit plan participant funds held in a fiduciary capacity by a custodian or other third parties." According to the Luse Gorman opinion of February 23, 2010, MSCS serves more than 300 MSCS customers by servicing $100 billion in assets through the MSCS platform. In 2009, MSCS kept approximately $260 million of MSCS customers' deposits with the Bank. Under the terms of the agreement, MSCS is acting as a deposit broker since it is facilitating the placement of deposits with an insured depository institution.

---

[8] Recently, ETC requested permission for the OTS to exercise this provision in the contract.

Appendix

In their legal opinions, Bank counsel contend MSCS qualifies for the primary purpose exception and cite FDIC Advisory Opinion 05-02 in support of this position.  Specifically, Bank counsel assert the following in support of this position:

1.  MSCS' primary business is the clearing of the purchase and redemption trades of various mutual funds for MSCS customers;
2.  MSCS' deposits are placed at the Bank primarily to facilitate MSCS' clearing activities for its customers;
3.  The funds placed at the Bank are a small percentage of the total amount of funds MSCS handles for its customers; and
4.  The Bank does not pay a fee to MSCS for the placement of the funds with the Bank.

Despite the Bank's arguments, there are several reasons why the MSCS Agreement does not meet the primary purpose exception.  First, even excluding the issue of the fee the Bank pays to MSCS, Bank counsel was unable to show that MSCS met the first three factors of the FDIC Advisory Opinion 05-02.  Instead, Bank counsel has contended that "the funds placed at the Bank are a small percentage of the total amount of funds MSCS handles for MSCS customers."

Also, in the March 10, 2010, Buckley Sandler LLP opinion, counsel argues: "Based on the information provided to us, it also appears that the amount of cash in the MSCS accounts at the Bank are well below the permissible ratio. These contentions by Bank counsel, at best, only satisfy the permissible ratio factor of FDIC Advisory Opinion 05-02.  Bank counsel's legal opinions do not address the monthly ratio factor nor the fact that the permissible ratio is not exceeded on consecutive months or for three months during any 12-month period.

On the other hand, if one were to assume that MSCS met the first three factors of FDIC Advisory Opinion 05-02, the fourth factor is not met as the fees paid to MSCS appear to have been paid for the placement of deposits.  The fees that the Bank pays to MSCS for its administrative services on the deposit accounts MSCS opens at the Bank for MSCS' customers are tied to the balance of these deposits.  Paragraph 4(d) of the agreement provides as follows: "As such the Bank desired to limit the fees paid to MSCS pursuant to this Agreement to an amount based upon the actual deposits generated by MSCS furnishing Administrative Services to those Customers who have chosen to deposit their funds with the Bank." In Exhibit "A" to the MSCS Agreement, these fees are tied to the amount on deposit at the Bank.  This type of compensation for services rendered based on the amounts deposited is a clear indication that MSCS is acting as a deposit broker. Furthermore, unlike the parties in Opinion 05-02, MSCS and the Bank are not affiliated.

The MSCS Agreement commenced on July 5, 2007, and terminates on July 5, 2010, but is subject to two automatic one-year renewals, unless certain conditions occur.  Interestingly, one of these conditions is MSCS' notification to the Bank of "its intent to solicit bids from other depositories." Upon such notification, MSCS is given 45 days to get "bona fide offers from independent financial institutions of the terms upon which such financial institutions desire to provide the Administrative Services." The Bank is then given 30 days to match any such bona fide bid.  These provisions clearly show that MSCS is a deposit broker since it is bidding out its deposits to the highest bidder who will pay MSCS the most for the Administrative Services MSCS provides.

Appendix

The MSCS Agreement is subject to termination if the Bank is not adequately capitalized (numbered paragraph 5(b)(i)). As discussed in the ETC Agreement analysis above, such a provision is an indicia that the deposits in question are brokered deposits because a bank that is not adequately capitalized can not accept, renew or roll over any brokered deposit. 12 C.F.R. § 337.6(b)(2)(B)(3)(ii).

Finally, two other reasons why the primary purpose of the agreement appears to be the placement of funds with the depository institution are the provision that lists as a cause for termination of the agreement by MSCS if the Bank refuses to renew a certain line of credit to MG Trust Company, LLC[9] and the provision that allows the Bank to terminate the agreement if MSCS' customers fail to maintain at anytime a minimum deposit level of $1,000,000.

For the reasons set forth above, the FDIC concluded that MSCS' deposits are brokered deposits.

Lincoln Trust Agreement

Lincoln is described in the agreement as a Colorado industrial bank with trust powers. The term of the agreement is for one year, with yearly renewals, unless either party provides a 90-day notice of termination. Under the agreement, Lincoln will deposit with the Bank funds of its clients that Lincoln holds in a custodial capacity. The Bank will properly designate these deposit accounts so that they will receive pass through deposit insurance coverage. Lincoln is therefore acting as a deposit broker under this agreement since it is facilitating the deposits of the funds of its customers.

The Bank has provided a legal opinion concerning this agreement. The opinion summarizes Bank counsel's understanding of the facts as follows:[10]

"Lincoln Trust Company is an industrial bank, with trust powers, that is chartered under the laws of the State of Colorado ("LTC"). LTC, in its capacity as a custodian, provides custodial and related services to employee benefit plans, individual retirement accounts, and other qualified plan accounts ("Customers"). LTC does not exercise any investment discretion over the accounts of its Customers. However, it performs certain managerial and administrative functions for its Customers (for example, collecting rents, paying taxes, collecting reports and annual evaluations of the assets maintained in the Customers accounts and the like). LTC has entered into an agreement with the Bank to establish various custodial deposit accounts at the Bank for the benefit of the underlying Customer. The Bank does not pay the TLC (sic) a fee for placing these custodial deposit accounts at the Bank. The Bank, however, pays TLC (sic) a fee for providing certain administrative services on behalf of the Bank to its Customers."

Based on these facts, Bank counsel concluded as follows: "It is apparent from the above that TLC (sic) is acting as a plan administrator for its Customers and performs a managerial function for its Customers."

---

[9] According to the MSCS Agreement, this line of credit was guaranteed by MG Colorado Holdings (sic) to which entity the line of credit was provided for liquidity purposes. MG Colorado Holdings, Inc. owns MSCS.
[10] Luse Gorman opinion of February 23, 2010.

8

Appendix

As discussed in the ETC Agreement analysis above, FDIC interprets the regulatory exception for a plan administrator to require that the entity claiming this exception be the actual plan administrator for a pension plan or other employee benefit plan and that such person perform managerial functions with respect the plan. The Bank has not provided any evidence showing that Lincoln is such a plan administrator.

The Lincoln Agreement provides that Lincoln is either "(a) a directed trustee of a pension or other employee benefit plan, with respect to funds of the plan; (b) a person acting as a plan administrator or an investment adviser in connection with a pension plan or other employee benefit plan provided that that person is performing managerial functions with respect to the plan; or (c) a trustee or custodian of a pension or profit sharing plan qualified under section 401(d) or 403(a) of the Internal Revenue Code of 1986; or (d) an agent or nominee whose primary purpose is not the placement of funds with depository institutions." Despite these provisions in the agreement, the only exception to the brokered deposit definition which the Bank argued was the one for a plan administrator discussed above.[11]

The Bank does not argue in its legal opinions that the primary purpose exception is applicable in this case. Were the Bank to argue this exception, the terms of the agreement contravene this possibility. First, under paragraph 3.2 the Bank agreed to pay Lincoln a fee for record-keeping services based upon the aggregate monthly balance in the accounts of Lincoln's customers: "In addition to the Rate being paid by Bank with respect to the Deposit Account, Bank shall pay LTC a monthly fee equaling an annual percentage rate of 0.75% (75 basis points) of the average collected balance of the Deposit Account." As previously discussed above, tying the compensation to the amount deposited is a clear indication that Lincoln is acting as a deposit broker. In the Buckley Sandler LLP opinion, Bank counsel concedes that the fee that the Bank pays to Lincoln is based on the deposit balance: "The LTC (Lincoln) subaccounting relationship is similar to the ETC subaccounting relationship wherein LTC provides subaccounting and record-keeping services for Bank and Bank pays a fee to LTC for such services, based on the level of deposits."[12]

In light of the foregoing reasons, the FDIC concluded that Lincoln's deposits were brokered deposits.

---

[11] In the White Paper the Bank indicated that the main line of business of the trust companies ("Trust Companies") for which the Bank has opened transaction accounts (e.g. money market and demand deposit accounts) is "serving as an IRC qualified custodian for IRAs providing administration and managerial services for those accounts as a named custodian for such accounts." The White Paper goes on to state: "They may, from time to time, serve as custodian, trustee or plan administrators for other qualified retirement plans under IRC Sections 401 or 403, but we leave those services aside because of this discussion since the vast majority of retirement plan accounts administered by the Trust Companies' are IRAs." See p. 15 of White Paper.

[12] In its legal opinions submitted, the Bank did not argue that Lincoln qualified under the deposit broker exception for "a trustee or custodian of a pension or profit-sharing plan qualified under section 401(d) or 403(a) of the Internal Revenue Code of 1986 (26 U.S.C. 401(d) or 403(a))." 12 C.F.R. §337.6(5)(ii)(H). Instead, the Bank made the statement set forth in footnote 16, supra.

Appendix

## Legent Agreement

According to the White Paper, Legent acts as a "clearing firm" on behalf of over 200,000 customers of over 100 FINRA member firms ("correspondents") and provides its customers with securities clearing and settlement services. Legent takes custody of the clients' securities, cash and other assets and "provides extensive trade, execution, settlement, delivery and other services to such clients on a daily basis." Furthermore, the White Paper provides that Legent allows its clients to place idle cash in an omnibus account with the Bank, but the clients may also choose to place their idle cash in a money market mutual fund, or provide credits to Legent to allow it to execute margin loans to other Legent clients. Additionally, the White Paper summarizes the terms of the Legent Agreement as follows:

"In November 2008, Legent Clearing and Bank entered into a Program Bank Fee Agreement whereby Bank would establish accounts at Bank for customers of broker-dealers in which Legent Clearing provides clearing services. The accounts at Bank would be entitled 'Legent Clearing LLC as agent and custodian for the exclusive benefit of customers of its Introducing Broker-Dealers.' Under this arrangement, Deutsche Bank Trust Company of Americas ('DBTCA') provides certain record-keeping services to Legent Clearing and Bank. DBTCA's services include providing recording the beneficial interest held by each Customer in the custodial account maintained at Bank. For example, Legent Clearing will carry out each customers directions with respect to a customer account, provide back up withholding and for sending IRS Form 1099 interest information to each customer." The original term of the Legent Agreement is under a yearly automatic renewal, unless either party provides the other with a 120-day notification of termination prior to the end of the current year.

Bank counsel's legal opinions on the Legent Agreement make the same arguments as on the MSCS contract: that the primary purpose of Legent is the settlement of securities trades by its customers and that the Legent contract qualifies for the primary purpose exception set forth in Opinion 05-02. In arguing that Legent qualifies for the primary purpose exception as set forth in Opinion 05-02, Bank counsel asserts that "approximately 10% of the total amount of funds Legent handles for Legent customers is currently in the omnibus accounts at the Bank." Bank counsel, as with the MSCS contract, failed to address the monthly ratio factor or the assertion that the permissible ratio is not exceeded on consecutive months or for three months during any 12-month period. In addition, Bank counsel did not establish any affiliation between Legent and the Bank, as was the case with the entities involved in Opinion 05-02. (The Bank has, however, entered into a non-binding letter agreement to acquire Legent).

With regards to the payment of fees by the depository institution in Opinion 05-02 to the company which was sweeping its clients funds into the affiliated banks, the fees were not calculated on the basis of the amount of funds placed at the affiliated banks. The fees were flat fees on a "per account" or a "per customer" basis. The fees in the Legent Agreement are not flat fees and are tied to the average monthly deposits maintained at the Bank, as acknowledged by the Bank in the White Paper:

"The monthly fees payable to DBTCA and Legent Clearing are for services rendered. The monthly servicing fee that Bank pays Legent Clearing and DBTCA is equal to 1.10% of the

Appendix