average monthly customer deposits maintained at Bank (five basis points of the 1.10% is paid to Legent Clearing's customers)."[13]

Furthermore, Bank counsel acknowledges that the Legent Agreement does not meet all the parameters of 05-02: "While the arrangements between the Bank and MSCS and Legent differ from the particular facts presented by the bank seeking advice in Opinion 05-02, we believe viewing MSCS and Legent as within the exception from the definition of "deposit broker" in 12 U.S.C. ¶ 1831f(g)(2)(I) and 12 C.F.R. ¶ 337.6(a)(5)(ii)(I) is consistent with the principles underlying Opinion 05-02 and the brokered deposit rules."[14]

From the foregoing, it is evident that Legent is a deposit broker since it places its clients' funds in an omnibus account at the Bank and none of the deposit broker exceptions apply to Legent. In the DBTCA-Legent Broker-Dealer Money Market Deposit Account Agreement of June, 2006, it is noteworthy that under section 11(g) a "Program Bank" where DBTCA places the funds of Legent's customers becomes ineligible "in the event that the program bank has insufficient capital or is otherwise ineligible under the regulations of the Federal Deposit Insurance Corporation from receiving brokered deposits." Such a contractual provision, as discussed above, tends to show that the parties may have viewed the deposits made by DBTCA on Legent's behalf to constitute brokered deposits.

The FDIC concluded, for the reasons set forth above, that Legent's deposits were brokered deposits.

### Constellation Trust Agreement

In this agreement Constellation Trust Company ("Constellation") agrees to place on deposit with Bank funds for which it acts as custodian and emanate from designated accounts such as employees benefit plans and retirement plans. The agreement mentions that insurance in excess of $100,000 is obtainable if there is a relationship that can be ascertainable from either the records of the insured bank or the records of the account customer. The agreement further provides that Constellation wants the custodial funds it deposits with the Bank to be "insured to the fullest extent provided by law." Constellation is therefore acting as a deposit broker since it is facilitating the placement of deposits with the Bank so as to obtain pass through deposit insurance coverage for Constellation's customers. Although the initial term of this agreement ended on May 11, 2008, the agreement continues in existence as it automatically renews on a yearly basis, unless one of the parties provides written notice of termination, 30 days before the renewal date. The Bank has not provided a legal opinion on this agreement. On the face of the agreement there is no exception cited that precludes the conclusion that Constellation is a deposit broker and that the funds deposited under this agreement are brokered deposits.

### TMI Agreement

This agreement is very similar to the Constellation Trust Agreement and the analysis and conclusion are practically identical. In this agreement TMI seeks to obtain additional insurance

---

[13] White Paper, pp. 35-36.
[14] Buckley Sandler LLP legal opinion of March 10, 2010.

beyond $100,000 on the deposit accounts it holds at the Bank on behalf of its customers. As a result, Bank agrees under the terms of the agreement to provide that TMI's funds are being held in a custodial capacity by TMI and that the records reflecting the separate interests of TMI's customers in these accounts are maintained by TMI. This provision by the Bank enables TMI's customers to receive pass through deposit insurance under 12 C.F.R. § 330.5. The Bank has not provided a legal opinion on this agreement. On the face of the agreement there is no exception cited that precludes the conclusion that TMI is a deposit broker and that the funds deposited under this agreement are brokered deposits.

### UWTC Agreement

This agreement is nearly identical to the TMI agreement and the analysis and conclusion are the same. In this agreement, UWTC sought pass through deposit insurance for its customers on whose behalf it opened deposit accounts at the Bank. The Bank agreed to properly designate UWTC's accounts to show that UWTC's deposits are held in a custodial capacity and that the separate interests of UWTC's customers are maintained by UWTC. Such an indication on its record by the Bank enables UWTC to obtain pass through deposit insurance for its customers. UWTC is therefore acting as a deposit broker since it is facilitating the placement of deposits with the Bank so as to obtain pass through deposit insurance coverage for its customers. In the agreement, the Bank agrees to pay UWTC a fee for certain recordkeeping services on the accounts of UWTC's customers on whose behalf UWTC is depositing funds with the Bank. The fee is the greater of a flat fee of $3.00 "per record-keeping non-zero balance account (with the number of accounts and activity be measured down to the individual investor level)," or a 1% annual fixed rate on the average daily deposit balanced kept by UWTC at the Bank. Since the payment of these fees by the Bank is tied to the amount on deposit by UWTC, this constitutes, under previously cited advisory guidance by FDIC, a strong indication that UWTC acted as a deposit broker. The Bank has not provided a legal opinion on this agreement. On the face of the agreement, there is no exception cited that precludes the conclusion that UWTC is a deposit broker and that the funds deposited under this agreement are brokered deposits.

If you have any questions regarding this letter, please contact Assistant Regional Director Joseph A. Meade, (972) 761-2068, or Case Manager Thomas L. Trujillo, (972) 761-2255.

Sincerely,

*Kathleen M. James/for/*

Kristie K. Elmquist
Acting Regional Director

# A Brief History of United Western Bancorp, Inc.

## *Formation; First Major Non-Brokered Consumer Deposit Source Identified*

The consolidated company that is now United Western Bancorp, Inc. (the parent company of United Western Bank) was founded in 1989 by Guy A. Gibson.[1] Mr. Gibson started his formal business career in the business of trading mortgage servicing rights ("MSR") for third parties.

In 1989, Mr. Gibson recognized that there was a significant opportunity in the acquisition of MSR from distressed banks and savings associations. Mr. Gibson formed United Financial, Inc. ("United") in 1989. United became a full service MSR brokerage and consulting service company to the mortgage banking industry. United was an approved loan servicing broker for the Resolution Trust Company ("RTC").

In 1990, Mr. Gibson formed Matrix Financial Services Corporation ("MFSC") which went on to become a major acquirer of MSR from the RTC in the early 1990s. As is well known, MSR servicers are in control of significant interest free deposits in the form of monthly principal and interest payments due from homeowners as well as low interest rate escrow balances for the payment of casualty insurance and property taxes. These large, interest free balances inevitably incline mortgage servicers to acquire FDIC insured depository institutions to hold these balances in an efficient manner.

In 1993, Mr. Gibson caused MFSC to acquire United Western Bank (the "Bank") which was then a federally chartered savings bank with approximately $35 million in

---

[1] United Western Bancorp, Inc. was originally known to the OTS and the FDIC as "Matrix Capital Corporation" and United Western Bank was originally known to OTS and FDIC as the "Donna Anna Savings & Loan" and later "Matrix Capital Bank." The charter for Donna Anna Savings Loan was granted in 1962.

United Western Bank. Core Deposit Management
Strategic Planning and Regulatory Issues
March 8, 2010

footings. MFSC acquired the Bank with a view to funding the liability side of its balance sheet with inexpensive, stable MSR related deposits. On the asset side of the balance sheet, the Bank focused on acquiring 1-4 family residential mortgage loans. Supplementary activities included MSR valuation and brokerage services and other sources of fee income.

United Western Bancorp, Inc. (the "Company") completed an initial public offering in 1996 to increase available capital and expand operations.

### *Second Major Non-Brokered Consumer Deposit Source Developed*

In 1997, the Company acquired UW Trust Company (f/k/a Sterling Trust Company), a Waco, Texas based, non-depository trust company regulated by the Texas Department of Banking. UW Trust, at the time of acquisition, was engaged in the business of providing custodial and management services for 26,550 individual retirement account holders[2]. As an Internal Revenue Code ("IRC") qualified custodian, UW Trust enabled IRA investors to invest in both traditional investments (*e.g.*, stocks and bonds) as well as alternative investments (*e.g.*, real estate, energy and other types of assets). As an incident of these investment activities, IRA holders have idle cash amounts in their IRAs that require interim position holding. At the time of acquisition by the Company, these idle cash amounts aggregated approximately $90 million.

Initially, the UW Trust IRA holders idle cash was directed to a third party money market mutual fund. Following its acquisition by the Company, the Bank developed an omnibus account for UW Trust's IRA account holders with the Bank. This allowed convenient deposit positioning for UW Trust clients while their funds awaited investment

---

2 In addition to its IRA custodial services business, UW Trust also provided administrative services to other IRC qualified retirement plans and escrow account management for the life settlement industry totaling approximately 3,000 additional accounts.

- 3 -

388

Appendix