or distribution and provided the Bank with an extremely efficient, low cost source of liabilities.

As UW Trust developed its business, until it sold its IRA custodial business to Equity Trust Company in June 2009, over 90,000 United States citizens opened accounts with UW Trust with deposit balances aggregating $327,000,000 at June 2009. The high water mark for deposit balances from UW Trust clients at the Bank was November 2007 with total average monthly balances of $412,000,000. Deposits decreased in the period 2008-2009 when UW Trust determined to reduce its activities in one escrow services market.

### *Third Major Non-Brokered Consumer Deposit Source Developed*

In 1998, UW Trust formed Matrix Advisory Services, Inc. ("MAS") to perform custody services for FINRA member firms, third-party advisors and others. At that time, MAS identified a material inefficiency in the mutual fund settlement and clearing business. The mutual fund industry inefficiency identified by MAS was the inability of major third party administrators (*e.g.,* Chase, Fifth Third and others) ("TPAs") to efficiently process mutual fund investments for the benefit of the IRC Section 401 and 403 funds they managed since none of the TPAs could interact with the thousands of mutual fund sponsors (*e.g.,* Fidelity Investments) across a common electronic (data processing) interface.

To resolve this problem, in 1998, MAS acquired a license for software from Optech. The Optech software was an agnostic data processing interface that worked with the hundreds of TPAs and the thousands of mutual fund sponsors in the United States. This allowed MAS to execute mutual fund trades on an electronic basis instead of with physical applications and physical bank checks. Optech was formed by Thomas McInerney, the then managing partner of Welsh, Carson, Anderson and Stowe, a major private equity firm with offices in New York, NY and which manages over $20 billion of investor funds. Welsh, Carson has always focused on the electronic processing business (for example, Welsh Carson founded BISYS Group, now owned by Citicorp).

- 4 -

Appendix

To further exploit and capitalize on the mutual fund industry inefficiency in communicating with TPAS, McInerney later agreed with the Bank and MAS to joint venture for the formation of Matrix Settlement & Clearance Services, LLC. ("MSCS")[3] by contributing an exclusive license for the Optech software to MSCS. MSCS went on to market the Optech solution to hundreds of TPAs and mutual fund families. Today, this interface processes thousands of daily transactions for over $90 billion of investor funds.

As a result of the processing services provided by MSCS, investor funds are transmitted into mutual funds for investment and out of mutual funds for distributions or reinvestment. A portion of those funds at the end of each trading settlement day are retained in a Bank omnibus account for the benefit of the individual investors for whom the TPAs provide custodial and management services. This provides the Bank with a low cost, stable source of liabilities that has averaged $179,000,000 over the past three years.

The Bank provides a material amount of services to MSCS as described under *Matrix Settlement & Clearance Services Omnibus Account* below. The degree of services provided to MSCS is both sophisticated and unique. This level of sophistication and uniqueness allows MSCS to profitably service its TPA client base and encourages MSCS to remain with the Bank.

### *Major Non-Brokered Consumer Deposit Source Expanded*

In 2000, the Bank developed a client relationship with Equity Trust Company, a non-depository trust company regulated by the South Dakota Division of Banking. Equity Trust was, and is, engaged in the same manner of services for IRA holders as UW Trust was engaged in. Equity Trust required a bank that understood the exigencies of managing the idle cash of IRA holders and was willing to facilitate an electronic data processing

---

[3] At the time of formation, the Company owned a 45% interest in MSCS. The Company sold an approximately 38% ownership position in MSCS to a McInerney led group in 2004 and sold its remaining 7% to Mr. McInerney in 2009.

interface and other services for Equity Trust. The Bank was then, and is today, the best source of those services for Equity Trust and the relationship progressed to the point that UW Trust elected to sell its 90,000 IRA and IRC Section 401 account relationships to Equity Trust in June 2009.

Over the course of the last decade, this relationship has provided a stable, well-priced source of deposits to the Bank.

### Fourth Major Non-Brokered Consumer Deposit Source Identified

In mid-2002, Mr. Gibson stepped down from the active management of the Company and the Bank to acquire Legent Clearing, LLC, an international securities clearing company engaged in providing securities clearing services to Financial Industry Regulatory Authority ("FINRA") member firms in the United States. The securities clearing business was attractive to Mr. Gibson since, like mortgage servicing and mutual fund settlement and clearing services, the securities clearing company's provide access to substantial indirect consumer deposit relationships (substantially similar to the UW Trust and Equity Trust experience).[4]

When Mr. Gibson acquired Legent Clearing, client accounts held approximately $35,000,000 of idle cash balances that required deposit account services. As Mr. Gibson and his team[5] developed the Legent Clearing business, client account balances grew to over $500,000,000 within 24 months. While individual client accounts may have cash balance volatility, on a collective basis the deposits are very stable and inexpensive.[6]

---

[4] The United Western Bancorp, Inc. white paper on Legent Clearing, LLC and the United States securities clearing industry is attached hereto as Exhibit A.

[5] Former Legent Clearing management members that continue in management at the Company include Guy A. Gibson, Michael J. McCloskey, William D. Snider and Michael A. Stallings.

[6] For example, today TD Ameritrade sweeps client idle cash balances to TD Bank, N.A., TD Bank USA, N.A., or both. Assets at each bank are eligible for FDIC insurance of up to $250,000 per depositor. Because there are two banks in the program, balances could be covered for up to $500,000 per depositor. TD Bank N.A. and TD Bank USA, N.A. are affiliates of TD AMERITRADE. TD Bank, N.A. has

- 6 -

In February 2005, Mr. Gibson sold Legent Clearing to an investor group led by Mr. Henry C. Duques, the former Chairman of the Board and Chief Executive Officer of First Data Corporation, one of the major electronic data processing companies in the United States. Mr. Gibson did this to allow him and his team to focus on a strategic redirection for the Bank.

Legent Clearing has had a deposit relationship with the Bank since 2003[7]. This deposit relationship, described in greater detail below, provides the Bank with a stable and inexpensive source of deposits. As described in Exhibit A, the Bank now has a non-binding letter of intent to acquire Legent Clearing.

### The Company Recapitalizes and Expands Directions for the Bank

In August 2005, Mr. Gibson approached OTS with a plan to recapitalize the Company and redirect the Bank's liability and asset focus into the community banking sector to aid in the formation of additional, local liabilities and assets for the Bank. The OTS acquiesced to this plan and Mr. Gibson completed the recapitalization of the Company in December 2005. New management, led by Scot T. Wetzel, assumed control of the Company and the Bank on December 9, 2005.

Since the 2005 recapitalization, the following major developments have occurred:

a. the Bank has built its community bank branch system to eight branches from one, covering the front range of Colorado;

---

approximately $117.5 million in deposits on its latest call report, yet, it doesn't list any brokered deposits on its call report. TD Bank USA, N.A. lists approximately $400 million of brokered deposits on latest call report. Interest paid to the underlying customer on these balances is extremely low.

[7] The initial deposit relationship was negotiated with the Bank by Michael J. McCloskey when he served as Executive Vice President for Legent Group, Inc. on behalf of Legent Clearing, LLC. Mr. McCloskey was not an affiliate of the Bank at that time, but is today the Executive Vice President and General Counsel of United Western Bancorp, Inc.

- 7 -

Appendix

United Western Bank. Core Deposit Management
Strategic Planning and Regulatory Issues
March 8, 2010

b. in 2006, both the Company and the Bank disposed of several non-critical business lines (*e.g.*, the charter school loan business, real estate brokerage and other);

c. The Bank's balance sheet, comprised of approximately $1 billion in 1-4 family residential mortgage loans and $1 billion of mortgage backed securities at December 31, 2005 has been redirected into higher earning community bank loans;

d. Community bank deposits have grown from approximately $11,000,000 to over $400,000,000 at December 31, 2009;

e. UW Trusts sold the significant majority of its custodial rights to service customer accounts to Equity Trust in June 2009;

f. Equity Trust, at the instructions of and on behalf of over 100,000 IRA and other accounts, entered into a three to seven year subaccounting agreement in favor of the Bank;

g. in September 2009, the Company raises $88.8 million of new capital via a common stock offering and added over $65 million in new bank capital; and

h. Total core institutional deposits equaled $1.6 billion at February 28, 2010.

## *Solid History of Non-Brokered Core Consumer Deposit Development Through Data Processing Technology*

Since the commencement of significant disintermediation of deposit funds from banks and savings banks, in 1971 with the advent of The Reserve money market mutual

- 8 -

Appendix

United Western Bank. Core Deposit Management
Strategic Planning and Regulatory Issues
March 8, 2010

The following chart demonstrates the growth in Equity Trust IRA holders deposits on deposit with the Bank and the interest rate paid on such deposits to those IRA holders (the spike in deposits in the second half of 2009 is attributable to the acquisition of the UW Trust custodial account agreements):



- 21 -

Appendix

406

United Western Bank. Core Deposit Management
Strategic Planning and Regulatory Issues
March 8, 2010

The following chart demonstrates the growth in MSCS clients' deposits on deposit with the Bank and the interest rate paid on such deposits to such clients.



415

Appendix

United Western Bank. Core Deposit Management
Strategic Planning and Regulatory Issues
March 8, 2010

The following chart demonstrates the growth in Legent customer deposit with the Bank and the interest rate paid on such deposits.



423

Appendix

a. Charles Schwab, which owns Charles Schwab Bank, a Nevada based, federally chartered savings bank;

b. TD Ameritrade, which owns TD Bank USA, a national bank regulated by the OCC; and

c. The group which controls UBS Financial Services, Inc, owns UBS Bank USA, a Utah chartered ILC, headquartered in Salt Lake City, Utah.

Further, First Southwest Securities was recently acquired by Plains Capital Corporation. First Southwest offers corporate finance, investment banking, fixed income sales and trading services, asset management and correspondent clearing.

Speaking about First Southwest in their recent IPO, Plains Capital said, "First Southwest's correspondent clearing business represents a dependable and significant source of deposits for the Bank." We believe United Western Bank will be able to make the same statement following the acquisition of Legent.

Legent has not been profitable for the past three years. Cumulative loss for the three years ending June 30, 2009 was $9.4 million. A large part of this loss is attributable to the venture clearing arrangement Legent entered into with TradeKing. The value of the warrants on TradeKing stock, based on the latest offer for TradeKing from an independent third party, would bring a gain of $12.22 million to Legent to offset this operating loss. We will not be acquiring the TradeKing options in this transaction.

Legent needs to grow its top line revenues through correspondent growth to become profitable. Top line growth is occurring at Legent as Legent has recently repriced the services provided to its largest correspondent, Kane Reid Securities, Inc. (trade name, "TradeKing"). Correspondent growth near at hand, as well as operating efficiencies being imposed by a new Chief Executive Officer, will make Legent profitable, by management's expectations, in 2010.

With regard to pricing metrics, we have analyzed this transaction, preliminarily, from two view points:

a. assuming that Legent is a cost center, from the perspective of the implied cost of deposits; and

b. assuming that Legent is a profit center, and that the Bank pays a subaccounting fee equal to $3.33 per month per account for all accounts holding deposits ($625,000 per month to Legent from the Bank on an intra-company transfer pricing basis), from a multiple of EBITDA perspective.

Assuming that Legent should be treated as a cost center, the implied cost of Legent deposits, at this time, is 0.50% or less;

Confidential

Appendix

The table below illustrates Legent largest correspondent client relationships for the month ending December 31, 2009, in terms of number of trades, number of accounts, sweep balances, margin lending and free credit balances.

| | | | | | Legent Clearing LLC | | | | | |
| | | | | | Top Five Correspondents as of December 31, 2009 | | | | | |
| | | | | | ($ in thousands) | | | | | |
| | Number of trades | | Number of Accounts | | Sweep Deposits | | Margin Lending | | Free Credit Balances | |
| Rank | Correspondent | # | Correspondent | # | Correspondent | ($000) | Correspondent | ($000) | Correspondent | ($000) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Trade King | 218,067 | Trade King | 168,080 | Trade King | $ 184,088 | Trade King | $ 19,271 | Trade King | $ 58,056 |
| 2 | Success Trade | 37,167 | Newbridge | 14,993 | Newbridge | 106,585 | Newbridge | 13,736 | Mutual savings | 4,244 |
| 3 | Newbridge | 37,967 | Pointe Capital | 4,185 | Ridgeway Conger | 37,396 | National Securities | 10,556 | Benjamin & Jerrold | 4,202 |
| 4 | Jessup & Lamont | 14,175 | Ridgeway Conger | 4,129 | Chicago Investment | 24,254 | Pointe Capital | 8,170 | Jessup & Lamont | 2,402 |
| 5 | My Stock Fund | 11,006 | My Stock Fund | 3,629 | Olympus | 17,574 | Jessup & Lamont | 7,308 | Seaboard Securities | 2,371 |
| | Subtotal | 318,382 | | 195,016 | | $ 369,897 | | $ 59,041 | | $ 71,275 |
| | All others | 78,556 | | 54,745 | | 184,684 | | 55,127 | | 27,341 |
| | Total | 396,938 | | 249,761 | | $ 554,581 | | $ 114,168 | | $ 98,616 |

## SUMMARY FIANCNIAL DATA

The table shows summary financial information for Legent Clearing – Year to date through November 2009 and the prior four fiscal years. Legent Clearing is on a June fiscal year. Legent Clearing is a LLC and ultimately pays taxes through the owners of Legent Group. However for illustrative purposes, the table below reflects net income after taxes at a rate of 35%.

Confidential

Appendix

## LUSE GORMAN POMERENK & SCHICK
### A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

5335 WISCONSIN AVENUE, N.W., SUITE 780
WASHINGTON, D.C. 20015

TELEPHONE (202) 274-2000
FACSIMILE (202) 362-2902
www.LuseLaw.com

March 8, 2010

**VIA FEDEX**

Board of Directors
United Western Bank
700 Seventeenth Street
Denver, CO 80202

     Re:   <u>Brokered Deposits</u>

Dear Board Members:

    As special counsel to United Western Bank (the "Bank"), we have been requested to provide our opinion regarding whether the below described deposits held at the Bank are "brokered deposits" under federal law and regulation.

## FACTS

    The Bank holds deposits from two trust companies: (1) Equity Trust Company ("ETC") and Lincoln Trust Company ("LTC"). ETC is a trust company chartered under the laws of the State of South Dakota and LTC is a trust company chartered under the laws of the State of Colorado.

    ETC and LTC both provide similar services to their respective customers. In this regard, ETC and LTC both provide custodial and business services to individual participants' accounts in employee benefit plans, individual retirement accounts, and other qualified plan accounts ("Customers"). ETC and LTC do not exercise any investment discretion over the accounts of its Customers. Instead, the Customers self-direct the investments in their plan.

    The Customers of ETC and LTC have the ability to invest in traditional and alternative investments. Traditional investments include such things as publicly-traded stocks, bonds and mutual funds. Alternative investments include such things as investments in private placement offerings of stock, limited liability companies, limited partnerships, real estate, mineral rights, and precious metals.

    In connection with the Customers' investment, ETC and LTC perform certain administrative and managerial functions for the account, including the following:

- Reviewing the transaction to ensure that the self-dealing rules and other restrictions imposed under the Internal Revenue Code are not violated by the Customer's transaction;

Appendix

**LUSE GORMAN POMERENK & SCHICK**
A PROFESSIONAL CORPORATION

Board of Directors
United Western Bank
March 8, 2010
Page 2

- Taking custody of the assets;

- Holding title to the assets for the benefit of the Customers;

- Executing investment documents and take possession of the investment securities for the benefit of the Customers;

- Collecting rents and paying taxes;

- Accounting for contributions to and distributions from the Customer's account;

- Collecting annual evaluations of the assets maintained in the Customer's account; and

- Preparing mandated tax reporting documents.

The Customers of ETC and LTC also have the option to direct that idle cash balances in their accounts be held in money market mutual funds and/or an omnibus deposit account at the Bank. These funds represent cash awaiting investment by the Customer or for distribution. The omnibus account at the Bank was established as a custodial account for pro-rata benefit of the underlying Customer so that pass-through deposit insurance applies to the omnibus account. We understand that the interest rate paid on the omnibus account is de minimis.

In connection with the establishment of ETC's omnibus accounts, the Bank determined that it was in its best interests to have ETC perform, directly or indirectly through affiliated companies, certain subaccounting functions for the account. By agreement dated June 27, 2009 (a copy of which is attached), the Bank and ETC agreed that ETC would, among other things, provide record-keeping and certain other services to the Customer who directed that funds be placed in the omnibus account maintained at the Bank. These record-keeping and other services related to (i) tracking deposits to the omnibus account from the Customer's account, (ii) tracking withdrawals from the omnibus account to the Customer's account, (iii) accounting services for the Customer's account, (iv) data processing services for sub-account administration of the omnibus accounts, and (v) monthly statements, notices and disclosures to Customers in compliance with all applicable laws and regulations. For performing the sub-accounting functions, the Bank agreed to pay a monthly fee equal to $40.00 multiplied by the number of active accounts (as defined in the agreement); provided, however, that the aggregate monthly fee could never exceed a percentage yield with respect to the

**LUSE GORMAN POMERENK & SCHICK**
A PROFESSIONAL CORPORATION

Board of Directors
United Western Bank
March 8, 2010
Page 3

omnibus account equal to the applicable contract variable rate was set forth in Exhibit A to the agreement.

The Bank's agreement with LTC is similar. In connection with the establishment of LTC's omnibus accounts, the Bank determined that it was in its best interests to have LTC perform certain subaccounting functions for the account. By agreement dated February 1, 2010 (a copy of which is attached), the Bank and LTC agreed that LTC would, among other things, provide record-keeping and certain other services to the Customer who directed that funds be placed in the omnibus accounts maintained at the Bank. These record-keeping and other services related to (i) tracking deposits to the omnibus account from the Customer's account, (ii) tracking withdrawals from the omnibus account to the Customer's account, (iii) accounting services for the Customer's account, (iv) data processing services for sub-account administration of the omnibus account, and (v) periodic statements, notices and disclosures to Customers in compliance with all applicable laws and regulations. For performing the sub-accounting functions, the Bank agreed to pay a monthly fee equal to an annual percentage rate of 75 basis points of the average collected balance of the omnibus account.

To protect the Bank, the agreements with both ETC and LTC establish withdrawal limits from the omnibus account, the minimum level of deposit at the account as well as the maximum level of deposit at the Bank.

## LAW AND REGULATION

Federal law defines a "deposit broker" as "any person engaged in the business of placing deposits, or facilitating the placement of deposits, of third parties with insured depository institutions . . . ." 12 U.S.C. § 1831f(g)(1). Excluded from the definition of "deposit broker" is:

> A person acting as a plan administrator or an investment adviser in connection with a pension plan or other employee benefit plan provided that person is performing managerial functions with respect to the plan . . . .

*Id.* § 1831f(g)(2)(E).

Regulations promulgated by the Federal Deposit Insurance Corporation ("FDIC") relating to brokered deposits mirror the above definition and exclusion; *to wit*, that a "deposit broker" is defined as "any person engaged in the business of placing deposits, or facilitating the placement of deposits,

Appendix

**LUSE GORMAN POMERENK & SCHICK**
A PROFESSIONAL CORPORATION

Board of Directors
United Western Bank
March 8, 2010
Page 4

of third parties with insured depository institutions . . . " and excluded from the definition of "deposit broker" is a "person acting as a plan administrator or an investment adviser in connection with a pension plan or other employee benefit plan provided that person is performing managerial functions with respect to the plan . . . ." 12 C.F.R. §§ 337.6(a)(5)(i)(A) and (E).

## ANALYSIS, QUALIFICATIONS, ASSUMPTIONS AND CONCLUSION

The exclusion from the definition of "deposit broker" set out in federal law and FDIC regulation is specific and plain. Any person "acting as a plan administrator" in connection with a "pension plan or other employee benefit plan" is excluded from the definition of a "deposit broker" provided such person "is performing managerial functions with respect to the plan." 12 U.S.C. § 1831f(g)(2)(E).

We reviewed the legislative history to this section of federal law as well as the preamble to the FDIC's regulation promulgating 12 C.F.R. § 337.6, and found no discussion of any qualifications or limitations to the above-referenced exception. Additionally, we found no FDIC legal interpretations qualifying or limiting the above-referenced exception. Because the statutory language is so plain, we believe that the above exception is self-executing by any person that meets the statutory definition and that the exception is unqualified. We believe our position is supported by the U.S. Supreme Court decision in *Board of Gov. v. Dimension Fin. Corp.*, 474 U.S. 361 (1986), wherein the Court stated:

> [t]he "plain purpose" of legislation ... is determined in the first instance with reference to the plain language of the statute itself. Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises.

*Dimension Fin. Corp.*, 474 U.S. 361, 373-74 (1986). Also cited in *Stoddard v. Board of Gov.*, 868 F.2d 1308 (C.A.D.C. 1989) (denying the banking regulator's removal action against a bank director who resigned before the commencement of such action because the plain language of the federal law at the time only permitted such actions against current directors).

Appendix

**LUSE GORMAN POMERENK & SCHICK**
A PROFESSIONAL CORPORATION

Board of Directors
United Western Bank
March 8, 2010
Page 5

In the instant case, ETC and LTC are acting as plan administrators for their Customers and actually perform administrative and managerial functions for their Customers. As such, ETC and LTC meet the "plain language" of the statutory exception to the term "deposit broker." Accordingly, the deposits placed at the Bank by ETC and LTC should not be "brokered deposits" for federal law purposes.

Further, since ETC and LTC meet the statutory exception for being deposit brokers, the fact that the Bank pays them a fee (albeit a fee for subaccounting services actually performed for the Bank and for services that the Bank determined to be in its best interests), does not alter the application of this statutory exception to ETC and LTC and, as such, the payment of any fees to them is irrelevant to the analysis.

The opinions expressed herein are based upon, and subject to, the following assumptions, limitations, qualifications and exceptions:

1.  In rendering its opinions, the firm has relied solely upon any representations of officers of the Bank that the facts, as stated herein, are true, complete and correct.

2.  The firm has assumed that there are no other facts that would change the opinions contained herein.

3.  The firm has not independently verified the accuracy, completeness, or correctness of any of the facts presented above.

4.  The firm expresses no opinion as to any other laws or regulations, other than the applicable FDIC regulations discussed herein.

5.  The firm expresses no opinion as to the safety and soundness of any of the transactions contained therein.

6.  The opinions and conclusions expressed herein are based upon our interpretation of existing law and regulation, and are not intended to speak with reference to standards hereafter adopted or evolved in subsequent judicial or regulatory decisions or interpretations, or to laws, rules or regulations hereafter enacted or adopted. The opinions and conclusions expressed herein are as of the date hereof, and the firm assumes no obligation

510

**LUSE GORMAN POMERENK & SCHICK**
A PROFESSIONAL CORPORATION

Board of Directors
United Western Bank
March 8, 2010
Page 6

to update or supplement its opinions or conclusions to reflect any facts or circumstances that may hereafter come to our attention or any changes in law or regulation that may hereafter occur.

7.     The firm's opinions and conclusions are limited to the matters stated herein and no opinions may be implied or inferred beyond the matters expressly stated herein.

8.     This letter is delivered solely for the benefit of the Bank relating to the applicability of the noted FDIC regulations, and no other party or entity is entitled to rely hereon for any purpose whatsoever without the express prior written consent of this firm.

Very truly yours,

Luse Gorman Pomerenk & Schick, P.C.

Luse Gorman Pomerenk & Schick,
A Professional Corporation

Attachments

511

## AMENDED AND RESTATED
## SUBACCOUNTING AGREEMENT

This AMENDED AND RESTATED SUBACCOUNTING AGREEMENT (the "Agreement") is made and entered into by and among UNITED WESTERN BANK® (f/k/a Matrix Capital Bank), a federal savings bank ("Bank"), EQUITY TRUST COMPANY, a South Dakota trust company ("ETC"), EQUITY ADMINISTRATIVE SERVICES, INC., an Ohio corporation ("EAS"), and STERLING ADMINISTRATIVE SERVICES, LLC, a Texas limited liability company ("SAS" and, collectively with EAS, the "Companies"), as of this ̲2̲7̲ day of ̲J̲u̲n̲e̲ (the "Effective Date") (the Companies, ETC and Bank referred to herein each as a "Party" and collectively the "Parties").

WHEREAS, EAS and Bank previously entered into an Amended and Restated Subaccounting Agreement effective as of March 1, 2009 (the "Current Subaccounting Agreement") wherein, among other things, EAS provides certain subaccounting services to Bank and Bank pays fees to EAS for such services pursuant to the terms of the Current Subaccounting Agreement; and

WHEREAS, ETC, SAS, Sterling Trust Company, an affiliate of Bank ("Sterling"), and United Western Bancorp, Inc., the parent corporation of Bank ("UWBK"), are parties to an Asset Purchase Agreement, dated April 7, 2009 (the "Purchase Agreement"), pursuant to which ETC and SAS have agreed to acquire from Sterling its individual retirement and qualified plan business;

WHEREAS, the Companies provide (or will provide) certain administrative management services to ETC; and

WHEREAS, ETC, as custodian, provides custodial and business services to individual participants' accounts in employee benefit plans, individual retirement plans and other qualified plan accounts (hereinafter referred to as "Custodial Accounts") (and such individual participants of these Custodial Accounts are hereinafter referred to as "Custodial Account Holders"); and

WHEREAS, the Companies and ETC have opened and will open various accounts with Bank (the "Bank Accounts") for the benefit of Custodial Account Holders; and

WHEREAS, the regulations of the FDIC provide that deposit account records of an insured bank must disclose the existence of a relationship that provides the basis for additional insurance, and the details of that relationship must be ascertainable from the records of the insured bank or the records of the account customer; and

WHEREAS, the Companies and ETC desire that the funds maintained in the Bank Accounts be insured to the fullest extent provided by law for each Custodial Account and Custodial Account Holder, and consequently records and statements must be prepared for each Custodial Account Holder regarding the status of each Custodial Account which is within and a part of each Bank Account; and

WHEREAS, Bank could provide account holder record-keeping for the Custodial Accounts and Custodial Account Holders or obtain such services from a third-party provider; and

WHEREAS, the Companies are willing to act as agent for Bank to provide Custodial Account Holder record-keeping and certain other services with respect to the account activity by Custodial Accounts and balances maintained in the Bank Accounts by the individual Custodial Accounts; and

Page 1 of 8

Appendix

## LUSE GORMAN POMERENK & SCHICK
### A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

5335 WISCONSIN AVENUE, N.W., SUITE 780
WASHINGTON, D.C. 20015

TELEPHONE (202) 274-2000
FACSIMILE (202) 362-2902
www.LuseLaw.com

March 8, 2010

**VIA FEDEX**

Board of Directors
United Western Bank
700 Seventeenth Street
Denver, CO 80202

     Re:   <u>Brokered Deposits</u>

Dear Board Members:

     As special counsel to United Western Bank (the "Bank"), we have been requested to provide our opinion regarding whether the below described deposits held at the Bank are "brokered deposits" as defined in the regulations promulgated by the Federal Deposit Insurance Corporation ("FDIC").

## FACTS

**Legent Clearing LLC**

     Legent Clearing LLC ("Legent") is a limited liability company organized under the laws of the State of Delaware and a FINRA member firm. Legent's primary business is providing correspondent clearing services in connection with the settlement of stock trades for broker-dealers, banks and other financial institutions ("Legent Customers"). There are over 200,000 Legent Customers. On behalf of the Legent Customers, Legent takes custody of the Legent Customer's securities, cash and other assets and provides them with extensive trade, execution, settlement, delivery and other services on a daily basis. The amount of cash in a Legent Customer's account will fluctuate depending on the level of its trading activity, market conditions and economic forecasts. Legent Customers are permitted to place idle cash into a money market fund or to provide credit to Legent Clearing so that it can execute margin loans to other Legent Customers.

     The banking relationship between Legent and the Bank has existed since 2002. In November 2008, the Bank became a "program bank" under the Broker-Dealer Money Market Deposit Account Agreement between Deutsche Bank Trust Company Americas and Legent. In connection with this agreement, the Bank entered into a Program Bank Fee Agreement dated November 24, 2008. ( A copy of the Program Fee Agreement is attached hereto.) We understand that the Program Bank Fee Agreement was amended at the beginning of 2010 to amend the maximum bank payment to a maximum fixed rate of 1.10%. In the Broker-Dealer Money Market Deposit Account Agreement,

Appendix

**LUSE GORMAN POMERENK & SCHICK**
A PROFESSIONAL CORPORATION

Board of Directors
United Western Bank
March 8, 2010
Page 2

Legent established and maintained an omnibus demand deposit account and money market account at the Bank, as agent and for the benefit of Legent Customers.

We understand that Legent offers the placement of funds into the omnibus accounts at the Bank substantially for the purpose of facilitating Legent's settlement of stock trades by Legent Customers. Approximately 10% of the total amount of funds Legent handles for Legent Customers is currently in the omnibus accounts at the Bank. Additionally, as provided for in Schedule I to the Fourth Amendment to the Legent agreement with the Bank, the Bank pays interest on the omnibus accounts to Legent Customers and a fee to Legent. We understand that the fee to Legent is for certain administrative fees performed by Legent for the benefit of the Bank.

## Matrix Settlement and Clearance Services LLC

Matrix Settlement and Clearance Services LLC ("MSCS") is a New York limited liability company, MSCS' primary business consist of facilitating the clearing of purchase and redemption trades of various mutual funds for customer accounts of financial institutions, such as third-party record-keepers, banks, and registered investment advisors ("MSCS Customers"). Together with its affiliates and subsidiaries, MSCS is one of the nation's largest providers of back-office, trust, custody, trading and mutual fund settlement services for banks, trust companies, registered investment advisors and record-keepers/third-party administrators.

In connection with its trading activities, MSCS Customers may transfer funds to the Bank for the purpose of settlement of trades by the MSCS Customers. The funds transferred to the Bank are generally from qualified employee benefit plan participant funds held in a fiduciary capacity by a custodian or other third-party. The funds are transferred to an omnibus demand deposit account and money market account at the Bank, which has been established by MSCS as agent and for the benefit of MSCS Customers.

The Bank and MSCS entered into a Third Amended and Restated Administrative Services Agreement dated July 5, 2007, whereby MSCS transfers funds consisting of qualified employee benefit plan funds held in a fiduciary capacity by a custodian or third party administrator to the Bank for the purpose of settlement of trades conducted by MSCS. (A copy of the MSCS agreement is attached.) The MSCS Customers require services of both MSCS and the Bank with respect to the transfer of funds for settlement purposes, such as the automated transmission of data, the creation of data interfaces, the automation of funds movement from the MSCS Customer's financial institution to the Bank, and the ongoing maintenance and support required for such services to facilitate the transfer of funds (the "MSCS Administrative Services"). The Bank has determined to have MSCS

**LUSE GORMAN POMERENK & SCHICK**
A PROFESSIONAL CORPORATION

Board of Directors
United Western Bank
March 8, 2010
Page 3

provide these MSCS Administrative Services for which the Bank pay MSCS a monthly servicing fee consisting of an amount equal to the product of the average daily balance of MSCS deposits at the Bank (subject to the exclusion of some accounts identified in Exhibit A of the MSCS agreement) and the Cap Rate as provided on Schedule A-1 of the MSCS agreement. The Bank does not pay any rate on the balances at Bank to MSCS' customers. The Cap Rate is based on the Average Daily Fed Funds Target of interest as described on Schedule A-1 to the MSCS agreement.

We understand that that MSCS currently serves more than 300 MSCS Customers by servicing $100 billion in assets through the MSCS platform. In 2009, MSCS maintained approximately $268 million of MSCS Customers' deposits with the Bank.

## LAW AND REGULATION

A "deposit broker" is defined as "any person engaged in the business of placing deposits, or facilitating the placement of deposits, of third parties with insured depository institutions . . . ." 12 C.F.R. 337.6(a)(5)(i)(A). However, a deposit broker does not include "an agent or nominee whose primary purpose is not the placement of funds with depository institutions." *Id.* § 337.6(a)(5)(ii)(I). This exception is referred to as the "primary purpose exception."

The "primary purpose exception" has been interpreted by the FDIC to apply to "an agent who places funds into a depository institution for a substantial purpose <u>other than</u> to obtain deposit insurance coverage for a customer or to provide the customer with a deposit-placement service." FDIC Advisory Opinion 05-02 (February 3, 2005) [emphasis added].

In Advisory Opinion 05-02, the FDIC concluded that a broker-dealer's sweep of its customers' funds to the broker-dealer's affiliated banks did not constitute a "brokered deposit" because the "primary purpose" of placing the funds at the banks was to facilitate its customers' purchase and sale of securities.

In reaching its decision, the FDIC stated that the "primary purpose exception" is satisfied provided the following qualifications are met:

> • The funds swept to the affiliated banks should not exceed 10% of the total funds the broker-dealer could sweep to the affiliated banks (the "permissible ratio"); and

**LUSE GORMAN POMERENK & SCHICK**
A PROFESSIONAL CORPORATION

Board of Directors
United Western Bank
March 8, 2010
Page 4

• Based on the most recently available data, the average daily balance of swept funds during any month should not exceed 10% of the average of the funds handled by the broker-dealer during that month that are available to be swept to the affiliate banks.

The Advisory Opinion concluded that the funds placed by the broker-dealer will not be treated as brokered deposits provided:

a. the permissible ratio is not exceeded on consecutive months; or

b. the permissible ratio is not exceeded for three months during any 12-month period.

The Advisory Opinion noted that the banks' payment of a fee to the broker-dealer did not change the conclusion that the deposit was not a 'brokered deposit' because the fee was for providing "administrative services (such as recordkeeping and tax reporting information) related to the [d]eposit [a]ccounts."

The Advisory Opinion stated that the broker-dealer should provide the FDIC with monthly reports reflecting the permissible ratio calculations for each month and that daily calculations should be retained by the broker-dealer and available for inspection by the FDIC, and that in the event of a catastrophic event, the broker-dealer could contact the FDIC to request that the primary purpose exception continue to apply.

## ANALYSIS, QUALIFICATIONS, ASSUMPTIONS AND CONCLUSION

We believe that FDIC Advisory Opinion 05-02 is instructive in determining if the deposits at the Bank are "brokered deposits" as defined under federal law and regulation.

With respect to Legent, it is clear that its primary business is the settlement of securities trades by its Legent Customers and not the placement of funds in depository institutions. The Legent deposits are placed at the Bank primarily to facilitate Legent's settlement of Legent Customers' trades in securities. Additionally, only approximately 10% of the total amount of funds Legent handles for Legent Customers is currently in the omnibus accounts at the Bank. Finally, while the Bank pays Legent a fee pursuant to the terms of its agreement with Legent, we understand that the fee is for administrative services provided to the Bank by Legent as opposed to a fee paid Legent for the placement of the funds with the Bank. Accordingly, based on the above and consistent with

Appendix