**LUSE GORMAN POMERENK & SCHICK**
A PROFESSIONAL CORPORATION

Board of Directors
United Western Bank
March 8, 2010
Page 5

FDIC Advisory Opinion 05-02, the Legent deposits at the Bank should not be brokered deposits under the FDIC's regulation.

With respect to MSCS, its primary business is the clearing of purchase and redemption trades of various mutual funds for MSCS Customers, and the MSCS deposits are placed at the Bank primarily to facilitate MSCS' clearing activities for its MSCS Customers' trades. The funds placed at the Bank are a small percentage of the total amount of funds MSCS handles for MSCS Customers. Additionally, the fee the Bank pays MSCS are for the MSCS Administrative Services performed for the benefit of the Bank as opposed to a fee for the placement of the funds with the Bank. Accordingly, based on the above discussion and FDIC Advisory Opinion 05-02, the MSCS deposits at the Bank should not be brokered deposits under the FDIC's regulation.

The opinions expressed herein are based upon, and subject to, the following assumptions, limitations, qualifications and exceptions:

1.  In rendering its opinions, the firm has relied solely upon any representations of officers of the Bank that the facts, as stated herein, are true, complete and correct.

2.  The firm has assumed that there are no other facts that would change the opinions contained herein.

3.  The firm has not independently verified the accuracy, completeness, or correctness of any of the facts presented above.

4.  The firm expresses no opinion as to any other laws or regulations, other than the applicable FDIC regulations discussed herein.

5.  The firm expresses no opinion as to the safety and soundness of any of the transactions contained therein.

6.  The opinions and conclusions expressed herein are based upon our interpretation of existing law and regulation, and are not intended to speak with reference to standards hereafter adopted or evolved in subsequent judicial or regulatory decisions or interpretations, or to laws, rules or regulations hereafter enacted or adopted. The opinions and conclusions expressed herein are as of the date hereof, and the firm assumes no obligation

Appendix

**LUSE GORMAN POMERENK & SCHICK**
A PROFESSIONAL CORPORATION

Board of Directors
United Western Bank
March 8, 2010
Page 6

to update or supplement its opinions or conclusions to reflect any facts or circumstances that may hereafter come to our attention or any changes in law or regulation that may hereafter occur.

7. The firm's opinions and conclusions are limited to the matters stated herein and no opinions may be implied or inferred beyond the matters expressly stated herein.

8. This letter is delivered solely for the benefit of the Bank relating to the applicability of the noted FDIC regulations, and no other party or entity is entitled to rely hereon for any purpose whatsoever without the express prior written consent of this firm.

Very truly yours,

Luse Gorman Pomerenk & Schick,
A Professional Corporation

Attachments

# BUCKLEY SANDLER LLP

1250 24th Street NW, Suite 700
Washington, DC 20037

March 10, 2010

United Western Bank
700 Seventeenth Street
Denver Colorado 80202

      RE:   Brokered Deposits

Gentlemen:

We have been requested, in our capacity as special counsel to the United Western Bank (the "Bank") to provide our opinion as to whether certain deposits maintained at the Bank are "brokered deposits" within the meaning of 12 USC §1831(f) and the rules and regulations promulgated by the Federal Deposit Insurance Corporation.

## Facts

Based on representations from the Bank, we understand the following to be the facts. The Bank has entered into a number of agreements with institutions which have custody of customer funds, pursuant to which the institutions maintain deposit funds in money market and/or demand deposit accounts at the Bank, which are held on behalf of the institution's customers in the ordinary course of business. The accountholders are described in greater detail below. In each case, appropriate agreements are entered into between the Bank and its counterparty, and each such agreement clearly provides that these are custodial accounts maintained for the benefit of the customers of the depositing institution, which are entitled to the pass-through of deposit insurance. In each case, these agreements provide that sub-accounting and recordkeeping functions are to be performed by the depositing institutions. In each case, the Bank pays the depositing institution a fee for performing these administrative, recordkeeping and/or other services. No amount of the fee is paid for providing the deposits. In each case, the rates paid on deposits do not exceed the limits on rates payable by institutions subject to the brokered deposits restrictions under 12 C.F.R. 337.6(b).

*Equity Trust Company ("ETC")* — ETC is a non-depository trust company primarily engaged in the business of serving as a qualified custodian for self directed IRA accounts and other retirement accounts. ETC is the named custodian and, as a plan administrator, provides significant administrative and management services for the accountholders, including, holding title to assets, holding investment securities, valuation and tax reporting services, and accounting for investments and distributions, such as lease payments. ETC offers its IRA holders the opportunity to invest in traditional and alternative investments. Traditional investments include stocks, bonds, mutual funds and similar instruments. Alternative investments include indirect

United Western Bank
March 10, 2010
Page 2

investments in private placements, limited partnerships and limited liability companies and direct investments in real estate and oil and gas interests. The decision as to selection with regard to these investments is left to the holder of the self directed IRA. Absent directions to the contrary from the accountholder, ETC sweeps idle cash, if any, in the accounts to the omnibus money market or demand deposit accounts at the Bank.  Pursuant to the Subaccounting Agreement dated June 27, 2009 between ETC, Equity Administrative Services, Inc. ("EAS"), Sterling Administrative Services, LLC ("SAS") (EAS and SAS collectively referred to herein as the "ETC Companies") and Bank (the "ETC Subaccounting Agreement"), the ETC Companies will provide sub-accounting and recordkeeping, administrative or other services related to the custodial account holders' accounts and the Bank shall pay the ETC Companies a monthly fee for such services equal to $40.00 multiplied by the number of custodial accounts at Bank; however, in no event shall the aggregate monthly fee exceed a percentage yield with respect to the accounts equal to the rate set forth in the ETC Subaccounting Agreement. The ETC Subaccounting Agreement has a five year term, through June 2014. Under the ETC Subaccounting Agreement, as recently amended, ETC is contractually obligated to maintain its customer's cash balances at the Bank unless the Bank falls below the level of "adequately capitalized."

ETC has used the depository services of the Bank for the idle cash of its customers since 2002. ETC required a bank that understood the exigencies of managing the idle cash of IRA holders and was willing to facilitate an electronic data processing interface and other services. As the Bank then provided similar services for the IRA accounts maintained by its affiliate trust company, the Bank's capacities represented an attractive resource to ETC and its customers, including customers of the Bank's affiliate trust company sold to ETC in June 2009.  The ETC relationship has provided a stable, reasonably priced source of deposits to the Bank for eight years.

*Lincoln Trust Company ("LTC")* – LTC is a non-depository trust company primarily engaged in the business of serving as a qualified custodian for self directed IRA accounts and other retirement accounts.  The LTC subaccounting relationship is similar to the ETC subaccounting relationship wherein LTC provides subaccounting and record-keeping services for Bank and Bank pays a fee to LTC for such services, based on the level of deposits.

LTC has used the depository services of the Bank for the idle cash of its customers since February 2010. LTC elected to utilize the depository resources of the Bank in recognition of the Bank's long history of being able to provide trust companies, such as ETC and UW Trust Company, with necessary depository services to make the trust operations run efficiently.

*Matrix Settlement and Clearance Services, LLC ("MSCS")* – MSCS is a limited liability company primarily engaged in providing back-office, trust, custody, trading and mutual fund settlement and clearing services to banks, trust companies, registered investment advisers and third party administrators representing tax exempt retirement plans.  Through the MSCS interfaces with MSCS and certain third party administrators, the third party administrators purchase and sell mutual fund interests in numerous mutual fund families on behalf, and at the direction, of the participants in the benefit plans serviced by the administrators.  Idle cash

United Western Bank
March 10, 2010
Page 3

following settlement of trades is swept into the omnibus account maintained at the Bank by MSCS. Under the Bank's administrative services agreement with MSCS, MSCS will provide certain services to the Bank and its customers with respect to the transfer of funds for settlement purposes—such services including the automated transmission of data, the creation of data interfaces, the automation of funds movement from customer's financial institution to the Bank, and the ongoing maintenance and support required for such services to facilitate the transfer of funds. In consideration of providing these services that MSCS provides to Bank, Bank pays MSCS a monthly servicing fee based on the average daily balance of funds (with certain funds excluded). Given the nature of MSCS's business, the level of cash deposits swept by MSCS into the Bank, as compared to the total assets of the underlying plan accounts of the third party administrators, is not readily susceptible to calculation by MSCS or the Bank. However, you have advised us that the total assets of the underlying plan accounts of third party administrators are in the $80 billion to $100 billion range, therefore the cash in the MSCS omnibus accounts at Bank necessarily represents less than ten percent of the overall assets in these plans.

United Western Bancorp, Inc. (the Company"), the Bank's holding company, was a founder of MSCS in 1999, and as high as a 45% shareholder, until the sale of its remaining shares in 2009. MSCS has used the Bank's depositary services since 1999. The sophisticated data processing interfaces developed by MSCS, with the participation of the Bank, is significantly intertwined in the Bank's operations. MSCS subleases office space from the Bank and uses Bank provided computer equipment, telephony, and other office services. The Bank provides support for MSCS's web based workflow management. The Bank generates customized data files that are formatted to feed directly into MSCS's system. These formats were created when MSCS was a subsidiary of the Bank's holding company and would be difficult to recreate. The MSCS relationship has provided a stable, reasonably priced source of deposits to the Bank for over ten years.

*Legent Clearing, LLC ("Legent")* – Legent is in the business of providing securities clearing and settlement services to over 100 FINRA member brokerage firms and their customers. Legent takes custody of the brokerage customer's securities, cash and other assets and provides extensive trade, execution, settlement, delivery and other services to customers on a daily basis. Legent allows these customers to place idle cash in an omnibus account with the Bank. Customers may also elect to place their idle cash in a money market mutual fund or to provide credit to Legent to allow Legent to provide margin loans to customers. We understand that currently, approximately 10% of the total amount of assets available to Legent for sweeping to accounts such as the omnibus account maintained at the Bank, is deposited at the Bank. The Legent account is entitled "Legent Clearing LLC as agent and custodian for the exclusive benefit of customers of its Introducing Broker-Dealers." Under this arrangement, Deutsche Bank Trust Company of Americas ("DBTCA") provides certain record-keeping services to Legent and the Bank. DBTCA's services include providing recording the beneficial interest held by each customer in the custodial account maintained at Bank. Legent also provides services with respect to the customer accounts at Bank, including carrying out customer directions with respect to a customer account, providing back up withholding and sending IRS Form 1099 interest information to each customer. The Bank pays Legent and DBTCA a fee based on the average monthly customer deposits maintained at Bank.

United Western Bank
March 10, 2010
Page 4

The Bank's relationship with Legent dates to 2002, when Legent was acquired by Guy Gibson, the Chairman of the Company and Bank and its holding company, who stepped down from active management of the Bank. Legent has used the bank's depository services for the idle cash of its participant's customers since 2003. The Legent relationship has provided the Bank with a stable source of reasonably priced deposits. The relationship continued after Legent was sold to an independent third party. Four members of current management of the Company and/or Bank are former members of Legent management. The Legent relationship has provided a stable, reasonably priced source of deposits to the Bank for eight years.

**Analysis**

Brokered deposits are defined as "any deposit that is obtained, directly or indirectly, from or through the mediation or assistance of a deposit broker." 12 C.F.R. §337.6(a)(2). A "deposit broker" is defined, in relevant part, as "any person engaged in the business of placing deposits, or facilitating the placement of deposits, of third parties with insured depository institutions,…" 12 U.S.C. §1831f(g)(1)(A), 12 C.F.R. §337.6(a)(5). However, the term "deposit broker" does not include, among other exclusions:

> "(E) A person acting as a plan administrator or investment adviser in connection with a pension plan or other employee benefit plan, provided that person is performing managerial functions with respect to the plan; [or]
> (I) An agent or nominee whose primary purpose is not the placement of funds with depository institutions…" 12 U.S.C. §1831f(g)(2), 12 C.F.R. §337.6(a)(5)(ii)."

The exclusion from the definition of deposit broker in subsection (E) above does not appear to have been the subject of any official advice or commentary asserting additional requirements to reliance on the exception.

The exclusion from the definition of deposit broker in subsection (I) above, is referred to as the "primary purpose exception," and has been the subject of a number of advisory opinions by the FDIC. In Advisory Opinion 05-02, it was explained that "the FDIC has taken the position that "primary purpose" means "primary intent." In other words, the "primary purpose exception" applies to an agent who places funds into a depository institution for a substantial purpose other than to obtain deposit insurance coverage for a customer or to provide the customer with a deposit-placement service."

In Advisory Opinion 05-02, the FDIC agreed that a broker–dealer's sweep of credit balances in customer accounts into affiliated banks was not for the primary purpose of providing deposit placement services, and did not constitute brokered deposits where: (i) the swept funds did not exceed 10% of the total assets in the subject accounts (the "permissible ratio"); (ii) the average daily balance of swept funds during any month should not exceed 10% of the average assets in the subject accounts handled during the month (the "monthly ratio"); (iii) the

Appendix

United Western Bank
March 10, 2010
Page 5

permissible ratio is not exceeded in consecutive months; and (iv) the permissible ratio is not exceeded for three months in any twelve month period.

The Advisory Opinion also discusses the fees paid to the broker–dealer sweeping the deposits to the bank for recordkeeping and administrative services. In that opinion the fees were flat fees based on a "per account" or "per customer" basis. It was represented that the fees were not for the placement of deposits. The opinion notes that "[a]ssuming the accuracy of these representations, the existence of the fees does not change our conclusion" that the primary purpose exception is satisfied.

## Conclusion regarding ETC and LTC

Based on the facts set forth above, and subject to the additional qualifications herein contained, we are of the opinion that to the extent that the deposits swept by ETC and/or LTC into the Bank represent funds of IRA or other pension or retirement plans, which are deposited by ETC and/or LTC acting as a plan administrator and performing managerial functions with respect to the accounts or plans, then such entities are not "deposit brokers" and as such, deposits received through such entities are excluded from the definition of, and do not constitute, "brokered deposits."

## Conclusion regarding MSCS and Legent

As stated in Opinion 05-02, the primary purpose exception is intended to apply to an agent who places funds into a depository institution for a substantial purpose other than to obtain deposit insurance coverage for a customer or to provide the customer with a deposit-placement service. It is our view that substantial purposes other than deposit placement underlie the depositary relationships between the Bank and each of MSCS and Legent.

In the case of MSCS, its operations were developed on a highly integrated basis with the services of the Bank. The Bank has developed significant specialized reporting and procedures to accommodate and foster the business of MSCS, which, we are advised, are not readily available from other institutions. Termination of the depositary relationship with the Bank could result in a significant disruption to the business of MSCS and its customers. MSCS clearly maintains its relationship with the Bank for the purpose of providing its core mutual fund settlement and clearing services to its customers, and not to provide its customer with a deposit placement service for overnight idle funds resulting from that fundamental business. Based on the information provided to us, it also appears that the amount of cash in the MSCS accounts at the Bank are well below the permissible ratio.

Similarly, in the case of Legent, the provision of depositary services is an incidental accommodation to customers in connection with its primary business of securities settlement and clearing services for broker dealers and their customers, and not to provide deposit insurance or deposit placement services for its customers.

United Western Bank
March 10, 2010
Page 6

While the arrangements between the Bank and MSCS and Legent differ from the particular facts presented by the bank seeking advice in Opinion 05-02, we believe viewing MSCS and Legent as within the exception from the definition of "deposit broker" in 12 U.S.C. §1831f(g)(2)(I) and 12 C.F.R. §337.6(a)(5)(ii)(I) is consistent with the principles underlying Opinion 05-02 and the brokered deposit rules.

In the absence of a specific prior regulatory interpretation on all fours with the Bank's fact scenario, it is necessary to look to the language of the statute and regulation, and to the regulatory purposes underlying the exception to the definition of "deposit broker." Insofar as the restrictions on the use of brokered deposits by less than well capitalized institutions are intended to limit reliance on volatile and high cost non-core deposits, then the purpose of the restrictions would not be served by designating MSCS and Legent as "deposit brokers." Each of Legent and MSCS has a long relationship with the Bank, and, as represented by the Bank, the aggregate interest and administration costs of the deposits to the Bank is reasonable, and in line with or below the costs of comparable deposits originated on a retail basis. The level of deposits provided by each institution has been stable, and not subject to volatile swings.

Therefore, we believe that there is a reasonable good faith basis to conclude that Legent and MSCS are not deposit brokers, and that the deposits obtained by the Bank through its relationships with such entities should not be characterized as brokered deposits for purposes of 12 U.S.C. §1831(f).

In reaching the foregoing conclusions we have relied on the facts as represented to us and stated herein. Any change in the facts could affect our conclusions. We have not made any inquiries of the FDIC or other bank regulatory agencies in connection with rendering this opinion, and they may disagree with the views and conclusions expressed herein. We note that the FDIC has significant discretion in the interpretation of the provisions of the brokered deposit provisions of law and regulation.

Our examination of matters of law in connection with the opinions and conclusions expressed herein has been limited to, and accordingly our opinions and conclusions expressed herein are limited to, the federal laws of the United States of America. We express no opinion with respect to the laws of any other jurisdiction. This letter is given as of the date hereof, and we assume no obligation to advise you after the date hereof of facts or circumstances that come to our attention or changes in law that occur that could affect the opinions contained herein.

Very truly yours,

*BuckleySandler LLP*

BuckleySandler LLP

**EXHIBIT D**

**United Western Bank**
**New Brokered Deposits Listing**

| | May 31, 2010 Ending Balance | | Interest Rate (6) | March 31, 2010 Quarterly Average Balance | | December 31, 2009 Yearly Average Balance *(In Thousands)* | | December 31, 2008 Yearly Average Balance | | December 31, 2007 Yearly Average Balance | December 31, 2006 Yearly Average Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Equity Trust | $ 632,949 | (1) | 0.10% | $ 942,150 | | $ 696,959 | (3) | $ 482,000 | $ | 463,224 | $ 452,070 |
| Matrix Financial Solutions, Inc. (MSCS) | 174,629 | | 0.00% to 0.25% | 246,594 | | 191,973 | | 222,728 | | 152,417 | 177,505 |
| Lincoln Trust | 120,766 | | 0.13% | 86,844 | (2) | - | | - | | - | - |
| Legent Clearing, LLC | 203,044 | | 1.10% | 165,231 | | 119,202 | | 182,388 | | 167,222 | 64,838 |
| Constellation Trust | 36,549 | | 0.13% | 25,732 | | 18,200 | | 27,701 | | 8,833 | 4,922 |
| TMI | 10,780 | | 1.00% | 10,750 | | 10,680 | | 10,574 | | 10,435 | 10,362 |
| UW Trust Company | 17,869 | | 1.10% | 21,538 | | 193,596 | (4),(5) | 384,481 | | 389,061 | 319,541 |
| **Total** | **1,196,586** | | | **1,498,839** | | **1,230,610** | | **1,309,872** | | **1,191,192** | **1,029,238** |
| | | | | | | | | | | | |
| Total Deposits and Custodial Escrow | 1,825,085 | | | 2,401,217 | | 1,998,053 | | 1,557,202 | | 1,511,357 | 1,363,751 |
| Other deposits deemed brokered | 233,650 | | | 628,177 | | 529,954 | | 63,998 | | 18,596 | 50,078 |
| Net deposits | 1,591,435 | | | 1,773,040 | | 1,468,099 | | 1,493,204 | | 1,492,761 | 1,313,673 |
| | | | | | | | | | | | |
| New Brokered Deposits under the FDIC Letter | 75% | | | 85% | | 84% | | 88% | | 80% | 78% |

(1) Reflects transfer of $350 million of Equity Trust deposits to another institution, which occurred May 3, 2010.  Contemporaneously, we reduced the cap on this relationship from $1 billion to $700 million.
(2) Reflects new relationship developed in 2010 to allow for diversification of deposit base
(3) Reflects increase in Equity Trust deposits from June 26, 2009 purchase of substantially all assets of UW Trust Company, formerly Sterling Trust.
(4) Reflects decrease in UW Trust deposits from June 26, 2009 sale to Equity Trust.
(5) Reflects reduction in business associated with one life settlement company.
(6) Does not include administrative fees, if any.

\\Denfile1\projectm\!!! OTS\Brokered Deposits\FDIC Waiver Application 061010\Exhibit D for FDIC Response.xlsBrokered Deposits

Appendix



**Office of Thrift Supervision**
Department of the Treasury                                                                          *Western Region*

Pacific Plaza, 2001 Junipero Serra Boulevard, Suite 650, Daly City, CA  94014-3897          Daly City Area Office
P.O. Box 7165, San Francisco, CA 94120-7165 • Telephone: (650) 746-7000 • Fax: (650) 746-7001

June 22, 2010

Board of Directors
United Western Bank
700 17th Street, Suite 2100
Denver, CO 80202

Dear Directors:

In a letter dated May 24, 2010, the FDIC informed United Western Bank that the agency had determined that the Bank's deposits from seven institutional deposit relationships are brokered deposits.  The letter further indicated that the FDIC deemed the maturity dates of the deposits to be those of the underlying deposit instruments rather than those of the contracts between the institutional depositors and the Bank. The FDIC also informed the institution that its current "Adequately Capitalized" status under PCA standards precludes United Western from accepting, renewing, or rolling over any brokered deposit without a waiver from the FDIC.

United Western Bank has not demonstrated to us that it has the ability to replace these funds in the near future.  While we acknowledge that United Western filed a request for a brokered deposit waiver on June 10, 2010, it is uncertain whether United Western will be able to reach agreement with the FDIC on a plan for the orderly reduction of the institutional deposits that would provide the basis for approval of a waiver. The duration of any such waiver, if approved, is also uncertain.

In view of this situation, we believe that there is a possibility that United Western could face a severe liquidity crisis in the near future that would threaten the viability of the institution.  We, therefore, are downgrading the Liquidity component rating to "5."

If you have comments or questions, please contact me at (650) 746-7025 or Office Examiner Steve Harris at (650) 746-7048.

Sincerely,

*Nicholas J. Dyer*

Nicholas J. Dyer
Assistant Director

cc:  Tom Trujillo, FDIC-Dallas

# UNITED STATES OF AMERICA
## Before the
## OFFICE OF THRIFT SUPERVISION

| | |
|---|---|
| In the Matter of | Order No.:  WN-10-019 |
| **UNITED WESTERN BANK** | Effective Date:  June 25, 2010 |
| Denver, Colorado | |
| OTS Docket No. 06679 | |

## ORDER TO CEASE AND DESIST

**WHEREAS,** United Western Bank, Denver, Colorado, OTS Docket No. 06679

(Association), by and through its Board of Directors (Board), has executed a Stipulation and

Consent to the Issuance of an Order to Cease and Desist (Stipulation); and

**WHEREAS,** the Association, by executing the Stipulation, has consented and agreed to

the issuance of this Order to Cease and Desist (Order) by the Office of Thrift Supervision (OTS)

pursuant to 12 U.S.C. § 1818(b); and

**WHEREAS,** pursuant to delegated authority, the OTS Regional Director for the Western

Region (Regional Director) is authorized to issue Orders to Cease and Desist where a savings

association has consented to the issuance of an order.

**NOW, THEREFORE, IT IS ORDERED that:**

**Cease and Desist.**

1.      The Association and its directors, officers, and employees shall cease and desist from any

action (alone or with others) for or toward, causing, bringing about, participating in or

counseling, or aiding and abetting the unsafe or unsound practices that resulted in deteriorating

asset quality, ineffective risk management practices, inadequate oversight and supervision of the

lending function, and inadequate liquidity planning at the Association.

2.     The Association and its directors, officers, employees, and agents shall also cease and

desist from any action (alone or with another or others) for or toward causing, bringing about,

participating in, counseling or the aiding and abetting of any violation of:

(a)     12 C.F.R. § 560.93 (Lending Limitations); and

(b)     12 C.F.R. § 563.41 and Regulation W, 12 C.F.R. Part 223 (Transactions with

Affiliates).

**Capital.**

3.     By June 30, 2010, the Association shall meet and maintain a Tier 1 (Core) Capital ratio

equal to or greater than eight percent (8%) after the funding of an adequate Allowance for Loan

and Lease Losses (ALLL) and a Total Risk-Based Capital ratio equal to or greater than twelve

percent (12%).[1]

4.     Within seven (7) days, the Board shall submit a written Capital Plan to the Regional

Director for review and comment.  The Capital Plan shall address how the Association will meet

and maintain the capital ratios set forth in Paragraph 3 of this Order.  At a minimum, the Capital

Plan shall:

(a)     take into consideration the requirements and restrictions imposed by this Order;

(b)     detail capital preservation and enhancement strategies with specific narrative

goals, which shall result in new equity and a capital infusion;

---

[1] The requirement in this Order to meet and maintain a specific capital level means that the Association may not be deemed to be "well-capitalized" for purposes of 12 U.S.C. §1831o and 12 C.F.R. Part 565, pursuant to 12 C.F.R. §565.4(b)(1)(iv).

(c)     consider and address the amount of additional capital that would be necessary to

meet the capital requirements of Paragraph 2 of this Order under different forward-

looking scenarios involving progressively stressed economic environments;

(d)     identify the specific sources of additional capital;

(e)     detail timeframes by which the additional capital will be raised, if necessary, and

provide specific target month-end capital levels; and

(f)     provide for alternative methods to strengthen capital, should the primary sources

identified under subparagraph (d) of this section not be available.

5.     Within fifteen (15) days after receipt of any comments from the Regional Director, the

Board shall make the changes, if any, to the Capital Plan required by the Regional Director.

Thereafter, the Board shall adopt and the Association shall implement and comply with the

Capital Plan.  Within five (5) days of the Board meeting at which the Capital Plan was adopted,

the Association shall provide a copy of the Capital Plan to the Regional Director.

6.     Within thirty (30) days after the end of each month, beginning with the month ending

June 30, 2010, the Board shall review monthly variance reports (Monthly Capital Plan Variance

Reports) prepared by Management on the Association's compliance with the Capital Plan.  Such

Monthly Capital Plan Variance Reports shall: (a) detail actual operating results versus projected

results; (b) include detailed explanations of any material deviations; and (c) include a description

of the specific corrective actions or measures that have been implemented or are proposed to

address each material deviation.

7.     The Board's review of the Monthly Capital Plan Variance Reports and evaluation of

Management and the Association's compliance with the Capital Plan shall be thoroughly

documented in the Board meeting minutes.  The Association shall submit the Board meeting

minutes to the Regional Director within five (5) days of the Board meeting.

United Western Bank
Order to Cease and Desist
Page 3 of 15

Appendix

8.      Within seven (7) days, the Association shall submit for the Regional Director's review and comment a written Contingency Plan. The Contingency Plan shall detail the actions to be taken, with specific time frames, to achieve one of the following results by the later of date of receipt of all required regulatory approvals or sixty (60) days after the implementation of the Contingency Plan: (a) merger with, or acquisition by, another federally insured depository institution or holding company thereof; or (b) voluntary liquidation by filing an appropriate application with the OTS in conformity with federal laws and regulations. The Board shall make any changes to the Contingency Plan required by the Regional Director upon being notified of such changes and shall provide a copy of the revised Contingency Plan to the Regional Director. The Association shall immediately implement the Contingency Plan upon notification from the Regional Director.

9.      Once the Contingency Plan has been implemented, the Association shall provide written status reports to the Regional Director detailing the Association's actions taken and progress in executing the Contingency Plan by no later than the first (1st) and fifteenth (15th) of each month following the implementation of the Contingency Plan until such time as the Regional Director determines such reports are no longer required. The status reports shall detail: any contacts with investment bankers, any parties doing due diligence, any offers relating to an acquisition or a merger, or the execution of binding letters of intent or purchase.

**Business Plan.**

10.      Within thirty (30) days, the Association shall submit an updated written comprehensive business plan covering the Association's operations through December 31, 2012 (Business Plan) to the Regional Director for review and comment. The Business Plan shall, at a minimum, include: (a) a detailed narrative of the Board's plans and strategies to strengthen and improve the Association's operations, earnings and profitability; (b) a detailed discussion of the Association's

current financial position and resources and the Board's plans and strategies for preserving and

enhancing the Association's financial resources to meet the Association's operational projections

under the Business Plan, adequately support the Association's risk profile, maintain the capital

ratios set forth in Paragraph 2 of this Order, and satisfy the Association's liquidity needs;

(c) quarterly pro forma financial projections (balance sheet and income statement) for each

quarter covered by the Business Plan; and (d) all relevant assumptions and projections, as well as

documentation supporting such assumptions and projections.

11.    Within fifteen (15) days of receipt of any comments from the Regional Director, the

Board shall make the changes, if any, to the Business Plan required by the Regional Director.

Thereafter, the Board shall adopt and the Association shall implement and comply with the

Business Plan. Within five (5) days of the Board meeting at which it was adopted, the

Association shall provide a copy of the Business Plan to the Regional Director.

12.    Any material modifications to the Business Plan shall be submitted to the Regional

Director for review and written non-objection thirty (30) days prior to the proposed

implementation date unless such time period is waived in writing by the Regional Director.

13.    Within forty-five (45) days after the close of each quarter, beginning with the quarter

ending September 30, 2010, the Board shall review quarterly variance reports prepared by

Management on the Association's compliance with the approved Business Plan (Quarterly

Business Plan Variance Reports). The Quarterly Business Plan Variance Reports shall include:

actual operating results versus projected results, detailed explanations of any material deviations

from the Business Plan, and a specific description of the corrective actions or measures that have

been implemented, proposed or are under consideration to correct any material deviation.

14.    The Board shall provide the Regional Director with a copy of each  Quarterly Business

Plan Variance Report and the Board meeting minutes detailing the Board's review of the

Quarterly Business Plan Variance Report, including the identification of any corrective actions

adopted by the Board, and the Board's evaluation and assessment of Management and the

Association's compliance with the Business Plan within ten (10) days after the date of the Board

meeting at which the Board's review was conducted.

**Classified Asset Reduction Plan.**

15.    Within thirty (30) days, the Association shall submit a revised written comprehensive

Classified Asset Reduction Plan to the Regional Director for review and comment.  The

Classified Asset Reduction Plan shall contain specific Board strategies for reducing the

Association's ratio of classified assets to Tier One (Core) Capital plus ALLL to a level and

within a time frame acceptable to the Regional Director.  The Classified Asset Reduction Plan

shall specify the manner and methods for reducing the Association's level of classified assets to

the target set therein and provide a contingent plan to further strengthen its capital base in the

event this target is not met.  Further, the Classified Asset Reduction Plan shall require provision

of monthly asset quality reports to the Board (with a copy to the Regional Director) in order for

the Board to assess the Association's progress in achieving the targeted classified assets ratio.

The Board shall document its review of the periodic asset quality reports in the Board meeting

minutes.

16.    Within fifteen (15) days of receipt of any comments from the Regional Director, the

Board shall make the changes, if any, to the Classified Asset Reduction Plan required by the

Regional Director.  Thereafter, the Board shall adopt the Classified Asset Reduction Plan and the

Association shall implement and comply with the Classified Asset Reduction Plan.  Within five

(5) days of the Board meeting at which it was adopted, the Association shall provide a copy of

the Classified Asset Reduction Plan to the Regional Director.  Any request to modify the

Classified Asset Reduction Plan shall be submitted to the Regional Director for review and

written non-objection at least thirty (30) days prior to the proposed date to implement any such modification.

**Concentration Reduction Plan.**

17.    Within thirty (30) days, the Association shall submit a revised written Concentration Reduction Plan to the Regional Director for review and comment. The Concentration Reduction Plan shall detail how the Association will reduce its existing concentration of construction loans, non-residential mortgage loans, and non-agency MBS as a percentage of Tier 1 (Core) Capital plus ALLL to a level acceptable to the Regional Director within a timeframe satisfactory to the Regional Director. At a minimum, the Concentration Reduction Plan shall include:

(a)    targets for reduction of the concentrations in each category as a percentage of Tier 1 (Core) Capital plus ALLL and time frames for each such target;

(b)    a description of the manner and methods for reducing the Association's concentrations in each category to the targets set therein; and

(c)    all relevant assumptions and projections and documentation supporting such assumptions and projections.

18.    Within fifteen (15) days of receipt of any comments from the Regional Director, the Board shall make the changes, if any, to the Concentration Reduction Plan required by the Regional Director. Thereafter, the Board shall adopt the Concentration Reduction Plan and the Association shall implement and comply with the Concentration Reduction Plan. Within five (5) days of the Board meeting at which it was adopted, the Association shall provide a copy of the Concentration Reduction Plan to the Regional Director. Any request to modify the Concentration Reduction Plan shall be submitted to the Regional Director for review and written non-objection at least thirty (30) days prior to the proposed date to implement any such modification.

**Construction and Land Loans.**

19.     The Association shall continue to not directly or indirectly make, invest in, purchase, or commit to make or purchase new construction or land loans without prior written non-objection from the Regional Director.

20.     Notwithstanding the restriction in Paragraph 19, the Association may originate construction loans that are underwritten through the preferred lender program of the United States Small Business Administration (SBA).

**Investment Securities.**

21.     The Association shall continue to not increase its investment in non-agency securities without the prior written notice of non-objection of the Regional Director.

**Liquidity Contingency Plan.**

22.     Within seven (7) days, the Association shall submit a written comprehensive Liquidity Contingency Plan to the Regional Director for review and comment.  The Liquidity Contingency Plan shall contain specific Board strategies for ensuring that the Association maintains adequate short-term and long-term liquidity to withstand any anticipated or extraordinary demand against its funding base, and shall, at a minimum:

    (a)     conform to applicable statutes, regulations, and regulatory guidance;

    (b)     specifically address deposit concentrations and plans to reduce or manage such concentrations;

    (c)     set forth the Association's strategies for the funding of projected lending activities;

    (d)     include a cash flow analysis of liquidity that includes reasonable assumptions, identifies anticipated funding needs and the sources of liquidity to meet those needs, and addresses potential contingent liabilities;

(e)    include identification of alternative funding sources to meet extraordinary demands, including, at a minimum, the selling of assets, obtaining lines of credit from correspondent institutions, recovering charged-off assets, and injecting additional equity capital; and

(f)    set forth the assumptions used in the formulation of the Liquidity Contingency Plan, including, but not limited to, assumptions regarding the source of the Association's deposits, the quality of the Association's unpledged assets, the collateral requirements for Federal Home Loan Bank (FHLB) advances, and borrowing capability from Federal Reserve Banks.

23.    Within fifteen (15) days of receipt of any comments from the Regional Director, the Board shall make the changes, if any, to the Liquidity Contingency Plan required by the Regional Director. Thereafter, the Board shall adopt the Liquidity Contingency Plan and the Association shall implement and comply with the Liquidity Contingency Plan. Within five (5) days of the Board meeting at which it was adopted, the Association shall provide a copy of the Liquidity Contingency Plan to the Regional Director. Any request to modify the Liquidity Contingency Plan shall be submitted to the Regional Director for review and written non-objection at least thirty (30) days prior to the proposed date to implement any such modification.

24.    Within five (5) days of receipt, the Association shall provide to the Regional Director any correspondence from the FHLB or the Federal Reserve Bank imposing restrictions on the Association's borrowing capacity or requiring additional collateral.

25.    Effective immediately, the Association shall, on a weekly basis or more frequently if requested by the Regional Director, submit a liquidity and cash flow analysis acceptable to the Regional Director until such time as the Regional Director releases the Association from this reporting requirement.

**Growth Restrictions.**

26.     Effective immediately, the Association shall not increase its total assets during any quarter in excess of an amount equal to net interest credited on deposit liabilities during the prior quarter without the prior written notice of non-objection of the Regional Director.

**Directorate and Management Changes.**

27.     Effective immediately, the Association shall comply with the prior notification requirements for changes in directors and Senior Executive Officers[2] set forth in 12 C.F.R. Part 563, Subpart H.

**Severance and Indemnification Payments.**

28.     Effective immediately, the Association shall not make any golden parachute payment[3] or prohibited indemnification payment[4] unless, with respect to each such golden parachute payment, the Association has complied with the requirements of 12 C.F.R. Part 359 and, as to indemnification payments, 12 C.F.R. § 545.121.

**Employment Contracts and Compensation Arrangements.**

29.     Effective immediately, the Association shall not enter into, renew, extend or revise any contractual arrangement relating to compensation or benefits for any Senior Executive Officer or director of the Association, unless it first provides the OTS with not less than thirty (30) days prior written notice of the proposed transaction.  The notice to the OTS shall include a copy of the proposed employment contract or compensation arrangement or a detailed, written description of the compensation arrangement to be offered to such officer or director, including all benefits and perquisites.  The Board shall ensure that any contract, agreement or arrangement

---

[2] The term "Senior Executive Officer" is defined at 12 C.F.R. § 563.555.
[3] The term "golden parachute payment" is defined at 12 C.F.R. § 359.1(f).
[4] The term "prohibited indemnification payment" is defined at 12 C.F.R. § 359.1(l).

submitted to the OTS fully complies with the requirements of 12 C.F.R. Part 359, 12 C.F.R. §§

563.39 and 563.161(b), and 12 C.F.R. Part 570 – Appendix A.

**Third-Party Contracts.**

30.     Effective immediately, the Association shall not enter into any arrangement or contract

with a third party service provider that is significant to the overall operation or financial

condition of the Association[5] or outside the Association's normal course of business unless, with

respect to each such contract, the Association has: (a) provided the OTS with a minimum of

thirty (30) days prior written notice of such arrangement or contract; (b) determined that the

arrangement or contract complies with the standards and guidelines set forth in Thrift Bulletin

82a (TB 82a); and (c) received written notice of non-objection from the Regional Director.

31.     Effective immediately, the Association shall provide the OTS with written notice of all

arrangements or contracts with third party service providers consistent with the requirements of

12 U.S.C. § 1464(d)(7)(D)(ii).  Such notice shall be provided to the Regional Director not later

than thirty (30) days after the earlier of:  (a) the date on which the Association enters into the

contract; or (b) the date on which the performance of the service is initiated.  The Board shall

review all arrangements or contracts with third party service providers covered by this Paragraph

to ensure compliance with the standards and guidelines set forth in TB 82a.

**Capital Distributions.**

32.     Effective immediately, the Association shall not declare or pay dividends or make any

other capital distributions, as that term is defined in 12 C.F.R. § 563.141, without receiving the

prior written approval of the Regional Director.  The Association's written request for written

approval should be submitted to the Regional Director at least thirty (30) days prior to the

anticipated date of the proposed declaration, dividend payment or distribution of capital.

---

[5] A contract will be considered significant to the overall operation or financial condition of the Association where
the annual contract amount equals or exceeds two percent (2%) of the Association's total capital.

**Transaction With Affiliates Restrictions.**

33.     By August 31, 2010, the Association shall adjust its loan portfolio to comply with the quantitative limitations regarding covered transactions with a single affiliate set forth in 12 C.F.R. § 563.41 and Regulation W, 12 C.F.R. Part 223.

34.     Effective immediately, the Association shall not engage in any transaction with an affiliate unless, with respect to each such transaction, the Association has complied with the notice requirements set forth in 12 C.F.R. § 563.41(c)(4), which shall include the information set forth in 12 C.F.R. § 563.41(c)(3). The Board shall ensure that any transaction with an affiliate for which notice is submitted pursuant to this Paragraph complies with the requirements of 12 C.F.R. § 563.41 and Regulation W, 12 C.F.R. Part 223.

**Loan-to-One Borrower.**

35.     By August 31, 2010, the Association shall reduce its loan concentrations to comply with the lending limitations set forth in 12 C.F.R. § 560.93.

**Brokered Deposits.**

36.     Effective immediately, the Association shall comply with the requirements of 12 C.F.R. § 337.6(b).

**Violations of Law.**

37.     Within forty-five (45) days, the Association shall ensure that all violations of law and/or regulation in this Order are corrected and that adequate policies, procedures and systems are established or revised and thereafter implemented to prevent future violations.

**Board Compliance Committee.**

38.     Within thirty (30) days, the Board shall appoint a committee (Regulatory Compliance Committee) comprised of three (3) or more non-employee directors to monitor and coordinate the Association's compliance with the provisions of this Order.

39.    Within forty-five (45) days of the Effective Date, and within forty-five (45) days after the

end of each quarter, beginning with the quarter ending June 30, 2010, the Regulatory

Compliance Committee shall submit a written progress report to the Board detailing the actions

taken to comply with each provision of this Order and the results of all such actions.  The

Board's consideration of the Regulatory Compliance Committee's progress report for the period,

including comments and questions concerning the progress report and additional actions taken or

directed by the Board, shall be reflected in the minutes of the Board meetings.

40.    Within forty-five (45) days of the Effective Date, and within forty-five (45) days after the

end of each quarter, beginning with the quarter ending June 30, 2010, a copy of the Regulatory

Compliance Committee's progress report for the quarter, with any revisions or comments by the

Board, shall be provided to the Regional Director.

41.    Nothing contained herein shall diminish the responsibility of the entire Board to ensure

the Association's compliance with the provisions of this Order.

**Effective Date, Incorporation of Stipulation.**

42.    This Order is effective on the Effective Date as shown on the first page.  The Stipulation

is made a part hereof and is incorporated herein by this reference.

**Duration.**

43.    This Order shall remain in effect until terminated, modified, or suspended by written

notice of such action by the Regional Director, acting by and through the Regional Director's

authorized representatives.

**Time Calculations.**

44.    Calculation of time limitations for compliance with the terms of this Order run from the

Effective Date and shall be based on calendar days, unless otherwise noted.

United Western Bank
Order to Cease and Desist
Page 13 of 15

Appendix

45. The Regional Director, or an OTS authorized representative, may extend any of the deadlines set forth in the provisions of this Order upon written request by the Association that includes reasons in support for any such extension. Any OTS extension shall be made in writing.

**Submissions and Notices.**

46. All submissions, including any reports, to the OTS that are required by or contemplated by this Order shall be submitted within the specified timeframes.

47. Except as otherwise provided herein, all submissions, requests, communications, consents or other documents relating to this Order shall be in writing and sent by first-class U.S. mail (or by reputable overnight carrier, electronic facsimile transmission or hand delivery by messenger) addressed as follows:

    (a)    <u>To the OTS:</u>

        Lori J. Quigley, Acting Regional Director
        Attn: Nicholas J. Dyer, Assistant Director
        Office of Thrift Supervision, Western Region
        2001 Junipero Serra Boulevard, Suite 650
        Daly City, CA 94014-3897

    (b)    <u>To the Association:</u>

        James R. Peoples, Chairman
        United Western Bank
        700 17th Street, Suite 2100
        Denver, CO 80202-3501

**No Violations Authorized.**

48.     Nothing in this Order or the Stipulation shall be construed as allowing the Association, its

Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED.**

OFFICE OF THRIFT SUPERVISION

By: _____

Lori J. Quigley
Acting Regional Director
Western Region

Date: See Effective Date on page 1

UNITED STATES OF AMERICA
Before the
OFFICE OF THRIFT SUPERVISION

|  |  |  |
|---|---|---|
| In the Matter of | ) ) ) | Order No.: WN-10-019 |
| **UNITED WESTERN BANK** | ) ) ) | Effective Date: June 25, 2010 |
| Denver, Colorado OTS Docket No. 06679 | ) ) ) | |

## STIPULATION AND CONSENT TO ISSUANCE OF ORDER TO CEASE AND DESIST

**WHEREAS,** the Office of Thrift Supervision (OTS), acting by and through its Regional Director for the Western Region (Regional Director), and based upon information derived from the exercise of its regulatory and supervisory responsibilities, has informed United Western Bank, Denver, Colorado, OTS Docket No. 06679 (Association), that the OTS is of the opinion that grounds exist to initiate an administrative proceeding against the Association pursuant to 12 U.S.C. § 1818(b);

**WHEREAS,** the Regional Director, pursuant to delegated authority, is authorized to issue Orders to Cease and Desist where a savings association has consented to the issuance of an order; and

**WHEREAS,** the Association desires to cooperate with the OTS to avoid the time and expense of such administrative cease and desist proceeding by entering into this Stipulation and Consent to the Issuance of Order to Cease and Desist (Stipulation) and, without admitting or denying that such grounds exist, but only admitting the statements and conclusions in Paragraphs 1 and 2 below concerning Jurisdiction, hereby stipulates and agrees to the following terms:

United Western Bank
Stipulation and Consent to Issuance of Order to Cease and Desist
Page 1 of 5

Appendix

**Jurisdiction.**

1.     The Association is a "savings association" within the meaning of 12 U.S.C. § 1813(b) and 12 U.S.C. § 1462(4).  Accordingly, the Association is "an insured depository institution" as that term is defined in 12 U.S.C. § 1813(c).

2.     Pursuant to 12 U.S.C. § 1813(q), the Director of the OTS is the "appropriate Federal banking agency" with jurisdiction to maintain an administrative enforcement proceeding against a savings association.  Therefore, the Association is subject to the authority of the OTS to initiate and maintain an administrative cease and desist proceeding against it pursuant to 12 U.S.C. § 1818(b).

**OTS Findings of Fact.**

3.     OTS finds that the Association has:  (a) engaged in unsafe or unsound banking practices that resulted in deteriorating asset quality, ineffective risk management practices, inadequate oversight and supervision of the lending function, and inadequate liquidity planning at the Association; and (b) violated laws and regulations regarding transactions with affiliates (12 C.F.R. § 563.41) and loans to one borrower (12 C.F.R. § 560.93).

**Consent.**

4.     The Association consents to the issuance by the OTS of the accompanying Order to Cease and Desist (Order).  The Association further agrees to comply with the terms of the Order upon the Effective Date of the Order and stipulates that the Order complies with all requirements of law.

**Finality.**

5.     The Order is issued by the OTS under 12 U.S.C. § 1818(b).  Upon the Effective Date, the Order shall be a final order, effective, and fully enforceable by the OTS under the provisions of 12 U.S.C. § 1818(i).

**Waivers.**

6.     The Association waives the following:

(a)     the right to be served with a written notice of the OTS's charges against it as provided by 12 U.S.C. § 1818(b) and 12 C.F.R. Part 509;

(b)     the right to an administrative hearing of the OTS's charges as provided by 12 U.S.C. § 1818(b) and 12 C.F.R. Part 509;

(c)     the right to seek judicial review of the Order, including, without limitation, any such right provided by 12 U.S.C. § 1818(h), or otherwise to challenge the validity of the Order; and

(d)     any and all claims against the OTS, including its employees and agents, and any other governmental entity for the award of fees, costs, or expenses related to this OTS enforcement matter and/or the Order, whether arising under common law, federal statutes, or otherwise.

**OTS Authority Not Affected.**

7.     Nothing in this Stipulation or accompanying Order shall inhibit, estop, bar, or otherwise prevent the OTS from taking any other action affecting the Association if at any time the OTS deems it appropriate to do so to fulfill the responsibilities placed upon the OTS by law.

**Other Governmental Actions Not Affected.**

8.     The Association acknowledges and agrees that its consent to the issuance of the Order is solely for the purpose of resolving the matters addressed herein, consistent with Paragraph 7 above, and does not otherwise release, discharge, compromise, settle, dismiss, resolve, or in any way affect any actions, charges against, or liability of the Association that arise pursuant to this action or otherwise, and that may be or have been brought by any governmental entity other than the OTS.

**Miscellaneous.**

9. The laws of the United States of America shall govern the construction and validity of this Stipulation and of the Order.

10. If any provision of this Stipulation and/or the Order is ruled to be invalid, illegal, or unenforceable by the decision of any Court of competent jurisdiction, the validity, legality, and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby, unless the Regional Director in his or her sole discretion determines otherwise.

11. All references to the OTS in this Stipulation and the Order shall also mean any of the OTS's predecessors, successors, and assigns.

12. The section and paragraph headings in this Stipulation and the Order are for convenience only and shall not affect the interpretation of this Stipulation or the Order.

13. The terms of this Stipulation and of the Order represent the final agreement of the parties with respect to the subject matters thereof, and constitute the sole agreement of the parties with respect to such subject matters.

14. The Stipulation and Order shall remain in effect until terminated, modified, or suspended in writing by the OTS, acting through its Regional Director or other authorized representative.

**Signature of Directors/Board Resolution.**

15. Each Director signing this Stipulation attests that he or she voted in favor of a Board Resolution authorizing the consent of the Association to the issuance of the Order and the execution of the Stipulation. This Stipulation may be executed in counterparts by the directors after approval of execution of the Stipulation at a duly called board meeting.

**WHEREFORE,** the Association, by its directors, executes this Stipulation.

Accepted by:

**UNITED WESTERN BANK**
Denver, Colorado

**OFFICE OF THRIFT SUPERVISION**

By: _____
       James R. Peoples, Chairman

By: _____
       Lori J. Quigley
       Acting Regional Director
       Western Region

Date: See Effective Date on page 1

_____
Guy A. Gibson, Director

_____
Charles J. Berling, Director

_____
James H. Bullock, Director

_____
Bernard C. Darré, Director

_____
Benjamin C. Hirsh, Director

_____
Gary G. Petak, Director

Tuesday, June 22, 2010 4:36 PM                    Bullock J 5055214883                              p.01

WHEREFORE, the Association, by its directors, executes this Stipulation.

Accepted by:

UNITED WESTERN BANK                      OFFICE OF THRIFT SUPERVISION
Denver, Colorado

By: _____             By: _____
      James R. Peoples, Chairman               Lori J. Quigley
                                               Acting Regional Director
                                               Western Region

                                         Date: See Effective Date on page 1

_____
Guy A. Gibson, Director

_____
Charles J. Berling, Director

_____
James H. Bullock, Director

_____
Bernard C. Darré, Director

_____
Benjamin C. Hirsh, Director

_____
Gary G. Petak, Director

United Western Bank
Stipulation and Consent to Issuance of Order to Cease and Desist
Page 5 of 5

573

**WHEREFORE,** the Association, by its directors, executes this Stipulation.

Accepted by:

**UNITED WESTERN BANK**
Denver, Colorado

**OFFICE OF THRIFT SUPERVISION**

By: _____
James R. Peoples, Chairman

By: _____
Lori J. Quigley
Acting Regional Director
Western Region

Date: See Effective Date on page 1

_____
Guy A. Gibson, Director

_____
Charles J. Berling, Director

_____
James H. Bullock, Director

_____
Bernard C. Darré, Director

_____
Benjamin C. Hirsh, Director

_____
Gary G. Petak, Director

UNITED STATES OF AMERICA
Before the
OFFICE OF THRIFT SUPERVISION

| | |
|---|---|
| In the Matter of | Order No.:  WN-10-020 |
| **UNITED WESTERN BANCORP, INC.** | Effective Date:  June 25, 2010 |
| Denver, Colorado<br>OTS Docket No. H2192 | |

## ORDER TO CEASE AND DESIST

**WHEREAS,** United Western Bancorp, Inc., Denver, Colorado, OTS Docket No. H2192

(Holding Company), by and through its Board of Directors (Board), has executed a Stipulation

and Consent to the Issuance of an Order to Cease and Desist (Stipulation); and

**WHEREAS,** the Holding Company, by executing the Stipulation, has consented and

agreed to the issuance of this Order to Cease and Desist (Order) by the Office of Thrift

Supervision (OTS) pursuant to 12 U.S.C. § 1818(b); and

**WHEREAS,** pursuant to delegated authority, the OTS Regional Director for the Western

Region (Regional Director) is authorized to issue Orders to Cease and Desist where a savings and

loan holding company has consented to the issuance of an order.

**NOW, THEREFORE, IT IS ORDERED that:**

**Cease and Desist.**

1.      The Holding Company and its directors, officers, employees, and agents shall cease and

desist from any action (alone or with another or others) for or toward causing, bringing about,

United Western Bancorp, Inc.
Order to Cease and Desist
Page 1 of 7

Appendix

participating in, counseling or the aiding and abetting of unsafe or unsound practices that resulted

in:  (a) deteriorating asset quality, ineffective risk management practices, inadequate oversight and

supervision of the lending function, and inadequate liquidity planning at its wholly owned

subsidiary, United Western Bank, Denver, Colorado, OTS Docket No. 06679 (Association); and

(b) the Association's violation of laws and regulations regarding transactions with affiliates (12

C.F.R. § 563.41) and loans to one borrower (12 C.F.R. § 560.93).

**Capital.**

2.       Within seven (7) days, the Holding Company shall submit for Regional Director review

and comment a consolidated capital plan to preserve and enhance the capital of the Holding

Company and the Association (Capital Plan).  At a minimum, the Capital Plan shall:

      (a)       consider the requirements and restrictions imposed by this Order and the Order to

Cease and Desist issued by the OTS against the Association, dated June 25, 2010; and

      (b)       detail how the Association shall meet and maintain a Tier 1 (Core) Capital ratio

equal to or greater than eight percent (8%) after the funding of an adequate Allowance for

Loan and Lease Losses (ALLL) and a Total Risk-Based Capital ratio equal to or greater

than twelve percent (12%), including a specific description of the method(s) by which

additional capital will be raised, if necessary, and an identification of the sources of such

capital.

3.       Within fifteen (15) days of receipt of any comments from the Regional Director, the Board

shall make the changes, if any, to the Capital Plan required by the Regional Director.  Thereafter,

the Board shall adopt and the Holding Company shall implement and comply with the Capital

Plan. Within five (5) days of the Board meeting at which it was adopted, the Holding Company shall provide a copy of the Capital Plan to the Regional Director.

**Capital Distributions and Stock Repurchases.**

4.      Effective immediately, the Holding Company shall not declare, make, or pay any dividends or other capital distributions, or repurchase or redeem any capital stock without receiving the prior written non-objection of the Regional Director. The Holding Company's written request for such non-objection shall be submitted to the Regional Director at least thirty (30) days prior to the anticipated date of the proposed dividend payment, capital distribution or stock redemption.

**Debt Limitations/Restrictions.**

5.      Effective immediately, the Holding Company shall not incur, issue, renew, repurchase, or rollover any debt, increase any current lines of credit, or guarantee the debt of any entity without receiving the prior written notice of non-objection of the Regional Director. The Holding Company's written request for such non-objection shall be submitted to the Regional Director at least thirty (30) days prior to the anticipated date of any such proposed action.

**Payment Limitations/Restrictions.**

6.      Effective immediately, the Holding Company shall make no payments (including but not limited to principal, interest, or fees of any kind) on any existing debt without receiving the prior written non-objection of the Regional Director. The Holding Company's written request for such non-objection shall be submitted to the Regional Director at least thirty (30) days prior to the anticipated date of any such proposed payment.

**Operations Plan.**

7.      Within thirty (30) days, the Holding Company shall submit to the Regional Director for review and comment an Operations Plan that addresses how the Holding Company will meet all financial obligations for the remainder of 2010 through 2012, including, but not limited to, payments on senior notes, dividend payments on preferred stock, and interest payments on trust preferred securities without reliance on dividends from the Association.  The Operations Plan shall include, at a minimum, comprehensive pro forma cash flow projections detailing all anticipated sources and uses of funds, including, but not limited to, any scheduled payment obligations of Holding Company related to outstanding debt, operating expenses, and equity issuances.

8.      Within fifteen (15) days of receipt of any comments from the Regional Director, the Board shall make the changes, if any, to the Operations Plan required by the Regional Director. Thereafter, the Board shall adopt and the Holding Company shall implement and comply with the Operations Plan.  Within five (5) days of the Board meeting at which it was adopted, the Holding Company shall provide a copy of the Operations Plan to the Regional Director.

9.      Any request to modify the Operations Plan shall be submitted to the Regional Director for review and written non-objection at least thirty (30) days prior to the proposed date to implement any such modification.

10.     On a quarterly basis, beginning with the quarter ending September 30, 2010, the Board shall review a report prepared by Management detailing the adequacy of the Operations Plan given the projected financial obligations of the Holding Company and actual operating results, including a detailed description of any material deviations from the Operations Plan and a description of the corrective actions or measures that have been implemented or are proposed to address each material deviation (Variance Analysis Report).

11.     Within forty-five (45) days after the end of each quarter, beginning with the quarter ending September 30, 2010, the Board shall provide the Regional Director with a copy of each Variance Analysis Report, and the minutes from the Board meeting containing the Board's discussion of the Variance Analysis Report, including, if applicable, any Board discussion of possible modifications to the Operations Plan.

**Thrift Oversight.**

12.     Effective immediately, the Holding Company shall ensure the Association's compliance with applicable laws, rules and regulations and all terms and conditions of the Order to Cease and Desist issued by the OTS against the Association, dated June 25, 2010.

**Directorate and Management Changes.**

13.     Effective immediately, the Holding Company shall comply with the prior notification requirements for changes in directors and Senior Executive Officers[1] set forth in 12 C.F.R. Part 563, Subpart H.

**Employment Contracts/Compensation Arrangements.**

14.     Effective immediately, the Holding Company shall not enter into, renew, extend or revise any contractual arrangement relating to compensation or benefits for any Senior Executive Officer or director of the Holding Company, unless it first provides the OTS with not less than thirty (30) days prior written notice of the proposed transaction. The notice to the OTS shall include a copy of the proposed employment contract or compensation arrangement or a detailed, written description of the compensation arrangement to be offered to such officer or director, including all benefits and perquisites. The Board shall ensure that any contract, agreement or arrangement submitted to the OTS fully complies with the requirements of 12 C.F.R. Part 359.

---

[1] The term "Senior Executive Officer" is defined at 12 C.F.R. § 563.555.

United Western Bancorp, Inc.
Order to Cease and Desist
Page 5 of 7

Appendix

**Severance and Indemnification Payments.**

15.     Effective immediately, the Holding Company shall not make any golden parachute payment[2] or prohibited indemnification payment[3] unless, with respect to each such golden parachute payment, the Holding Company has complied with the requirements of 12 C.F.R. Part 359.

**Transactions With Affiliates.**

16.     Effective immediately, the Holding Company shall not enter into any transaction or otherwise engage in any action that would cause the Association to violate Regulation W, 12 C.F.R. Part 223 and 12 C.F.R. § 563.41.

**Effective Date, Incorporation of Stipulation.**

17.     This Order is effective on the Effective Date as shown on the first page.  The Stipulation is made a part hereof and is incorporated herein by this reference.

**Duration.**

18.     This Order shall remain in effect until terminated, modified, or suspended by written notice of such action by the OTS, acting by and through its authorized representatives.

**Time Calculations.**

19.     Calculation of time limitations for compliance with the terms of this Order run from the Effective Date and shall be based on calendar days, unless otherwise noted.

20.     The Regional Director, or an OTS authorized representative, may extend any of the deadlines set forth in the provisions of this Order upon written request by the Holding Company that includes reasons in support for any such extension.  Any OTS extension shall be made in writing.

---

[2] The term "golden parachute payment" is defined at 12 C.F.R. § 359.1(f).
[3] The term "prohibited indemnification payment" is defined at 12 C.F.R. § 359.1(l).

United Western Bancorp, Inc.
Order to Cease and Desist
Page 6 of 7

Appendix

**Submissions and Notices.**

21.     All submissions, including any reports, to the OTS that are required by or contemplated by

this Order shall be submitted within the specified timeframes.

22.     Except as otherwise provided herein, all submissions, requests, communications, consents,

or other documents relating to this Order shall be in writing and sent by first-class U. S. mail (or

by reputable overnight carrier, electronic facsimile transmission, or hand delivery by messenger)

addressed as follows:

      (a)     To the OTS:

             Lori J. Quigley, Acting Regional Director
             Attn:  Nicholas J. Dyer, Assistant Director
             Office of Thrift Supervision, Western Region
             2001 Junipero Serra Boulevard, Suite 650
             Daly City, CA 94014-3897

      (b)     To the Holding Company:

             Guy A. Gibson, Chairman
             United Western Bancorp, Inc.
             700 17th Street, Suite 2100
             Denver, CO 80202

**No Violations Authorized.**

23.     Nothing in this Order or the Stipulation shall be construed as allowing the Holding

Company, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED.**

                                **OFFICE OF THRIFT SUPERVISION**

                                By: _____
                                     Lori J. Quigley
                                   Acting Regional Director
                                   Western Region

                                Date: See Effective Date on page 1

UNITED STATES OF AMERICA
Before the
OFFICE OF THRIFT SUPERVISION

| | |
|---|---|
| In the Matter of | Order No.:  WN-10-020 |
| **UNITED WESTERN BANCORP, INC.** | Effective Date:  June 25, 2010 |
| Denver, Colorado OTS Docket No. H2192 | |

## STIPULATION AND CONSENT TO ISSUANCE OF ORDER TO CEASE AND DESIST

**WHEREAS,** the Office of Thrift Supervision (OTS), acting by and through its Regional Director for the Western Region (Regional Director), and based upon information derived from the exercise of its regulatory and supervisory responsibilities, has informed United Western Bancorp, Inc., Denver, Colorado, OTS Docket No. H2192 (Holding Company), that the OTS is of the opinion that grounds exist to initiate an administrative proceeding against the Holding Company pursuant to 12 U.S.C. § 1818(b);

**WHEREAS,** the Regional Director, pursuant to delegated authority, is authorized to issue Orders to Cease and Desist where a savings and loan holding company has consented to the issuance of an order; and

**WHEREAS,** the Holding Company desires to cooperate with the OTS to avoid the time and expense of such administrative cease and desist proceeding by entering into this Stipulation and Consent to the Issuance of Order to Cease and Desist (Stipulation) and, without admitting or denying that such grounds exist, but only admitting the statements and conclusions in Paragraphs 1 - 3 below concerning Jurisdiction, hereby stipulates and agrees to the following terms:

United Western Bancorp, Inc.
Stipulation and Consent to Issuance of Order to Cease and Desist
Page 1 of 6

Appendix