IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

UNITED WESTERN BANK,                        )
                                            )
                        Plaintiff,          )
           v.                               )           C.A. No. 11-cv-408 (ABJ)
                                            )
OFFICE OF THE COMPTROLLER OF                )
THE CURRENCY, *et al*.                      )
                                            )
                        Defendants.         )
_____

### **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................3

    I.    STATUTORY AND REGULATORY BACKGROUND ...........................................3

        A.  Prudential Supervision of Federal Savings Associations .....................................3

        B.  Prompt Corrective Action......................................................................................4

        C.  Receivership Decisions ..........................................................................................6

SCOPE AND STANDARD OF REVIEW .................................................................7

ARGUMENT ..............................................................................................................10

    I.    THE ADMINISTRATIVE RECORD DEMONSTRATES THAT UWB
        WAS UNDERCAPITALIZED AND PRESENTED AN UNACCEPTABLY
        HIGH RISK OF AN UNCONTROLLED COLLAPSE DUE TO LIQUDITY
        ISSUES.................................................................................................................10

        A.  The Bank Declines Into an Unsafe and Unsound Condition .............................10

        B.  The Bank's Efforts to Recapitalize Are Unsuccessful .......................................16

        C.  The Bank Enters Its Final Crisis........................................................................18

            1.  The Bank's Descent to Undercapitalized Status Triggers the Statutory
               Requirement that the Bank File a Capital Restoration Plan ..........................20

            2.  Institutional Depositors Begin to Flee the Bank ...........................................21

        D.  OTS Denies the Bank's Application to Purchase Legent, as Well as its Capital
            Restoration Plan .................................................................................................23

        E.  The Acting Director Appoints the FDIC as Receiver for the Bank ...................24

II.    THE ADMINISTRATIVE RECORD SUPPORTS THE ACTING
       DIRECTOR'S DETERMINATIONS WITH RESPECT TO EACH OF THE
       THREE GROUNDS FOR RECEIVERSHIP .......................................................26

       A.  The Administrative Record Contains Sufficient Information to Support the
           Acting Director's Opinion that the Bank Was Likely to Be Unable to Meet Its
           Depositors' Demands and Other Obligations in the Normal Course of Business
           When it Was Closed .........................................................................................26

       B. The Administrative Record Contains Sufficient Information to Support the
          Acting Director's Opinion that the Bank Was Undercapitalized and Had
          Failed to Submit a Capital Restoration Plan Acceptable to OTS When it Was
          Closed ...............................................................................................................27

       C. The Administrative Record Contains Sufficient Information to Support the
          Acting Director's Opinion that the Bank Was in an Unsafe and Unsound
          Condition When It Was Closed .........................................................................29

III.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD
       BE DENIED .........................................................................................................30

       A.  The OTS Did Not Arbitrarily and Capriciously Deny UWB's CRP...................31

           1    PCA Does Not Grant a Bank Forty Five Days to Submit a CRP..................31

           2    The OTS's Rejection of the Plan Was Appropriate .......................................33

       B. The OTS Did Not "Imagine" the Liquidity Threat .................................................34

       C. The Bank Was in an Unsafe and Unsound Condition ...........................................37

CONCLUSION ......................................................................................................40

<u>**TABLE OF AUTHORITIES**</u>

## CASES

*Biscayne Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*,
720 F. 2d 1499 (11th Cir. 1983) ........................................................................................ 7, 8

*Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ................................................................................................................ 8

*Camp v. Pitts*,
411 U.S. 138 (1973) ................................................................................................................ 8

*Dorris v. FDIC*,
1994 U.S. Dist. LEXIS 19939 (D.D.C. Oct. 27, 1994) ....................................................... 33

*Environmental Defense Fund v. Costle*,
657 F.2d 275 (D.C. Cir. 1981) ............................................................................................. 8, 9

*Fidelity Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*,
689 F.2d 830 (9th Cir. 1982) .................................................................................................. 9

*First Nat'l Bank & Trust v. Dept. of the Treasury*,
63 F.2d 894 (9th Cir. 1995) ................................................................................................. 8, 9

*Franklin Sav. Ass'n v. Office of Thrift Supervision*,
934 F.2d 1127 (10th Cir. 1991) .............................................. 7, 8, 9, 26, 30, 34, 37, 38, 39

*Gibraltar Sav. v. Ryan*,
772 F. Supp. 1290 (D.D.C. 1991) ......................................................................................... 8

*Guaranty Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*,
794 F.2d 1339 (8th Cir. 1986) ............................................................................................. 8, 9

*Gulf State Utils. Co. v.FPC*,
518 F.2d 450 (D.C. Cir. 1975) ............................................................................................. 33

*In re Subpoena Served Upon the Comptroller of the Currency*,
967 F.2d 630 (D.C. Cir. 1992) ............................................................................................. 3, 4

*James Madison, Ltd. v. Ludwig*,
82 F.3d 1085 (D.C. Cir. 1996) .......................................................................................... 8, 9, 26

*James Madison, Ltd. v. Ludwig*,
868 F. Supp. 3 (D.D.C. 1994) ............................................................. 3, 23, 30, 33, 34, 38

*National Fuel Gas Supply Corp. v. FERC,*
    811 F.2d 1563 (D.C. Cir. 1987) ................................................................................ 33

*North Carolina v. FERC,*
    112 F.3d 1175 (D.C. Cir. 1997) ................................................................................ 32

*Rhoades v. Casey,*
    196 F.3d 592 (5th Cir. 1999) ................................................................................... 20

*Riordan v. SEC,*
    627 F.3d 1230 (D.C. Cir. 2010) ............................................................................... 32

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Com'n.,*
    789 F.2d 26 (D.C. Cir. 1986)(*en banc*) ................................................................. 8, 9

*San Marino Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.,*
    605 F. Supp. 502 (C.D. Cal. 1984) ............................................................................ 9

*Sunshine State Bank v. FDIC,*
    783 F.2d 1580 (11th Cir. 1986) ............................................................................... 33

*United States v. Philadelphia Nat'l Bank,*
    374 U.S. 321 (1963) .................................................................................................... 4

*Woods v. Fed. Home Loan Bank Bd.,*
    826 F.2d 1400 (5th Cir. 1987) .............................................................................. 8, 9

## FEDERAL STATUTES

12 U.S.C. § 1461 .............................................................................................................. 6

12 U.S.C. § 1463(a)(1) ..................................................................................................... 3

12 U.S.C. § 1464 ............................................................................................................ 30

12 U.S.C. § 1464(a)(2) ..................................................................................................... 3

12 U.S.C. § 1464(d)(2)(A) ....................................................................................... 1, 6, 25

12 U.S.C. § 1464(d)(2)(B) .......................................................................................... 7, 25

12 U.S.C. § 1818 ............................................................................................................ 30

12 U.S.C. § 1818(b) ....................................................................................................... 15

12 U.S.C. § 1818(h) ................................................................................................................. 20

12 U.S.C. § 1818(i) ................................................................................................................... 20

12 U.S.C. § 1821(c)(5) ........................................................................................................... 1, 6

12 U.S.C. § 1821(c)(5)(C) ...................................................................................................... 1, 7

12 U.S.C. § 1821(c)(5)(F) ................................................................................................. 1, 7, 37

12 U.S.C. § 1821(c)(5)(K)(iii) ....................................................................................... 1, 6, 7, 27

12 U.S.C. § 1831i ....................................................................................................................... 33

12 U.S.C. § 1831o ........................................................................................................................ 4

12 U.S.C. § 1831o(b) ............................................................................................................... 1, 7

12 U.S.C. § 1831o(c)(2) ............................................................................................................... 5

12 U.S.C. § 1831o(e)(2) .......................................................................................................... 5, 20

12 U.S.C. § 1831o(e)(2)(C) ..................................................................................................... 6, 27

12 U.S.C. § 1831o(e)(2)(C)(i)(II) .......................................................................................... 20, 21

12 U.S.C. § 1831o(e)(2)(C)(i)(III) ......................................................................................... 20, 21

12 U.S.C. § 1831o(e)(2)(D)(i) .................................................................................................. 5, 31

12 U.S.C. § 5414(a)(2)(B) ............................................................................................................ 1

Pub. L. No. 101-73, 103 Stat 183 (1989) ..................................................................................... 6

## CODE OF FEDERAL REGULATIONS

12 C.F.R. § 559.11 ..................................................................................................................... 18

12 C.F.R. § 563, Subpart H ........................................................................................................ 15

12 C.F.R.§ 565.4(b) ...................................................................................................................... 5

12 C.F.R. § 565.5(a) ................................................................................................................... 31

**FEDERAL REGISTER**

78 Fed. Reg. 48950 (Aug. 9, 2011)................................................................................................ 5

**LEGISLATIVE HISTORY**

H.R. Rep. No. 102-330 (1991)..................................................................................................... 4

**OTHER AUTHORITIES**

LCvR 7(h)(2) ................................................................................................................................ 2

OTS Examination Handbook....................................................................................................... 10

## APPENDIX OF ACRONYMS

| | |
|---|---|
| ALLL | Allowance for Loan and Lease Losses |
| CAMELS | Capital, Assets, Management, Earnings, Liquidity, Sensitivity to interest rate risk |
| CRP | Capital Restoration Plan |
| ETC | Equity Trust Company |
| FDIC | Federal Deposit Insurance Corporation |
| FDICIA | Federal Deposit Insurance Corporation Improvement Act of 1991 |
| FINRA | Financial Industry Regulatory Authority |
| FIRREA | Financial Institutions Reform, Recovery and Enforcement Act of 1989 |
| LTC | Lincoln Trust Company |
| MBS | Mortgage-Backed Securities |
| MOU | Memorandum of Understanding |
| MSCS | Matrix Settlement and Clearing Services |
| OCC | Office of the Comptroller of the Currency |
| OCC SOF | Office of the Comptroller of the Currency Statement of Facts |
| OTS | Office of Thrift Supervision |
| PCA | Prompt Corrective Action |
| UWB | United Western Bank |

## INTRODUCTION

Congress granted the Director of the Office of Thrift Supervision ("OTS") the authority to appoint a receiver for any insured savings association "if the Director determines, in the Director's discretion, that 1 or more of the grounds specified in section 1821(c)(5) of [Title 12] exists."  12 U.S.C. § 1464(d)(2)(A).  On January 21, 2011, after an extensive examination of the Bank's operations, books and records OTS Acting Director John E. Bowman ("Acting Director")[1] determined that the factual record before him supported three separate statutory grounds for the appointment of the Federal Deposit Insurance Corporation ("FDIC") as receiver for United Western Bank, ("the Bank", "UWB," or "Plaintiff").  The Acting Director concluded:

- UWB was in an unsafe or unsound condition to transact business (12 U.S.C. § 1821(c)(5)(C));
- UWB was likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business (12 U.S.C. § 1821(c)(5)(F)); and
- UWB was undercapitalized (as defined in 12 U.S.C. § 1831o(b)), and had failed to submit a capital restoration plan acceptable to the OTS (12 U.S.C. § 1821(c)(5)(K)(iii)).

Administrative Record ("AR") 2.

As set forth below, the Acting Director's decision to appoint a receiver for UWB was a proper exercise of the Acting Director's discretion under the statute and is fully supported by the Administrative Record.[2]  The Acting Director's decision to appoint a receiver for UWB was not,

---

[1]     The Dodd-Frank Wall Street Reform and Consumer Protection Act merged the OTS into the Office of the Comptroller of the Currency ("OCC") and transferred supervision of federal savings associations to the OCC.  Since this case was pending as of the transfer date, the OCC and the Comptroller of the Currency were substituted as successor parties-in-interest to the OTS and its Acting Director.  12 U.S.C. § 5414(a)(2)(B).  The brief describes actions taken before the transfer date and, therefore, refers to the activities of the OTS and the Acting Director.

[2]     The OCC has previously filed the Administrative Record with the Court.  The material facts relevant to this case, along with appropriate citations to the Administrative Record, are set

(footnote continues on next page)

as Plaintiff suggests, the result of a sudden dissatisfaction on the part of OTS with respect to the

Bank's business model.  Nor was UWB, as Plaintiff contends, a "viable institution that held

significant capital and faced no risk of failing."[3]  Rather, as reflected in the Administrative

Record, the Acting Director's decision to appoint a receiver was a wholly appropriate response

to an institution that (1) was undercapitalized and did not appear to have a credible prospect of

recapitalizing in the near term, and (2) as a result of its capital problems, presented an

unacceptably high risk of an uncontrolled collapse due to liquidity issues.

In challenging the Acting Director's decision to appoint a receiver for UWB, the Plaintiff

tenders three arguments.  First, Plaintiff contends that the capital restoration plan ("CRP")

submitted by UWB – a plan premised in part on the OTS waiving the requirement that the Bank

"meet and maintain" safe levels of capital – was unreasonably rejected by the OTS

notwithstanding the agency's well-considered objections.  Second, Plaintiff argues that the OTS

"imagined"  UWB's liquidity issues – a set of very real problems that the OTS concluded were

caused by the Bank's inability to maintain acceptable levels of capital and exacerbated by

UWB's over-reliance on large institutional deposits for its liquidity.  Third, the Bank disagrees

with the OTS's assessment that the bank was operating in an "unsafe and unsound" manner,

despite the fact that UWB's losses continued to mount, capital levels continued to decline, and

the deposit structure put in place by Bank management left it exposed to a depositor run as

conditions deteriorated.

---

forth in the Defendants' Statement of Material Facts ("OCC SOF"), submitted
contemporaneously with this memorandum pursuant to LCvR 7(h)(2).

[3]      Memorandum in Support of United Western Bank's Motion for Summary Judgment
("Pl.'s Mem.") at 1.

As set forth below, the Court should conclude that "plaintiff's objections to the [OTS's] examination are, in reality, simply disagreement regarding the choices made by [agency] personnel in examining and analyzing the bank[]."  *James Madison, Ltd. v. Ludwig*, 868 F. Supp. 3, 9 (D.D.C. 1994), *aff'd,* 82 F.3d 1085 (D.C. Cir. 1996), *cert. denied,* 519 U.S. 1077 (1997).  In each instance, the decision by the OTS was fully supported on the factual record and constituted an appropriate exercise of the Acting Director's statutory discretion.  The OCC respectfully submits that, given the deteriorating conditions at UWB and the lack of an acceptable plan to recapitalize the bank in the near term, the Administrative Record fully supports the decision by the OTS to appoint a receiver for UWB.

## BACKGROUND

### I.   STATUTORY AND REGULATORY BACKGROUND

#### A.  Prudential Supervision of Federal Savings Associations

Plaintiff was a savings association chartered by the OTS pursuant to 12 U.S.C. § 1464(a)(2).  OTS was the prudential banking regulator for the institutions it chartered and, as such, was charged by Congress with responsibility for "the examination, safe and sound operation, and regulation of savings associations" including UWB.  12 U.S.C. § 1463(a)(1).

Because the Bank operated with the guarantee of the full-faith and credit of the United States for repayment of its insured deposits, the role of prudential banking regulator requires a level of governmental scrutiny and supervision not present in other industries.  As the United States Court of Appeals for the District of Columbia Circuit has aptly described it, bank

> safety and soundness supervision is an iterative process of comment by the regulators and response by the bank …. [B]ank examiners concern themselves with all manner of a bank's affairs: Not only the classification of assets and the review of  financial transactions, but also the adequacy of security systems and of internal reporting requirements, and even the quality of managerial personnel are of concern to the examiners.

*In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 633-34 (D.C. Cir.

1992).  *See generally, United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 329 (1963) ("But

perhaps the most effective weapon of federal regulation of banking is the broad visitorial power

of federal bank examiners.").

##### B. <u>Prompt Corrective Action</u>

In 1991, Congress enacted the Federal Deposit Insurance Corporation Improvement Act

of 1991 (the "FDICIA"), a portion of which was later codified at 12 U.S.C. § 1831o, and is

commonly known as the Prompt Corrective Action ("PCA") statute.  PCA was intended to

reduce losses to the FDIC as insurer, mandating a series of corrective actions by prudential bank

regulators when the condition of a bank begins to deteriorate.  The comprehensive statutory PCA

requirements reflect a Congressional judgment that is

> premised on the realization, based on the experience of many savings and loan
> resolutions, that the longer an insolvent insured depository institution is allowed
> to remain open, the more it will ultimately cost to resolve the institution.
> Therefore, regulatory discretion to allow an insolvent institution to remain open is
> narrowed, and a system of tripwires and timetables is established to guide the
> regulators in how to handle a failing or insolvent institution.

H.R. Rep. No. 102-330 (1991), reprinted in 1991 U.S.C.C.A.N. 1916-17.

One of the primary concepts in PCA is that specific regulatory responses are triggered

when a bank's capital falls below certain specified levels.  Section 1831o divides bank capital

levels into five different categories, ranging from "well capitalized" to "critically

undercapitalized."  Congress directed each federal banking agency to establish by regulation

specific capital levels for each PCA capital classification.  12 U.S.C. § 1831o(c)(2).  For OTS-

regulated institutions, the capital levels were as follows:

- "Well capitalized" means that the institution is not subject to certain institution-
specific capital requirements and has a total risk-based capital ratio of 10% or

higher, has a Tier 1 risk-based capital ratio of 6.0% or higher, and a leverage ratio
of 5.0% or higher.

• "Adequately capitalized" means that the institution has a total risk-based capital
ratio of 8% or higher, has a Tier 1 risk-based capital ratio of 4.0% or higher, and
has a leverage ratio of 4.0% or higher.

• "Undercapitalized" means that the institution has a total risk-based capital ratio of
less than 8.0%, has a Tier 1 risk-based capital ratio of less than 4.0%, or has a
leverage ratio of less than 4%.

• "Significantly undercapitalized" means that the institution has a total risk-based
capital ratio of less than 6.0%, has a Tier 1 risk-based capital ratio of less than
3.0%, or has a leverage ratio of less than 3%.

• "Critically undercapitalized" means that the institution has a ratio of tangible
equity to total assets that is equal to or less than 2.0%.

12 C.F.R. § 565.4(b).[4]

When a regulated bank falls from "adequately capitalized" to "undercapitalized," as

Plaintiff did here, the regulatory scheme requires several things to happen.  First, the bank must

submit a CRP to the prudential regulator.  12 U.S.C. § 1831o(e)(2).  The statute requires the

institution to submit its CRP "not later than 45 days after the institution becomes

undercapitalized." 12 U.S.C. § 1831o(e)(2)(D)(i).  Congress decreed that the prudential regulator

"shall not accept a capital restoration plan" unless the plan "is based on realistic assumptions,

and is likely to succeed in restoring the institution's capital."  12 U.S.C. § 1831o(e)(2)(C).  The

regulators are also instructed not to accept a CRP if it would "appreciably increase the risk

(including credit risk, interest-rate risk, and other types of risk) to which the institution is

---

[4]      The citations to OTS regulations throughout the brief are to the version that was in effect
prior to the merger of the OTS into the OCC on July 21, 2011.  To facilitate the OCC's
enforcement and administration of former OTS rules and to make appropriate changes to these
rules to reflect OCC supervision of federal savings associations as of the transfer date, the OCC
republished OTS regulations found in Chapter V of Title 12 of the Code of Federal Regulations
in Chapter I of Title 12 of the Code of Federal Regulations.  76 Fed. Reg. 48950 (Aug. 9, 2011).

exposed." Id. If the reviewing agency determines that a bank's CRP is not acceptable, then receivership of the bank is explicitly authorized by statute. 12 U.S.C. § 1821(c)(5)(K)(iii).

Another important consequence that flows from an insured depository institution's fall to PCA "undercapitalized" status is the statutory bar preventing these banks on from accepting employee benefit plan deposits. 12 U.S.C. § 1821(a)(1)(D)(ii). As the Receivership Order noted, the Bank's fall to undercapitalized status in the quarter before its receivership meant that certain large institutional depositors were statutorily required to, and in fact did, withdraw their deposits from the Bank. AR 5. *See*, *infra* at 21. *See also* AR 1729-30.

### C.   Receivership Decisions

The OTS was created by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183-553 (1989), the provisions of which were codified at 12 U.S.C. § 1461 *et seq*. Among the powers accorded to the agency under FIRREA, Congress vested the Director of OTS with the authority to appoint a receiver for "any insured savings association if the Director determines, in the Director's discretion, that 1 or more of the grounds specified in [12 U.S.C. § 1821(c)(5)] exists." 12 U.S.C. § 1464(d)(2)(A). Of the twelve separate bases for the appointment of a receiver set forth in 12 U.S.C. § 1821(c)(5), the three at issue in this case are:

- The determination that UWB was in an unsafe or unsound condition to transact business (12 U.S.C. § 1821(c)(5)(C));

- The determination that UWB was likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business (12 U.S.C. § 1821(c)(5)(F)); and

- The determination that UWB was undercapitalized (as defined in 12 U.S.C. § 1831o(b)), and had failed to submit a capital restoration plan acceptable to the OTS (12 U.S.C. § 1821(c)(5)(K)(iii)).

FIRREA expressly places the decision whether to appoint a receiver for an OTS-chartered institution within the discretion of the Director.  "FIRREA establishes that the determination of whether the statutory grounds to appoint a [receiver] exist lies in the province of the *director's opinion*." *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 934 F.2d 1127, 1137 (10th Cir. 1991), *cert. denied*, 503 U.S. 937 (1992)(emphasis in original).  *See* 12 U.S.C. § 1464(d)(2)(B) (the Director shall have "exclusive power and jurisdiction" to appoint a receiver for a federal savings association if "in the opinion of the Director" any ground for the appointment of a conservator or receiver exists).[5]  Congress' comprehensive statutory scheme contemplates that the OTS Director will "act promptly in appointing a [receiver] once he is of the opinion that a statutory ground exists."  *Franklin Savings*, 934 F.2d at 1137.

## SCOPE AND STANDARD OF REVIEW

In a case challenging the appointment of a receiver, both the scope and the standard of review are limited.  The sole issue for the Court is whether there were sufficient facts before the Acting Director, when he acted, on which he could reasonably have concluded that at least one of the statutory grounds for the appointment of a receiver existed.  *Biscayne Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 720 F.2d 1499, 1503 (11th Cir. 1983), *cert. denied*, 467 U.S. 1215 (1984); *Franklin Savings*, 934 F.2d at 1148.  The scope of review in an action challenging the appointment of a receiver is limited to the administrative record that the decision maker considered and relied upon at the time he or she acted.  *James Madison, Ltd. v. Ludwig*, 82 F. 3d 1085, 1095 (D.C. Cir. 1995);  *Franklin Savings*, 934 F. 2d at 1138-42; *Woods v. Fed. Home Loan Bank Bd.*, 826 F.2d 1400, 1406-09 (5th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988);

---

[5]     This provision was amended effective July 21, 2011 to substitute "appropriate Federal banking agency" for the "Director."

*Guaranty Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 794 F.2d 1339, 1341-43 (8th Cir. 1986); *Gibraltar Sav. v. Ryan*, 772 F. Supp. 1290, 1293 (D.D.C. 1991); *see also, First Nat'l Bank & Trust v. Dept. of the Treasury*, 63 F.3d 894, 897-98 (9th Cir. 1995), *cert. denied*, 517 U.S. 1233 (1996).

The standard of review for the Acting Director's decision to appoint a receiver for UWB is whether the Acting Director acted in an arbitrary or capricious manner. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Franklin Savings*, 934 F.2d at 1142; *Woods*, 826 F.2d at 1408-09; *Guaranty*, 794 F.2d at 1342; *Gibraltar*, 772 F. Supp. at 1292. As the Court of Appeals has stated, the arbitrary and capricious standard of review is highly deferential to the agency, presuming the agency's action to be valid. *Environmental Defense Fund v. Costle,* 657 F.2d 275, 283 (D.C. Cir. 1981).

District courts that are called upon to review a decision to appoint a receiver for a depository institution

> do not resolve factual issues, but operate instead as appellate courts resolving legal questions. Like appellate courts, district courts do not duplicate agency fact-finding efforts. Instead, they address a predominantly legal issue: Did the agency "articulate a rational connection between the facts found and the choice made"?

*James Madison*, 82 F.3d at 1096, *quoting Bowman Transp. Inc. v. Arkansas-Best Freight Sys. Inc.*, 419 U.S. 281 (1974)(citations omitted). The party challenging the agency action bears the burden of proof. *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Com'n.*, 789 F.2d 26, 37 (D.C. Cir.) (*en banc*), *cert. denied*, 479 U.S. 923 (1986); *Guaranty*, 794 F.2d. at 1342.

Moreover, the courts are precluded from substituting their judgments for those of the agency. *Franklin Savings*, 934 F.2d at 1142; *Woods*, 826 F.2d at 1409; *San Luis Obispo*, 789 F.2d at 37; *Environmental Defense Fund*, 657 F.2d at 283; *see also, First*

*Nat'l Bank*, 63 F.3d at 899.  Rather, the agency's decision must be affirmed if there is a rational basis for it.  *Environmental Defense Fund*, 657 F.2d at 283; *Franklin Savings*, 934 F.2d at 1139, 1149; *San Marino Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 605 F. Supp. 502, 508 (C.D. Cal. 1984).  *See also James Madison*, 82 F.3d at 1098-99. In determining whether a rational basis exists in the record for the appointment of a receiver, the Court must accord great weight and substantial deference to the Acting Director's findings regarding the Bank's financial condition.  *See Franklin Savings*, 934 F.2d at 1141*; Fidelity Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 689 F.2d 803, 808 (9th Cir. 1982), *cert. denied*, 461 U.S. 914 (1983); *San Marino*, 605 F. Supp. at 509.

In sum, the OTS action must be sustained if the administrative record contains sufficient information for the Acting Director, exercising his expert judgment, to have rationally concluded that any one of the three grounds contained in the Receivership Order existed when he signed it. As shown below, the information in the administrative record supports all three grounds for appointing the FDIC as receiver.

## ARGUMENT

## I.   THE ADMINISTRATIVE RECORD DEMONSTRATES THAT UWB WAS UNDERCAPITALIZED AND PRESENTED AN UNACCEPTABLY HIGH RISK OF AN UNCONTROLLED COLLAPSE DUE TO LIQUDITY ISSUES

### A.   The Bank Declines Into an Unsafe and Unsound Condition

In October 2007, OTS began a comprehensive examination of the Bank, covering all aspects of its operations and based upon financial data the Bank supplied OTS as of June 30, 2007.  AR 51.  At the time of the exam and at all times relevant to the case, the Bank was a wholly-owned subsidiary of United Western Bancorp, Inc., (the "Holding Company" or "Bancorp").  AR 55.  At the time of the 2007 exam, the OTS warned the Bank that it had concentrations of risky construction and nonresidential land loans, as well as mortgage-backed securities ("MBS") that were not guaranteed by any federal agency or chartered instrumentality. AR 56, 62, 64-67, 81.  Significantly, in light of future events, OTS also warned the Bank of the concentration risk presented by its institutional deposits, with just four institutional entities representing 73% of the Bank's total deposits.  AR 81.

As of June 30, 2007, the Bank had a 14.38% Total Risk-Based capital ratio and a 13.69% Tier 1 (Core) capital ratio.[6]  AR 60.  Because of the various concentration risks, and because OTS found that the Bank's capital was in the process of declining, OTS directed the Bank in the

---

[6]     Capital absorbs losses, promotes public confidence, and provides protection to depositors and the FDIC insurance fund. *OTS Examination Handbook* at 120.1. http://files.ots.treas.gov/422017.pdf (accessed May 7, 2012).  Capital provides a financial cushion that can allow a bank to continue operating during periods of losses or other adverse conditions.  *Id.*

2007 examination to "maintain a prudent level of capital *above* the 'well-capitalized'" level.[7] AR 60-62 (emphasis added).  The examiners gave the Bank a composite rating of "2" on a scale of 1 to 5, with 1 the highest possible rating and 5 the lowest.[8]

On March 30, 2009, OTS's examiners commenced another comprehensive examination of the Bank, utilizing financial data reported by the Bank as of December 31, 2008.  AR 130. The examiners found that the Bank's year-end capital ratios had significantly declined to a level just above the threshold to be considered "well capitalized."  AR 142.  During the course of the 2009 exam, the Bank reported its capital levels as of June 30, 2009, showing still further deterioration.[9]  AR 2474.  Capital was steadily declining, and the Bank's outstanding portfolio of loans at risk of not being fully repaid with interest ("classified assets") was steadily increasing. AR 135, 141, 146.  The Bank's concentrated portfolio of MBS assets was losing value and its classified assets had nearly tripled, from $25.2 million on June 30, 2007 to $70.3 million as of March 31, 2009.  AR 135, 146, 149.

After discovering that the Bank's concentration in institutional deposits had reached 87% of total deposits, the examiners repeated their earlier warnings about the risky nature of this concentration and warned the Bank that "termination of one or more of the larger institutional

---

[7]     The Bank also informed the examiners that UWB had changed its business strategy in late 2005 to move away from reliance upon institutional depositors to collecting deposits through a community branch network.  AR 55, 81.  The Bank did not follow through with this strategy. As of the date of receivership in 2011, nearly 70% of its deposits were associated with only four depositors, almost identical to the 2007 figure.  AR 31-35.

[8]     The federal banking regulatory agencies rate banks' Capital, Assets, Management, Earnings, Liquidity, and Sensitivity ("CAMELS") on a scale of 1 to 5 with 1 being the highest rating, as well as a composite rating reflecting the overall condition.  AR 100.

[9]     As of June 30, 2009, the Bank reported Total Risk-Based and Tier 1 (Core) capital ratios of 10.17% and 9.07%, respectively.  AR 2474.  As noted above, in the 2007 Examination, those ratios had been 14.38% and 13.69%, respectively.  AR 60.

deposit relationships could place UWB in a precarious liquidity position, as it may not be able to find replacement funding on reasonable terms."  AR 161.

OTS completed the 2009 Report of Examination on August 4, 2009, and the Bank was downgraded to a composite CAMELS "3" rating.[10]  A key portion of the Report was a directive to the Bank to raise its capital to safe levels.[11]  The Bank was required to meet and maintain a Total Risk-Based capital ratio to at least 12% and a Tier 1 (Core) capital ratio to at least 8% not later than December 31, 2009.  AR 139.

Just as OTS issued the 2009 Report, the Bank's reported earnings collapsed.  For the quarter ending June 30, 2009 the Bank reported to OTS that it had lost over $29 million.  AR 2475-76.  The following two quarters saw losses totaling over $42 million, with the Bank losing a total of over $69 million on the year.  AR 865-66, 2475-76.  By the end of 2009, the Bank had

---

[10]     Institutions with a composite "3" rating "exhibit some degree of supervisory concern in one or more component areas.  These financial institutions exhibit a combination of weaknesses that may range from moderate to severe; however, the magnitude of the deficiencies generally will not cause a component to be rated more severely than 4.  Management may lack the ability or willingness to effectively address weaknesses within appropriate time frames.  Financial institutions in this group generally are less capable of withstanding business fluctuations and are more vulnerable to outside influences than those institutions rated a composite 1 or 2.  Additionally, these financial institutions may be in significant noncompliance with laws and regulations.  Risk management practices may be less than satisfactory relative to the institution's size, complexity, and risk profile.  These financial institutions require more than normal supervision, which may include formal or informal enforcement actions.  Failure appears unlikely, however, given the overall strength and financial capacity of these institutions."  AR 100.

[11]     In 2008 and in 2009 the Holding Company downstreamed capital into the Bank.  In 2008 the Bancorp sold off assets and injected approximately $37.5 million cash into the Bank.  AR 143-44, 211.  In 2009 the Holding Company floated a stock offering on the NASDAQ capital market, raising approximately $81 million, of which $61 million was injected as capital into the Bank.  AR 144-45.  However, because of the mounting levels of losses and classified assets at the Bank, these funds were quickly used up and failed to stem the decline in the Bank's capital levels.  AR 25.  Because of its dwindling stock price and mounting losses, thereafter the Bancorp was unable to go back to the public markets to seek more capital in a standard capital raise.  AR 856.

not only failed to meet and maintain the safe 12% and 8% capital levels required by the 2009

Examination, its capital cushion had fallen even further, despite the Holding Company's

injection of capital into UWB.  AR 25.  As of year-end 2009, the Bank's Total Risk-Based and

Tier 1 (Core) capital ratios had fallen to 10.07% and 8.81% respectively, just above the well

capitalized level.  AR 256.

 The Bank's 2009 record of losses and dwindling capital led to an informal enforcement

action.  The Bank and the OTS signed a Memorandum of Understanding  ("MOU") on

December 10, 2009, wherein the Bank committed to raising its capital levels to the safe 12% and

8% levels not later than June 30, 2010.[12]  AR 220-34.

 OTS examiners commenced a limited examination at the Bank on January 11, 2010,

which concluded on April 28, 2010.  AR 255-66.  During the examination, they discovered

irregularities with the Bank's accounting for the valuation of its MBS portfolio.  AR 256-58,

289-90.  In addition, the examiners found that the Bank's classified assets were increasing,

primarily due to the Bank's concentration in risky construction and land loans that OTS had been

warning the Bank about since 2007.  AR 258-59.  The OTS's earlier concerns regarding the

Bank's overreliance upon institutional deposits carried over to this examination as well.  The

examiners discovered that the deposit concentration had not been addressed, and that almost 80%

of the Bank's deposits were concentrated in institutional depositors, with a single depositor -

Equity Trust Company ("ETC") - accounting for 46% of the Bank's deposits.  The amount of

---

[12] The Bank also committed to reduce its classified assets.  The MOU required the Bank to reduce its ratio of classified assets to Tier 1 (Core) capital plus allowances for loan and lease lossess ("ALLL") to not more than 25% by December 31, 2010.  But instead of reducing its levels of bad loans, the Bank saw them mushroom.  As of September 30, 2008 the Bank's classified assets stood at $25 million.  As of September 30, 2009 this figure had reached $143 million.  On September 30, 2010, the figure was $348 million, or 200% of the Bank's Tier 1 (Core) capital plus ALLL.  AR 29.

deposits in the Bank attributed to ETC had almost doubled between 2007 and the end of 2009. AR 81 ($461M), 264 ($934M).

The examiners concluded that the Bank's combination of increasing losses, dwindling capital, and continuing concentration in institutional deposits was putting UWB at risk of failure. On February 11, 2010, the Bank was informed that it was downgraded to a composite CAMELS "4" rating, the next-to-lowest level, meaning that "[*f*]*ailure is a distinct possibility if the problems and weaknesses are not satisfactorily addressed and resolved*."[13]  AR 269, 275-76 (emphasis in original).  OTS repeated the receivership warning to the Bank two months later, when it wrote to the Bank, warning that the Bank's concentration in institutional deposits put the bank at risk of liquidity failure should one or more of its institutional depositors depart.  AR 161, 267.

Despite repeated admonitions to raise capital and reduce its level of classified assets, throughout 2010 the Bank's level of capital continued to dwindle and its level of classified assets continued to increase.  The Bank reported negative earnings in 2010 with its losses exceeding $82 million.  AR 25 (capital); 29 (assets); 30(earnings).  As of March 31, 2010, the Bank was no longer "well capitalized;" its Total Risk-Based capital ratio of 9.02% as of that date meant that the Bank was now considered only "adequately capitalized."  AR 865.

---

[13]     Institutions with a composite "4" rating "generally exhibit unsafe and unsound practices or conditions.  There are serious financial or managerial deficiencies that result in unsatisfactory performance.  The problems range from severe to critically deficient.  The weaknesses and problems are not being satisfactorily addressed or resolved by the board of directors and management.  Financial institutions in this group generally are not capable of withstanding business fluctuations.  There may be significant noncompliance with laws and regulations.  Risk management practices are generally unacceptable relative to the institution's size, complexity, and risk profile.  Close supervisory attention is required, which means, in most cases, formal enforcement action is necessary to address the problems.  Institutions in this group pose a risk to the deposit insurance fund.  Failure is a distinct possibility if the problems and weaknesses are not satisfactorily addressed and resolved."  AR 100.

The Bank's decline to "adequately capitalized" status and its continuing inability to raise its capital levels pursuant to the directives contained in the 2009 Examination and 2009 MOU meant that a formal enforcement action was necessary.  On June 25, 2010, the Bank consented to the issuance of a formal Cease and Desist Order ("C&D Order" or "Consent Order"), the most severe enforcement action that the OTS could take against UWB.  AR 553-74.  *See* 12 U.S.C. § 1818(b).

The C&D Order found that the Bank had been engaged in "unsafe and unsound banking practices that resulted in deteriorating asset quality, ineffective risk management practices, inadequate oversight and supervision of the lending function, and inadequate liquidity planning." AR 569.  The Order placed a number of binding legal requirements on the Bank to address its unsafe or unsound practices and deteriorating condition:

- Paragraph 3 of the C&D Order required the Bank to "meet and maintain" safe capital levels, including a Total Risk-Based Capital Ratio of 12% and a Tier 1 (Core) capital ratio of 8% beginning June 30, 2010.   AR 554
- Paragraph 19 required the Bank not to directly or indirectly make, invest in, purchase, or commit to make or purchase new construction or land loans without prior written non-objection by the OTS Regional Director.  AR 560
- Paragraph 26 restricted growth in total Bank assets to an amount not greater than the net interest credited on deposit liabilities during the prior quarter, without prior written notice of non-objection of the OTS Regional Director.[14] AR 562
- Paragraph 27 required the Bank to comply with prior notification requirements for changes in directors and Senior Executive Officers of the Bank described in 12 C.F.R. § 563, Subpart H.  AR 562

---

[14]      On a bank's balance sheet, its assets must be equal to its liabilities plus capital. Consequently, the limitation on UWB's growth in assets also served to limit the extent to which its deposit liabilities could grow.

- Paragraph 29 prevented the Bank from entering into, renewing, extending, or revising any arrangement for compensation or benefits for any Senior Executive Officer or director of the Bank without prior OTS approval.  AR 562-63

At no point in time did the Bank comply with the most important of these requirements: the provision to meet and maintain a safe capital level.  Instead, throughout 2010 the Bank's losses continued to mount and its capital continued to dissipate.  At the end of the quarter ending September 30, 2010, the Bank reported its 2010 losses had already reached almost $69 million, about equal to its total losses for the whole of the previous year.  AR 30, 866.  As of the same date, the Bank also became "undercapitalized" for PCA purposes, as its Total Risk-Based capital ratio fell below the 8% "adequately capitalized" cutoff, with the Bank's ratio at only 7.80%.  As of September 30, 2010, the Bank's Tier 1 (Core) capital ratio was 6.53%.  AR 25, 865.

## B.    The Bank's Efforts to Recapitalize Are Unsuccessful

With the Bank weighed down with non-performing assets, beset with sinking capital levels, and facing a potential liquidity crisis if one or more of its large institutional depositors withdrew their deposits, UWB and its parent company were required to look for sources of additional capital to bolster the Bank.  Despite repeated assurances to the OTS that an infusion was imminent,[15] the Bank was unable to put together a viable transaction.

Ultimately, the Holding Company and the Bank devised a complex and ultimately unsuccessful private-placement recapitalization plan involving private equity funds.  On October 28, 2010, the Holding Company entered into an investment agreement ("Investment

---

[15]    The Bank and its parent repeatedly promised throughout 2010 that they were on the verge of raising capital.  *See, e.g.*, AR 1779, 1789 (May 12, 2010 promise of a $125 million capital raise to close not later than June 30, 2010); AR 691 (June 10, 2010 promise of closing "in the near future");  AR 605, 609 (July 2, 2010 promise of capital to be committed by August 9, 2010 and transaction to close September 10, 2010);  AR 1807, 1809 (September 16, 2010 promise of a $200 to $250 million capital raise not later than September 27, 2010).

Agreement") with Lovell Minnick Equity Partners, Oak Hill Capital Partners, and Henry C. Duques (collectively "Anchor Investors"). Instead of a "$200 million to $250 million" capital raise as the Bank had previously promised to OTS, the Investment Agreement provided that the Anchor Investors would contribute only $103 million, all of which was contingent upon meeting a large number of written conditions prior to or at the time of closing.[16] Among these conditions was a requirement for the Bank to obtain still more investors who would contribute at least another $97 million and no more than $102 million to the deal.[17] AR 983 (¶N).

More important from the perspective of whether the OTS could approve the plan were the Investment Agreement's other contingencies: conditions precedent to the consummation of the recapitalization that hinged on the agency's willingness to waive a number of the important safety and soundness provisions contained in the Cease and Desist Order that had been issued just four months before. In order for the Investment Agreement to be consummated, it would be necessary for the OTS to waive paragraphs 3, 19, 26, 27, and 29 of the C&D Order.[18] AR 981. In addition, the required OTS waiver of the asset growth restrictions contained in ¶26 of the C&D Order was to be accompanied by agency approval of a business plan that would further

---

[16]     A provision of the Investment Agreement prohibited the Bank from seeking other capital raising opportunities, locking UWB in and making the October 28, 2010 agreement the only hope the Bank had of raising capital. AR 1028.

[17]     Amidst many promises and missed deadlines by the Bank and Holding Company, these additional investors never materialized. *See generally* AR 1112, 1177, 1822, 1825, 1830.

[18]     As previously noted, ¶3 of the Consent Order required the Bank to "meet and maintain" safe capital level ratios of 12% and 8%, ¶19 prevented the making any new construction or land loans without prior OTS consent, ¶26 prevented the Bank from growing its asset size materially larger without prior OTS consent, ¶27 prevented the Bank from changing its directors or senior managers without prior notification to OTS, and ¶29 prevented the Bank from entering into any new or changing any old compensation arrangements for senior executives or directors without prior OTS approval. AR 554, 560, 562-63.

*increase* the size of the Bank's institutional deposits and would expand the asset size of the Bank

by approximately 75%, from $2 billion to $3.5 billion.  AR 1500.

Finally, the Investment Agreement included another condition precedent: a requirement

that the OTS, the FDIC, and the Financial Industry Regulatory Authority ("FINRA") approve the

Bank's purchase of a brokerage firm, Legent Clearing, LLC ("Legent"), and its addition to the

Bank as an operating subsidiary.[19]   Regulatory approval for this acquisition was necessary

pursuant to 12 U.S.C § 1828(m).  *See also* 12 C.F.R. § 559.11.  Legent's majority owner was

Henry Duques, one of the Anchor Investors.  AR 980, 2536.  Guy Gibson, a former Plaintiff in

this case as well as a Director of the Bank, was the founder of Legent and a member of Legent's

Board of Directors while the Bank was engaged in negotiations to purchase the money-losing

brokerage.  *Id.*

### C.    The Bank Enters its Final Crisis

In late 2010, the combination of the Bank's continuing losses, mounting classified assets,

declining capital, inability to obtain investors willing to recapitalize the Bank, and insistence on a

continuing concentration in institutional deposits led to a liquidity crisis that resulted in the

failure of the Bank.

---

[19]     Legent was an unprofitable broker dealer that had been the subject of public disciplinary
enforcement actions by FINRA.  This included failure to have an effective anti-money
laundering program, failure to file Suspicious Activity Reports for suspected money laundering,
as well as for allowing itself to be used as a vehicle by known penny stock fraudsters.  AR 2540-
41;  3151-55 (FINRA 2010 enforcement action);  3159-76 (FINRA 2009 enforcement action);
3183-90 (NASD 2004 enforcement action);  3192-99 (NASD 2005 enforcement action);  3480-
96, 3632, 4234, 4239-40.  In addition to losing money every year between 2008 and 2010,
Legent also lost its largest customer in the Spring of 2010, which represented 68% of its
accounts.  AR 2535-42 (staff analysis of proposed Legent transaction).

Less than a month after signing its Investment Agreement, the Bank met with OTS staff in Washington, D.C. to discuss UWB's recapitalization efforts.  At the meeting, the Bank outlined the various concessions and approvals that it required from the OTS and the other regulators if the Bank was to satisfy the conditions precedent imposed by the Anchor Investors in the Investment Agreement.  The Bank also outlined the modifications to the Cease and Desist Order that were necessary in order to obtain the investment, which included: (1) a waiver of the Order's requirement that the Bank meet and maintain safe capital ratios of 12% and 8%; (2) permission to resume the high-risk land and construction lending programs that had already resulted in massive losses for the Bank; and (3) relaxation of the asset growth provisions of the Order, to allow the Bank to rapidly grow from about $2 billion to well over $3.5 billion in a short period.  AR 1154-70.  The Bank's presentation confirmed for the examiners that UWB was unwilling to comply with the terms of the C&D Order that it had consented to in June 2010, the provisions of which were necessary to ensure the safe and sound operation of the Bank.[20]  *Id*. UWB also insisted that the OTS and FDIC promptly approve the Bank's purchase of Legent.  *Id*.

In order to clarify the Bank's position on revisions to the C&D Order and its acquisition of Legent, the OTS Regional Director asked the Bank to identify which provisions of the Investment Agreement's conditions precedent were "must-haves" and which were "nice-to-have."  AR 1181.  The Bank responded by letter that the "must have" provisions included a waiver of the Consent Order's requirement to meet and maintain safe capital levels of 12% and

---

[20]     During the presentation, UWB noted that it still had not obtained the additional investors and had no binding agreements from parties able to invest the additional $100 million as required by the Investment Agreement.  The Bank promised OTS that the missing investors would be promptly obtained and that recapitalization would be ready to proceed not later than December 31, 2010.  AR 1157.  Like all the Bank's other promises of swift recapitalization, this commitment was not met.

8%, as well as approval of the Legent purchase.  AR 1182.  The Bank's letter represented that

the Anchor Investors might be willing to waive other conditions precedent to the Investment

Agreement.  However, none of these assurances was provided to OTS by the Anchor Investors

themselves.  *Id*.  Indeed, in subsequent filings made to the OTS, the proposed investors

themselves all explicitly reaffirmed their insistence that the agency waive all the C&D Order

provisions as contemplated in the October 28, 2010 Investment Agreement.[21]

While reserving judgment on the questionable Legent purchase, the OTS's Regional

Director wrote back to the Bank on December 3, 2010, informing UWB that the OTS would not

entertain the Bank's demand to waive the meet and maintain safe capital provision of the C&D

Order.  AR 1192-93.  Thus, the Bank was again on notice that it was required to comply with the

capital provisions of the Consent Order.[22]  Nevertheless, the Bank continued to insist that it be

relieved of its obligation to meet and maintain safe capital levels.

### 1.     The Bank's Descent to Undercapitalized Status Triggers the Statutory Requirement that the Bank File a Capital Restoration Plan

The Bank became "undercapitalized" for PCA purposes on September 30, 2010.  This

status was disclosed to investors by the Bancorp in a filing with the Securities and Exchange

Commission on December 14, 2010.  *See*

---

[21]     *See, e.g*., AR 4198, 4201, 4207, 4210, 4221.

[22]     While the Bank now attempts to describe the C&D Order as arbitrary and capricious in
support of its motion for summary judgment, this issue is not before the Court.  Congress has
withdrawn jurisdiction for any district court to consider, either directly or collaterally, a
challenge to a cease and order issued under 12 U.S.C. § 1818.  12 U.S.C. §§ 1818(h) and (i).
*Rhoades v. Casey*, 196 F.3d 592, 597 (5th Cir. 1999), *cert. denied*, 531 U.S. 924 (2000) ("district
court does not have jurisdiction to affect by injunction or otherwise the enforcement of any
order, or to review, modify, suspend, terminate or set aside any order " issued by OTS).  In
executing its consent to the C&D Order, the Bank explicitly waived all right of judicial review.
AR 570.

http://www.sec.gov/Archives/edgar/data/944725/000094472510000024/form8k.htm (accessed

November 8, 2012).  The PCA statute, 12 U.S.C. § 1831o(e)(2), requires an undercapitalized

bank to provide its regulator with a capital restoration plan based upon realistic assumptions, that

will be likely to restore the failing institution's capital without appreciably increasing the risks to

which the bank is exposed.  12 U.S.C. § 1831o(e)(2)(C)(i)(II)-(III).

The Bank submitted its CRP to the OTS on December 20, 2010.  The plan was largely a

recapitulation of the Investment Agreement of October 28, 2010.  Notably, UWB repeated its

insistence that OTS promptly approve the purchase of the money-losing Legent Clearing as an

operating subsidiary of the Bank, requested again that it be relieved of the responsibility to meet

and maintain the safe capital ratios of 12% and 8% as required by the C&D Order, and submitted

a revised business plan that would violate the asset-growth restrictions of the C&D Order by

growing assets from approximately $2.1 billion as of year-end 2010 to almost $3.5 billion by

2013.  Finally, the Bank's CRP projected continued reliance upon institutional deposits, the very

concentration that posed the most imminent risk to the Bank.  AR 1475-78, 1491, 1500, 1507,

1512.

## 2.      Institutional Depositors Begin to Flee the Bank

On December 20, 2010, OTS examiners commenced a limited examination of the Bank.

Two days later they completed their review and concluded that given the Bank's unsatisfactory

liquidity position, its undercapitalized status greatly raised the level of risk.  The examiners

concluded that withdrawal of institutional deposits was likely, in part because of the statutory

restriction against undercapitalized banks holding employee benefit plan deposits.  AR 1729-30.

The examiners' fears were fully justified.  Two large institutional depositors, Matrix

Settlement and Clearing Services ("MSCS") and CPI, began to pull their combined $215 million

of deposits from the Bank on December 20, 2010, a process that continued over the next several days.  AR 32, 35, 2242-43.

On December 22, 2010, as MSCS and CPI were withdrawing their deposits, UWB approached another large institutional depositor, Lincoln Trust Company ("LTC"), and asked it not to withdraw its funds.  The Bank procured a short-term forbearance from LTC, which pledged to hold off on withdrawing its funds on deposit until January 31, 2011, subject to the specific condition that the Bank would return to "well capitalized" status as of that date.  LTC also reserved its right to withdraw its funds sooner if the Bank's capital position worsened.  AR 34-35, 1947.

The Bank's largest institutional depositor, Equity Trust Company, had previously given UWB notice that it would withdraw its funds if the Bank did not recapitalize by December 31, 2010.  AR 33, 1945.  The Bank also was able to convince ETC to refrain from immediately withdrawing its deposits.  Two days before ETC was set to leave, it gave the Bank a final short-term forbearance until February 15, 2011.  ETC informed the Bank that this was an "absolute outside date" for recapitalization, after which ETC would withdraw its deposits.  *Id.*  ETC's $697 million in deposits at the Bank on the date of the receivership exceeded the entire liquidity of the Bank.  AR 32.

In the midst of the withdrawals of institutional deposits, on December 29, 2010, OTS downgraded UWB to a composite CAMELS rating of "5," the lowest possible rating.[23]  AR 100,

---

[23]     Institutions with a composite "5" rating "exhibit extremely unsafe and unsound practices or conditions; exhibit a critically deficient performance; often contain inadequate risk management practices relative to the institution's size, complexity, and risk profile; and are of the greatest supervisory concern.  The volume and severity of the problems are beyond management's ability or willingness to control or correct.  Immediate outside financial or other assistance is needed in order for the financial institution to be viable.  Ongoing supervisory

(footnote continues on next page)

1727.  As this Court observed in a previous receivership challenge case, a "rating of 5 means that an institution has an extremely high short-term probability of failure in the near term, and that an immediate infusion of capital is required." *James Madison*, 868 F. Supp. at 4.

   D.  **OTS Denies the Bank's Application to Purchase Legent, as Well as its Capital Restoration Plan**

By letter dated January 18, 2011, the OTS denied the Bank's application to purchase Legent.  By separate letter sent the same day, the OTS rejected the capital restoration plan.

The OTS determined that the Legent application was objectionable on multiple grounds.  First, Legent's unsatisfactory enforcement record, with multiple, serious, and recent FINRA disciplinary violations, made the institution an inappropriate subsidiary for a federally-insured bank.  AR 4120.  Second, OTS determined that Legent was an unprofitable business that had been losing money for three consecutive years, and had recently lost its largest customer which represented 68% of its accounts.  The OTS, therefore, objected to the incorporation of this money-losing brokerage into a money-losing bank.  AR 4119-21.  Third, the purchase of Legent and placement of all its institutional deposits in the Bank would exacerbate, rather than alleviate, the Bank's already high concentration of institutional deposits that was the foundation of the severe liquidity risks facing UWB.  *Id*.

Because the purchase of Legent and its incorporation into the Bank was a "must-have" condition for the Investment Agreement and the Bank's CRP, the denial of the Legent application meant that the Bank's entire recapitalization transaction could not go forward.[24]  AR

---

attention is necessary.  Institutions in this group pose a significant risk to the deposit insurance fund and failure is highly probable." AR 100.

[24]     The Administrative Record shows that UWB also failed to obtain the approval of either FINRA or the FDIC for the Legent purchase, approvals which were necessary for the transaction to take place.  AR 27 n.7.

982 ¶E, 1181 ("must-haves").  The Bank had previously explained that "each step is predicated

upon consummation of the others, and the failure to consummate any step will adversely impact

the Recapitalization Transaction."  AR 1109.

On the same date as OTS denied the application to purchase Legent, the OTS's Regional

Director denied the Bank's capital restoration plan.  AR 4123-27.  While the denial of the CRP

was premised on a number of grounds, the most salient points for the denial are[25]:

- The CRP was premised on the October 28, 2010 Investment Agreement that required
  the Bank to obtain $100 million in commitments from additional investors beyond the
  $100 million from "Anchor Investors."  Three months after the Investment
  Agreement was signed, no additional investors had been found, and thus it was
  unrealistic to assume that the required investors would be immediately forthcoming;

- The CRP required OTS to waive various provisions of the Cease and Desist Order,
  including the one requiring the Bank to meet and maintain safe capital ratios of 12%
  and 8% and another restricting asset growth.  The CRP incorrectly assumed that OTS
  would waive these provisions, even though their compliance was mandated by the
  C&D Order issued in June 2010;

- The CRP was premised upon the Bank's proposal to increase its institutional deposits
  from $1.2 billion to $1.8 billion, an unacceptable increase in risk for the Bank;

- And finally, the CRP was dependent upon the purchase of Legent as an operating
  subsidiary of the Bank, an acquisition that the OTS had already denied.

*See* AR 4124-4125.

### E.  <u>The Acting Director Appoints the FDIC as Receiver for the Bank</u>

After denial of the Legent purchase and rejection of UWB's capital restoration plan, OTS

field staff submitted a supervisory recommendation ("S-Memo") to the agency's Deputy

Director, recommending that UWB be placed into receivership.  The S-Memo was signed on

---

[25]      The actual denial is found at AR 4123-27 and the staff's analyses of the various
provisions of the CRP are found at AR 4129-37, 4158-59, and 4175-76.

January 19, 2011.[26]  AR 21-49.  The 29-page memorandum, with 100 exhibits, outlined in

specific detail the supervisory history and condition of the Bank.  The S-Memo was endorsed by

the Deputy Director the next day.[27]  AR 21.

On January 20, 2011, the Acting Chief Counsel for the OTS signed the "L-Memo,"

opining to the Acting Director that, as a matter of law, three separate grounds for receivership

existed.  AR 10-19.

On Friday, January 21, 2011, being fully advised by his staff, the Acting Director

determined that in his opinion there were three separate legal grounds to place the Bank into

receivership.[28]  AR 2-8.  Based on the record before him, the Acting Director appointed the

FDIC as receiver for the Bank.

---

[26]     Plaintiff cites to a Problem Bank Memo dated June 29, 2010, authored by an examiner and financial analyst, as proof of that the OTS had already determined to appoint a receiver for UWB prior to January of 2011.  Pl.'s Mem. at 12.  This is simply not the case.  While the opinion and eventual recommendation of field staff regarding UWB's condition and prospects was certainly considered by the Acting Director, the statute enacted by Congress required that the final decision whether or not to appoint a receiver for UWB rested with him alone.  12 U.S.C. § 1464(d)(2)(A)-(B).  The Administrative Record reflects that the Acting Director's decision to appoint a receiver was reached in January 21, 2011, and not before.  AR 8.  The Problem Bank Memo merely captures the contemporaneous concerns of the field staff regarding the institution as well as their frank assessment of the Bank for the benefit of OTS's management; it does not reflect the Acting Director's final decision or that a particular outcome was pre-ordained.

[27]     The fact that the FDIC Board of Directors voted on November 9, 2010 to make preparations for a possible receivership is of little moment.  *See* Pl.'s Mem. at 16.  As the FDIC itself explained to the Court, it must prepare to receive many failing banks.  Making preparations in case a bank fails is not tantamount to a decision to place a bank into receivership.  Many banks in troubled condition take effective remedial measures and avoid failure.  *See* FDIC's Reply to Response to Notice of *In Camera* Production of Documents, Docket No. 79 at 7.

[28]     Having received notice that a receivership was imminent, on January 21, 2011, the Bank attempted to forestall the appointment by submitting to OTS a number of non-binding expressions of interest from investors who might be interested in the Bank.  One of these expressions was from an alleged Cayman Islands hedge fund operating out of a post office box. AR 4198.  OTS staff carefully reviewed the Bank's various submissions and concluded that their submission did not change the supervisory recommendation for receivership.  AR 4227-29.

## II.   THE ADMINISTRATIVE RECORD SUPPORTS THE ACTING DIRECTOR'S DETERMINATION WITH RESPECT TO EACH OF THE THREE GROUNDS FOR RECEIVERSHIP

The sole question before the Court is whether the Administrative Record supports the conclusion that the Acting Director had a rational basis to exercise his statutory discretion to appoint a receiver for United Western Bank.  *James Madison*, 82 F.3d at 1096; *Franklin Savings*, 934 F.2d at 1139.  The OCC respectfully submits that the Administrative Record fully supports the decision by the Acting Director to appoint a receiver for UWB.

### A.   The Administrative Record Contains Sufficient Information to Support the Acting Director's Opinion that the Bank Was Likely to Be Unable to Meet Its Depositors' Demands and Other Obligations in the Normal Course of Business When it Was Closed

One ground upon which the Acting Director acted on January 21, 2011 to appoint a receiver was his determination that the Bank was likely to be unable to meet its depositors' demands and other obligations in the normal course of business.  AR 6-7.  As set forth in the Administrative Record, institutional depositors, including MSCS and CPI, had already begun to pull their deposits out of the Bank in December 2010.  AR 32, 35, 2242-43.  Two additional institutional depositors, LTC and ETC, gave the Bank notice that they would only maintain their deposits in the Bank until January 31 and February 15, 2011, respectively.  Both of these depositors had executed short-term forbearances that were expressly predicated on the Bank's immediate recapitalization, an event which, based upon Bank's failed efforts over the prior six months, the OTS reasonably concluded had no realistic chance of occurring in the near term.  AR 5.

The Bank's liquidity position was insufficient to meet the outflows that the OTS determined were likely to occur after the failure of the recapitalization efforts.  The Bank's own

estimate of its total liquidity at the time of receivership was approximately $416 million.[29]  *Id.*

LTC's deposits as of January 2011 totaled $136 million.  AR 34.  ETC's deposits totaled $697

million.  AR 32.

Given the facts set forth in the Administrative Record, the Acting Director reasonably

concluded that the Bank's total available liquidity was insufficient to permit UWB to meet the

anticipated withdrawals of $848 million in institutional deposits that were likely to occur as a

result of the Bank's inability to successfully recapitalize.

### B.   The Administrative Record Contains Sufficient Information to Support the Acting Director's Opinion that the Bank Was Undercapitalized and Had Failed to Submit a Capital Restoration Plan Acceptable to OTS When it Was Closed

A second ground upon which the Acting Director acted on January 21, 2011 to appoint a

receiver was that the Bank was undercapitalized and that it had failed to submit an acceptable

capital restoration plan to the OTS.  AR 7.  As explained above, to be approved under the statute

a CRP must be "based on realistic assumptions" and must be "likely to succeed in restoring the

institution's capital."  12 U.S.C. § 1831o(e)(2)(C).  The statute also instructs regulators that they

may not accept any CRP if it would "appreciably increase the risk (including credit risk, interest-

rate risk, and other types of risk) to which the institution is exposed."  *Id.*  If the reviewing

agency determines that a bank's CRP is not acceptable, then receivership of the bank is explicitly

authorized by statute.  12 U.S.C. § 1821(c)(5)(K)(iii).  The Administrative Record fully supports

---

[29]     The Bank also alleged that it was theoretically possible that it could obtain $137 million in additional liquidity from another source.  AR 5.  However, the Acting Director reasonably concluded that the Bank's total possible liquidity of $553 million was still substantially outweighed by the $848 million in withdrawals that the institutional depositors had indicated would be promptly forthcoming.  *Id.*

the Acting Director's conclusion that the CRP submitted by the Bank failed both statutory

requirements.

The CRP was not based on "realistic assumptions," nor was it "likely to succeed" in

restoring the Bank's capital.  In short, the CRP was not viable.  The CRP was premised on

obtaining regulatory approval from not only the OTS but also FINRA and the FDIC, approvals

which the Bank failed to obtain.  The OTS's own denial of the Legent purchase was based on

several supervisory objections to the acquisition.  First, Legent had a negative recent history of

discipline by its primary regulator for its ineffective anti-money laundering procedures and for

allowing known penny stock fraudsters to utilize its services.  Second, the OTS concluded that

Legent's history of negative earnings and recent loss of its largest customer (accounting for 68%

of its accounts) made it an inappropriate purchase for the money-losing Bank.  Third, the

incorporation of Legent's institutional deposits into the Bank would have exacerbated, rather

than reduced, the Bank's concentration risk in institutional deposits.

The Bank had also failed to obtain the necessary written commitments from investors to

recapitalize the Bank.  The CRP was premised on the October 28, 2010 Investment Agreement

that required the Bank to obtain about $100 million in commitments from additional investors

beyond an initial $103 million from "Anchor Investors."  Three months after the Investment

Agreement was signed, no additional investors had materialized, and thus it was unrealistic to

assume that the additional investors would be immediately forthcoming.  AR 4123-27.

The OTS also reasonably concluded that the preconditions imposed by the Anchor

Investors – notably the waiver of regulatory conditions imposed by OTS due to the Bank's

operational troubles – would have increased the level of risk to which UWB was exposed.  For

example, the Bank's CRP required OTS to waive the requirement that the Bank meet and

maintain safe capital ratios of not less than 12% Total Risk-Based and 8% Tier 1 (Core) capital, levels necessary in order for the Bank to operate in a safe and sound manner and that the OTS had required of the Bank since 2009.  Consequently, the CRP would have freed the bank to operate with an unsafe and unsound level of capital.

The Bank's CRP also required the OTS to waive the Cease and Desist Order's restrictions that limited the institution's growth.  The plan projected ballooning the Bank's balance sheet from about $2 billion at year end 2010 to nearly $3.5 billion by year end 2013, a level of growth that would have been reckless.  The CRP was also premised upon the Bank increasing its institutional deposits from $1.2 billion to $1.8 billion – the wrong direction for this concentration to go given the Bank's increased exposure to liquidity risk.  Taken together, the OTS reasonably concluded that the Bank's documented history of writing risky land and construction loans, purchasing risky mortgage-backed securities, and very high concentration of deposits in a small number of institutional depositors meant that the CRP would have increased, rather than decreased, the risks to which the institution was exposed, contrary to the requirements of 12 U.S.C. § 1831o(e)(2)(C)(i)(III) (barring regulators from accepting any CRP which would appreciably increase a bank's exposure to risk).

## C. The Administrative Record Contains Sufficient Information to Support the Acting Director's Opinion that the Bank Was in an Unsafe and Unsound Condition When It Was Closed

The final basis for receivership was that the Bank was in an unsafe and unsound condition.  AR 6.  An unsafe and unsound condition is one that, in the regulatory agency's

judgment, presents an unacceptable risk for the bank's depositors or the FDIC's Deposit Insurance Fund.[30]  *Franklin Savings*, 934 F.2d at 1145.

With respect to this ground, the Acting Director determined that an unacceptable risk existed because:  (a) the Bank was unprofitable, it had an excessive amount of classified assets, and it had insufficient capital with no realistic expectation that it would raise capital in the foreseeable future; and (b) the Bank relied on four institutional depositors for nearly 70 percent of its deposits, the second largest of those depositors was in the process of withdrawing its funds, and the largest and fourth largest of those depositors had the ability to withdraw their funds quickly and had reason to do so. AR 2-7.  As discussed above, the Administrative Record amply supports such a finding – the Bank had been unprofitable for almost two years, its capital had eroded, there was no credible recapitalization plan on the horizon, and the institution was facing a devastating liquidity failure.

## III.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

In challenging the Acting Director's decision to appoint a receiver for UWB, the Plaintiff tenders three arguments.  First, it contends that the capital restoration plan submitted by UWB, a plan premised on, *inter alia*, the OTS waiving the requirement that the bank "meet and maintain"

---

[30]    Plaintiff attempts to argue that the OTS "applied the wrong standard" when it concluded that UWB was in an unsafe and unsound condition.  Pl's Mem. at 39.  All Plaintiff's cited cases involve challenges to banking enforcement actions under 12 U.S.C. § 1818.  This is not an enforcement case, but rather a receivership challenge case arising under 12 U.S.C. § 1464.  Moreover, while OCC does not concede the point, *see James Madison*, 868 F. Supp. at 15 (deferring to the regulator's judgment as to the condition of a bank prior to receivership), Plaintiff's formulation of the standard under enforcement cases does not advance their cause.  Even using its formulation of the test, that an "unsafe or unsound" condition is one that presents a reasonably foreseeable undue risk to the institution, the Court may readily conclude that it was more than reasonably foreseeable that the problems at UWB could result in the undue risk of a devastating liquidity shortfall.  Indeed, as reflected in the Administrative Record, large institutional depositors were already in the process of leaving the bank due to its undercapitalized status.  AR 2242.

safe levels of capital, should have been acceptable to the OTS notwithstanding the agency's objections.  Second it argues that the OTS "imagined" the bank's liquidity problems, despite the contrary evidence contained in the Administrative Record.  Third, it disagrees with the OTS's assessment that the bank was in an "unsafe and unsound" condition, despite the facts that the Bank's capital levels continued to decline, its losses continued to mount, and the deposit structure put in place by Bank management left it exposed to a depositor run as conditions deteriorated.  None of the Plaintiff's arguments has merit.

**A.**     **The OTS Did Not Arbitrarily and Capriciously Deny UWB's CRP**

Parsing through the rhetoric, Plaintiff argues that OTS arbitrarily and capriciously denied the Bank's CRP for two reasons.  First, it argues that the OTS "unreasonably demanded" that the Bank produce a plan within seven days.  Pl.'s Mem. at 26.  Second, it argues that the reasons tendered by the OTS for the rejection of the CRP "do not pass muster."  *Id*. at 29.  Neither contention is correct.

**1.  PCA Does Not Grant a Bank Forty Five Days to Submit a CRP**

As a threshold issue, Plaintiff argues that the Bank was not allowed a "reasonable" time to submit its CRP, and that a reasonable time to submit a CRP pursuant to PCA is generally 45 days.  This is simply incorrect.  As set forth in the statute, an institution is not granted 45 days under the statute, but rather a plan must be filed "*not later than* 45 days after the institution becomes undercapitalized." 12 U.S.C. § 1831o(e)(2)(D)(i) (emphasis added).  A regulator may reasonably shorten the time where, as is the case here, the condition of the bank mandates quick action. *See* 12 C.F.R. § 565.5(a)(agency has the discretion to shorten the period if "OTS notifies the savings association in writing that the plan is to be filed within a different period.").  Indeed,

the threatened liquidity issues at the bank and the threat of an uncontrolled collapse reasonably prompted the OTS to mandate the Bank submit its CRP by December 20, 2010.[31]  AR 1441.

Moreover, the Court should conclude that the requirement to file a CRP in seven days presented no novel or unfair burden for UWB.  The Bank had been working on its recapitalization since at least June 2010 and efforts to find additional investors had been ongoing.  Indeed, the basis for their plan (from the Bank's perspective) was in place on October 28, 2010, and the CRP that was submitted re-incorporated that Investment Agreement.  AR 1473-78.

Plaintiff fails to articulate precisely how the preparation of their CRP was negatively affected by the allegedly short time frame or how the deadline prejudiced the Bank.  The Bank's brief fails to demonstrate how its CRP would have been different or how the Acting Director's receivership decision would have been altered if there had been a different deadline for the CRP's submission.  *See, e.g., North Carolina v. FERC*, 112 F.3d 1175, 1191 (D.C. Cir. 1997), *cert. denied*, 552 U.S. 1108 (1998)(harmless error when petitioner failed to demonstrate how administrative proceeding would have rendered a different result without minor computational errors); *Riordan v. SEC*, 627 F.3d 1230, 1233 (D.C. Cir. 2010)(harmless error when petitioner failed to demonstrate that wrongly-excluded evidence would have changed administrative agency's determination).

The Bank filed its CRP in a timely fashion.  If it needed more time or had anything to add, nothing in the statute or regulation forbade submission of an amended CRP.  12 C.F.R. § 565.5 (2010).  OTS did not render an immediate decision on the CRP.  Rather, it considered the

---

[31]     The Bank's largest institutional depositor, Equity Trust Company, previously notified the Bank that it would withdraw its funds from UWB if it did not recapitalize by December 31, 2010.  AR 33, 1945.  ETC did not extend this deadline until December 29, 2010.  *Id.*

CRP for almost a month, giving the Bank more than sufficient time to make any additional arguments or submit any additional evidence it might have wished to provide the agency.  AR 4123-27.

### 2.   The OTS's Rejection of the Plan Was Appropriate

As discussed previously, the OTS's decision to ultimately reject the Bank's CRP was hardly "arbitrary and capricious."  The OTS's decision was fully articulated on the record, and backed up by facts.

As the Court has previously observed, reviewing courts should give deference to regulatory determinations by banking agencies where, as is the case here, the agency is called upon to use its technical expertise to make a judgment or prediction about an institution's prospects and future performance:

> Although the courts are by no means a rubber stamp for agency actions, there are particular situations in which the court should give certain deference to an agency's decision because of the court's lack of knowledge and expertise. "Deference is particularly appropriate where the question of interpretation is a technical one."  *National Fuel Gas Supply Corp. v. Federal Energy Regulatory Commission, 258 U.S. App. D.C. 374, 811 F.2d 1563, 1570 (D.C. Cir. 1987) (citing Gulf State Utils. Co. v. Federal Power Commissioner, 171 U.S. App. D.C. 57, 518 F.2d 450, 457 (D.C. Cir. 1975)).*  The case at bar is a prime example of when a court should give a substantial amount of deference to the reviewing agency.  As the record shows, this case involves a great deal of facts and financial analysis of plaintiff's performance.  Furthermore, this case is not based solely on an analysis of plaintiff's past performance but a prediction of his future performance as well.  Courts have found that deference especially should be paid to the agency "in the case of technical expertise and informed predictions about the likely course of future events."  *Sunshine State Bank v. Federal Deposit Ins. Corp.,* 783 F.2d 1580, 1582 (11th Cir. 1986).

*Dorris v. FDIC*, 1994 U.S. Dist. LEXIS 19939, *16 - 17 (D.D.C. Oct. 27, 1994) (review of the denial of an application under 12 U.S.C. § 1831i).

The practical application of this deferential standard was demonstrated in *James Madison* where the Court explained that simply disagreeing with the choices and assessments made by

agency personnel in examining and analyzing a bank is not sufficient to overturn a decision to appoint a receiver.[32]   The decision to appoint a receiver is "entitled to great deference from this court" and the presumption of the correctness of the agency's determination "is even stronger where Congress has charged an agency with complex analytical responsibilities and the duty to make predictive judgments."   *Id*. at 8 (*citing Franklin Savings*, 934 F.2d at 1147-48).

At bottom, Plaintiffs arguments regarding the OTS's decision to deny the Bank's recapitalization plan amount to little more than disagreement with the choices and assessments made by OTS personnel in examining and analyzing the CRP submitted by the Bank.   As discussed above, the Administrative Record amply supports the OTS's decisions – the Bank had been unprofitable for some time, its capital had eroded, there was no credible recapitalization plan on the horizon, and the institution was facing a potentially devastating liquidity problem.

### B.   The OTS Did Not "Imagine" the Liquidity Threat

The Court may quickly dispose of Plaintiff's arguments that the OTS "imagined" that the Bank's reliance upon a few large institutional depositors posed an immediate threat to the viability of UWB.   The threat was very real, and the OTS's concerns regarding the Bank's deposit concentration was of long standing.

---

[32]   The Court's articulation of the showing that would be necessary to support a colorable case is high:

> Certainly, if there were evidence that the OCC specifically set out to find the [banks] insolvent and place them in receivership, regardless of their true financial state, this court would intervene.   Or, if it appeared that OCC examiners had been derelict in their duties, classifying loans at whim and pulling numbers out of the air rather than actually examining bank records and performing necessary calculations, relief would be granted.   However, plaintiff's objections to the OCC's examination are, in reality, simply disagreements regarding the choices made by OCC personnel in examining and analyzing the banks.

*James Madison*, 868 F. Supp. at 9.

As a threshold issue, Plaintiff's contention that the OTS suddenly "reversed" its policy regarding the Bank's institutional deposit concentration "for no discernible reason," *see* Pl.'s Mem. at 35, is simply incorrect.  The Administrative Record shows OTS raised its concern over this concentration in the 2007 examination, warning the Bank regarding its concentration risk in its institutional deposits, with just four institutional entities constituting 73% of the Bank's total deposits.  AR 81.  When the OTS's 2009 Examination of UWB revealed that the Bank's concentration in institutional deposits had reached 87% of total deposits, it prompted the OTS to warn that "termination of one or more of the larger institutional deposit relationships could place UWB in a precarious liquidity position, as it may not be able to find replacement funding on reasonable terms."  AR 161.  These warnings identified real and presently existing risks that ultimately would be realized.[33]

More importantly, the Court should conclude that the Administrative Record amply supports the OTS's conclusion that the Bank's descent to "undercapitalized" status exposed UWB to an increased liquidity risk should one or more of the large institutional depositors leave the bank.  As the facts unfolded in late December of 2010, the Administrative Record supports the conclusion that the examiners' fears were fully justified.[34]  As discussed previously, two

---

[33]    The Administrative Record shows that in 2007 the Bank planned to move away from a risky concentration in institutional deposits to a more stable business model based on branch deposits from its local area.  AR 55, 81.  This did not occur.

[34]    In letters to the NASDAQ stock exchange in late 2010, the Holding Company itself raised the specter of a  liquidity crisis at the Bank.  As the exchange explained in its reply letter of December 2, 2010:

> Due to its weakened financial status, the Bank has
> experienced a decline in deposits, and it believes that unless it
> resolves its difficulties in the near-term, additional depositors may
> move their funds elsewhere, further weakening the financial

(footnote continues on next page)

large institutional depositors, MSCS and CPI, began to pull their combined $215 million of

deposits from the Bank on December 20, 2010, a process which continued over the next several

days.  AR 2242.  On December 22, 2010, as MSCS and CPI were withdrawing their funds, UWB

scrambled to persuade another large institutional depositor, Lincoln Trust Company, to keep its

funds at the Bank.[35]  The Bank procured a short-term forbearance from LTC, which pledged to

hold off on withdrawing its funds on deposit until January 31, 2011, subject to the specific

condition that the Bank would return to "well capitalized" status as of that date.  LTC also

reserved its right to withdraw its funds sooner if the Bank's capital position worsened.  AR 1947.

    The Bank also had to convince Equity Trust Company to not immediately withdraw its

deposits, and was able to only temporarily forestall its departure.  ETC had previously given the

Bank notice that it would withdraw its funds if the Bank did not recapitalize by December 31,

2010.  AR 33, 1945.  Two days before ETC was set to leave, the depositor gave the Bank a final

---

condition of both the Company and the Bank…. The cumulative
effect has been to erode the Company's equity account and to
materially and adversely affect the Bank's compliance with
applicable banking regulations. Consequently, pursuant to Cease
and Desist Orders (the "Orders"), the banking regulators have
imposed stringent enforcement actions requiring the Company and
the Bank to raise additional capital in the near term or face
additional regulatory actions.  Thus far the Company has been
unable to raise the capital required under the Orders… The
Company also expects that at the end of the current year, the Bank
will fall below the level required to be adequately capitalized…
As a result, the Bank would be unable to hold certain deposits (that
currently account for over 75% of its total deposits) and would
face a liquidity crisis that it believes would lead to the regulator
recommending the seizure of the Bank, resulting in the liquidation
of the Company.

AR 2457-59.

[35]    LTC, with $136 million in the Bank, advertised to its clients that it would deposit their
funds only in "well capitalized" depository institutions.  AR 34.

short-term forbearance until February 15, 2011.  The Bank was told by ETC that this was an

"absolute outside date" after which ETC would withdraw its deposits.  *Id.*  ETC's $697 million

in deposits at the Bank on the date of the receivership exceeded the entire liquidity of the Bank.

*Id.*

In short, the Court should conclude that the Acting Director's determination that there

was a serious liquidity problem at the bank was neither arbitrary nor capricious, but was fully

supported by the facts set forth in the Administrative Record.[36]  The facts show that the large

institutional depositors upon which UWB relied were withdrawing their deposits or, at best,

temporarily refraining from leaving the bank subject to the institution being recapitalized.  Given

the size and concentration of the deposits at issue, the Acting Director reasonably concluded that

the Bank faced significant liquidity risk unless the Bank was immediately recapitalized.  This

was an event that had no reasonable possibility of occurring.  AR 27-28.

### C.  The Bank Was in an Unsafe and Unsound Condition

Finally, the Plaintiff takes issue with the Acting Director's conclusion that the Bank was

in an unsafe and unsound condition when it was closed.  Pl.'s Mem. at 41-43.  Between 2009 and

the date of receivership, the Bank lost at least $152 million.  AR 30, 1492.  From 2009 to 2010,

the Bank's Total Risk-Based and Tier 1 (Core) capital ratios fell from 10.55% and 9.68% to

7.80% and 6.53%, respectively.  AR 142 (beginning of 2009), AR 25 (September 30, 2010).  In

---

[36]     The Plaintiff suggests that that "the OTS was required to stand aside" until the Bank was
actually unable to meet its depositors' demands for withdrawal of their funds.  Pl.'s Mem. at 1.
To the contrary, the receivership statute required OTS to place UWB into receivership once the
Acting Director determined that the institution was "likely to be unable to pay its obligations or
meet its depositors' demands in the normal course of business."  12 U.S.C. § 1821(c)(5)(F).
Instead of waiting for the Bank to actually fail as a result of a depositor run, the statutory scheme
recognized that "liquidity may suddenly disappear."  *Franklin Savings*, 934 F.2d at 1137.  This
fact, amongst others, required the Acting Director to be "vigilant and responsive" and to "act
promptly" once a statutory ground for receivership exists.  *Id.*

its capital restoration plan submitted December 20, 2010, the Bank projected its capital ratios as of year end would decline still further, to only 6.4% and 5.0%.  AR 1491.  Despite these facts, the Bank mischaracterizes its condition at the time of its closure as "relatively well-capitalized", *see* Pl.'s Mem. at 2, a standard absent from the regulatory standards set forth in the statutes and regulations.

Likewise, prior to the time of its closure, the amounts of bad loans and sub-investment grade mortgage-backed securities on the Bank's books had reached an unsafe and unsound level. As of September 30, 2010, the Bank's non-performing assets stood at $348.2 million, more than double the Tier 1 (Core) capital remaining in the Bank.  AR 29.  By way of comparison, the Bank's amount of non-performing assets on September 30, 2008 stood at a much more modest $25 million.  *Id*.  The Bank's concentration in institutional deposits, the threatened withdrawal of which sparked the Bank's final crisis, was at 70% of total deposits, a level little changed from years earlier when the Bank's capital was at a much higher level.  This also constituted an unsafe and unsound condition and, when coupled with the institutional depositors' ability to promptly withdraw their funds, posed an imminent peril to the Bank.  AR 30-40 (S-Memo analysis).

The Plaintiff, however, concludes that the only problem was its regulator's "unduly narrow view of the Bank's capital prospects."  Pl.'s Mem. at 43.  Like the Plaintiffs in the *Franklin Savings* and *James Madison* cases, the Plaintiff's position here is simply a reflection of its disagreement with the OTS's conclusions about the Bank's financial state.  *See Franklin Savings*, 934 F.2d at 1145, *James Madison*, 868 F. Supp. at 9 ("strong disagreement with another's decision-making process does not by itself render that process 'arbitrary and capricious.'").  The Acting Director, relying on the documentation of the Bank's problems provided through several examinations of the Bank, determined that the combination of the

Bank's massive and continuing losses, depleted level of capital, excessive concentration in institutional deposits, excessive level of classified assets, and proven inability to quickly raise capital left the Bank in an unsafe and unsound condition to transact business.  AR 6.  This expert conclusion is not to be disturbed by a reviewing court unless it transgresses "the bounds of reason." *Franklin Savings*, 934 F.2d at 1147.  Nothing cited by the Plaintiff in its submission to the Court comes close to meeting that standard.

**<u>CONCLUSION</u>**

For the reasons set forth above, OCC respectfully requests that the Court grant its motion for summary judgment, deny Plaintiff's motion for summary judgment, and enter a final judgment in favor of the Defendants.

Date: November 9, 2012   Respectfully submitted,

Daniel P. Stipano,
  Acting Chief Counsel
Horace G. Sneed, (MI Bar No. P33434)
  Director, Litigation Division
Gregory F. Taylor,
  Assistant Director, Litigation Division
  DC Bar No. 417096

*/s/Christopher A. Sterbenz*
Christopher A. Sterbenz,
  Counsel, Litigation Division
  DC Bar No. 437722
  250 E Street, S.W.
  Washington, D.C. 20219
  Telephone: (202) 927-9124
  Facsimile: (202) 874-5279
  christopher.sterbenz@occ.treas.gov
  *Attorneys for Office of the Comptroller of the*
  *Currency and Comptroller Thomas J. Curry*