**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
UNITED WESTERN BANK,                    )
                                        )
           Plaintiff,                   )
                                        )
     v.                               )     Civil Action No. 11-0408 (ABJ)
                                        )
OFFICE OF THE COMPTROLLER OF            )
THE CURRENCY, *et al.*,                 )
                                        )
                                        )
           Defendants.                  )
_____)

**MEMORANDUM OPINION**

      The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") grants the Director of the Office of Thrift Supervision ("OTS" or "the agency") "exclusive power and jurisdiction" to appoint a receiver or conservator for a savings association "if the Director determines, in the Director's discretion, that 1 or more of the grounds specified in section 1821(c)(5) of this title exists."  12 U.S.C. § 1464(d)(2)(A)–(B) (2006) (amended July 21, 2011).  Although the agency's decision to appoint a receiver is highly discretionary, it is not immune from judicial review.  In the event of the appointment of a receiver, "the association may, within 30 days thereafter, bring an action . . . in the United States District Court for the District of Columbia, for an order requiring the Director to remove such conservator or receiver."  *Id.* § 1464(d)(2)(B).

      In this case, plaintiff United Western Bank ("the Bank" or "the association") asks the Court to set aside the January 21, 2011 decision by the Acting Director of OTS to appoint the Federal Deposit Insurance Corporation ("FDIC") as receiver for the Bank.  Compl. [Dkt. # 1] ¶ 1; *see also* United Western Bank's Mot. for Summ. J. ("Pl.'s Mot.") [Dkt. # 99] at 1.  The Bank

has moved for summary judgment contending that OTS's appointment decision should be overturned because it "was arbitrary, capricious, an abuse of discretion, and not in accordance with FIRREA's requirements." *See* Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") [Dkt. # 99] at 2.

Defendants – the Office of the Comptroller of the Currency ("OCC") and Thomas Curry, Comptroller of the Currency – oppose the motion, and they have filed their own cross-motion for summary judgment. They assert that placing the Bank into receivership was a proper exercise of discretion under the FIRREA because the Acting Director's decision was based on three independent statutory grounds and supported by the administrative record. Defs.' Mem. in Supp. of their Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Defs.' Mem.") [Dkt. # 111] at 1, 9. Because the Court finds that the Bank has failed to show that OTS's decision was arbitrary or capricious, the Court will deny the Bank's motion and grant defendants' cross-motion.

The Bank contends that it was not "necessary" for the agency to take the drastic step of placing the Bank into receivership on the date that the Acting Director issued his decision. Tr. [Dkt. # 112] 26:8–12. But that is not the proper inquiry. The law does not invite the Court to make its own judgment about whether it would have been feasible, appropriate, or even preferable, for the agency to wait; the sole question presented by this case is whether the agency action was unreasonable.

In forcefully worded pleadings, the Bank passionately insists that the agency's attitude took a "sudden" and inexplicable turn in December of 2011, and that the regulators surprised the bank with unrealistic deadlines and unnecessary requirements. Pl.'s Mem. at 36–37; Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply") [Dkt. # 106] at 5. But any change in the

regulators' approach was prompted by the seismic changes in the nation's economy, and more particularly, by the ongoing and significant deterioration of the Bank's financial condition.  The review of the administrative record in its entirety reveals that the agency's decision was the culmination of a steady progression and not, as the Bank would have the Court conclude, a sudden wrenching of gears.  In early to mid-2009, the Bank had begun to suffer substantial losses, and the agency began voicing concerns about the adequacy of the Bank's capitalization, its reliance on institutional investors, its liquidity, and its investment in mortgage-backed securities.  The same concerns that led to the receivership were the focus of a 2009 Report of Examination, a Memorandum of Understanding between the Bank and the agency entered into in December of 2009, a January 2010 examination, and even a cease and desist order agreed to by the Bank in June of 2010.  The Bank emphasizes that the record is devoid of evidence of criminal activity or malfeasance on the part of the Bank's managers, and the Court has little doubt that they sincerely believed in their ability to save the institution until the moment the door was closed.  But the absence of those factors cannot alter the result compelled by the review of the record under the deferential standard the Court is required to apply.

## BACKGROUND

United Western Bank is a federally chartered savings association under 12 U.S.C. § 1464(a)(2) that was wholly owned by United Western Bancorp, Inc. ("the holding company") at all times relevant to this case.  Administrative Record ("AR") 11.  With primary operations in Colorado, the Bank originated construction, land, commercial real estate, and non-mortgage commercial loans, maintained a large portfolio of non-agency mortgage-backed securities, and

relied on institutional custodial deposits as its primary source of funding.[1]  AR 11, 23.  The

Bank's largest institutional depositors were:  Equity Trust Company ("ETC"), Matrix Settlement

and Clearing Services, LLC ("MSCS"), Legent Clearing, and Lincoln Trust Company ("LTC").

AR 32.

During the relevant period, the Office of Thrift Supervision was the primary regulator

for savings associations, and as such, was responsible for their "examination, safe and sound

operation, and regulation."  12 U.S.C. § 1463(a)(1) (2006) (amended July 21, 2011);[2] *see also* 12

C.F.R. § 563.170(a) (requiring OTS to periodically examine savings associations).  During its

examinations, OTS evaluated the financial health of savings associations using a variety of

metrics.  The agency rated the associations' Capital, Asset Quality, Management, Earnings,

Liquidity, and Sensitivity to Market Risk ("CAMELS") on a scale of one to five with one being

the best rating.  *See* AR 22 n.1, 100.  Banks received a separate rating for each of the CAMELS

categories as well as a composite CAMELS rating reflecting the bank's overall condition.  *See,*

*e.g.*, United Western Bank 2007 Report of Examination, AR 55.  In addition to the CAMELS

rating, OTS also classified the adequacy of a bank's capital according to the Federal Deposit

Insurance Corporation Improvement Act of 1991 (the "FDICIA"), a portion of which was later

codified at 12 U.S.C. § 1831*o*, and is commonly known as the Prompt Corrective Action

("PCA") statute.  The PCA divides bank capital levels into five different categories, ranging

---

1       According to the Bank, these institutional depositors "are trust companies and settlement companies that provide significant and regulated trust or brokerage services to millions of customers.  As a byproduct of their primary business activities, the Institutional Depositors regularly handle idle customer funds that are in transit to or from external investments or are awaiting distribution.  The Institutional Depositors place these funds on deposit at omnibus deposit accounts at the Bank during these transitory periods."  United Western Bank Request for Review of Material Supervisory Determination, AR 1760.

2       On July 21, 2011, OTS became part of OCC.  OCC currently regulates both national banks and federal savings associations.  12 U.S.C. § 5412.

from "well capitalized" to "critically undercapitalized."  12 U.S.C. § 1831*o*(b)(1).  Negative ratings under these metrics can expose a bank to certain statutorily mandated regulatory responses.

The administrative record in this case confirms that prior to early 2009, the Bank enjoyed "an unbroken 16 years of profitability" and correspondingly high CAMELS and PCA capital ratings.  AR 1474.  As a result of the global financial crisis, the Bank's earnings, asset quality, and capital ratios deteriorated, and one of its largest sources of liquidity began withdrawing its funds.  AR 11–12, 2475.  The Bank based its hope for survival on the consummation of a highly contingent private sector recapitalization plan.  AR 972–1091.  The plan depended upon the agency's agreement to lift certain requirements it had previously imposed, AR 1185–90, but the agency declined to do so, AR 4.  Ultimately, the agency determined that there were three statutory grounds supporting placing the Bank into receivership.   AR 5–7; *see also* Recommendation for Appointment of the Federal Deposit Insurance Corporation (FDIC) as Receiver for United Western Bank, ("S-Memo"), AR 21–44.  Based on this recommendation, on January 21, 2011, the Acting Director of OTS appointed the FDIC as a receiver for the Bank pursuant to 12 U.S.C. § 1464(d)(2)(A).  AR 2–8.

The chronology of the events that led to the imposition of the receivership is as follows:

## I.   October 2007 OTS Examination

Between October 2007 and January 2008, OTS conducted a comprehensive risk-focused examination of the Bank's operations during the fifteen-month period ending on June 30, 2007.  AR 51–52, 55.  The 2007 Report of Examination ("2007 ROE") was overall positive.  In the report, the OTS examiners concluded that the Bank's asset quality, earnings, and liquidity sources were satisfactory, and they gave the Bank a CAMELS composite rating of 2, which

meant that the Bank was "fundamentally sound[,] . . . stable and . . . capable of withstanding business fluctuations." AR 56–57, 60, 100. The report also noted that as of June 30, 2007, approximately 73% of the Bank's total deposits were attributable to four institutional depositors. AR 81. Although the agency cautioned that the Bank "continue[d] to face risk from its concentration in institutional deposits," it tempered this statement by concluding that the Bank's continued efforts to increase its retail deposits and its "contractual agreements with some of the largest of these depositors help[ed] protect the institution's liquidity position." AR 57. Additionally, the OTS examiners stated that although the Bank was "well capitalized" under PCA standards, it had to "remain cognizant" of its concentration in institutional deposits and "continue to maintain a prudent level of capital above the 'well capitalized' standards."[3] AR 56.

## II. March 2009 OTS Examination

OTS's next examination of the Bank occurred during the financial crisis; it began on March 30, 2009, and covered the twenty-six month period ending in mid-September 2009. AR 130–31, 134. As the 2009 Report of Examination explained, "the review period saw unprecedented declines in real estate markets, a changing economic environment, and dislocation in capital markets." AR 135. These poor and uncertain market conditions adversely impacted certain aspects of the Bank's operations. AR 135. The report specified that the Bank's "asset quality ha[d] deteriorated" due, in part, to losses on its mortgage-backed securities, and its earnings had declined due to a $4.1 million write-down on two mortgage-backed securities. AR

---

3       On June 30, 2007, the Bank had a 14.38% Total Risk-Based capital ratio and a 13.69% Tier 1 (Core) Risk-Based capital ratio. AR 60. Under the PCA, an institution is "well capitalized" if it has a total risk-based capital ratio of 10.0% or higher, has a Tier 1 risk-based capital ratio of 6.0% or higher, a leverage ratio of 5.0% or higher, and is not subject to an OTS directive to meet and maintain a specific capital level. 12 C.F.R. § 565.4(b).

135–36.  The OTS examiners added that any further deterioration of the Bank's mortgage-backed securities portfolio presented additional risks to its earnings.  AR 136.

The examiners also noted that their concerns about the Bank's liquidity sources and capital levels had escalated due to the Bank's deteriorating condition.

- Capital:  The report concluded that the Bank's capital – which had declined to just above the "well capitalized" PCA level – was "less than satisfactory" because it did not fully support the Bank's risk profile.  AR 141.  Specifically, the OTS examiners warned that "capital levels remain a concern due to risks posed by the bank's remaining non-agency MBS portfolio and negative asset quality trends."  AR 142–43.  According to the report, the Bank's management was aware of the need to bolster the capital position and was pursuing various options to maintain a prudent level of capital above the PCA "well capitalized" standard.  AR 135, 143.

- Liquidity:  The report also stated that the agency's "[l]iquidity risk concerns ha[d] been elevated" due to the Bank's continued overreliance on institutional deposits.  AR 136.  As of March 31, 2009, institutional deposits represented 86.9% of the Bank's total deposits.  AR 160.  A third of these depositors could withdraw their deposits at any time because they had no contractual agreements with the Bank.  AR 161.  The remaining two-thirds had contractual agreements with the Bank that allowed them to withdraw their funds in a variety of circumstances, including a decline of the Bank's capital to below "well capitalized" levels.  AR 161.  OTS then concluded that the "termination of one or more of the larger institutional deposit relationships could place UWB in a precarious liquidity position, as it may not be able to find replacement funding on reasonable terms."  AR 161.

In light of the problems and risks uncovered in the examination, OTS downgraded the Bank to a CAMELS composite rating of 3, which meant that the Bank had "a combination of weaknesses that may range from moderate to severe" and required "more than normal supervision."  AR 100, 134.

As part of the 2009 ROE, the agency also required the Bank to take remedial actions:  (1) to increase core and total risk-based capital ratios from 9.07% and 10.17% to at least 8.0 and 12.0% by December 31, 2009; (2) to "[d]evelop a revised comprehensive concentration policy that sets limits . . . for the bank's funding sources, including exposures to institutional depositors"; and (3) to "[p]rovide a Liquidity Contingency Plan that contains specific board

strategies for ensuring that the Bank maintains adequate short-term and long-term liquidity to withstand any anticipated or extraordinary demand against its funding base." AR 139–40.

After the issuance of the March 2009 ROE, the Bank's financial condition worsened; it lost a total of over $69 million during the year, and its capital ratios continued to decline. AR 865–66, 2475–76. As a result of the Bank's losses and declining capital, on December 10, 2009, OTS and the Bank signed a Memorandum of Understanding ("MOU") in which the Bank again pledged to fulfill the remedial measures set forth in the 2009 ROE. AR 220–34. Specifically, the Bank agreed to raise its capital ratio levels to 12% and 8% by June 30, 2010, AR 220, and to develop a liquidity contingency plan that "specifically address[ed] deposit concentrations and plans to reduce or manage such concentrations," AR 223–24.

### III. January 2010 OTS Examination

As the financial crisis raged on, the Bank reported a loss of $21.02 million for the quarter ending on March 31, 2010. AR 865–66. In April of 2010, OTS sent a letter to the Bank summarizing the results of the agency's January 2010 limited examination of the Bank. AR 267–69. In the letter, the agency expressed serious concerns about the Bank's capital levels and its continued concentration in institutional deposits. AR 267–69.[4]

- Capital: In the letter, the agency explained that the Bank's capital rating had "been downgraded given current risks to capital posed by the bank's worsening asset quality trends, the potential impact of future [write-downs] from the bank's remaining relatively large portfolio of below investment grade MBS, and deteriorating earnings." AR 267. Additionally, the agency explained that revised calculations performed by the Bank during the January 2010 field visit required the Bank to take an $18 million write-down for the 2009 year-end, which reduced the Bank's total risk-based and core capital ratios to 10.07% and 7.68% respectively. AR 267–68. Although these capital levels were still above the "well capitalized" PCA standard,

---

4    The Court will refrain from summarizing or quoting language from the January 2010 Report of Examination because OTS has been unable to confirm whether the report was mailed to the Bank. Defs.' Opp. to Pl.'s Mot. to Supplement the Admin. R. at 7 [Dkt. # 48]. However, the Bank does not dispute that it received the April 2010 letter. *Id.*

they were below the levels required by the MOU and the agency expressed concern that the Bank may not be able to meet and maintain the capital levels required by the MOU by the June 30, 2010 deadline.  AR 268.

- Liquidity:  The agency also stated that "liquidity risk at UWB ha[d] increased and [was] of heightened concern" because of the "Bank's significant concentration in institutional deposits."  AR 267.  The letter explained that this concentration was particularly problematic because the FDIC was reviewing whether these deposits were "brokered."[5]  If the FDIC concluded that the institutional deposits were all brokered, the Bank would not be able to accept or renew any such brokered deposits without a waiver from the FDIC once the Bank was officially deemed "Adequately Capitalized."  AR 267.  The letter then noted that the agency had already informed the Bank that it would be deemed "adequately capitalized" in the near term,[6] and directed the Bank to "consider all strategic alternatives available, including the possible sale, merger, or self-liquidation of United Western, to prevent the potential failure of the institution due to insufficient liquidity."  AR 267, 269.

OTS's concerns about the "brokered" status of the institutional deposits materialized on May 24, 2010.  On that day, the FDIC notified the Bank that it had concluded that seven of the Bank's institutional depositors, including ETC – the Bank's largest depositor – were "deposit brokers" and that the Bank's "adequately capitalized" status precluded it from accepting, renewing, or rolling over any brokered deposits without a waiver from the FDIC.  AR 369–80.  In response, the Bank filed a request for a waiver from the FDIC on June 10, 2010, AR 690, and it modified its depositor contracts in an attempt to place them within an exception to the "brokered deposit" designation, AR 1558.  On June 22, 2010, OTS sent a letter to the Bank stating that in light of the uncertainty as to whether the FDIC would grant a waiver and the Bank's failure to demonstrate its ability to replace the institutional deposits in the near future, the Bank could "face a severe liquidity crisis in the near future that would threaten the viability of

---

5       A brokered deposit is "any deposit that is obtained, directly or indirectly, from or through the mediation or assistance of a deposit broker."  12 C.F.R. § 337.6(a)(2).

6       In a February 11, 2010 meeting, the agency told Bank management that the Bank would be deemed "Adequately Capitalized" and its CAMELS composite rating would be downgraded to a 4.  AR 269.  This downgrade meant that the Bank was "in troubled condition" pursuant to 12 C.F.R. § 563.555 and would be subject to various operating restrictions.  AR 269.

the institution." AR 549.  Based on this determination, the agency informed the Bank that its

liquidity rating had been downgraded to 5, the lowest possible rating.  AR 549.

## IV. June 2010 Cease and Desist Order

Three days later on June 25, 2010, the Bank and its holding company consented to the

issuance of a formal Cease and Desist Order from OTS.  AR 553–94.  The order set forth OTS's

determination that the Bank had "engaged in unsafe or unsound banking practices that resulted in

deteriorating asset quality, ineffective risk management practices, inadequate oversight and

supervision of the lending function, and inadequate liquidity planning at the [Bank]."  AR 569.

The Bank did not admit or deny OTS's findings, but it agreed to comply with a number of

legally binding requirements:  to "meet and maintain" total risk-based and core capital ratios of

12% and 8% by June 30, 2010; and to refrain from increasing its total assets beyond a certain

level without prior approval from the OTS Regional Director.  AR 554, 562, 569.  Although the

capital ratio requirements had been in place since the March 2009 OTS Report of Examination,

the Bank made several requests for an extension of time to meet the requirements.   OTS denied

all of these requests.  AR 671.

## V.  The Bank Attempts to Recapitalize

A.  Legent Purchase and Recapitalization Transaction

In mid- to late 2010, the Bank and its holding company proposed two transactions in an

attempt to alleviate OTS's concerns about the stability of the Bank's institutional deposits and its

capital ratios.  First, on July 27, 2010, the Bank formally notified OTS of its intent to acquire

Legent, one of its institutional depositors.  AR 2551.  By absorbing Legent as an operating

subsidiary, the Bank hoped to obviate any concerns regarding the stability or status of Legent's

deposits.  AR 2552.  After determining that the proposed transaction raised "significant issues of

policy," OTS transferred the acquisition application to its office in D.C. for additional review on November 4, 2010.  AR 3008.

Second, the Bank's holding company developed a plan to raise approximately $200 million from private investors, $102.5 million of which would be contributed as capital to the Bank ("Recapitalization Transaction").  AR 972–1091, 1111.  On October 28, 2010, the holding company entered into an investment agreement ("Investment Agreement") with Oak Hill Anchor Investor, Lovell Minnick Anchor Investor, and Legent/Duques Anchor Investor (together "Anchor Investors").  AR 980.  Pursuant to the Investment Agreement, the Anchor Investors agreed to contribute $103 million to the Recapitalization Transaction if, prior to or contemporaneous with the closing of the proposed investment transaction:  (1) the holding company raised an additional $97 to $102 million from other private investors;  (2) OTS waived certain conditions of the Bank's June 2010 Cease and Desist Order including the "meet and maintain" requirement; (3) OTS approved the Bank's application to acquire Legent; and (4) OTS approved the Bank's business plan.  AR 980–85.  In a November 29, 2010 letter, the Bank informed OTS that the Anchor Investors were willing to waive a number of the closing conditions but that they still insisted on these four requirements.  AR 1185–90.

The first nail in the Recapitalization Transaction's coffin came on December 3, 2010, when OTS notified the Bank of its refusal to remove the "meet and maintain" requirement.  AR 1192–93.  To make matters worse, in another letter on the same day, OTS also directed the Bank to take an additional write-down on certain mortgage-backed securities for the quarter ending September 30, 2010.  AR 2092–93.  This additional loss reduced the Bank's total risk-based capital ratio to 7.8%, which meant that the Bank had become "undercapitalized."  AR 1441. Things continued to worsen for the Bank on December 13, 2010 when OTS explained that since

11

the Bank was "undercapitalized," it was no longer permitted to accept brokered deposits or employee benefit plan deposits, including any such funds from its institutional depositors.  AR 1451.  In yet another letter on the same day, the agency directed the Bank to submit a capital restoration plan ("CRP") by December 20 and to restore its capital position to "adequately capitalized" no later than December 31, 2010.  AR 1441–42.

B. <u>Capital Restoration Plan</u>

On December 20, 2010, the Bank submitted its CRP, which largely recapitulated the Recapitalization Transaction and projected an infusion of approximately $102.5 million of new capital into the Bank following the consummation of the transaction.  AR 1473–79.  The Bank recognized that OTS's refusal to waive the "meet and maintain" requirement – one of the closing conditions of the Investment Agreement – affected the viability of its recapitalization plan.  AR 1476–77.  Nonetheless, the Bank continued to argue in favor of the waiver and asserted that OTS's unwillingness to waive the requirement was "not a proper exercise of the agency's fiduciary duties to the Deposit Insurance Fund."  AR 1476–77.  The Revised Business Plan that the Bank submitted as part of the CRP was also premised on the assumption that OTS would approve the Legent transaction.  AR 1485.

In late December 2010 and early January 2011, the Bank told OTS that a variety of investors had expressed interest in investing a total of up to $130 million in the Recapitalization Transaction.  AR 1748, 2468–69.  According to the Bank, some of these investors had confirmed their intent to invest and were in the process of reviewing proposed investment agreements, while others had offered "strong expression[s] of interest" but had not confirmed their intent to invest.  AR 1800.  All the potential additional investments were subject to the same conditions precedent included in the October 2010 Anchor Investment Agreement.  AR 1748, 2470.

C.  OTS Rejection of the Legent Application and Capital Restoration Plan

On January 18, 2011, OTS rejected the Bank's proposal to acquire Legent on the grounds that:  (1) Legent had an unsatisfactory enforcement record due to its multiple, serious, and recent FINRA disciplinary violations; (2) Legent was an unprofitable business that had been losing money for three consecutive years and had lost 68% of its accounts in spring 2010; and (3) the purchase of Legent and placement of its institutional deposits in the Bank would exacerbate, rather than alleviate, the already high concentration of institutional deposits that was posing severe liquidity risks.  AR 4190; *see also* AR 2540–41 (discussing Legent's FINRA violations).

On the same day, OTS also rejected the Bank's CRP on the grounds that it was premised upon a series of assumptions that the agency found to be unrealistic.  OTS noted that the CRP assumed that:

1.  The Bank would be able to secure the additional $100 million in funding necessary to complete the Recapitalization Transaction.  AR 4124.  The rejection letter explained that although the Bank had identified several potential additional investors, none of these investors had signed a letter of intent or executed an investment agreement.  AR 4124.

2.  OTS would remove the growth restriction provision of the Cease and Desist Order.  The agency explained the asset growth projected in the CRP was unacceptable in light of the Bank's financial condition.  AR 4124.

3.  OTS would approve an increase in institutional deposits from $1.2 billion to $1.8 billion, a growth that the agency considered to be an unacceptable increase in risk for the Bank.  AR 4124.

4.  OTS would approve the Bank's revised business plan, which according to the agency relied on "excessive concentration in institutional deposits" and an "excessive level of asset growth."  AR 4124–25, 4127.

5.  OTS would approve the Bank's purchase of Legent, which the agency had rejected earlier that day.  AR 4125.

6.  The Anchor Investors would amend or waive several unsatisfied closing conditions although the Bank had failed to explicitly state in the CRP that the Anchor Investors had agreed to amend or waive any closing conditions, and had failed to provide a draft or executed amendments to the Investment Agreement or communication from the Anchor Investors of their intent to waive the conditions.  AR 4125.

OTS also faulted the Bank for submitting a guarantee that was different from the agency's standard-form guarantee.  AR 4125.

## VI. Liquidity and Institutional Investors

While the Bank was attempting to restore its capital, it was simultaneously addressing some liquidity issues.  Under the Federal Deposit Insurance Act, 12 U.S.C. § 1821(a)(1)(D)((ii), the Bank could no longer accept employee benefit plan (ERISA) deposits because of its "undercapitalized" status.  Therefore, on December 20, 2010, MSCS, and its client CPI, began withdrawing their ERISA deposits from the Bank.  AR 2242–43.  MSCS withdrew its deposits on demand without adhering to the 60 day notice requirement contained in its depositor agreement.  AR 2242–43.  In a letter to OTS, the Bank explained that it did not expect MSCS and CPI's withdrawals to impact the Bank's operations because it had "sufficient liquidity to address these withdrawals," and the Bank's business plan did not assume that any material portion of the MSCS or CPI deposits would remain on deposit beyond 2011.  AR 2243.

The day after MSCS began withdrawing its funds, OTS directed the Bank to submit a revised liquidity contingency plan that "address[ed] the current acute liquidity risks" at the Bank.  AR 1534.  Specifically, OTS was concerned that the Bank's "interpretation of its contractual agreements with Institutional Depositors . . . underestimate[d] the risk that certain Institutional Depositors [would] seek to terminate or withdraw deposits pursuant to their respective Depositor Agreement."  AR 1536.  For example, two of the remaining institutional depositors, ETC and LTC, had the right to withdraw their deposits since the Bank's capital had fallen below the PCA "well capitalized" level.  AR 1945, 1952.  So the agency asked the Bank to explain what steps it would take in a worst case scenario if other large institutional depositors, such as LTC and ETC, either voluntarily withdrew their funds or were required to withdraw their deposits in the event

the FDIC determined that the funds were "brokered deposits," despite modifications to the depositor agreements aimed at avoiding that designation.  AR 1536.

On December 28, 2010, the Bank submitted its revised liquidity contingency plan.  Like everything else the Bank had submitted to OTS, this plan was dependent on the consummation of the Investment Agreement with the Anchor Investors.  With respect to the first scenario – voluntary withdrawal – the Bank noted that unlike MSCS, which was statutorily required to withdraw its ERISA deposits, the other institutional investors had few if any ERISA deposits. AR 1555–57.  The Bank added that the depositors had remained loyal to the Bank during "significant and material challenges," so it was "confident that in contemplation of the pending private-sector Recapitalization Transaction, none of the remaining Institutional Depositors [would] seek to withdraw their funds."  AR 1554 (footnote omitted).

Specifically, the Bank stated that LTC had indicated that it would not terminate its deposit relationship "while the Recapitalization Transaction [was] still a viable transaction for the Bank's parent company."  AR 1556.  This assertion was supported by a December 22, 2010 letter, in which LTC pledged to refrain from withdrawing its funds until January 31, 2011, subject to the condition that the Bank return to "well capitalized" status by then.  AR 1947. Additionally, on December 29, 2010, ETC pledged to refrain from withdrawing its funds until February 15, 2011 but added that February 15 was an "absolute outside date" for recapitalization. AR 1944–45.  Both ETC and LTC reserved their rights to withdraw their funds before the end of the forbearance period if the Bank's capital position worsened.  AR 1944, 1947.

With respect to the second scenario – a determination from the FDIC that the institutional deposits were brokered despite modifications to the deposit agreements – the Bank explained that if the Recapitalization Transaction was not completed, and the FDIC maintained its position

that the institutional deposits were "brokered," the Bank would be required to gradually eliminate the deposits in a safe and sound manner.  AR 1559.  It added that a "prompt reduction of 76% of the Bank's deposits [all of its institutional deposits] would constitute a 'worst case' scenario, likely requiring an unsustainable fire-sale of unencumbered assets of the Bank, which likely could not be accomplished without significant adverse changes to the Bank's capital ratios."  AR 1559.

In a December 29, 2010 letter to the Bank, the agency explained that after an off-site review of the Bank, the OTS examiners had concluded that the Bank's undercapitalized status: greatly increased the risk that institutional depositors would withdraw their funds; precluded the Bank from continuing to accept ERISA deposits; and prevented the FDIC from considering a waiver of its brokered deposit regulations.  AR 1729.  Based on this conclusion and the Bank's decline in earnings, OTS downgraded the Bank to a CAMEL composite rating of 5, the lowest possible rating.  AR 1727, 1729–30.  This rating meant that the institution had an extremely high probability of failure and an immediate infusion of capital was required.  AR 1729.

## VII.   OTS Appoints FDIC as Receiver for the Bank

On January 19, 2011, OTS field staff submitted a memorandum ("S-Memo") to the agency's Deputy Director, recommending that the Bank be placed into receivership.  AR 21–49. The following day, the Bank informed OTS during a conference call that it was successfully recruiting investors for its Recapitalization Plan, but it still did not provide any legally binding investment agreement or letters of intent from any of them.  AR 4192, 4229.  On the same day, the OTS Deputy Director endorsed the S-Memo, AR 21, and the OTS Acting Chief Counsel signed a legal memorandum recommending that the Acting Director appoint FDIC as receiver for the Bank ("L-Memo").  AR 10–19.

On January 21, 2011, the OTS Acting Director appointed FDIC as a receiver for United Western Bank pursuant to 12 U.S.C. § 1464(d)(2)(A) ("Appointment Order").  AR 2–8.  The S-Memo, L-Memo, and Appointment Order all identified the same three statutory grounds for the decision:  (1) the association was in an unsafe and unsound condition to transact business, *see* 12 U.S.C. § 1821(c)(5)(C); (2) the association was "likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business," *see* 12 U.S.C. § 1821(c)(5)(F); and (3) the association was undercapitalized, as defined by 12 U.S.C. § 1831*o*(b), and had "fail[ed] to submit a capital restoration plan acceptable" to OTS within the appropriate amount of time, *see* 12 U.S.C. § 1821(c)(5)(K)(iii).  AR 2, 10–11, 21.

On February 18, 2011, the Bank brought this action under 12 U.S.C. § 1464(d)(2)(B) seeking the removal of the FDIC as its receiver and the restoration of the Bank to its prior owner.  Compl. ¶ 1.  The original defendants of that action included OTS, its Acting Director, and the FDIC.  Compl. ¶¶ 26–28.  On March 4, 2011, defendants OTS and its Acting Director moved under Fed. R. Civ. Proc. 12(b)(1) to dismiss the complaint for lack of subject matter jurisdiction.  Defs. Bowman and OTS Mot. to Dismiss [Dkt. # 13].  On April 19, 2011, the FDIC also moved to dismiss the claims brought against it in its corporate capacity and in its capacity as receiver for the bank.  Def. FDIC Mot. to Dismiss [Dkt. # 21].

On June 24, 2011, the Court dismissed the FDIC as a defendant in this action, but it allowed the Bank's claims to proceed against OTS and its Acting Director.  Order [Dkt. # 32]; *see also* Mem. Op. [Dkt. # 33].  On July 21, 2011, OTS became part of OCC and on July 25, 2011, the Court granted OCC's motion to substitute itself and the Acting Comptroller of the Currency for defendants OTS and its Acting Director.  Minute Order (July 25, 2011).  On February 9, 2012, the Court also granted the Bank's motion to compel production of the

complete administrative record and permitted it to obtain information beyond what defendants had designated as the administrative record.  Order [Dkt. # 74].

On April 20, 2012, the Bank moved for summary judgment arguing that OTS's decision to place the Bank into receivership was "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law" because the three statutory grounds the agency relied on were "unsupported and conclusory."  Pl.'s Mot. at 1; Pl.'s Mem. at 27.  Defendants dispute these assertions in their cross-motion for summary judgment and contend that OTS's decision was proper and reasonable and should be upheld.  Defs.' Mem. at 1–2, 26.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  The existence of a factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *see Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

"'The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion.'" *Sherwood v. Washington Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).   In assessing a party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

In the January 21, 2011 order, the Acting Director of OTS identified three statutory grounds for appointing the FDIC as receiver for United Western Bank.  In its motion, the Bank asserts that OTS's appointment order should be set aside because the Acting Director's determination that these three statutory grounds existed was conclusory and unsupported by the administrative record and the decision was therefore "arbitrary, capricious, an abuse of discretion, and not in accordance with FIRREA's requirements."[7]  Pl.'s Mot. at 2.

Arbitrary and capricious review "focuses on the reasonableness of the agency's decisionmaking processes." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). The standard is highly deferential.  *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007).  "An agency need only articulate a rational connection between the facts found and the choice made, and the court will not intervene unless the [agency] failed to consider

---

[7]     The weight of authority indicates – and both parties agree – that the judicial review provision of the FIRREA allows a federal court to set aside an appointment decision if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1093 (D.C. Cir. 1996); *Franklin Sav. Ass'n v. Dir. Office of Thrift Supervision*, 934 F.2d 1127, 1142 (10th Cir. 1991); *Woods v. Fed. Home Loan Bank Bd.*, 826 F.2d 1400, 1406 n.3 (5th Cir. 1987); *see also* Pl.'s Mem. at 26 & n.46; Defs.' Mem. at 8.

relevant factors or made a manifest error in judgment." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008), citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Where a highly technical question is involved, courts necessarily must show considerable deference to an agency's expertise." *Id.* (internal quotation marks omitted). Although the court must conduct "a thorough, probing, in-depth review" of the agency's decision, it may not "substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). The party challenging the agency action as arbitrary and capricious bears the burden of proof. *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986). Judicial review of OTS's appointment decision must be based upon the administrative record. *See Franklin Sav. Ass'n v. Dir. Office of Thrift Supervision*, 934 F.2d 1127, 1137 (10th Cir. 1991); *Guar. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 794 F.2d 1339, 1342 (8th Cir. 1986).

Since the Bank fails to overcome this high threshold, the Court will deny its motion for summary judgment and grant defendants' cross-motion.

**I.  The Administrative Record Supports OTS's Conclusion That The Bank Failed To Submit An Acceptable Capital Restoration Plan**

One of the statutory grounds for the agency's decision to appoint a receiver for the Bank was that the Bank was undercapitalized and had failed to submit an acceptable capital restoration plan to OTS within the time prescribed by 12 U.S.C. § 1831*o*(e)(2)(D).  AR 7.  In its motion, the Bank argues that the Court should overturn the agency's rejection of the CRP because:  (1) the agency imposed a deadline for the submission of the plan that was shorter than the statutorily prescribed time period, and (2) "there was no basis for the OTS to reject the Bank's CRP."  Pl.'s Mem. at 28–36.  These arguments are unpersuasive.

A.  The Bank Had Reasonable Time To Submit Its CRP

The Bank's first challenge is procedural:  it contends that OTS failed to give the Bank a reasonable time to file its CRP as required by statute.  Pursuant to 12 U.S.C. § 1831*o*(e)(2)(D)(i), OTS is required to "establish deadlines that . . . provide insured depository institutions with reasonable time to submit capital restoration plans, and generally require an institution to submit a plan not later than 45 days after the institution becomes undercapitalized."  Contrary to the Bank's pleadings, this statutory language does not "entitle[]" it to forty-five days to file its CRP.  Pl.'s Mem. at 28.  Rather, the word "generally" means that under normal circumstances, OTS should give an undercapitalized bank a period of up to forty-five days to submit a CRP.  But the "not later than" wording also gives the agency discretion to impose a shorter deadline as long as that deadline is "reasonable."[8]  According to the Bank, "[w]hat constitutes a reasonable time is a question of law for this Court [to review *de novo*] and an issue for which the agency receives no

---

8     OTS's regulations also allow the agency to impose a deadline shorter than forty-five days if it "notifies the savings association in writing that the plan is to be filed within a different period."  *See* 12 C.F.R. § 565.5(a)(1).

deference."  Pl.'s Mem. 28–29.  Even if the Court accepts that legal proposition, it concludes that the date for the submission of the CRP was reasonable under the circumstances in this case.

On December 13, 2010, OTS directed the Bank to submit a CRP by December 20.[9]  AR 1441.  The Bank asserts that developing a CRP is a significant task and "seven short days . . . did not give the Bank 'reasonable time'" to conduct the necessary preliminary financial analysis and projections, and create a plan that was acceptable to customers, shareholders, and regulators.  Pl.'s Mem. at 28–30.  But December 13 was not the first time OTS asked the Bank to restore its capital.  OTS directed the Bank to increase its capital levels more than a year earlier in the March 2009 Report of Examination, and the Bank agreed to do so in the December 2009 Memorandum of Understanding and June 2010 Cease and Desist Order.  AR 139, 220, 554.  In carrying out these obligations, the Bank conducted the necessary analysis and negotiations and developed a plan for a private sector recapitalization, which was formalized in the October 2010 Investment Agreement.  AR 972–1091.  Since the basis for the Bank's CRP was already in place in October 2010, the seven-day deadline gave the Bank reasonable time to transform its recapitalization plan into a CRP.  And in fact, the Bank met this deadline and submitted a CRP that largely recapitulated the October 2010 Investment Agreement.

As the Bank admits in its own pleadings, OTS accepted additional submissions from the Bank concerning the Recapitalization Transaction "right up until its final hours of existence" – about thirty more days after the submission of the CRP.  *See* Pl.'s Reply at 17.  So while a seven day deadline could be viewed as unduly harsh when viewed in isolation, it is not as if OTS

---

9       The Bank became undercapitalized on December 8, 2010 and was required to submit its CRP twelve days later on December 20, 2010.  *See* AR 1441.   Under 12 U.S.C. § 1831o(e)(2)(D)(i), the forty-five day statutory maximum starts running from the date the institution becomes undercapitalized, not from the date the institution is required to submit a CRP.  But since the pleadings of both parties focus on the seven day deadline imposed by the December 13 letter, the Court will evaluate whether this deadline was reasonable.

suddenly gave the Bank only seven days to restore its capital position.   The seven days came after months of waiting for the promised investors to materialize, and in any event, the deadline did not operate as a bar to later supplementation while the plan was under consideration.

The Bank's argument that the deadline was not "reasonable" under the circumstances because OTS "failed to provide a reasoned explanation" for its imposition also fails.   Pl.'s Mem. at 30.   In the December 13 letter, OTS explained that the imposition of the shorter deadline was based on the Bank's "unsafe and unsound condition."   AR 1441.   This explanation is supported by the administrative record because at the time, the Bank was undercapitalized, its capital was continuing to decline, its asset quality and earnings were deteriorating, and the agency had been expressing serious concerns about the Bank's liquidity for years.   AR 865–66.   The "unsafe and unsound" designation in December should not have come as a surprise to the Bank because it echoed the finding in the June 2010 Cease and Desist Order, which stated that the Bank had "engaged in unsafe or unsound banking practices," AR 569, and OTS's March 4, 2010 letter designating the Bank as being "in troubled condition," AR 275–77.   Thus, the CRP submission deadline was "reasonable."

B.  OTS's Rejection of the CRP Was Not Arbitrary and Capricious

Recognizing that OTS rejected the CRP on its merits and not because the Bank failed to meet the submission deadline, the Bank next argues that "there was no basis for the OTS to reject the Bank's CRP."   Pl.'s Mem. at 36.   According to the Bank, the CRP projected an infusion of capital into the Bank in excess of the levels required by the agency.   AR 1476.   The Bank acknowledges, though, that OTS cannot accept a CRP unless:   (1) it is based on "realistic assumptions," and is likely to succeed in restoring the institution's capital; and (2) it would not "appreciably increase" the risk (including credit risk, interest-rate risk, and other types of risk) to which the institution is exposed.   Pl.'s Mem. at 28, citing 12 U.S.C. § 1831$o$(e)(2)(C).

In its January 2011 letter rejecting the CRP, the agency presented six grounds for its determination that the CRP failed to meet both statutory requirements.  AR 4123–26.  The Bank contends that none of these grounds "passes muster."  Pl.'s Mem. at 30.  The Court disagrees.

1.  *Additional Investors*

OTS's first ground for rejecting the CRP was that it unreasonably assumed that the Bank would obtain the additional $100 million necessary to consummate the Investment Agreement.  AR 4124.  The agency noted that although the Bank had identified several potential additional investors, it had not executed letters of intent or investment agreements with any of them.  *Id.*  In challenging this determination, the Bank asserts that it had identified "serious and substantial" investors, and OTS's desire for signed agreements was unreasonable because that "level of proof" is not required by statute or OTS's regulations.  Pl.'s Mem. at 31–32.

This argument misses the mark.  As the Bank notes in its own pleadings, the "statute only requires that a CRP be built on 'realistic assumptions'"; it does not define what level of proof is required.  Pl.'s Reply at 21.  So the question before the Court is not whether the evidentiary standard that OTS employed was statutorily mandated but whether OTS's determination that the CRP was based on unrealistic assumption was unreasonable or unsupported by the administrative record.  In a January 10, 2011 letter, the Bank informed the agency that three potential investors had started reviewing proposed investment agreements and three others had expressed strong interest in the deal.  AR 1801.  However, none of these investors had legally committed to investing in the deal, and the Bank provided no timeline as to when it expected to obtain such commitments.  AR 1800–02.  In the absence of such commitments or a timeline, it was not unreasonable for the agency to conclude that the Bank had "fail[ed] to provide sufficient support for its optimistic assumption that Additional Investors will invest an additional $100 million into

UWBK in a timely manner or by January 31, 2011, the Association's proposed date of recapitalization in the CRP." AR 4124.[10]

   2. *Increase of the Bank's Risks*

   The second, third, and fourth grounds for OTS's rejection of the CRP were all related to the agency's determination that the asset growth projected in the CRP unreasonably increased the Bank's level of risk. AR 4124–25. OTS explained that the projected asset growth was unacceptable for two reasons. First, the growth "rel[ied] upon an increase to the already excessive concentration of institutional deposits at the Association." AR 4124. Since the agency had been voicing concern about the liquidity risks associated with the Bank's concentration in institutional deposits since at least March 2009, it is not surprising or unreasonable for OTS to determine that a plan that relied on an increase in that concentration was unacceptable. Second, the agency explained that the "asset growth described in the CRP [was] also unacceptable in light of the Association's poor ratings, troubled condition, high level of existing problem assets, and poor earnings." *Id.* Again, this explanation was not novel or irrational; rather OTS relied on very similar reasons when it imposed the asset growth restriction in the Cease and Desist Order. In light of this reasoned explanation, the Court cannot agree with the Bank's contention that the agency's "concern over the Bank's anticipated growth in total assets" was based on its "unfounded" assumption that "asset growth is *per se* destructive," Pl.'s Mem. at 33; the agency was concerned about a particular type of asset growth.

---

10    By the date of the appointment order, the Bank had still failed to submit any binding letters of intent or investment agreements with additional investors. AR 4192–4225. Although the Bank submitted non-binding letters of intent from several investors, each expressly stated that the letter of intent "d[id] not constitute a legally binding offer or commitment on the part of the Investor or its affiliates to consummate any transaction with the Company or any of its members." AR 4198–4201, 4207–10, 4221.

Moreover, as defendants point out in their motion, the success of the CRP was dependent upon an agreement by OTS to waive the "meet and maintain" requirement contained in the Cease and Desist Order.  AR 1476–77.  But OTS had already informed the Bank that it would not waive this requirement seventeen days before the CRP was submitted.  AR 1192–93. Nonetheless, in the CRP and its pleadings the Bank argued that OTS's unwillingness to waive the requirement was "not a proper exercise of the agency's fiduciary duties to the Deposit Insurance Fund."  AR 1476–77; *see also* Pl.'s Reply at 23.  In open court, the Bank added that it was unreasonable for the agency to insist on the requirement because after the consummation of the Recapitalization Transaction, the Bank would have been well capitalized, and the requirement would have been unnecessary.  Tr. 30:9–18.  Based on the administrative record, the Court cannot conclude that it was unreasonable for the agency to insist on a requirement that it had imposed since March of 2009 and that the Bank had specifically agreed to fulfill in a memorandum of understanding and a consent decree.  Even if the Bank is correct in its assertion that the Recapitalization Transaction would have allowed it to meet or exceed the agency's demands, it was not irrational for OTS to decide wait until the Bank met the requirement before removing it.

### 3.  *Legent Acquisition*

OTS's fifth ground for rejecting the CRP was that "[t]he CRP's assumption that the OTS will approve [the Legent] application is unreasonable."  AR 4125.  The Bank argues that this determination was unfair because it was "forced to speculate about the prospects for the Legent application's success" since the application was still pending when it submitted the CRP.  Pl.'s Mem. at 34.  But the Bank was not speculating in a vacuum.  On November 4, 2010 – more than a month before the submission of the CRP – OTS informed the Bank that it had determined that the Legent application "raise[d] significant issues of policy."  AR 3008.  This letter notified the

Bank of the very real possibility that the Legent application could be denied.  Therefore, it was not irrational for OTS to conclude that the Bank's assumption that the Legent acquisition would be approved was unreasonable.

The Bank also submits that it was unfair to deny the Legent application and the CRP on the same day because "[h]ad the OTS issued its decision regarding Legent even one day before the CRP denial, then the Bank could have revised its CRP to reflect new assumptions following the rejection."  Pl.'s Mem. at 34.  This argument also fails.  Since the Legent acquisition was a condition precedent of the Recapitalization Transaction, the onus was on the Bank to submit a CRP that addressed the viability of the Recapitalization Transaction and the CRP if the Legent application was denied.  In open court, the Bank argued that OTS's short deadline prevented it from developing and including this kind of information in the CRP.  Tr. 35:17–23.  But as the Court has already noted, the November 2010 letter gave the Bank more than a month to plan for the possibility of the denial of the Legent application and include a back-up plan in its CRP.[11]

### 4.  *Other Closing Conditions*

Lastly, the agency explained that the CRP was unacceptable because it "unreasonably and without support or explanation, assume[d] that the Anchor Investors [would] waive or amend [several] express closing conditions."  AR 4125.  In its pleadings, the Bank contends that this determination was arbitrary and capricious because the agency ignored "the Bank's representations [in a November 29, 2010 letter] that the Anchor Investors would waive [certain]

---

[11]   In its pleadings, the Bank also argues that the denial of the Bank's application to acquire Legent did not doom the Recapitalization Transaction because the Bank was prepared to restructure the deal to have the holding company purchase Legent.  Pl.'s Reply at 24.  However, since the CRP did not present this alternative, the Court cannot conclude that OTS acted irrationally when it concluded that the denial of the Legent application – one of the conditions precedent of the Investment Agreement – doomed the Recapitalization Transaction and the CRP.  Moreover, in the three days between the rejection of the CRP and the appointment of the receiver, the Bank did not propose an alternative plan that did not depend on the Legent acquisition.

conditions." Pl.'s Mem. at 32–33. But the agency expressly took the representations in the letter into consideration, saying: "the Association previously suggested that the Anchor Investors might be willing to provide new capital without satisfaction of some [of] these closing conditions." AR 4125 n.2. The problem is that the November 29 letter was merely a list of "Proposed Revisions to Conditions to Closing," AR 1185–90, and, as OTS pointed out in the CRP rejection letter, the Bank never provided the agency with any document stating "that the Anchor Investors ha[d] agreed to any of the proposed changes." AR 4125. Without such documentation, OTS rationally concluded that the CRP's assumption that investors who had protected themselves with conditions would waive or amend those conditions was unrealistic. AR 4125.

In sum, the CRP was dependent upon a series of unlikely events, including predictions that the agency would be inclined to relax its position on the "meet and maintain" requirements even though it had just stated that it wouldn't, and that the agency would bless the Legent transaction that it had just described as troubling. It was not unreasonable for the agency to find that the Bank's assumptions – particularly its assumptions about what the agency itself was likely to do – were unduly optimistic, and it was not unreasonable for it to require confirmation beyond the Bank's own say-so about what the investors were or were not willing to do. Since OTS has presented a reasoned explanation for its determination that the CRP was statutorily unacceptable, and the Bank has failed to demonstrate that these reasons were arbitrary or capricious, the Court will uphold the appointment decision based on this statutory ground.[12]

---

[12]     OTS also rejected the CRP because the Bank submitted a guarantee that was different from the agency's standard-form guarantee. AR 4125. The Court will not address this ground because it finds that the agency provided sufficient grounds for upholding the rejection based its determination that the CRP did not meet the statutory requirements that it be realistic and not appreciably increase the Bank's risks.

## II.  OTS Reasonably Determined That The Bank Was Facing A Liquidity Crisis

Another statutory basis for the appointment decision was that the Bank was "likely to be unable to . . . meet its depositors' demands in the normal course of business" under 12 U.S.C. § 1821(c)(5)(F).  AR 2.  The Bank challenges this determination, asserting that OTS "wrongfully concluded that the Bank faced a liquidity crisis because of its relationships with the Institutional Depositors."  Pl.'s Mem. at 36.  To support this assertion, the Bank argues that OTS:  (1) arbitrarily reversed its prior policy concerning the institutional depositors; (2) wrongfully concluded that the institutional depositors were likely to withdraw their funds; and (3) erred in its determination that the Bank did not have sufficient funds to cover permissible withdrawals.  Pl.'s Mem. at 36–44; Pl.'s Reply at 4–14.  The Court will address these arguments in turn.

A.  OTS Did Not Unreasonably Reverse Its Prior Policy Concerning Institutional Deposits

First, the Bank contends that the statement in the appointment order that "there [was] an unacceptable risk that institutional depositors may withdraw their deposits in the near term" was arbitrary and capricious because it constituted an unexplained and unsubstantiated reversal of the agency's policy concerning the institutional depositors.  Pl.'s Mem. at 36–37.  The Bank points to the legal principle that an agency "may change its policy only if provides a reasoned analysis indicating that prior policies and standards are deliberately changed, not casually ignored." *Honeywell Int'l Inc. v. Nuclear Regulatory Comm'n*, 628 F.3d 568, 579 (D.C. Cir. 2010), quoting *Mich. Pub. Power Agency v. FERC*, 405 F.3d 8, 12 (D.C. Cir. 2005)  (internal quotation marks omitted).  But that case has little bearing on the situation at hand.

In *Honeywell*, a company requested exemptions from the Nuclear Regulatory Commission's regulations in three consecutive years.  628 F.3d at 571.  The Commission granted the company's first two requests but denied the third.  *Id.*  In its pleadings, the Commission attempt to justify its actions by arguing that the denial was warranted because of the company's

declining financial condition.  *Id.* at 581.  The Court of Appeals rejected this explanation and stated that the company's financial condition did not justify the Commission's denial of the third exemption request because the company was already in decline when the Commission granted the two other exemptions.  *Id.*  The court then overturned the Commission's denial of the third exemption request because the decision was "inconsistent with its precedent addressing [the company's] exemption requests" and the Commission failed to provide a reasoned decision for changing its policy.  *Id.* at 580–81.

Here, the administrative record reflects a fundamental change in circumstances warranting a different approach to institutional deposits.  Prior to the financial crisis, the agency did not object to the Bank's concentration in institutional depositors.  AR 6 n.9.  But contrary to the Bank's assertion, the agency did not suddenly express concern about this concentration just before the seizure, and there is no inconsistent precedent as in the *Honeywell* case.  After the economy collapsed and the Bank's fortunes declined along with it, the agency regularly voiced its concerns on this subject, and it provided a reasoned explanation for its worry.[13]

---

[13]   The Bank incorrectly argues that "the Court should look only to the Seizure Order to supply [the agency's] reasoning" for concluding that the institutional depositors "presented a sudden liquidity danger."  Pl.'s Mem. at 37.  In support of this argument, the Bank relies on the well-established rule that "[w]hen there is a contemporaneous explanation of the agency decision, the validity of that action must stand or fall on the propriety of that finding."  *Id.*, citing *Sierra Club v. Costle*, 657 F.2d 298, 392 (D.C. Cir. 1981).  The Bank takes that quotation out of context.  When the Supreme Court announced this rule in *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973), it was explaining that "the focal point for judicial review [under the arbitrary and capricious standard] should be the administrative record already in existence, not some new record made initially in the reviewing court."  Thus, this rule requires the Court to confine its review of the agency's decision to the administrative record to the exclusion of any evidence outside of that record.  It does not restrict the Court to specific parts of that record.  Therefore, the Court will look at the entire administrative record to supply OTS's reasons for developing concern regarding the institutional depositors during the financial crisis.

OTS's first clear warning about the Bank's concentration in institutional deposits came during the global financial crisis.[14]   In the March 2009 Report of Examination, the agency cautioned that "termination of one or more of the larger institutional deposit relationships could place UWB in a precarious liquidity position."  AR 161.  The Bank contends that "the [March 2009] ROE . . . lacked any useful analysis explaining the agency's new hostility toward the historically-stable, long-standing Institutional Depositors."  Pl.'s Reply at 7.  Contrary to this contention, the March 2009 ROE provided an adequate explanation for OTS's determination that the Bank's concentration in institutional deposits had become risky.  The report explained that as a result of the financial crisis, the Bank's asset quality had deteriorated, its earnings had decreased, and its capital had declined to levels that were barely above the threshold necessary for the Bank to qualify as "well capitalized."  AR 135–36.  The report added that the contractual agreements with some of the institutional depositors allowed them to withdraw their funds if the Bank's capital fell below the PCA "well capitalized" level, and a continued decline of capital could place the Bank into a precarious liquidity position.  AR 161, 164.  Notably, the agency did not immediately take action against the Bank in light of these concerns.  Rather, it worked with the Bank to develop a Memorandum of Understanding, pursuant to which the Bank pledged to develop a concentration policy that "specifically address[ed] deposit concentrations and plans to reduce or manage such concentrations."  AR 223–24.

---

14      OTS argues that it first warned the Bank about this risk in the October 2007 ROE when it stated that the Bank "continue[d] to face risk from its concentration in institutional deposits." AR 57; *see also* Defs.' Mem. at 35.  However, in the 2007 ROE, OTS tempered this warning by ultimately concluding that the Bank's liquidity sources were "satisfactory" and that the Bank's business strategy and contractual agreements with the institutional depositors "help[ed] protect the institution's liquidity position."  AR 57.  As the Bank notes, this muddled message "could hardly be said to have sounded the alarm" about the institutional deposits.  Pl.'s Reply at 6.

As the Bank's condition worsened, the agency's concerns about the risks associated with its concentration in institutional deposits escalated.  In an April 2010 letter, the agency stated that the Bank's "significant concentration in institutional deposits . . . pose[d] a threat to the viability of the Bank" and directed the Bank to consider a "possible sale, merger, or self-liquidation . . . to prevent the potential failure of the institution due to insufficient liquidity."  AR 267.  Again, the agency provided a reasoned explanation for these alarming statements.  It explained that the concentration in institutional deposits was problematic because the FDIC was reviewing whether the deposits were "brokered."  AR 267.  If the FDIC concluded that the institutional deposits were brokered, the Bank would not be able to accept or renew the brokered deposits without a waiver from the FDIC because it would have become only adequately capitalized.  AR 267; *see also* AR 317, 1110 (the Bank became "adequately capitalized" as of March 31, 2010).  Again, the agency did not immediately seize the Bank; rather it worked with the Bank and developed the Consent Cease and Desist Order in which the Bank again agreed to create a liquidity contingency plan that "specifically address[ed] deposit concentrations and plans to reduce or manage such concentrations."  AR 560.

The change in the Bank's financial condition during the financial crisis justifies OTS's concern about the concentration in institutional investors.  Unlike in *Honeywell*, where the Commission granted the two prior exemptions while the company's financial condition was already in decline, here OTS made it clear that it did not approve of the Bank's reliance on institutional depositors as soon as the Bank's condition began to decline, and it never wavered. It alerted the Bank to its concerns in the March 2009 ROE, the December 2009 MOU, the April 2010 letter, and the June 2010 Cease and Desist Order.  In light of the changing economic environment, and the agency's reasoned explanations for its concerns, the Court cannot agree

with the Bank's contention that OTS "suddenly" and arbitrarily reversed its policy concerning institutional depositors shortly before the seizure.

B.  OTS's Conclusion That There Was An Unacceptable Risk That Institutional Depositors May Withdraw Their Deposits In The Near Term Was Reasonable

Second, the Bank's contention that the agency "imagined" a liquidity crisis because "there was no likelihood whatsoever that the institutional depositors would withdraw," Pl.'s Mem. at 39, is contradicted by the record.  Approximately a month before the appointment decision, MSCS, the Bank's second largest institutional depositor, began withdrawing its ERISA deposits because the Bank's undercapitalized status prevented it from accepting such deposits.[15] AR 1457–58.

Further, the Bank's undercapitalized status triggered the termination clauses in the deposit agreements with ETC and LTC, the association's largest and fourth largest institutional depositors.  AR 1945, 1952; *see also* Defs.' Mem. at 30.  The Bank correctly points out that these depositors had a "long and loyal history," with the Bank and had consistently worked with the Bank during the financial crisis.  Pl.'s Reply at 13.  As the Bank noted at the hearing, the depositors removed their ERISA deposits from the Bank so that they would not be subject to the same rule that required MSCS to withdraw its funds, they modified their deposit agreements with

---

15    The Bank claims that MSCS and its client CPI were forced by OTS to withdraw their deposits because the agency "in its quest to set the Bank up for failure" forced "the Bank into undercapitalized status via an unnecessary" write-down on its mortgage portfolio.  Pl.'s Reply at 8–9 & n.7.  But "when reviewing an agency's decision concerning matters lying within the agency's field of expertise, a reviewing court should begin by acknowledging that a presumption of procedural and substantive regularity attaches."  *James Madison*, 868 F. Supp. at 8, citing *Franklin Savs. Ass'n v. Dir. Office of Thrift Supervision*, 934 F.2d 1127, 1147 (10th Cir. 1991). In its letter directing the Bank to take the write-down, the agency explained that it had "carefully reviewed" the Bank's objections to the write-down and had found that the Bank's "modeling approach and assumptions do not conform to regulatory reporting requirements."  AR 2092. Since the Bank provides no basis for its claim that the write-down was unnecessary or that the agency wanted the Bank to fail, the Court concludes that it has not met its burden to overcome the presumption of validity accorded to the agency's decision.

the Bank to avoid the "brokered deposit" designation, and they signed written agreements to refrain from withdrawing their funds from the Bank albeit with certain caveats.  Tr. 40:1–13; 41:7–23; 42:2–13.  But even if the Court agrees that the depositors might have been willing to weather the storm with the Bank, the arbitrary and capricious standard does not allow it to substitute its judgment for that of the agency.  *Overton Park*, 401 U.S. at 415–16.  The sole question before the Court is whether OTS's conclusion that there was an "unacceptable risk that the institutional depositors may withdraw their deposits in the near term" was reasonable based on the administrative record.  Pl.'s Mem. at 37.

As the Bank has acknowledged, the institutional depositors were willing to maintain their deposits "so long as the recapitalization remained a viable option."  Tr. 41:15.  Both ETC and LTC expressly conditioned their agreements to refrain from withdrawing their funds on the Bank restoring its capital by a set deadline:  LTC specifically "reserve[d] its right to terminate the [deposit] Agreement" if the Bank did not achieve "well capitalized" status by January 31, 2011, AR 1947, and ETC agreed to refrain from exercising its right to withdraw its deposits until February 15, 2011 based on its understanding that the Bank was close to securing capital to remedy its situation.  AR 1945, 1947.  Since OTS had already refused to implement several conditions precedent of the Recapitalization Transaction, it was not unreasonable for it to determine that the plan was no longer viable, and that there was an unacceptable risk that the institutional depositors would withdraw their funds when it became "clear that the [Bank's] present attempts to raise capital [would] be unsuccessful."  AR 34.[16]

---

16    The depositors ultimately agreed to extend their forbearance agreements to match the scheduled closing date of the Recapitalization Transaction.  Pl.'s Reply at 11–12.  But this fact does not alter the Court's analysis because the agreements were still conditioned on the Bank consummating the Recapitalization Transaction, which OTS had reasonably determined was no longer viable.

Indeed, the Bank's holding company made public statements about the Bank's liquidity position at the time that were consistent with OTS's conclusions.  In a December 2, 2010 letter to the Bank, the NASDAQ stock exchange explained that the holding company had informed it that:

> Due to its weakened financial status, the Bank has experienced a decline in deposits, and it believes that unless it resolves its difficulties in the near-term, additional depositors may move their funds elsewhere, further weakening the financial condition of both the Company and the Bank. . . . Consequently, pursuant to Cease and Desist Orders (the "Orders"), the banking regulators have imposed stringent enforcement actions requiring the Company and the Bank to raise additional capital in the near term or face additional regulatory actions.  Thus far the Company has been unable to raise the amount of capital required under the Orders. . . .  The Company also expects that at the end of the current year, the Bank will fall below the level required to be adequately capitalized. . . . *As a result, the Bank would be unable to hold certain deposits (that currently account for over 75% of its total deposits) and would face a liquidity crisis that it believes would lead to the regulator recommending the seizure of the Bank, resulting in the liquidation of the Company.*

AR 2457–58 (emphasis added).  The letter also stated that the holding company had informed the exchange that the Recapitalization Transaction was "the only viable option" for restoring its capital and eliminating "the prospect of the Bank being seized or the Company being liquidated." AR 2458.  Again, since OTS had already rationally concluded that the Recapitalization Transaction was not viable, it was not unreasonable for it to agree with the holding company's conclusion that without such recapitalization, the Bank "would face a liquidity crisis."

C.  OTS's Determination That the Bank Had Insufficient Liquidity To Sustain Institutional Deposit Withdrawals Was Not Arbitrary Or Made In Bad Faith

Third, the Bank argues that OTS erroneously concluded that the Bank had insufficient liquidity to cover mass institutional deposit withdrawals.  Pl.'s Reply at 13.  OTS's appraisal of assets leading to an insolvency determination "is a matter of judgment and discretion," and the Court will not substitute its judgment for that of the agency "unless it appears by convincing

proof that the Comptroller's action is plainly arbitrary, and made in bad faith."  *United States Savs. Bank v. Morgenthau*, 85 F.2d 811, 814 (D.C. Cir. 1936).[17]  The "presumption of the correctness of an agency's determination is even stronger where Congress has charged an agency with complex analytical responsibilities and the duty to make predictive judgments."  *James Madison*, 868 F. Supp. at 8, quoting *Franklin Savs. Ass'n v. Dir., Office of Thrift Supervision*, 934 F.2d 1127, 1147–48 (10th Cir. 1991).

In its memorandum recommending placing the Bank into receivership, the OTS field staff provided a detailed analysis of the Bank's liquidity situation.  The memorandum explained that according to the Bank's own liquidity analysis, as of January 13, 2011, the Bank had: $398.5 million in total cash, $17.8 million in unused borrowing capacity from FHLB-Topeka, and an additional $137 to $350 million that it could have obtained from Legent.  AR 38–39; *see also* AR 39 n.30.  This added up to a total of $553.3 to $766.3 million, which would have been insufficient to cover the potential withdrawal of a total of $848 million in deposits from ETC, LTC, and MSCS's remaining funds.  AR 39–40 n.30–31.

The Bank disputes this conclusion by asserting that its on-hand liquidity increased to $426 million on January 20 and that it could have taken advances from the FHLB and accepted Qwikrate deposits to shore up its cash position.  Pl.'s Reply at 13.  However, as defendants point out, OTS's calculations already accounted for the FHLB and Qwikrate funds, and the $27.5 million increase in liquidity would have increased the Bank's total available liquidity to a maximum of $793.8 million, which still would have been insufficient to cover the withdrawal of institutional deposits.  Defs.' Reply at 13 n.14.  Even if the institutional depositors withdrew their funds incrementally over several months, instead of all at once, the Bank has not explained

---

17      Although OTS did not actually declare the Bank to be insolvent, as the Bank points out, its "emphasis on liquidity and . . . capitalization was a close cousin."  Tr. 22:5.

how it would have obtained additional resources to cover the withdrawals.  The Bank has thus failed to overcome the presumption of correctness accorded to the agency's detailed analysis of the Bank's liquidity position because it has not submitted any facts to show that the agency's determination was arbitrary or made in bad faith.

Since the Bank has failed to show that OTS's conclusion that the Bank was likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business was irrational, manifestly erroneous, or made without consideration of the relevant factors, the Court will also uphold the appointment order on that ground.

### III. OTS's Determination That the Bank Was Unsafe And Unsound Was Not Irrational

The third statutory ground for the appointment order was that the Bank was operating in an unsafe and unsound condition under 12 U.S.C. § 1821(c)(5)(C).  AR 2.  In challenging this ground, the Bank asserts that OTS "erred in applying the wrong standard for 'an unsafe or unsound practice' . . .  [and that] even if the agency had applied the correct standard, the agency's position would still be refuted by the facts before it."  Pl.'s Mem. at 42.

The Bank's argument that the agency should have used the "unsafe and unsound" standard of the D.C. Circuit instead of the "more permissive standard" of the Tenth Circuit, Pl.'s Reply at 26, fails on its face.  An agency must follow the law of the circuit having jurisdiction over the action, *see Johnson v. U.S. R.R. Ret. Bd.*, 969 F.2d 1082, 1090–91 (D.C. Cir. 1992), and as the Bank admits in its pleadings, both the Tenth and the D.C. Circuit could have exercised jurisdiction over this lawsuit.  Pl.'s Mem. at 42 & n.97.  Since the Bank's home office is in Colorado, and at the time of the appointment decision, there was no lawsuit pending in either circuit, the agency's decision to apply the Tenth Circuit standard was reasonable.  The cases cited by the Bank to support its position are inapposite because none of them require an agency to anticipate that the Bank will ultimately file a case in the jurisdiction with the more stringent

standard and apply the law of that circuit.  *See* Pl.'s Mem. 42 n.97.  Finally, the Bank's argument

that OTS routinely applies Tenth Circuit law even when there is no nexus with the Tenth Circuit

is irrelevant because in this case, there was a strong nexus to the Tenth Circuit and the agency

was legally allowed to apply its case law.

More importantly, the factors that the agency considered in its appointment order support

a conclusion that the Bank was unsafe and unsound even under the D.C. Circuit standard.  In this

circuit, a Bank operates in an unsafe and unsound condition if it is in a condition or engaged in

practice that presents a reasonably foreseeable undue risk to the institution.  *See Kaplan v. OTS*,

104 F.3d 417, 421 (D.C. Cir. 1997).

The appointment order articulated several events that presented a reasonably foreseeable

undue risk to the Bank.  The order cited the Bank's:

- "[C]ontinuing significant operating losses."  AR 6.  The Bank had in fact lost at least
  $152 million between 2009 and the date of the receivership.  AR 30, 1492.

- "[W]eak capital position."  AR 6.  From 2009 to 2010, the Bank's capital levels
  deteriorated significantly.  AR 142, AR 25; *see also* Bank CRP, AR 1491 (projecting
  that capital ratios would continue to decline).

- "[S]ignificant asset problems."  AR 6.  The Bank's assets had been deteriorating since
  2008.  AR 135–36.

- "[R]eliance on a small number of institutional depositors" for the vast majority of its
  liquidity.  AR 6.  One of these depositors had already withdrawn most of its deposits
  and two others might have withdrawn their funds once they realized that the Bank's
  recapitalization efforts were not viable.  AR 5–6.

The Bank argues that the agency's "unsafe and unsound"' determination does not meet

this circuit's standard because it was based on the "faulty premise that the Institutional

Depositors posed a liquidity risk to the Bank" and the erroneous conclusion that the Bank had

"insufficient capital" and "no realistic prospects for raising capital in the short term."[18]  Pl.'s

Mem. at 45.  However, as the Court has already decided, the agency had a reasonable basis for

concluding that the Bank's concentration in institutional deposits posed a liquidity risk to the

Bank, and that the Bank had no viable plan for restoring its capital.

Since the factors relied on by OTS in the appointment order also support a determination

that the Bank was unsafe and unsound under the D.C. Circuit standard, the Court will uphold the

appointment order on that ground.

## CONCLUSION

At bottom, after one strips away all of the hyperbole about the agency's "sudden" change

of heart, the Bank's fundamental grievance is that if only the agency had just given it a little

more time, it would have been able to come up with the necessary capital to save the day.

Maybe.  There are reasons to be skeptical:  the Bank's plans were dependent upon regulatory

changes that were unlikely to materialize, and the potential investors had carefully buffered their

commitments with numerous contingencies.  On the other hand, this was a Bank with a long

history of profitability, it had longstanding institutional relationships, and there were at least

some investors willing to take a closer look.  There is no doubt that the officers and directors

---

18      The Bank takes issue with OTS's conclusion that the Bank had "no realistic prospects for
raising capital in the short term" contending that Congress did not demand immediate
recapitalization and that OTS's belief that the Bank's recapitalization efforts "would necessarily
rise and fall with the Recapitalization Transaction" was an "unduly narrow view of the Bank's
capital prospects."  Pl.'s Mem. at 45–46.  But the agency did not demand immediate
capitalization.  It had been asking the Bank to recapitalize for more than one and a half years.
*See e.g.,* 2009 MOU, AR 220 (asking the Bank to "submit a written Capital Plan").  In that time
period, the Bank presented only one recapitalization plan and the holding company stated that
this plan was the Bank's "only viable option" for restoring its capital.  AR 2458.  Further, the
2010 Investment Agreement prohibited the Bank from "enter[ing] into any agreement to raise
capital other than in connection with the transaction contemplated under the Investment
Agreement."  AR 1189 (November 2010 letter to OTS stating that the investors were unwilling
to waive this provision).  Therefore, the agency reasonably concluded that the since the
Recapitalization Transaction was not viable, the Bank had no realistic prospects for restoring
capital.

were seriously committed to the task, and one cannot simply dismiss their efforts, or their sincere

belief that they would ultimately succeed, as frivolous.  But in the end, whether the Court accepts

the Bank's assessment of its prospects wholeheartedly or with reservations is beside the point.

Given the standard that must be applied in this proceeding, the Court cannot find that the

agency's decision was unreasonable under all of the circumstances at the time it was made, or

that it was not supported by the administrative record.  The Court will uphold OTS's decision to

appoint the FDIC as receiver for the Bank because the Bank has failed to demonstrate that the

Acting Director failed to articulate a rational basis, failed to consider the relevant factors, or

made a manifest error in judgment when he concluded that there were three statutory grounds

that independently supported the decision.[19]  Accordingly, the Court will deny the Bank's motion

for summary judgment and grant the defendants' cross-motion.  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge


DATE: March 5, 2013

---

19      "When an agency relies on multiple grounds for its decision, some of which are invalid,
[courts] may only sustain the decision where one is valid and the agency would clearly have
acted on that ground even if the other were unavailable."  *Williams Gas Processing-Gulf Coast,
Co., L.P. v. FERC*, 475 F.3d 319, 321 (D.C. Cir. 2006).  Since the Court has concluded that all
three statutory grounds are valid, it need not address the Bank's argument that "even if the Court
determines that one ground of the seizure order was valid, none of the alleged grounds is
sufficient – standing alone – to sustain the decision."  Pl.'s Reply at 29.